OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE
3500 DEFENSE PENTAGON
WASHINGTON, DC 20301-2900

STRATEGY AND THREAT REDUCTION

5 May
Cited/Frank
Recommend you concur w/ proposed approach.
Susan

MEMORANDUM FOR DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR THREAT REDUCTION POLICY

FROM: DIRECTOR OF COOPERATIVE THREAT REDUCTION POLICY, (S&TR/CTR)
Prepared by: Palevitz, CTR, 693-0289/West, DTRA

5/5 — Yes
— No
— Other

SUBJECT: Provision of Additional Funding to Die Casters International, Inc. Defense Conversion Project in Ukraine

**BACKGROUND**: In your memo to Bill Taylor on February 11, 2000 you explained that it was necessary to proceed with the allocation of additional defense conversion funds to the DCI-Burevestnik joint venture to permit installation of previously purchased machinery and completion of this project (TAB A). You requested the benefit of Bill's views on this issue. Since the date of your memo we've had two separate discussions with Kim Savit, who has raised a number of concerns (in bold) addressed below. Also, the DoD IG has closed its investigation of DCI billing practices without any conclusion of wrongdoing, and no action will be taken against DCI.

Most immediately, however, **equipment for this project in storage in Moldova is now in imminent danger of being confiscated**. The approximately $1.4 million worth of equipment purchased with DoD and DCI funds was shipped to Moldova for DCI developed modification. These modifications were completed over two years ago. Due to the delays in project funding, however, DCI has been unable to ship the equipment from Moldova, and it has now been in Moldova far longer than the customs officials normally allow. Moldavian customs has declared that DCI must either ship the equipment, pay import duties, or they will confiscate the equipment. DCI does not have the funds to pay the import duties nor would we want to. If we are to prevent the equipment from being confiscated, we need to move quickly to fund DCI and ship the equipment to Kiev for installation.

**DISCUSSION**: The CTR Policy and DTRA/CT facts address the issues that Kim has raised.

- Issue: **Why are we responsible to prevent the equipment in Moldova from being confiscated? It should be DCI's responsibility, not the USG. Who owns the equipment? DoD or DCI? Why not just sell it off?** DoD is responsible because it has 75% ownership of the equipment until the completion of the contract. DCI is not responsible for protection of the equipment once the contract funding is exhausted. While it may be possible to sell the equipment, DoD does not have clear title to it and selling it does not achieve our defense conversion objectives.

- Issue: **Is the contract complete? Does DoD owe DCI any more funding?** No, the original contract is not complete. DoD does not owe DCI additional funding, but DCI can not complete the contract without additional funding. If DoD chooses not to fund the contract, DoD will have to close the contract and make a decision regarding disposition of the equipment. Since the equipment is approximately 75% government owned, DoD has a vested interest in its disposition.

- Issue: **Die Casters is untrustworthy and improperly billing the government**. In two and a half years of investigation DCAA and the DoD IG were unable to find any evidence of improper billing. Die Casters submitted $4 million in vouchers and was reimbursed in accordance with the contract $3 million for the work performed. Die Casters funded the remaining $1 million.

- Issue: **Die Casters put nothing of its own into the venture and DCI president Frederickson merely took out loans to fund DCI's portion of the work**. This was a cost share contract. DoD provided 75% of the funding; DCI provided the remaining 25%. DoD IG has verified the invoices submitted to the DoD for $4 million were valid expenses. Since DoD only reimbursed DCI for $3 million, DCI's investment was $1 million. If Die Casters took out loans to finance its portion of the work that is entirely allowable.

- Issue: **What happened to the other million?** Of the $4 million expended on this project to date, approximately $3 million went to equipment expenses and the remaining $1 million went to project development costs, DCI overhead, initial work with Meridian before that company withdrew from the project, and searching for and establishing a business relationship with a new partner (Burevestnik).

- Issue: **DoD spent $3 million and got nothing for it**. Die Casters went beyond normal expectations. When their first DoD approved partner opted out of the venture, DCI searched out another potential partner. DoD approved the new partner and DCI established a business relationship with the new partner. Of the $4 million expended, $2.97 million went for equipment purchases-the approximate value of the portion reimbursed by DoD . This equipment, once installed, will upgrade production and create additional employment at an existing die cast business that had $2.2 million in sales last year. This new die cast equipment will be housed in a building formerly devoted to military production.

- Issue: **Die Casters will just use follow-on DoD funding to pay previous debt**. In the two years of audit and investigation DCAA and the DoD IG found nothing improper. The contract with DCI will be structured, as all CTR contracts are, to pay the contractor after the work is complete.

- Issue: **Die Casters has no business plan and has been unable to get venture capital funding**. First, the state of the Ukrainian economy has been quite poor and not a major draw for venture capitalists. Second, it is unlikely venture capitalists would make an initial investment in a firm that is under investigation as Die Casters has been for the past two and a half years. Finally, DCI does have a business plan, which served as the basis for the DoD funding. The cost data in this plan, now several months old, will be revised to accurately

reflect the anticipated costs of the remaining activities for this project.

- Issue: **The State Department was told by the Defense Enterprise Fund that the DCI plan could not pass due diligence as a viable investment.** First, this project is not about investing. DoD does not expect a financial return on our investment. We expect conversion of former WMD production assets. Second, the DCI plan that the DEF reviewed was with Meridian, a company with no die cast experience and no viable contribution other than a building. Meridian pulled out of the project in 1997. The current project is with Burevestnik as a partner. Burevestnik has significant die cast experience, and skilled management, in an on-going, profitable die cast business. An independent IESC evaluation of the Ukrainian partner concluded that it was a viable business. In short, we have the opportunity to get $3.5 million worth of conversion for $560,000.

- Issue: **If DCI has been cleared of improper billing and is no longer under investigation, why not let it pursue venture capital funding?** The venture capital process is a lengthy one. It takes a significant length of time to perform due diligence on a newly formed venture such as DCB (the resulting venture). With the equipment in storage in Moldova now subject to confiscation, there is insufficient time available for venture capitalists to evaluate this project.

- Issue: **There is sufficient time available for venture capitalists to evaluate this project.** Timeliness is a factor. DoD must move to protect the equipment in Moldova immediately. DoD is not evaluating this as an investment. We are evaluating it as a conversion opportunity. A venture capital firm would take significant time negotiating over ownership or pay back terms with the venture partners. DoD is not worried about return on investment and can avoid this lengthy process.

**CONCLUSION:** After reviewing these issues, we are persuaded that we can best accomplish our defense conversion objectives by the allocation of additional funding ($560,000) to complete the DCI project. We also note that the U.S.-Ukraine Business Council has strongly endorsed additional funding to complete the DCI project (**TAB B**). Although Kim is still not convinced, her written comments to us, which we have incorporated into this memo, state that she is prepared to defer to DoD's judgement on this issue.

**RECOMMENDATION:** Authorize CTR Policy to direct DTRA to contract with DCI to transport and install the previously purchased equipment (**TAB C**).

Approve JCM Disapprove ____________

Other:

for ELW

5 May 2000