No. 04-1113C
(JUDGE BRADEN)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DIE CASTERS INTERNATIONAL, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# APPENDIX TO DEFENDANT'S RESPONSE TO PLAINTIFF'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
VOLUME I (Pages 1-34)

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

WILLIAM K. OLIVIER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-6288
Fax: (202) 514-7965
Email: william.olivier@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

DAVID C. RICKARD
Deputy General Counsel
Defense Threat Reduction
Agency

Dated: November 18, 2004

# INDEX TO APPENDIX

Letter, dated March 15, 1996, from C.W. Maillefert, to Scott Morton, Re: Status of Procurement . . . . . . . . . . 1

Letter, dated March 28, 1996, from Alan C. Frederickson, to Scott Morton, Re: Status of Procurement . . . . . . . . . . 4

Letter, dated June 25, 2004, from Robert J. Bemben, to Goldberg & Connolly, Re: Final Decision . . . . . . . . . . 7

Contract MOdification, P00002 . . . . . . . . . . . . . . . . . 12

Excerpt, Defense Contract Audit Agency Audit Report for 1995 17

Excerpt, Defense Contract Audit Agency Audit Report for 1996 24

Excerpt, Defense Contract Audit Agency Audit Report for 1997 35

Excerpt, Defense Contract Audit Agency Audit Report for 1998 47

Memorandum for Deputy Assistant Secretary of Defense, dated May 5, 2000, from Director of Cooperative Threat Reduction Policy, Subject: Provision of Additional Funding to Die Casters International, Inc. Defense Conversion Project in Ukraine . . . . . . . . . . . . . . . . . . . . . . . . . 60

Declaration of Mark West, with attachments . . . . . . . . . 63

Letter, dated May 31, 2000, from Herbert A. Thompson, Jr., to Alan C. Frederickson, Re: Shipment of Equipment . . . . 73

Contract Modification, P00001 . . . . . . . . . . . . . . . . . 74

Die Casters International, Inc.

*Quality and Service Worldwide*

One Spruce Terrace, Wayne, New Jersey, USA 07470
(201) 696-0100 Fax: (201) 696-9194

DIE CASTERS INTERNATIONAL INC. faxed 11:26 3/15/96

March 15, 1996

Mr. Scott Morton
Contracting Officer (AM)
Defense Nuclear Agency
6801 Telegraph Road
Alexandria, VA 22310

***Via facsimile and certified mail***

Subject: DNA Contract No. DNA 001-95-C-0169

Dear Mr. Morton:

As you know, the above referenced contract provides partial funding for conversion of the Meridian (formerly Korlyev) defense plant in Kyiv, Ukraine. The purpose of this letter is to inform you of project status, and certain financial and other matters relating to Die Casters International ("DCI" or "the Company") that may impede or impair its ability to implement the contract, including, *inter alia*, the resignation of certain key officers and employees.

As a result of irreconcilable differences with senior management over personnel matters, the manner in which resources are being obligated and overall implementation of the project, together with the demonstrable lack of progress in obtaining financing required to cover DCI's cost share and to pay salaries, three of the Company's four full time employees and one of its part time employees intend to resign immediately. These employees include:

- Captain Christopher W. Maillefert, USN (Retired), Executive Vice President, responsible for finance and contract administration, a former Assistant Director of Naval Intelligence for Resources (finance and personnel);
- George P. Michaely, Secretary of the Corporation and Corporate Counsel, a former Chief Counsel to the Division of Corporation Finance for the U.S. Securities and Exchange Commission;
- David L. Konick, a Russian speaking attorney and acknowledged expert on legal affairs in the NIS, who has been responsible for various legal matters pertaining to the Company's operations in Ukraine, including creating the legal framework for the Meridian joint venture; and

Commander Robert Engh, USN (Retired). Vice President Ukraine Operations, a former manager in ship/shore overhaul and maintenance, who has been responsible for management of implementation of the Meridian facility rehabilitation, equipment procurement and installation, and training of Meridian personnel.

The resignation of these employees will effectively leave DCI with no qualified officers or staff, other than Mr. Frederickson, to implement the DNA contract. Moreover, without these positions to bill against (and employees in those positions willing to accept only a fraction of their actual salaries as they accrue), DCI has inadequate resources with which to remain in operation or proceed effectively with the Meridian conversion project.

DCI has billed the U.S. Government a total of $140,733.89 as of our invoice 96-07 dated February 22, 1996. This represents 74 percent of the obligations incurred under subject contract. Unfortunately, DCI has been unable to finance its 26 percent share of these obligations as of this date. The company has been financing its portion of operations by making partial payments on employees' salaries. This was agreed to in November 1995 by certain employees, with the stipulation that Mr Frederickson, the President, CEO and principal stockholder of DCI, would diligently pursue efforts to obtain the $1,062,687 needed to meet our cost share under the DNA contract.

To date, no real progress has been made in obtaining all or any part of these funds, other than some informal discussions with potential lenders or investors. Very little progress has been made on developing a realistic business plan -- one that would withstand the scrutiny of a due diligence review by any potential lender. Further, it was recommended to me in a memo dated March 2, 1996 by the President of DCI that discussions be suspended with the only lending institution that had offered to assist us in obtaining a loan through the Small Business Administration and U.S. Export Assistance Center. The reason given for the suspension was that the principal stockholders of DCI apparently are unwilling to submit personal financial statements or signatures against such a loan. At this juncture, it does not appear likely that DCI will be able to meet its obligation to raise the necessary funds at any time in the near future.

DCI's apparent inability to secure financing for its $1.06 million cost share under the DNA contract raises grave concerns about the Company's viability and ability to perform under the DNA contract. Since the inception of the DNA contract and currently there are no means to support DCI's 26 percent cost share of these operating expenses, except by billing DNA for salaries and diverting those funds, once paid by DNA, to other operating expenses. Certain employees agreed to this arrangement, *strictly as an interim measure*, based on assurances from Mr. Frederickson that timely action would be taken by him to obtain financing required for DCI's cost share. As noted above, this has not occurred, does not appear likely to occur in the foreseeable future, and the Company's current employees are no longer willing to perform services for less than their full salaries.

Cost of operations are approximately $11,500 per month, taking into account $7,500 per month for U.S. operations and the anticipated operations costs for a representative office in Kyiv that

are estimated at $4,000 per month. These monthly operations costs do not include salaries or employee benefits, which through the end of February totaled an additional $30,000 per month. No Kyiv representative office has yet been established. Although DCI representatives who visited Kyiv in February found suitable premises for such purposes, they were without adequate funds or authority to execute a long term lease. Questions have been raised about DCI's ability to implement the contract without such a representative office in Kyiv.

Nor can DCI reasonably be expected to proceed with procurement of the necessary die casting machines and other equipment required for the Meridian plant conversion in Kyiv because the Company has insufficient funds with which to make the required advance payments for such procurement and related services. For example, in order to proceed with the purchase of the die casting equipment DCI had hoped to procure from a manufacturer located in the Republic of Moldova, the Company was recently informed that it would be required to make an advance payment of approximately $120,000. Of this amount, approximately $30,000 would have to be provided directly by DCI. These amounts do not include the cost of hydraulic, electronic controls, or the TYMAC control systems, all of which would have to be procured and paid for separately. As noted below, without financing for its 26 percent cost share under the contract, the Company currently does not have the resources to cover any of these payments.

Although no formal bankruptcy proceedings have been initiated against the Company, DCI is insolvent and unable to meet its current obligations as they become due. As of March 14, 1996 DCI's current assets total approximately $18,700, including $6,200 in cash and $12,500 in computers and peripherals, valued at cost. The Company's current liabilities amount to approximately $156,900 (including accrued salary obligations to employees totaling approximately $100,823) of which only approximately $35,000 remains unbilled to DNA. In other words, the Company's outstanding liabilities currently exceed its cash reserves by approximately $115,700, even assuming that all current liabilities included in these totals are properly billable to, and payable by, DNA under the contract.

I have been advised that under the circumstances described above, as the Company's Executive Vice President and chief financial officer, I am under an obligation to report these matters to you before my resignation becomes effective, so that you may take whatever action, if any, you deem appropriate. Should you have any questions concerning the matter, please feel free to contact me at your convenience.

Yours truly,

C. W. Maillefert

C. W. Maillefert
Executive Vice President

cc: Mr. Alan Frederickson
DCI Board of Directors

**Die Casters International, Inc.**

*Quality and Service Worldwide*

One Spruce Terrace, Wayne, New Jersey, USA 07470
(201) 696 - 9100 Fax: (201) 696 - 9194

28 March 1996

Mr. Scott Morton
Contracting Officer (AM)
Defense Nuclear Agency
6801 Telegraph Road
Alexandria, VA 22310

Subject: DNA Contract Number DNA001-95-C-0169

Dear Mr. Morton:

This letter confirms the discussions held at our contract status meeting last Friday in your offices. I want to take this opportunity to thank you and Tom Cox for arranging a very productive exchange. Die Casters International, Inc. (DCI) appreciates being given the time to provide a full progress report and to answer all your questions concerning our project's status, including any questions raised as a result of Mr. Maillefert's allegations in his letter to the Defense Nuclear Agency (DNA) dated March 15, 1996. The following is a recap of some of the major issues which were discussed last Friday that will enable DCI to perform successfully under the above referenced contract.

*Staffing*:

DCI is currently planning to hire ~~Mr. Alexander I. Grechuck~~, a Ukrainian living in Moscow who, prior to Glasnost, worked as the Deputy Chief of the Ministry of Metallurgy. A copy of his resume is attached, and we will be submitting him for approval as an outside consultant. Mr. Grechuck is familiar with our project, as he came to Kyiv, at my request, while I was at Meridian last month. I plan to have ~~Mr. Grechuck coordinate all our facilities planning, equipment installation, building refurbishment, and other turn-key project management roles as our direct consultant in Ukraine~~. His background is perfect for our needs, and he already proved invaluable by identifying the need to conduct a detailed engineering study of the adequacy of Meridian's proposed plant, as he knew of other Kyiv plants where the foundations were not sufficient for a die casting operation. Having the die casting line and executive management experience he has adds an extremely valuable resource to our team.

I have also brought onboard ~~Mr. Robert Seidman, an experienced CPA~~. In addition, I have a commitment from an experienced executive, ~~Mr. William Anness~~, who will manage our books using the approved accounting software that was recommended by DCAA during our pre-award audit (Peachtree for Windows). Both will work part time for DCI on an as-required basis. In addition, I am ~~interviewing several candidates to become our full-time controller~~. One such person is Mr. Thomas Dula, who has the added value in that he is an American who speaks Russian. To manage the administrative issues, including meeting all reporting requirements under the contract, Mrs. Donna Frederickson will be working with us. She will also be managing our personnel issues, office setup, and general office management. These individuals will allow DCI to manage its business at significant cost savings from the previous arrangements. I can supply resumes if requested and will be discussing how they will be compensated (as a part time employee or consultant) with Mr. Cox and Mr. Cook.

We are working on the following areas:

➢ ~~Joint-Venture Negotiations and Legal Structure~~: I have been managing this and will be bringing in a Ukrainian-based legal expert as well as retaining an expert in the local area. Meridian is drafting the contracts and government paperwork and we have discussed the structure and assets transfer, which Meridian and DCI have verbally agreed to, with Ukrainian authorities, with positive responses. This process is on-going and is not a critical path to getting the production facilities operating.

- [redacted] Currently, this is our critical path, as our last trip to Kyiv indicated that Meridian's proposed facilities require engineering studies and designs to rebuild and upgrade the plant that Meridian is contributing to the joint venture. The original facility that we reviewed with Meridian prior to our proposal in 1994 was since "sold," and Meridian is now offering another building that may require improvements in the foundation as well as overhead cranes, etc. Mr. Pavlenko (Meridian) and Mr. Grechuck are coordinating the activities to accomplish this work and to lay out the new project schedule. With Mr. Grechuck, we have the expertise and executive management experience to properly develop the requirements and the project schedule and to mange the project.

- Quality Control, Training, and Production Management: I have also started a search for an experienced production and quality control executive who can assist Grechuck during the plant setup and can manage the training and setup of proper quality and production procedures as the plant comes on-line. This person is not critical until this summer, and we will use Mr. James Ballentine to coordinate these activities. As originally planned and now approved, Mr. Ballentine is well experienced in these matters, having successfully established an on-going joint venture foundry in Minsk, Belarus.

- In-country Office and Representation: We plan to set up an independent representative in-country. I will be submitting our proposed contract for approval (as a subcontractor, if this is necessary). In addition, we will be establishing a separate office at Meridian, with communications and other equipment, so that our people have a place to work as the joint venture's plant facilities are established. We plan to start interviewing prospective employees for our Ukrainian operations on our next trip in April. This is not a critical path item.

*Equipment Purchasing*:

Mr. Mickowski, of Matra, Inc., one of our recently approved consultants under the contract, indicated at our meeting last Friday that all the equipment that we plan to order for the joint venture has been researched, competitive quotes have been received, and the final vendors have been selected. Final engineering design details between our die cast machine manufacturer in Moldova (Tochlitmash) and TYMAC are underway. We currently plan to have TYMAC complete these plans in April, at which time we will establish a distributor relationship with Tochlitmash and will negotiate best and final pricing with them. Per Matra's efforts, all equipment costs are within budget and all are planned to be sourced from American manufacturers (except for Tochlitmash). In addition, DCI plans to negotiate potential distributor relationships with those manufacturers to obtain even more favorable pricing and to expand the benefits of our contract by increasing the potential for improved American exports into the NIS. We will define milestones once Meridian's engineering studies are completed in April.

*Financing Plan*:

DCI has entered into numerous finder's agreements in the States and in Germany, and several discussions with prospective investors have been conducted and are underway. DCI is currently exploring both public and private investment opportunities for both short- and long-term requirements. With the approval of Ambassador Upston's consultant agreement, DCI plans to begin researching sources of government funds (such as the WesNIS and DEF funds, The World Bank, and OPIC) as well as several major private investment banks. This past week, DCI met with an investment banking firm in New York City, which is interested in helping DCI raise $4 million to $10 million in private placement funds as part of DCI's long-term financing plan to go public within five years. In Germany, we have talked with Dredsner Bank and a venture capitalist who has experience that seems to be opening the door to German government funds. DCI expects to generate strong investment opportunities before it becomes necessary to purchase equipment in May.

In addition, DCI has been in touch with the European Bank for Reconstruction and Development concerning the financial needs of the joint venture. Meetings have been held in London as well as in Kyiv, and the bank has

expressed interest to provide financing to the joint venture. DCI will pursue this financing , once the financials can be defined better, after the facilities plan is completed and the capital contributions by Meridian are known and their mechanism of transfer is established.

*Maillefert's Allegations*:

Finally, let me restate what I discussed last Friday regarding Mr. Maillefert's letter to DNA dated March 15, 1996, the same day that he resigned from DCI. We unequivocally reject any implication drawn from the letter that DCI will be unable to meet its obligations under the contract. The resignation of Mr. Maillefert, and certain other individuals, will ultimately facilitate the completion of the contract without unnecessary distraction. These individuals were not part of DCI's original executive team and are not critical to the contract. In fact, their resignation followed an unsuccessful attempt on their part to take control of DCI. As a result of the resignations of these individuals and their replacement with personnel who are anxious to move this project forward, DCI is now poised to complete the contract on time.

I, and the rest of our DCI team, look forward to working with you and the rest of the DNA team. As you know, I will meet with Mr. Cook Friday to address, in more detail, our progress plans for the duration of the contract as well as to lay out how we can best meet all of your requirements.

Very truly yours,

Alan C. Frederickson
President

Defense Threat Reduction Agency
8725 John J. Kingman Road MSC 6201
Ft Belvoir, VA 22060-6201

Goldberg & Connolly
Attn: Mr. Gary Marcus
66 North Village Avenue
Rockville Centre, NY 11570

June 25, 2004

Dear Mr. Marcus:

By letter dated 25 February 2004, Die Casters International, Inc. (DCI) asserts several claims related to contract DNA001-95-C-0169. Claim number 1, in the amount of $3,359,901.51, is based on DCI's assertion of rights to an equitable adjustment pursuant to FAR 52.232-20(h), Limitation of Cost. Claim number 2, in the amount of $109,996,640.71, represents alleged damages and lost profits. Finally, DCI claims entitlement to settlement expenses in the amount of $137,191.74. For the reasons set forth below, all claimed amounts are denied in their entirety.

**Background**

Contract DNA001-95-C-0169 was awarded to DCI on 27 October 1995. The term of the contract was established in Section F.1 of the contract as effective on the date of contract award through twenty-four months thereafter. The contract was a cost-sharing arrangement with an estimated cost of $4,100,427.00. The maximum Government liability was established as 74% of the estimated costs or $3,034.316.00. The contractor share was $1,066,111.00.

The contract was modified three times. Modification P00001 added Federal Acquisition Regulation (FAR) clause 52.245-5, Government Property (Cost-Reimbursement, Time & Material, or Labor Hour Contract). Modification A00001 changed the Paying Office. Modification P00002 provided for a no-cost extension of the contract term to 30 January 1998 as requested in DCI letter dated 8 October 1997.

The contract Statement of Work (SOW) cites the objective of the contract:

> The primary objective of this defense conversion proposal is to provide assistance to Meridian to support the conversion and privatization of its defense related manufacturing base to the commercial production of consumer products . . . .

The Sow further states:

> The specific format of the proposed business relationship is based upon DCI's plan to form up to two joint venture stock ownership companies ("JV's") between Meridian and DCI as soon as possible. The JV's will be the legal entities upon which DCI will effectively produce close and enduring business relationships with Meridian. DCI will also build direct relationships with Meridian to enhance Meridian's individual capabilities to convert other assets to commercial production.

In recognition of DCI's plan to form the joint ventures, the contract included Special Contract requirement number 5, Use and Ownership/Disposition of Government-Provided Property. In part, this clause specifies that:

> All property, equipment and materials acquired with United States (U.S.) Government funding under this contract shall be acquired solely for the use of the joint venture, or business arrangement formed by the U.S. Contractor and the Former Soviet Union (FSU) enterprise partner in performance of the terms of this contract.

The clause also states:

> Title and ownership of all property, equipment and materials acquired with U.S. Government funding under the Contract shall vest with the joint venture upon conclusion of the Contract, as determined by the Contracting Officer. Prior to conclusion of the Contract, the U.S. Contractor is accountable for said items in accordance with standard government property clauses cited under Section I of this contract.

**Discussion**

DCI proceeded to purchase equipment and attempted to form the Joint Ventures which were the cornerstone of DCI's plan to meet the objectives of the contract. DCI invoiced for, and the Government paid for the purchased equipment up to the maximum Government liability of $3,034,316.00. While DCI was able to purchase equipment, DCI was unsuccessful in its attempts to establish the joint ventures. In fact, no joint ventures were ever established. When the term of the contract ended, DCI realized they needed to submit additional billings and, accordingly, requested a no-cost extension of the contract by letter dated 21 November 1997. In part, the letter states:

> This letter submits our request for your consideration and favorable approval in granting a "No-Cost" contract extension (DNA001-95-C-0169) through January, 1998. Please note that this request does not request additional funding, as we can

> complete the contract within the allocated funds originally authorized. However, it is our understanding that all billings for this contract must be completed by the end of October, 1997, as per Section F, Paragraph 1, of the base contract. Therefore, we are requesting approval to continue billings against authorized amounts through January, 1998.

DCI's request was granted and Modification P00002 extended the term of the contract through 30 January 1998. It is clear that DCI understood the contract would end on 30 January 1998 and that the Government was not responsible for any payments in excess of the Government's maximum liability established in the contract at $3,034,316.00. While DCI made a number of attempts to secure additional funding and, apparently, incurred costs after 30 January 1998, the Contracting Officer never promised or authorized additional funding or granted any extensions to the January 1998 contract end date. Moreover, DCI was notified on at least three occasions that the Government had not committed to provide additional funding and, in fact, intended to close out the contract. Any additional costs incurred by DCI are the sole responsibility of DCI.

DCI claims that the Government wrongfully appropriated and disposed of the equipment purchased under the contract. DCI asserts that, "In the event the Contract is not completed, the contractual remedy is provided for under paragraph (h) of FAR 52.232-20 Limitation of Cost which provides for an "equitable distribution based upon the share of costs incurred" by each party. I disagree. The contract was, in fact, completed, albeit unsuccessfully. DCI was not able to perform under the contract and meet the contract objectives. In absence of successful completion, the contract ended by virtue of reaching both the end of the contract term and the maximum Government liability for reimbursement of costs.

Since a joint venture was never formed, the title and ownership provisions of special contract requirement number 5 had no effect. Instead, the Government Property clause of the contract governed the accountability and ownership for the purchased equipment. This clause specifies that:

> Title to all property purchased by the Contractor for which the Contractor is entitled to be reimbursed as a direct item of cost under this contract shall pass to and vest in the Government upon the vendor's delivery of such property.

The clause further requires the contractor to:

> Establish and maintain a program for the use, maintenance, repair, protection, and preservation of Government property in accordance with sound business practice and the applicable provisions of FAR Subpart 45.5.

Unfortunately, DCI lacked the resources to protect the property and the Government was forced to take action to prevent seizure and loss of the property.

The Government believes it has paid all the costs for the property in question and, therefore, has full right to protect its property and dispose of it as deemed appropriate. I disagree that DCI has any right to possess or utilize the equipment since the contract had unsuccessfully ended due to DCI's poor performance and the Government had paid up to its maximum liability. Furthermore, there was no evidence presented that DCI ever used its own funds to make payments on any of the costs that comprise its 26% share. Therefore, DCI's claim to recover $2,921,653.49 together with a reasonable profit of $438,248.02 is denied.

With respect to its Claim number 2, DCI asserts entitlement to recovery of " . . . $5,955,969.49 representing the total value of the Equipment that DCI had a right to possess and utilize in the formation of the Joint Venture which was wrongfully disposed of by DTRA together with a reasonable profit of $893,395.42 with respect to the Equipment and lost profits of $103,147,275.80." As stated above, the Government does not believe DCI has a right to possess and utilize the equipment and, therefore, denies the claim. In addition, the claim for lost profits is extremely speculative, at best, and inappropriate for payment by the Government.

Finally, DCI claims entitlement to settlement expenses in the amount of $137,191.74 plus interest. Since the Government believes there is no need for any additional settlement activities, this claim is denied as well.

This is the final decision of the Contracting officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedures for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Robert J. Bemben

Robert J. Bemben
Contracting Officer

cc: Mr. Alan C. Frederickson, President
Die Casters International, Inc.
One Spruce Terrace
Wayne, New Jersey 07470

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE 1 OF 1 PAGES

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| P00002 | See Block 16c | N/A | N/A |

6. ISSUED BY CODE HD2001

HEADQUARTERS
DEFENSE SPECIAL WEAPONS AGENCY (AM)
6801 TELEGRAPH ROAD
ALEXANDRIA, VA 22310-3398

ATTN: THOMAS L. COX (703) 325-1196

7. ADMINISTERED BY *(If other than Item 6)* CODE S3101A

DCMC, SPRINGFIELD
955 SOUTH SPRINGFIELD AVENUE
SPRINGFIELD, NEW JERSEY 07081-3170

(FOR: PROPERTY ADMINISTRATION, PLANT CLEARANCE & COST ACCOUNTING STANDARDS ONLY)

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

DIE CASTERS INTERNATIONAL, INCORPORATED
ONE SPRUCE TERRACE
WAYNE, NEW JERSEY 07470

CODE 03VE3 FACILITY CODE

(X) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

X 10A. MODIFICATION OF CONTRACT/ORDER NO. DNA001-95-C-0169

10B. DATED *(SEE ITEM 13)* 95OCT25

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. Accounting and Appropriation Data *(If required)*

N/A

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (X) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc).* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER *(Specify type of modification and authority)* Mutual Agreement of the Parties/Terms and Conditions of the Contract |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return ________ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

SUBJECT: Extension of Performance Period

1. Contractor's letter(s) dated 97OCT08 is hereby incorporated by reference.
2. The total amount of this contract remains unchanged.
3. Under SECTION F - Deliveries or Performance, the term of the contract set forth in paragraph 1 is changed:

   FROM: 95OCT27 THROUGH: Twenty-four (24) months

   TO: 95OCT27 THROUGH: 98JAN30

4. There are no other changes to the contract by reason of this modification.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF SIGNER *(Type or print)* | |
|---|---|---|---|
| | | SCOTT G. MORTON<br>CONTRACTING OFFICER | |
| 15B. CONTRACTOR/OFFEROR<br>*(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY [signature]<br>*(Signature of Contracting Officer)* | 16C. DATE SIGNED<br>NOV 21 1997 |

NSN 7540-01-152-9070
PREVIOUS EDITION UNUSABLE

Created using PerForm Pro software.

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

# Die Casters International, Inc.

*Quality and Service Worldwide*

One Spruce Terrace, Wayne, New Jersey, USA 07470
(201) 696 - 9100 · Fax: (201) 696 - 9194

October 8, 1997

Mr. Scott G. Morton
Contracting Officer, Defense Conversion in Ukraine
Defense Special Weapons Agency
6801 Telegraph Road
Alexandria, VA 22310-3398

Fax No: 703-325-2955

Dear Scott:

RE: Request for "No-Cost" Contract Extension, DNA001-95-C-0169

This letter submits our request for your consideration and favorable approval in granting a "No-Cost" contract extension (DNA001-95-C-0169) through January, 1998. Please note that this request does not request additional funding, as we can complete the contract within the allocated funds originally authorized. However, it is our understanding that all billings for this contract must be completed by the end of October, 1997, as per Section F, Paragraph 1, of the base contract. Therefore, we are requesting approval to continue billings against authorized amounts through January, 1998.

Attached are two schedules, which highlight total billed costs to date, together with estimated costs to complete, the summary total of which clearly indicates that we can complete our contract within the total funding as originally authorized. The attachments also include a project milestone schedule.

For reasons previously outlined to DSWA, i.e., primarily related to our change in joint venture partner that resulted in some delay in the JV registration process and delays in equipment delivery schedules to Kyiv, Ukraine, our overall project milestone timetable has slipped several months now into early 1998. In essence, there are still several material costs remaining, the exact amount of which still need to be determined. Additionally, to complete performance on this contract and insure successful start-up of the joint venture, we will need to provide project management supervision, with travel expenses included therein, as outlined on the attached schedules.

What are they?

w/no further additional expense

We would be most happy to meet with you to review this request in greater detail and answer any questions you may have. Thank you for your consideration.

Sincerely,

DIE CASTERS INTERNATIONAL, INC.

Bernard Skown

Bernard Skown

10-20-97

cc: Mr. Alan C. Frederickson, President

Attachments:

Summary Schedule: Contract Billings "To Date" & "To Complete"
Supporting Schedule A1: Material (Equipment Purchases)
Supporting Schedule B: Project Milestone Schedule to Complete

DIE CASTERS INTERNATIONAL, INC.
REQUEST FOR CONTRACT EXTENSION
DNA001-95-C-0169

Summary Schedule
October 8, 1997

| Item Description | Billings Thru 3 Oct 97 (No. 97-44) | Billings To Complete | Total Contract | Projected Remaining Billings by Month: Oct 97 | Nov 97 | Dec 97 | Jan 97 | Total Remaining Oct-Jan |
|---|---|---|---|---|---|---|---|---|
| Labor: | | | | | | | | |
| Direct Labor | 557,964.10 | 50,000.00 | 607,964.10 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 50,000.00 |
| FICA & Indirect | 43,404.02 | 5,000.00 | 48,404.02 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 5,000.00 |
| **Sub-Total, Labor** | **601,368.12** | **55,000.00** | **656,368.12** | **13,750.00** | **13,750.00** | **13,750.00** | **13,750.00** | **55,000.00** |
| Other Direct Costs: | | | | | | | | |
| Travel | 175,290.17 | 37,725.00 | 213,015.17 | 2,325.00 | 22,500.00 | 8,100.00 | 4,800.00 | 37,725.00 |
| Material (Schedule A1) | 2,448,504.06 | 166,451.00 | 2,614,955.06 | 45,000.00 | 99,880.00 | 21,571.00 | | 166,451.00 |
| Engineering Services | 77,125.00 | | 77,125.00 | | | | | |
| Other Services | 221,384.44 | 30,300.00 | 251,684.44 | | 10,100.00 | 10,100.00 | 10,100.00 | 30,300.00 |
| Communications | 21,432.02 | 4,800.00 | 26,232.02 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 4,800.00 |
| **Sub-Total, ODC's** | **2,943,735.69** | **239,276.00** | **3,183,011.69** | **48,525.00** | **133,680.00** | **40,971.00** | **16,100.00** | **239,276.00** |
| **Total, Labor & ODC's** | **3,545,103.81** | **294,276.00** | **3,839,379.81** | **62,275.00** | **147,430.00** | **54,721.00** | **29,850.00** | **294,276.00** |
| Overhead | 256,041.09 | 5,006.10 | 261,047.19 | 1,250.00 | 1,250.00 | 1,250.00 | 1,256.10 | 5,006.10 |
| **Total Billing** | **3,801,144.90** | **299,282.10** | **4,100,427.00** | **63,525.00** | **148,680.00** | **55,971.00** | **31,106.10** | **299,282.10** |

**As Per Contract Authorization:**

| | Billings Thru 3 Oct 97 | Billings To Complete | Total Contract |
|---|---|---|---|
| Contractor's Share @ 26% | 988,297.67 | | 1,066,111.00 |
| Government's Share @ 74% | 2,812,847.23 | | 3,034,316.00 |
| **Total Contract Authorization** | **3,801,144.90** | **299,282.10** | **4,100,427.00** |

DIE CASTERS INTERNATIONAL, INC.
REQUEST FOR CONTRACT EXTENSION
DNA001-95-C-0169

Supporting Schedule A1
October 8, 1997

Supporting Schedule A1: Material (Equipment Purchases)

| Item Description | Billings Thru 3 Oct 97 (No. 97-44) | Billings To Complete | Total Contract | Projected Remaining Billings by Month: Oct 97 | Nov 97 | Dec 97 | Jan 97 | Total Remaining Oct-Jan |
|---|---|---|---|---|---|---|---|---|
| 1. HPM Remanufacturing Div.: | | | | | | | | |
| Die Cast Machine Shot-Ends & Miscellaneous Items | 1,128,955.76 | | 1,128,955.76 | | | | | |
| 2. Advance Products Corp.: | | | | | | | | |
| Ladlers, Die Sprayers, Central Lub, & Auxiliary Items | 388,909.00 | 12,100.00 | 401,009.00 | | 12,100.00 | | | 12,100.00 |
| Miscellaneous Spare Parts | | 6,260.00 | 6,260.00 | | 6,260.00 | | | 6,260.00 |
| 3. Lindberg/MPH Corp.: | | | | | | | | |
| Holding Furnaces and Parts | 117,612.80 | | 117,612.80 | | | | | |
| 4. Litmash Machine Foundry: | | | | | | | | |
| Die Cast Machine Clamp Ends | 287,120.00 | 9,571.00 | 296,691.00 | | | 9,571.00 | | 9,571.00 |
| 5. Binom Furnace Company: | | | | | | | | |
| Electric Arc Melting Furnaces | 272,600.00 | 108,520.00 | 381,120.00 | 45,000.00 | 51,520.00 | 12,000.00 | | 108,520.00 |
| 6. Visi-Trak Corp.: | | | | | | | | |
| Die Cast Control System Equip. | 34,850.00 | 8,000.00 | 42,850.00 | | 8,000.00 | | | 8,000.00 |
| **Sub-Total, Major Equipment** | **2,230,047.56** | **144,451.00** | **2,374,498.56** | **45,000.00** | **77,880.00** | **21,571.00** | **0.00** | **144,451.00** |
| 7. Freight Not Included Above: | | | | | | | | |
| From HPM to Litmash - Land/Sea | 24,318.00 | | 24,318.00 | | | | | |
| From Lindberg to DCB, Kiev | 15,635.00 | | 15,635.00 | | | | | |
| From Binom to DCB, Kiev | | 8,000.00 | 8,000.00 | | 8,000.00 | | | 8,000.00 |
| From Litmash to DCB, Kiev | | 8,000.00 | 8,000.00 | | 8,000.00 | | | 8,000.00 |
| From Visi-Trak to DCB, Kiev | | 1,000.00 | 1,000.00 | | 1,000.00 | | | 1,000.00 |
| From USA to DCB, Kiev, Misc.Parts | | 5,000.00 | 5,000.00 | | 5,000.00 | | | 5,000.00 |
| **Sub-Total, Freight** | **39,953.00** | **22,000.00** | **61,953.00** | **0.00** | **22,000.00** | **0.00** | **0.00** | **22,000.00** |
| 8. Other Misc. Items Previously Billed, But Not Included Above | 178,503.50 | | 178,503.50 | | | | | 0.00 |
| **Total Material, Including Major Pieces of Equipment** | **2,448,504.06** | **166,451.00** | **2,614,955.06** | **45,000.00** | **99,880.00** | **21,571.00** | **0.00** | **166,451.00** |

DIE CASTERS INTERNATIONAL, INC.
REQUEST FOR CONTRACT EXTENSION
DNA001-95-C-0169

Supporting Schedule B
October 8, 1997

Supporting Schedule B: Project Milestone Schedule

Week Beginning:

| Work Scope Activity | Sept 29 | Oct 6 | Oct 13 | Oct 20 | Oct 27 | Nov 3 | Nov 10 | Nov 17 | Nov 24 | Dec 1 | Dec 8 | Dec 15 | Dec 22 | Dec 29 | Jan 5 | Jan 12 | Jan 19 | Jan 26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HPM equipment shipment received Litmash | X | | | | | | | | | | | | | | | | | |
| Litmash final assembly of its clamp-ends with HPM shot-ends & Advance Prods. equip. | | X | — | — | X | | | | | | | | | | | | | |
| Dry cycle test runs of combined Litmash-HPM: | | | | | X | — | — | — | — | X | | | | | | | | |
| Machine #1 - 400T | | | | | o | o | | | | | | | | | | | | |
| Machine #2 - 400T | | | | | | | o | o | | | | | | | | | | |
| Machine #3 - 400T | | | | | | | | o | o | | | | | | | | | |
| Machine #4 - 630T | | | | | | | | | o | o | | | | | | | | |
| HPM field technician to Litmash | | | | | To Be Determined | | | | | | | | | | | | | |
| Complete Litmash assembly and dry testing | | | | | | | | | | X | | | | | | | | |
| Litmash shipment to DCB-Burevestnik, Kyiv: | | | | | | | X | — | — | — | X | | | | | | | |
| Machine #1 - 400T | | | | | | o | o | | | | | | | | | | | |
| Machine #2 - 400T | | | | | | | | o | o | | | | | | | | | |
| Machine #3 - 400T | | | | | | | | | | o—o | | | | | | | | |
| Machine #4 - 630T | | | | | | | | | | o | o | | | | | | | |
| USA - Advance Prods./Lindberg equipment: Arrives in Iljicovsk (vic. Odessa, Ukraine) | | | X | | | | | | | | | | | | | | | |
| Delivered to DCB-Burevestnik, Kyiv | | | X | X | | | | | | | | | | | | | | |
| Binom Furnaces to DCB-Burevestnik, Kyiv | | | | | | X | X | | | | | | | | | | | |
| Initial plant layout and equipment installation | | | | X | — | — | — | — | — | — | X | | | | | | | |
| Equipment start-up and initial system testing | | | | | | | | | X | — | — | — | — | X | | | | |
| HPM field technician to DCB-Burevestnik, Kyiv | | | | | | | | | | | | To Be Determined | | | | | | |
| APC field technician to DCB-Burevestnik, Kyiv | | | | | | | | | | | | To Be Determined | | | | | | |
| V-T field technician to DCB-Burevestnik, Kyiv | | | | | | | | | | | | | | | To Be Determined | | | |
| In-country DCB-Burevestnik operator training | | | | | | | | | | | X | — | — | — | — | X | | |
| Test "wet cycle" production runs | | | | | | | | | | | | | | X | — | — | X | |
| System commissioning and DSWA contribution to DCI joint venture: DCB-Burevestnik | | | | | | | | | | | | | | | | | | X |
| Begin "Real World" production runs | | | | | | | | | | | | | | | | | | X |

# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT

February 10, 1999

**PREPARED FOR:**

Defense Threat Reduction Agency
Formerly, Defense Special Weapons Agency (DSWA)
ATTN: Mr. Scott G. Morton, Contracting Officer
6801 Telegraph Road
Alexandria, Virginia 22310-3398

**PREPARED BY:**

Northern New Jersey Branch Office
Building 350 South
Picatinny Arsenal
Picatinny, NJ 07806-5000
Telephone No. (973) 724-4932
FAX No. (973) 724-2187
E-mail Address *fao6201@rma.dcaa.mil

**SUBJECT:** Audit of Incurred Costs for Calendar Year 1995

**REFERENCES:** DCAA: Audit Report No. 6201-97B10250006

**CONTRACTOR:**

Die Casters International, Inc. (DCI)
One Spruce Terrace
Wayne, NJ 07470

**REPORT RELEASE RESTRICTIONS:** See Page 9

**CONTENTS:**


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 1 |
| Results of Audit | 2 |
| Contractor's Accounting System | 7 |
| DCAA Personnel and Report Authorization | 8 |
| Audit Report Distribution and Restrictions | 9 |
| Contractor's Certificate of Indirect Costs | Attach. 1 |
| DCAA Form 1 | Attach. 2 |
| Schedule of Cumulative Allowable Costs | Attach. 3 |


**FOR OFFICIAL USE ONLY**

## SUBJECT OF AUDIT

We audited Die Casters International, Inc.'s (DCI's) September 12, 1996 certified incurred cost submission and related books and records for reimbursement of Calendar Year (CY) 1995 incurred costs. The purpose of the audit was to determine the allowability of direct costs and indirect cost rates and establish audit determined indirect cost rates for January 1, 1995 through December 31, 1995. The proposed rates apply to the contractor's sole contract in that year, cost share contract No. DNA001-95-C-0169. A copy of DCI's Certificate of Indirect Costs, dated September 12, 1996, is included as Attachment 1 to the report (see page 7).

The proposal is the responsibility of the contractor. Our responsibility is to express an opinion based on our audit.

## EXECUTIVE SUMMARY

Our audit did not disclose any exceptions to the contractor's proposed indirect costs of $6,487; however, due to our reduction of the direct costs included in the allocation base, we adjusted the proposed indirect cost rate of 6% upward to 7.45%. We questioned $15,599 of the direct costs proposed, which represent 26% of the submitted labor and subcontract costs.

## SCOPE OF AUDIT

We conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the data and records reviewed are free of material misstatement. An audit includes:

- reviewing the contractor's internal controls, assessing control risk and determining the extent of audit testing needed based on the control risk assessment;
- examining, on a test basis, evidence supporting the amounts and disclosures in the data and records reviewed;
- assessing the accounting principles used and significant estimates made by the contractor;
- evaluating the overall data and records presentation; and
- determining the need for technical specialist assistance.

We evaluated the proposal using the applicable requirements contained in the:

- Federal Acquisition Regulation (FAR), and
- DoD FAR Supplement (DFARS).

The contractor claims exemption under 48 CFR 9930.201-1(b)(3) from the practices required by the Cost Accounting Standards Board rules and regulations because it considers itself a small business concern.

As detailed in our Audit Report No. 6201-95B17740130, dated February 22, 1995, DCI's accounting system was considered adequate. However, the last initial pricing audit report, ref. A/R No. 6201-95B210000150, dated April 11, 1995, disclosed the contractor needed to properly define its direct labor/indirect labor functions and adjust its indirect rate calculations. Also, DCI is a small company with limited resources to be applied to compliance procedures and testing. Our audit scope reflects our assessment of control risk and provides a reasonable basis for our opinion.

The concurrent verification of labor and materials was omitted in this review.

## RESULTS OF AUDIT

Indirect Rates. Our audit did not disclose any exceptions to the contractor's proposed indirect costs of $6,487; however due to our reduction of direct costs included in the allocation base, the rate was adjusted upward from 6% to 7.45% as shown below.

| | Proposed | | Questioned | | Ref. | Page |
|---|---|---|---|---|---|---|
| Indirect Category | Expense Pool | Indirect Cost Rate | Expense Pool | Indirect Cost Rate | | |
| Composite G&A (a) | $ 6,487 | 6.00% | $ 0 | (1.45)% | Exh. A | 4 |

( ) =Denotes Upward Adjustment.

(a) Allocation Base - Total cost input (proposed: $108,123; audit determined $87,043)

Direct Costs. We questioned $15,599 of direct costs proposed under contract DNA001-95-C-0169. Direct costs not questioned are provisionally approved pending final acceptance. Final acceptance of amounts proposed under government contracts does not take place until performance under the contract is completed and accepted by the cognizant authorities and the audit responsibilities have been completed. A summary of the contractor's proposed and our questioned cost is as shown below.

| | Proposed | Questioned | Ref. | Page |
|---|---|---|---|---|
| Direct costs Incurred | $108,123 | $ 21,080 | | |
| Less DCI 26% Cost Share | 28,112 | 5,481 | | |
| Total Direct Cost | $ 80,011 | $ 15,599 | Exh. B | 5 |

GOVERNMENT PARTICIPATION IN ALLOCATION BASES

| Contract Type In Allocation Base | CY 1995 Indirect Expense Pool G & A |
|---|---|
| Gov't Cost Share Flexibly Priced | 100.00% |
| Gov't Firm Fixed Price and Commercial Work | 0.00% |
| Total | 100.00% |

We provided and discussed the audit results with the contractor's representative, Mr. Bernard Skown and Mr. Alan Frederickson, President, on an ongoing basis during the audit and again on 29 August 1997 and 17 September 1997. Mr. Frederickson understood the basis of our adjustments to the direct costs but did not agree with our results and would not sign the indirect rate agreement letter.

EXHIBIT A
Page 1 of 1

**STATEMENT OF PROPOSED CY 1995 G&A EXPENSES AND RATE AND RESULTS OF AUDIT**

| Cost Element | Proposed | Questioned & Nonconcurred | Notes | Page |
|---|---|---|---|---|
| Total G&A Pool | $ 6,487 | $ 0 | | |
| Total Cost Input Base | $ 180,123 | $ 21,080 | 1 | 4 |
| G&A Expense Rate | | | | |
| Proposed | 6.00% | | | |
| Questioned | (1.45)% | | | |
| Audit Determined | 7.45% | | | |
| Nonconcurred | (1.45)% | | | |

( ) Denotes upward adjustment.

Explanatory Notes:

1. Total Cost Input Base

a. Summary of Conclusions:

The $21,080 reduction in the G&A base is comprised of $18,480 of labor costs and $2,600 in subcontracts, which represents 26% of those cost elements proposed (See Exhibit B for more details).

b. Basis of Proposed Costs:

The cost input base includes labor, travel, material, communications expense and subcontract costs incurred in CY 1995, including the 26% of labor and subcontract costs not paid by the company to its employees and subcontractor, respectively.

c. Audit Evaluation:

We reduced the proposed total cost input base by $21,080 for the questioned direct costs.

d. Contractor's Reaction:

The contractor's representative, Mr. Alan Frederickson, President, understood the basis of our adjustments to the direct costs but did not agree with our results.

EXHIBIT B
Page 1 of 2

**STATEMENT OF PROPOSED CY 1995 DIRECT COSTS AND RESULTS OF AUDIT**

| Cost Element | Proposed | Audit Adjusted | Questioned | Notes | Page |
|---|---|---|---|---|---|
| Direct Labor | $ 71,077 | $ 52,597 | $18,480 | 1 | 5 |
| Travel | 15,126 | 15,126 | | 2 | 6 |
| Material | 10,146 | 10,146 | | 2 | 6 |
| Communications | 1,774 | 1,774 | | 2 | 6 |
| Subcontract | 10,000 | 7,400 | 2,600 | 1 | 5 |
| Costs Incurred | $108,123 | $ 87,043 | $21,080 | | |
| Less: DCI 26% Cost Share | 28,112 | 22,631 | 5,481 | | |
| Total Direct Cost | $ 80,011 | $ 64,412 | $15,599 | | |

Explanatory Notes:

1. Direct Labor and Subcontract Costs.

a. Summary of Conclusions:

We questioned 26% of the proposed labor and subcontract costs. These amounts represent payments withheld from employees and the subcontractor based on oral agreements. Although an accrued liability is established for these costs, they have not been paid in the ordinary course of business; in fact, they have not been paid to date. Therefore, the costs are considered unallowable per FAR 31.201-2 since, according to the contract terms (FAR 52.216-7(b)), the costs must be paid in the ordinary course of business.

b. Basis of Proposed Costs:

The contractor is including total labor and subcontract costs incurred in CY 1995 based on the value of labor hours expended and subcontract invoices received, including the 26% of each not paid by the company to the employees or the subcontractor.

c. Audit Evaluation:

We traced the labor costs supporting public voucher 95-02 to timesheets and payroll records, reviewed the payroll journal and general ledger concerning CY 1995 labor costs incurred and discussed the 26% holdback of salaries with the contractor's President, Mr. Alan Frederickson. We also reviewed the subcontract costs included on public voucher 95-02, by obtaining invoices and canceled checks for the amounts paid. Our review of the documentation disclosed that the payments to the subcontractor did not

# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT NO. 6201-1996B10100865

September 21, 2000

**PREPARED FOR:**

Contracting Officer
Defense Threat Reduction Agency
Formerly, Defense Special Weapons Agency (DSWA)
ATTN: Mr. Herbert Thompson, Contracting Officer
45045 Aviation Drive,
Dulles, VA 20166-7517

**PREPARED BY:**

Northern New Jersey Branch Office
Building 350 South
Picatinny Arsenal
Picatinny, NJ 07806-5000
Telephone No. (973) 724-4932
FAX No. (973) 724-2187
E-mail Address DCAA-FAO6201@dcaa.mil

**SUBJECT:** Audit of Incurred Costs for Calendar Year 1996

**CONTRACTOR:**

Die Casters International, Inc. (DCI)
One Spruce Terrace
Wayne, NJ 07470

**REPORT RELEASE RESTRICTIONS:** See Page 23

**CONTENTS:**

| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 1 |
| Results of Audit | 2 |
| Contractor's Organization and Systems | 21 |
| DCAA Personnel and Report Authorization | 22 |
| Audit Report Distribution and Restrictions | 23 |
| App. 1 - Contractor's Certificate of Indirect Costs | 24 |
| App. 2 - DCAA Form 1, Notice 1-Unallowable Costs | 25 |
| App. 3 – DCAA Form 1, Notice 2-Unpaid Costs | 27 |

**FOR OFFICIAL USE ONLY**

## SUBJECT OF AUDIT

We audited Die Casters International, Inc.'s (DCI's) May 17, 1999 certified incurred cost proposal and related books and records for reimbursement of Calendar Year (CY) 1996 incurred costs. The purpose of the audit was to determine the allowability of direct costs and indirect cost rates and establish audit determined indirect cost rates for January 1, 1996 through December 31, 1996. The proposed rates apply to the contractor's sole contract in that year, cost share contract No. DNA001-95-C-0169. A copy of DCI's Certificate of Final Indirect Costs, revised June 2, 1999, is included as Appendix 1 to the report (see page 21).

The proposal is the responsibility of the contractor. Our responsibility is to express an opinion based on our audit.

## EXECUTIVE SUMMARY

We questioned $198,945 of direct costs. The majority of direct costs questioned were $91,858 of direct labor, $65,607 of legal & professional fees and $27,040 of subcontract equipment. We questioned $10,413 of the contractor's proposed overhead expenses of $24,402, and also reduced the direct labor base, resulting in an adjustment to the proposed overhead rate from 10.29% to 9.63%. We questioned $25,968 of the G&A expense pool and reduced the total cost input base by $137,762. The net impact of the adjustments to G&A resulted in a reduction to the rate from 11.78% to 9.92%.

## SCOPE OF AUDIT

Except as noted below, we conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the data and records reviewed are free of material misstatement. An audit includes:

- reviewing the contractor's internal controls, assessing control risk and determining the extent of audit testing needed based on the control risk assessment;
- examining, on a test basis, evidence supporting the amounts and disclosures in the data and records reviewed;
- assessing the accounting principles used and significant estimates made by the contractor;
- evaluating the overall data and records presentation; and
- determining the need for technical specialist assistance.

We evaluated the proposal using the applicable requirements contained in the:

- Federal Acquisition Regulation (FAR),
- DoD FAR Supplement (DFARS) and
- Contract Provisions.

The contractor claims exemption under 48 CFR 9930.201-1(b)(3) from the practices required by the Cost Accounting Standards Board rules and regulations because it considers itself a small business concern.

The concurrent verification of labor and materials was omitted in this review.

As detailed in our Audit Report No. 6201-95B17740130, dated February 22, 1995, DCI's accounting system was considered adequate. However, the last initial pricing audit report (A/R No. 6201-95B210000150, dated April 11, 1995) disclosed that the contractor needed to properly define its direct labor/indirect labor functions and adjust its indirect rate calculations. Also, DCI is a small company with limited resources to be applied to compliance procedures and testing. Our audit scope reflects our assessment of control risk and provides a reasonable basis for our opinion.

## RESULTS OF AUDIT

Direct Costs. We questioned $198,945 of direct costs proposed under contract DNA001-95-C-0169. A significant portion resulted from the contractor's inclusion in its proposal of accrued costs not yet paid. Questioned direct costs are summarized below and detailed in Exhibit C. Direct costs not questioned are provisionally approved pending final acceptance. Final acceptance of amounts proposed under government contracts does not take place until performance under the contract is completed and accepted by the cognizant authorities and the audit responsibilities have been completed. Refer to Exhibit D for our determination of allowable CY 1996 contract costs. The contractor did not agree with the majority of our findings and recommendations. The nonconcurred disapproved amounts are set out in the DCAA Form 1s attached as Appendix 2 and 3.

| | Proposed | Questioned | Ref. | Page |
|---|---|---|---|---|
| Direct Costs Incurred | $637,259 | $198,945 | | |
| Less DCI 26% Cost Share | 165,687 | 51,726 | | |
| Net Direct Cost | $ 471,572 | $ 147,219 | Exh. C | 11 |

Indirect Rates. The audit results and recommendations of the proposed overhead and G&A rates are summarized below and detailed in Exhibits A and B, respectively. The contractor did not accept any of our findings and recommendations. The amounts disapproved are set out in the DCAA Form 1 attached as Appendix 3.

| | | Proposed | | Questioned | | Ref. | Page |
|---|---|---|---|---|---|---|---|
| Indirect Category | | Indirect Expense Pool | Cost Rate | Indirect Expense Pool | Cost Rate | | |
| Overhead | (a) | $24,402 | 10.29% | $ 10,413 | 0.66% | Exh. A | 4 |
| G&A | (b) | $77,946 | 11.78% | $ 25,968 | 1.86% | Exh. B | 7 |

( ) =Denotes Upward Adjustment.

(a) Allocation Base – Direct Labor (proposed: $237,134; audit determined $145,276).
(b) Allocation Base - Total cost input (proposed: $661,661; audit determined $523,899).

GOVERNMENT PARTICIPATION IN ALLOCATION BASES

| Contract Type in Allocation Base | CY 1996 Indirect Expense Pool | |
|---|---|---|
| | Overhead | G&A |
| Gov't Cost Share Flexibly Priced | 100.00% | 100.00% |
| Gov't Firm Fixed Price & Commercial Work | 0.00 | 0.00 |
| Total Participation | 100.00% | 100.00% |

Some of the costs questioned in this audit are believed to be subject to the penalties provided in DFARS 231.7002. Our recommendation for each questioned item is included in the notes to Exhibit C (pages 11 to 17 and supporting Schedule C-1 (page 18). The affected contract is identified in Exhibit D (page 19). Our recommendations concerning the interest to be recovered on unallowable cost paid will be furnished when we have received your determination on the penalties to be assessed. In this regard, we request that the ACO's decision be furnished as soon as possible.

The contractor's Certificate of Final Indirect Costs, as revised on June 2, 1999, is attached in Appendix 1.

Although contract costs have not been settled for CY 1996, we are providing our determination of the cumulative allowable costs on the subject contract through CY 1996 in Exhibit E.

The contractor billed its overhead and G&A at approximately 7.75% and 10.00%, respectively. These percentages represent the contractor's estimate of its CY 1995 booked rates adjusted for possible unallowables. We take no exception to this manner of developing the contractor's billing rates.

We provided and discussed the audit results with the contractor's representative, Mr. Alan Frederickson, President, on an ongoing basis during the audit and again on June 21, 1999. Mr. Frederickson understood the basis of our adjustments but did not agree with our results and would not sign a final indirect cost rate agreement. Accordingly, we have prepared DCAA Form 1s reflecting the impact of our questioned costs on the contractor's billings to the government (see Appendix 2 and 3).

We advised the contracting officer of the areas of disagreement on July 1, 1999 and the resulting need for our issuance of the DCAA Form 1s (see Appendix 2 and 3) to this report.

EXHIBIT C
Page 1 of 7

**STATEMENT OF PROPOSED CY 1996 DIRECT COSTS AND RESULTS OF AUDIT (Note 1)**

| Cost Element | Proposed | Audit Adjusted | Questioned | Notes | Page |
|---|---|---|---|---|---|
| Direct Labor | $237,134 | $ 145,276 | $ 91,858 | 2 | 12 |
| Subcontracts (Equip./Mat'l) | 134,200 | 107,160 | 27,040 | 3 | 12 |
| Eng. Services | 57,525 | 48,418 | 9,107 | 3 | 12 |
| Misc. Office | 27,916 | 27,916 | | | |
| Legal/Professional | 111,804 | 46,197 | 65,607 | 4 | 14 |
| Office Equipment | 7,998 | 11,167 | (3,169) | 5 | 15 |
| Travel | 60,682 | 52,180 | 8,502 | 6 | 16 |
| Total Costs Incurred | $637,259 | $ 438,314 | $198,945 | | |
| Less: DCI 26% Cost Share | (165,687) | (113,961) | (51,726) | | |
| Total Direct Cost | $471,572 | $324,353 | $147,219 | | |

Explanatory Notes:

1. Questioned Costs Subject to Penalty

a. DFARS 231.70 provides for the assessment of penalties when unallowable costs are included by contractor's in final indirect cost rate proposals or in the final statement of costs incurred or estimated to be under a fixed-price incentive contract, as follows;

1) DFARS 231.7002-1(a)(1) prescribes the penalty assessment when claimed costs are unallowable based on clear convincing evidence. This penalty is equal to the amount of the disallowed cost plus interest on the amount actually paid and is referred to as the level one penalty.

2) DFARS 231.7002-1(a)(2) prescribes the penalty assessment when claimed costs are determined to be unallowable before the proposal submission. This penalty is equal to twice the amount of the disallowed costs and is referred to as the level two penalty.

b. Of the total $198,945 direct costs questioned prior to the cost share reduction of 26%, it is our opinion that $61,002 (consulting of $52,500 and travel of $8,502) is subject to the level one penalty assessment under DFARS 231.7002-1(a)(1). Our audit did not disclose any questioned costs subject to the DFARS 231.7002-1(a)(2) level two penalty assessment.

The notes in the exhibit identify the unallowable costs that are, in our opinion, subject to these penalties. Schedule C-1 summarizes the FAR unallowable costs subject to penalty and identifies the only DoD contract with the penalty clause to which all the penalty applies.

2. Direct Labor Costs

a. Summary of Conclusions:

The $91,858 of questioned direct labor is due to that portion of the direct gross wages incurred in CY 1996, but not yet paid by the company to its employees. As stated previously, although accrued liabilities have been established for these costs, they have not been paid in the ordinary course of business; nor have they been paid to date. Therefore, the costs are considered unallowable per FAR 31.201-2 since, according to the contract terms (FAR 52.216-7(b)), the costs must be paid in the ordinary course of business.

b. Basis of Proposed Costs:

The direct labor base of $237,134 represents approximately 79.75% of the total labor (direct and indirect) incurred in CY 1996 of $297,345. It includes the wages accrued (not yet paid) in CY 1996.

c. Audit Evaluation:

We obtained the contractor's summary, by employee, of gross salaries incurred and paid in CY 1996. We randomly sampled labor entries supporting salaries incurred, and traced the hours back to the employee's timesheets without exception. Gross wages paid were verified to each employee's W-2 Wage and Tax Statement. Total salaries were traced to the contractor's general ledger for CY 1996, as were accrued wages payable. We also verified that the accrued wages payable for CY 1996, less the wages payable for CY 1995 equaled the difference between the gross salaries earned versus paid in CY 1996 of $115,182. The direct portion of this difference ($115,182 * 79.75% =$91,858) is the amount questioned in the direct labor base.

d. Contractor's Reaction:

The contractor's representative, Mr. Alan Frederickson, President, understood the basis of our adjustment, but did not agree the cost should be questioned. The accrued payroll taxes are a result of the accrued wages payable and are considered by Die Casters to be both valid and incurred, regardless of whether or not they have been paid to date. Also, DCI stated that if and when outside financing is received, the accrued payroll taxes will be paid.

e. Auditor's Response:

We informed the contractor that it is still our opinion that the costs identified, because they have not been paid in the ordinary course of business, are considered unallowable. We informed the contractor we will be issuing a DCAA Form 1, recommending these costs be suspended on the contract.

3. Subcontracts and Engineering Services

a. Summary of Conclusions:

We questioned $27,040 of the proposed subcontract costs related to TYMAC Controls Corp. (TYMAC) and $9,107 of engineering services supplied by MATRA, Inc. These amounts represent payments withheld from the subcontractors on invoices submitted for costs incurred and/or services provided. Although accrued liabilities have been established for these costs, they have not been paid in the ordinary course of business; in fact, they have not been paid to date. Therefore, the costs are considered unallowable per FAR 31.201-2 since, according to the contract terms (FAR 52.216-7(b)), the costs must be paid in the ordinary course of business.

b. Basis of Proposed Costs:

The subcontract costs of $134,200 are broken down as follows: TYMAC for $104,000, Tochlitmash for $24,200 and Binom Engineering for $6,000. The engineering service costs of $57,525 consist of $37,525 for MATRA, Inc. and $20,000 for Giproselmash. DCI is including the total subcontract costs incurred, and engineering services provided, in CY 1996 based on the value of the subcontract and engineering invoices received, including $27,040 not paid by the company to TYMAC and $9,107 not paid by the company to MATRA, Inc.

c. Audit Evaluation:

We traced the subcontract and engineering service costs to the general ledger. We selected the high dollar entries from the detailed general ledger for transaction testing. The invoices supporting the entries were obtained and reviewed. The difference between the amounts billed on the invoice and the amounts paid, per cancelled checks (which we also verified) or wire transfers was calculated. Subcontract and engineering service agreements were also obtained and reviewed. No exceptions were taken to the Tochlitmash or Binom Engineering subcontract costs or the Giproselmash engineering costs, which were paid in full by the contractor. However, our review of the documentation disclosed that the payments to both TYMAC and MATRA, Inc. were not for the full amounts invoiced, rather for $27,040 and $9,107 less, respectively. We requested written agreements with the subcontractors which would

bind the company to future payment of the costs incurred, but were told by the contractor that the agreements were oral only and no written documentation exists. Further review of correspondence between TYMAC and DCI also disclosed that TYMAC was not in agreement with DCI's "holdback" of the invoice cost. In fact, the company has requested payment for interest on the unpaid portion of invoices submitted, as well as the balance of invoiced costs not yet paid.

d. Contractor's Reaction:

The contractor does not agree with our results and stated they will not sign a rate agreement letter. The contractor feels they had oral agreements with the subcontractor in which both parties agreed to the hold back (generally 26% of the invoice submitted) and that the costs Die Casters submitted are valid and were incurred, regardless of whether or not they have been paid to date. Also, DCI stated that if and when outside financing is received, the subcontractor will be paid for the hold back costs.

e. Auditor's Response:

We informed the contractor that it is still our opinion that the costs identified, because they have not been paid in the ordinary course of business, are considered unallowable. We also informed the contractor we would again be issuing a DCAA Form 1, recommending these costs be suspended on the contract.

4. Legal/Professional Fees

a. Summary of Conclusions:

We questioned $65,607 of the $111,804 proposed legal and professional fees as summarized below:

| Consultant | Proposed | Questioned |
|---|---|---|
| Hintech, Int'l | $ 52,500 | $ 52,500 |
| John Upston | 19,000 | 4,400 |
| Al Grechuck | 17,000 | |
| Dolan Consulting | 13,158 | 3,421 |
| Manfred Trepte | 5,286 | 5,286 |
| Other/Misc. | 4,860 | 0 |
| Total | $111,804 | $ 65,607 |

Hintech, Int'l and Manfred Trepte costs of $52,500 and $5,286 were questioned in their entirety. The contract terms specifically require that all consultants be pre-approved by the contracting officer; however, no approvals could be located for these consultants. In addition, the Hintech, Int'l consulting costs are unallowable per FAR 31.205-33 (f)(2)&(3), in that there were no timesheets, detailed invoices, records of work products etc. as required to properly support these costs. Since the Hintech costs are expressly unallowable, they are believed to be subject to level one penalty provided in DFARS 231.7002. There are no costs subject to level two penalties. It should also be noted that included in the $52,500 is $17,400 of unpaid Hintech "holdback" fees considered unallowable per FAR 31.201-2 since, according to the contract terms (FAR 52.216-7(b)), the costs must be paid in the ordinary course of business.

The John Upston consulting costs of $4,400 and the Dolan consulting costs of $3,421 ($7,821 combined) were also questioned because they relate to payments withheld on services provided. Accrued liabilities have been established for all the "holdback" costs; however, since they still have not been paid to date, they are considered unallowable.

b. Basis of Proposed Costs:

The proposed costs are based on monthly invoices of retainer fees and miscellaneous expenses, per consulting agreements, as booked by the contractor in CY 1996.

c. Audit Evaluation:

We audited all the consultant costs, with the exception of the "other/misc." due to lack of materiality. We obtained and reviewed the terms of the consulting agreements. We also obtained the contracting officer's pre-approval letters for the consulting costs, where available, and contacted the contracting officer in those instances where DCI could not provide the pre-approval letter to determine if approval was obtained. We also reviewed detailed invoices, timesheets and canceled checks, as applicable and available. Where possible, we determined that hours worked by the consultants were commensurate with the retainer fees claimed.

d. Contractor's Reaction:

The contractor does not agree with our results and stated they will not sign a rate agreement letter. With respect to Hintech, Int'l and Manfred Trepte, the contractor feels that although pre-approval letters may not have been obtained, the services provided by both parties was a necessary and allowable expense. In terms of the holdback issue, as previously stated, DCI feels oral agreements were in place, in which both parties agreed to the hold back, and that the costs DCI submitted are valid, regardless of whether or not they have been paid to date.

e. Auditor's Response:

With regard to the "holdback" issue, we informed the contractor that it is still our opinion that the costs identified, because they have not been paid in the ordinary course of business, are considered unallowable and will be recommended as suspended on the DCAA Form 1. We still consider the Hintech consulting costs as not supported and expressly unallowable per the FAR. Therefore, we will recommend those costs be disapproved on the DCAA Form 1.

5. Office Equipment

a. Summary of Conclusions:

The office equipment was increased by $3,169 over the $7,998 submitted, due to an error made by the contractor in posting the entry to the wrong account.

b. Basis of Proposed Costs:

The office equipment proposed was based on actual costs as booked. The contractor corrected the general ledger to eliminate the posting error discussed above.

c. Audit Evaluation:

During our reconciliation of the contractor's submission with the general ledger, we disclosed an error in the accounts payable, which also affected the office equipment account.

d. Contractor's Reaction:

The contractor agreed with our adjustment and corrected the error.

6. Travel

a. Summary of Conclusions:

We questioned $8,502 of the $60,682 proposed direct travel costs in accordance with FAR 31.201-6(a). They represent travel costs incurred by Vladimir Hintze (President of Hintech Int'l) which are directly related to the unallowable professional fees claimed for Hintech. (See note 3 above) As a result, the costs are believed to be subject to level one penalty provided in DFARS 231.7002. There are no costs questioned subject to a level two penalty.

b. Basis of Proposed Costs:

The proposed costs include transportation, lodging and other travel related costs which are supported by expense reports and invoices, as applicable.

c. Audit Evaluation:

We ran random samples on each of the three main areas of travel costs, selected from the detailed general ledger, and traced the costs back to expense reports and invoices and identified back to the public voucher where the costs were billed. The original sample was expanded to include any entries that appeared to be related to Vladimir Hintze, in order to identify those related travel expenses.

d. Contractor's Reaction:

As stated in Note 3 above, the contractor did not agree with the questioned Hintech, Int'l consulting costs, and therefore did not agree with the questioned related travel expenses.

e. Auditor's Response:

We still consider the Hintech consulting costs as not supported and expressly unallowable per the FAR. Therefore, we will recommend those costs be disapproved on the DCAA Form 1.