No. 04-1113C
(JUDGE BRADEN)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DIE CASTERS INTERNATIONAL, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# APPENDIX TO DEFENDANT'S RESPONSE TO PLAINTIFF'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
VOLUME II (Pages 35-74)

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

WILLIAM K. OLIVIER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-6288
Fax: (202) 514-7965
Email: william.olivier@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

DAVID C. RICKARD
Deputy General Counsel
Defense Threat Reduction Agency

Dated: November 18, 2004

# INDEX TO APPENDIX

Letter, dated March 15, 1996, from C.W. Maillefert, to Scott Morton, Re: Status of Procurement . . . . . . . . . . 1

Letter, dated March 28, 1996, from Alan C. Frederickson, to Scott Morton, Re: Status of Procurement . . . . . . . . . . 4

Letter, dated June 25, 2004, from Robert J. Bemben, to Goldberg & Connolly, Re: Final Decision . . . . . . . . . . 7

Contract MOdification, P00002 . . . . . . . . . . . . . . . . . 12

Excerpt, Defense Contract Audit Agency Audit Report for 1995 17

Excerpt, Defense Contract Audit Agency Audit Report for 1996 24

Excerpt, Defense Contract Audit Agency Audit Report for 1997 35

Excerpt, Defense Contract Audit Agency Audit Report for 1998 47

Memorandum for Deputy Assistant Secretary of Defense, dated May 5, 2000, from Director of Cooperative Threat Reduction Policy, Subject: Provision of Additional Funding to Die Casters International, Inc. Defense Conversion Project in Ukraine . . . . . . . . . . . . . . . . . . . . . . . . . 60

Declaration of Mark West, with attachments . . . . . . . . . . 63

Letter, dated May 31, 2000, from Herbert A. Thompson, Jr., to Alan C. Frederickson, Re: Shipment of Equipment . . . . 73

Contract Modification, P00001 . . . . . . . . . . . . . . . . . 74

# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT NO. 6201-1997B10100865

July 2, 2001

**PREPARED FOR:** Contracting Officer
ATTN: Mr. Herbert Thompson, Contracting Officer
Defense Threat Reduction Agency/AMC
Formerly, Defense Special Weapons Agency (DSWA)
8725 John J. Kingman Drive, MSC 6201
Ft. Belvoir, VA 22060-6201

**PREPARED BY:** Northern New Jersey Branch Office
Building 350 South
Picatinny Arsenal
Picatinny, NJ 07806-5000
Telephone No. (973) 724-4932
FAX No. (973) 724-2187
E-mail Address DCAA-FAO6201@dcaa.mil

**SUBJECT:** Audit of Incurred Costs for Calendar Year 1997

**CONTRACTOR:** Die Casters International, Inc. (DCI)
One Spruce Terrace
Wayne, NJ 07470

**REPORT RELEASE RESTRICTIONS:** See Page 24

**CONTENTS:**


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 1 |
| Results of Audit | 2 |
| Contractor's Organization and Systems | 22 |
| DCAA Personnel and Report Authorization | 23 |
| Audit Report Distribution and Restrictions | 24 |
| App. 1 - Contractor's Certificate of Indirect Costs | 25 |
| App. 2 - DCAA Form 1, Notice 1-Overbilled Costs | 26 |
| App. 3 - DCAA Form 1, Notice 1-Unallowable Costs | 28 |
| App. 4 - DCAA Form 1, Notice 2-Holdback Costs | 32 |

## SUBJECT OF AUDIT

We audited Die Casters International, Inc.'s (DCI's) May 25, 2000 and updated July 21, 2000 certified incurred cost proposal and related books and records for reimbursement of Calendar Year (CY) 1997 incurred costs. The purpose of the audit was to determine the allowability of direct costs and indirect cost rates and establish audit determined indirect cost rates for January 1, 1997 through December 31, 1997. The proposed rates apply to the contractor's sole contract in that year, cost share contract No. DNA001-95-C-0169. A copy of DCI's Certificate of Final Indirect Costs, revised July 21, 2000, is included as Appendix 1 to the report (see page 25).

The proposal is the responsibility of the contractor. Our responsibility is to express an opinion based on our audit.

## EXECUTIVE SUMMARY

We questioned $897,189 of booked direct costs. The majority of direct costs questioned were $206,838 of direct labor, $587,193 of subcontract equipment and $82,820 of legal & professional fees. We questioned $6,535 of the contractor's proposed overhead expenses of $30,090, and also reduced the direct labor base, resulting in an upward adjustment to the proposed overhead rate from 8.08% to 14.22%. We questioned $15,094 of the G&A expense pool and reduced the total cost input base by $766,160. The net impact of the adjustments to G&A resulted in an increase to the G&A rate from 2.20% to 2.28%. Also, the contractor-billed costs in CY 1997 in excess of costs booked by $34,781 (See Exhibit D, page 19), which we questioned/disapproved in Appendix 2, page 26.

## SCOPE OF AUDIT

Except as noted below, we conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the data and records reviewed are free of material misstatement. An audit includes:

- reviewing the contractor's internal controls, assessing control risk and determining the extent of audit testing needed based on the control risk assessment;
- examining, on a test basis, evidence supporting the amounts and disclosures in the data and records reviewed;
- assessing the accounting principles used and significant estimates made by the contractor;
- evaluating the overall data and records presentation; and
- determining the need for technical specialist assistance.

We evaluated the proposal using the applicable requirements contained in the:

- Federal Acquisition Regulation (FAR),
- DoD FAR Supplement (DFARS) and
- Contract Provisions.

The contractor claims exemption under 48 CFR 9930.201-1(b)(3) from the practices required by the Cost Accounting Standards Board rules and regulations because it considers itself a small business concern.

The concurrent verification of labor was omitted in this review.

As detailed in our Audit Report No. 6201-95B17740130, dated February 22, 1995, DCI's accounting system was considered adequate. However, the last initial pricing audit report (A/R No. 6201-95B210000150, dated April 11, 1995) disclosed that the contractor needed to properly define its direct labor/indirect labor functions and adjust its indirect rate calculations. Also, DCI is a small company with limited resources to be applied to compliance procedures and testing. Our audit scope reflects our assessment of control risk and provides a reasonable basis for our opinion.

## RESULTS OF AUDIT

Direct Costs. In our opinion, claimed direct costs are provisionally approved as adjusted by our audit. We questioned $897,189 of direct costs proposed under contract DNA001-95-C-0169. A significant portion resulted from the contractor's inclusion in its proposal of accrued costs not yet paid. Questioned direct costs are summarized below and detailed in Exhibit C. Direct costs not questioned are provisionally approved pending final acceptance. Final acceptance of amounts proposed under government contracts does not take place until performance under the contract is completed and accepted by the cognizant authorities and the audit responsibilities have been completed. Refer to Exhibit E for our determination of allowable CY 1997 contract costs. The contractor did not agree with our findings and recommendations. The nonconcurred disapproved amounts are set out in the DCAA Form 1s' attached as Appendices 3 and 4.

| | Proposed | Questioned | Ref. | Page |
|---|---|---|---|---|
| Direct Costs Incurred | $3,010,548 | $897,189 | | |
| DCI 26% Cost Share | (782,742) | (233,269) | | |
| Net Direct Cost | $2,227,806 | $663,920 | Exh. C | 12 |

Indirect Rates. In our opinion, the contractor's proposed indirect rates are acceptable as adjusted by our audit. The audit results and recommendations of the proposed overhead and G&A rates are summarized below and detailed in Exhibits A and B, respectively. The contractor did not accept any of our findings and recommendations. The amounts disapproved are set out in the DCAA Form 1s attached as Appendices 3 and 4.

| | | Proposed | | Questioned | | Ref. | Page |
|---|---|---|---|---|---|---|---|
| Indirect Category | | Indirect Expense Pool | Cost Rate | Indirect Expense Pool | Cost Rate | | |
| Overhead | (a) | $30,090 | 8.08% | $6,535 | (6.14)% | Exh. A | 5 |
| G&A | (b) | $66,872 | 2.20% | $15,094 | (0.08)% | Exh. B | 8 |

( ) = Denotes upward adjustment.

(a) Allocation Base – Direct Labor (proposed: $372,444; audit determined $167,606).
(b) Allocation Base - Total cost input (proposed: $3,040,638; audit determined $2,274,478).

GOVERNMENT PARTICIPATION IN ALLOCATION BASES

| Contract Type in Allocation Base | CY 1997 Indirect Expense Pool | |
|---|---|---|
| | Overhead | G&A |
| Gov't Cost Share Flexibly Priced | 100.00% | 100.00% |
| Gov't Firm Fixed Price & Commercial Work | 0.00 | 0.00 |
| Total Participation | 100.00% | 100.00% |

None of the indirect costs questioned in this audit appear to be subject to the penalties provided in DFARS 231.7002.

The contractor's Certificate of Final Indirect Costs, dated July 21, 2000, is attached in Appendix 1.

Although contract costs have not been settled for CYs 1995-1997, we are providing our determination of the cumulative allowable costs on the subject contract through CY 1997 in Exhibit F.

The contractor billed its overhead and G&A at approximately 8.62% and 6.24%, respectively. These percentages represent the contractor's estimate of its CY 1997 booked rates adjusted for possible unallowables. We take no exception to this manner of developing the contractor's billing rates.

We provided and discussed the audit results with the contractor's representative, Mr. Alan Frederickson, President, on an ongoing basis during the audit and again during our exit conference of January 4, 2001. Mr. Frederickson understood the basis of our adjustments but did not agree with our results and would not sign a final indirect cost rate agreement. Accordingly, we have prepared DCAA Form 1s reflecting the impact of our questioned costs on the contractor's billings to the government (see Appendices 2, 3 and 4).

We advised the contracting officer of the areas of disagreement on March 1, 2001 and again on April 12, 2001 on the resulting need for our issuance of the DCAA Form 1s' (see Appendices 2, 3 and 4) to this report. The contracting officer concurred with our basis for issuing the three Form 1s.

EXHIBIT C
Page 1 of 7

## STATEMENT OF PROPOSED CY 1997 DIRECT COSTS AND RESULTS OF AUDIT

| Cost Element | | Proposed | Voluntary Deletions | Net Claimed | Audit Adjusted | Questioned | Notes | Page |
|---|---|---|---|---|---|---|---|---|
| Direct Labor | (A) | $ 372,444 | | $ 372,444 | $ 165,606 | $ 206,838 | 1 | 12 |
| ODCs: | | | | | | | | |
| Subs (Equip./Mat'l) | | $2,336,557 | | $2,336,557 | $1,749,364 | $587,193 | 2 | 13 |
| Freight | | 53,251 | | 53,251 | 53,251 | | | |
| Eng. Services | | 15,000 | | 15,000 | 15,000 | | | |
| Misc. Office | | 34,552 | | 34,552 | 34,552 | | | |
| Legal/Professional | | 123,837 | $ 29,604 | 94,233 | 11,413 | 82,820 | 3 | 15 |
| Travel | | 104,511 | | 104,511 | 84,173 | 20,338 | 4 | 17 |
| Subtotal ODCs | (B) | $2,667,708 | $ 29,604 | $2,638,104 | $1,947,753 | $690,351 | | |
| Subtotal Direct Costs | (A+B) | $3,040,152 | $ 29,604 | $3,010,548 | $2,113,359 | $897,189 | | |
| DCI 26% Cost Share | | (790,439) | (7,697) | (782,742) | (549,473) | (233,269) | | |
| Total Direct Cost | | $2,249,713 | $ 21,907 | $2,227,806 | $1,563,886 | $663,920 | | |

Explanatory Notes:

1. Direct Labor Costs

a. Summary of Conclusions:

The proposed direct labor consists of $333,369 of U.S. labor and $39,075 of overseas labor, which is actually consulting costs. Of the U.S. labor, $167,763 was questioned because it represents that portion of the direct gross wages incurred in CY 1997, but not yet paid by the company to its employees. Although accrued liabilities have been established for these costs, they have not been paid in the ordinary course of business; nor have they been paid to date. Therefore, the costs are considered unallowable per FAR 31.201-2 since, according to the contract terms (FAR 52.216-7(b)), the costs must be paid in the ordinary course of business. Of the $39,075 of overseas labor, we questioned $38,075 due to lack of pre-approval, with the remaining $1,000 reclassified as consulting costs in Legal & Professional Fees (see Note 3 below). The contractor was treating the overseas labor for A. Grechuck and A. Pavlenko as if those individuals were "employees", although they were actually acting in a consulting capacity. The contract terms specifically require that all consultants be pre-approved by the contracting officer; however, no approvals were provided. In addition, if the contractor does later demonstrate that pre-approvals were obtained, $9,475 of the $38,075 would still be questioned because it represents holdback costs. Again, accrued liabilities have been established for the "holdback" costs; however, since they still have not been paid to date, they would be considered unallowable.

b. Basis of Proposed Costs:

The direct labor of $372,444 is based on booked costs supported by employee timesheets and includes wages accrued (not yet paid) in CY 1997.

c. Audit Evaluation:

We obtained the contractor's summary, by employee, of gross salaries incurred and paid in CY 1997. We randomly sampled labor entries supporting salaries incurred, and traced the hours back to the employee's timesheets without exception. Gross wages paid were verified to each employee's W-2 Wage and Tax Statement. Total salaries were traced to the contractor's general ledger for CY 1997, as were accrued wages payable.

d. Contractor's Reaction:

The contractor's representative, Mr. Alan Frederickson, President, understood the basis of our adjustment, but did not agree the costs should be questioned. For the U.S. labor, Die Casters considers it to be both valid and incurred, regardless of whether or not it has been paid to date. Also, DCI stated that if and when outside financing is received, the wages would be paid. In respect to the overseas labor, DCI stated that since the company treated the individuals as if they were employees and not consultants, pre-approvals from the contracting officer were not required. Also, DCI indicated that the PCO was aware DCI was utilizing these individuals.

e. Auditor's Response:

We informed the contractor that it is still our opinion that the holdback costs identified, because they have not been paid in the ordinary course of business, are considered unallowable and our opinion regarding the overseas labor remains unchanged. Noting that we issued a DCAA Form 1s' on 1995 and 1996's operations for the same reason, we also informed the contractor we would again be issuing a DCAA Form 1, recommending the costs be disapproved on the contract. It is also still our opinion that pre-approvals for consulting costs should have been obtained from the ACO. In addition, the balance of allowable overseas labor should be reclassified, because the individual to which the cost related was not an employee of the company (received no benefits & paid no taxes) and was being paid a fee, not a salary.

2. <u>Subcontracts (Equipment/Material)</u>

a. Summary of Conclusions:

We questioned $587,193 of the proposed subcontract costs, as shown below:

| Cost Element | Proposed | Audit Adjusted | Questioned |
|---|---|---|---|
| Litmash | $ 287,120 | $ 212,469 | $ 74,651 |
| Advanced Products | 388,909 | 287,793 | 101,116 |
| Lindberg/MPH | 117,613 | 87,033 | 30,580 |
| Visi-Track | 34,850 | 25,789 | 9,061 |
| Binom | 385,150 | 319,055 | 66,095 |
| HPM | 1,122,915 | 817,225 | 305,690 |
| Total Sub. (Equip./Mat'l) | $2,336,557 | $1,749,364 | $ 587,193 |

All of the costs questioned for Litmash, Advanced Products, Lindberg/MPH and Visi-track, as well as $12,095 and $287,133 of the costs questioned for Binom and HPM, respectively, represent payments withheld from the subcontractors on invoices submitted ($74,651 + $101,116 + $30,580 + $9,061 + $12,095 + $287,133 = $514,636). Although accrued liabilities have been established for these costs, they have not been paid in the ordinary course of business; in fact, they have not been paid to date. Therefore, the costs are considered unallowable per FAR 31.201-2 since, according to the contract terms (FAR 52.216-7(b)), the costs must be paid in the ordinary course of business. In addition, the remaining $72,557 ($54,000 of Binom costs and $18,557 of HPM costs) proposed was questioned because the costs had been booked per the contract terms, but not billed by the subcontractors. DCI had subcontracts with several subcontractors, a portion of which it never exercised. The subcontractor's never incurred or billed these costs. Nonetheless, DCI booked as incurred, the unexercised value of these subcontract agreements in CY 1997. Since this does not reflect an actual expense, these costs totaling $72,557 are questioned in their entirety. The combination of the above results in total questioned subcontract costs of $587,193.

b. Basis of Proposed Costs:

DCI included total subcontract costs incurred in CY 1997 based on the value of the subcontracts for CY 1997, which included both items invoiced and those not yet invoice. Therefore, it includes "holdback" costs not yet paid by DCI to the subcontractors.

c. Audit Evaluation:

We traced the subcontract costs to the general ledger. We transaction tested the high dollar subcontractors (Litmash, Binom, HPM and Advanced products) from the entries in the detailed general ledger. The invoices supporting the entries were obtained and reviewed. The difference between the amounts billed on the invoice and the amounts paid, per cancelled checks (which we also verified) or wire transfers was calculated. Subcontract purchase orders were also obtained and reviewed.

d. Contractor's Reaction:

The contractor does not agree with our results (with the exception of questioning the $54,000 of Binom costs which DCI had removed in the CY 1998 submission instead) and stated they will not sign a rate agreement letter. The contractor feels that agreements with the subcontractors in which both parties agreed to the hold back 26% of the invoice submitted are valid and were incurred, regardless of whether or not they have been paid to date. Also, DCI stated that if and when outside financing is received, the subcontractors will be paid for the hold back costs.

e. Auditor's Response:

We informed the contractor that it is still our opinion that the costs identified, because they have not been paid in the ordinary course of business, are considered unallowable. We also informed the contractor we would again be issuing a DCAA Form 1, recommending these costs be disapproved.

3. Legal/Professional Fees

a. Summary of Conclusions:

We questioned $82,820 of the $94,233 proposed legal and professional fees as summarized below:

| | | Questioned Due To: | | |
|---|---|---|---|---|
| | | | Lack of | Total |
| Consultant | Proposed | Holdback | Pre-Approval | Questioned |
| Hintech, Int'l | $ 70,200 | $ 21,640 | $ 48,560 | $ 70,200 |
| A. Pavlenko | 10,462 | | 10,462 | 10,462 |
| J. Passer | 12,146 | 3,158 | | 3,158 |
| Other/Misc. | 1,425 | 0 | 0 | 0 |
| Subtotal | $ 94,233 | $ 24,798 | $ 59,022 | $ 83,820 |
| Reclassified: | | | | |
| From DL (net) | 0 | 0 | (1,000) | (1,000) |
| Total | $ 94,233 | $ 24,798 | $ 58,022 | $ 82,820 |

( ) = Denotes upward adjustment.

Hintech, Int'l and Alexander Pavlenko costs of $70,200 and $10,462 were questioned in their entirety. The contract terms specifically require that all consultants be pre-approved by the contracting officer; however, no approvals were provided by the contractor for these consultants. In addition, the Hintech, Int'l consulting costs are unallowable per FAR 31.205-33 (f)(2)&(3), in

that there were no timesheets, detailed invoices, records of work products etc. as required to properly support these costs. Also, per FAR 31.201-3(a), no presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by a contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable. The contractor offered no such proof. Also, included in the $70,200 is $21,640 of unpaid Hintech "holdback" fees considered unallowable per FAR 31.201-2 since, according to the contract terms (FAR 52.216-7(b)), the costs must be paid in the ordinary course of business. $3,158 of costs for J. Passer were also questioned because they represent holdback of payments on services provided. In addition, we reclassified from Direct Labor to Legal and Professional Fees the $1,000 balance of the claimed overseas direct labor of $39,075, which was actually consulting costs, as discussed in Note 1 above. This cost represents consultant fees for Alexander Grechuck. The contractor was treating this cost as direct labor when the individual was actually acting in a consulting capacity. We have taken no exception to this claimed cost since it represents the balance of allowable pre-approved consulting costs remaining from the costs incurred in the prior year, per the contracting officer's approval letter.

b. Basis of Proposed Costs:

The proposed costs are based on monthly retainer fees, invoices and other miscellaneous expenses, per consulting agreements, as booked by the contractor in CY 1997.

c. Audit Evaluation:

We audited all the consultant costs, with the exception of the "other/misc." due to lack of materiality. We obtained and reviewed the terms of the consulting agreements. We also obtained the contracting officer's pre-approval letter for the J. Passer legal fees and reviewed detailed invoices and canceled checks, as applicable and available.

d. Contractor's Reaction:

The contractor does not agree with our results and stated they will not sign a rate agreement letter. With respect to the lack of obtaining pre-approvals, the contractor feels that although pre-approval letters may not have been obtained, the services provided were a necessary and allowable expense. In terms of the holdback issue, as previously stated, DCI stated oral, and in some cases written agreements were in place, in which both parties agreed to the hold back, and that the costs DCI submitted are valid, regardless of whether or not they have been paid to date.

e. Auditor's Response:

It is still our opinion that pre-approvals for consulting costs should have been obtained from the ACO and that, in addition, Hintech consulting costs are not supported and are expressly unallowable per the FAR. The net allowable cost for overseas labor should have been reclassified, because the individual was not an employee of the company (received no benefits & paid no taxes) and was being paid a fee, not a salary. Lastly, with regard to the "holdback" issue, we informed the contractor that it is still our opinion that the costs identified, because they have not been paid in the ordinary course of business, are considered unallowable. Therefore, we will recommend all these costs be disapproved in the DCAA Form 1s.

4. Travel

a. Summary of Conclusions:

We questioned $20,338 of the $104,511 proposed direct travel costs in accordance with FAR 31.201-6(a), since they are directly related to the unallowable consultant costs (See Note 3 above). Of that amount, $9,181 represents travel costs incurred by Vladimir Hintze (President of Hintech Int'l) which are directly related to the unallowable consultant fees claimed for Hintech. The remaining $6,471 and $4,686 represent travel costs incurred by Alexander Grechuck and Alexander Pavlenko, respectively, which are directly related to their unallowable consulting fees.

b. Basis of Proposed Costs:

The proposed costs include transportation, lodging and other travel related costs which are supported by expense reports and invoices, as applicable.

c. Audit Evaluation:

We randomly sampled each of the three main areas of travel costs, selected from the detailed general ledger, and traced the costs back to expense reports and invoices and identified back to the public voucher where the costs were billed. The original sample was expanded to include any entries that appeared to be related to Vladimir Hintze, Alexander Grechuck and Alexander Pavlenko in order to identify those related travel expenses.

d. Contractor's Reaction:

As stated in Note 3 above, the contractor did not agree with the questioned direct costs, and therefore did not agree with the questioned related travel expenses.

e. Auditor's Response:

We still consider the Hintech consulting costs as not supported and expressly unallowable per the FAR. Also, we consider the Grechuck and Pavlenko costs to be unallowable since no required contracting officer approval for the costs had been obtained and that related travel costs should therefore be considered unallowable per the FAR. Therefore, we will recommend those costs be disapproved on the DCAA Form 1.

# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT NO. 6201-1998B10100865

September 19, 2001

**PREPARED FOR:** Contracting Officer
ATTN: Mr. Herbert Thompson, Contracting Officer
Defense Threat Reduction Agency/AMC
Formerly, Defense Special Weapons Agency (DSWA)
8725 John J. Kingman Drive, MSC 6201
Ft. Belvoir, VA 22060-6201

**PREPARED BY:** Northern New Jersey Branch Office
Building 350 South
Picatinny Arsenal
Picatinny, NJ 07806-5000
Telephone No. (973) 724-4932
FAX No. (973) 724-2187
E-mail Address DCAA-FAO6201@dcaa.mil

**SUBJECT:** Audit of Incurred Costs for Calendar Year 1998

**CONTRACTOR:** Die Casters International, Inc. (DCI)
One Spruce Terrace
Wayne, NJ 07470

**REPORT RELEASE RESTRICTIONS:** See Page 24

**CONTENTS:**


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 1 |
| Results of Audit | 2 |
| Contractor's Organization and Systems | 22 |
| DCAA Personnel and Report Authorization | 23 |
| Audit Report Distribution and Restrictions | 24 |
| App. 1 - Contractor's Certificate of Indirect Costs | 25 |
| App. 2 - DCAA Form 1, Notice 1 - Unallowable Costs | 26 |
| App. 3 - DCAA Form 1, Notice 2 - Holdback Costs | 30 |
| App. 4 - DCAA Form 1, Notice 1- Performance Period | 33 |
| App. 5 - DCAA Form 1, Notice 1 – Excess Billed Costs | 36 |

## SUBJECT OF AUDIT

We examined Die Casters International, Inc.'s (DCI's) May 27, 2000 and updated July 21, 2000 certified indirect cost proposal and related books and records for reimbursement of Calendar Year (CY) 1998 incurred costs. The purpose of the examination was to determine the allowability of direct costs and indirect cost rates and establish audit determined indirect cost rates for January 1, 1998 through December 31, 1998. The proposed rates apply to the contractor's sole contract in that year, cost share contract No. DNA001-95-C-0169. A copy of DCI's Certificate of Final Indirect Costs, revised July 21, 2000, is included as Appendix 1 to the report (see page 24).

The proposal is the responsibility of the contractor. Our responsibility is to express an opinion based on our examination.

## EXECUTIVE SUMMARY

We questioned $333,229 of booked direct costs. The majority of questioned direct costs were for $257,291 of direct labor and $58,319 of legal & professional fees. We also questioned $6,793 of the contractor's proposed overhead expenses of $17,824, and reduced the direct labor base, resulting in an upward adjustment to the proposed overhead rate from 6.88% to 54.83%. We questioned $10,246 of the G&A expense pool and reduced the total cost input base by $289,655. The net impact of the adjustments to G&A resulted in an increase to the G&A rate from 9.01% to 32.16%.

## SCOPE OF AUDIT

Except as noted below, we conducted our examination in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the examination to obtain reasonable assurance about whether the data and records examined are free of material misstatement. An examination includes:

- evaluating the contractor's internal controls, assessing control risk and determining the extent of audit testing needed based on the control risk assessment;
- examining, on a test basis, evidence supporting the amounts and disclosures in the data and records reviewed;
- assessing the accounting principles used and significant estimates made by the contractor;
- evaluating the overall data and records presentation; and
- determining the need for technical specialist assistance.

We evaluated the proposal using the applicable requirements contained in the:

- Federal Acquisition Regulation (FAR);
- DoD FAR Supplement (DFARS); and
- Contract Provisions.

The contractor claims exemption under 48 CFR 9903.201-1(b)(3) from the practices required by the Cost Accounting Standards Board rules and regulations because it considers itself a small business concern.

The concurrent verification of labor was omitted in this review.

As detailed in our Audit Report No. 6201-95B17740130, dated February 22, 1995, DCI's accounting system was considered adequate. However, the last initial pricing audit report (A/R No. 6201-95B210000150, dated April 11, 1995) disclosed that the contractor needed to properly define its direct labor/indirect labor functions and adjust its indirect rate calculations. Also, DCI is a small company with limited resources to be applied to compliance procedures and testing. Our audit scope reflects the risk of unallowable costs being included in the submission and includes expanded testing to provide a reasonable basis for our opinion.

## RESULTS OF AUDIT

Direct Costs. In our opinion, the contractor's claimed direct costs are provisionally approved as adjusted by our examination. We questioned $333,229 of direct costs claimed under Contract No. DNA001-95-C-0169. A significant portion resulted from the contractor's inclusion in its indirect expense proposal of accrued direct and indirect costs not yet paid. Questioned direct costs are summarized below and detailed in Exhibit C. Direct costs not questioned are provisionally approved pending final acceptance. Final acceptance of amounts proposed under government contracts does not take place until performance under the contract is completed and accepted by the cognizant authorities and the audit responsibilities have been completed. Refer to Exhibit D for our determination of allowable CY 1998 contract costs. The contractor did not agree with the majority of our findings and recommendations. The nonconcurred disapproved amounts are set out in the DCAA Form 1s' attached as Appendices 2, 3 and 4.

| | Claimed | Questioned | Ref. | Page |
|---|---|---|---|---|
| Direct Costs Incurred | $340,362 | $333,229 | | |
| Less DCI 26% Cost Share | 88,494 | (86,640) | | |
| Net Direct Cost | $251,868 | $246,589 | Exh. C | 12 |

Indirect Rates. In our opinion, the contractor's proposed overhead and G&A rates are not acceptable as proposed. The examination results and recommendations are summarized below and detailed in Exhibits A and B, respectively. The contractor did not accept any of our findings and recommendations. The amounts disapproved are set out in the DCAA Form 1 attached as Appendix 3.

| | | Proposed | | Questioned | | Ref. | Page |
|---|---|---|---|---|---|---|---|
| Indirect Category | | Indirect Expense Pool | Cost Rate | Indirect Expense Pool | Cost Rate | | |
| Overhead | (a) | $17,824 | 6.88% | $6,793 | (47.95)% | Exh. A | 5 |
| G&A | (b) | $32,284 | 9.01% | $10,246 | (23.15)% | Exh. B | 8 |

( ) = Denotes an upward adjustment.

(a) Allocation Base – Direct Labor (proposed: $258,968; audit determined $20,119).
(b) Allocation Base - Total cost input (proposed: $358,186; audit determined $68,531).

GOVERNMENT PARTICIPATION IN ALLOCATION BASES

| Contract Type in Allocation Base | CY 1998 Indirect Expense Pool Overhead | G&A |
|---|---|---|
| Gov't Cost Share Flexibly Priced | 100.00% | 100.00% |
| Gov't Firm Fixed Price & Commercial Work | 0.00 | 0.00 |
| Total Participation | 100.00% | 100.00% |

None of the indirect costs questioned in this audit appear to be subject to the penalties provided in DFARS 231.7002.

The contractor's Certificate of Final Indirect Costs, dated July 21, 2000, is attached as Appendix 1.

Although contract costs have not been settled for CYs 1995-1997, we are providing our determination of the cumulative allowable costs on the subject contract through CY 1998 in Exhibit E.

The contractor billed its overhead and G&A at approximately 7.02% and 7.13%, respectively. These percentages represent the contractor's estimate of its CY 1998 booked rates adjusted for possible unallowables. We take no exception to this manner of developing the contractor's billing rates.

We provided and discussed the audit results with the contractor's representative, Mr. Alan Frederickson, President, on an ongoing basis during the examination and again on January 4, 2001 and March 9, 2001. Mr. Frederickson understood the basis of our adjustments but did not agree with our results and would not sign a final indirect cost rate agreement.

Accordingly, we have prepared DCAA Form 1s reflecting the impact of our questioned costs on the contractor's billings to the government (see Appendices 2, 3 and 4).

We advised the contracting officer of the areas of disagreement on March 7, 2001 and the resulting need for our issuance of the DCAA Form 1s (see Appendix 2 and 3) to this report. The contracting officer concurred with our basis for issuing the DCAA Form 1s.

**STATEMENT OF PROPOSED CY 1998 DIRECT COSTS AND RESULTS OF AUDIT**

| Cost Element | | Proposed | Voluntary Deletions | Net Claimed | Audit Adjusted | Questioned | Notes | Page |
|---|---|---|---|---|---|---|---|---|
| Direct Labor | (A) | $ 258,968 | | $ 258,968 | $ 1,677 | $257,291 | 1 | 11 |
| ODCs: | | | | | | | | |
| Subs (Equip./Mat'l) | | $(29,402) | | $(29,402) | | $(29,402) | 2 | 13 |
| Freight | | 2,064 | | 2,064 | | 2,064 | 3 | 14 |
| Misc. Office | | 28,655 | | 28,655 | 2,388 | 26,267 | 3 | 14 |
| Legal/Professional | | 58,319 | | 58,319 | | 58,391 | 4 | 14 |
| Travel | | 22,291 | 533 | 21,758 | 3,068 | 18,690 | 5 | 17 |
| Subtotal ODCs | (B) | $ 81,927 | $ 533 | $ 81,934 | $ 5,456 | $75,938 | | |
| Ttotal Direct | (A+B) | $ 340,895 | $ 533 | $340,362 | $ 7,133 | $333,229 | | |
| DCI 26% Cost Share | | (88,633) | (139) | (88,494) | (1,854) | (86,640) | | |
| Net Direct Cost | | $252,262 | $ 394 | $251,868 | $ 5,279 | $246,589 | | |

Explanatory Notes:

1. Direct Labor Costs

a. Summary of Conclusions:

The proposed direct labor consists of $214,568 of U.S. labor and $44,400 of overseas labor, which is actually consulting costs. Of the U.S. labor, $194,449 was questioned because it represents that portion of the direct gross wages incurred in CY 1998, but not yet paid by the company to its employees. Although accrued liabilities have been established for these costs, they have not been paid in the ordinary course of business; nor have they been paid to date. Therefore, the costs are considered unallowable per FAR 31.201-2 since, according to the contract terms (FAR 52.216-7(b)), the costs must be paid in the ordinary course of business. The overseas labor of $44,400, which is consulting cost, was reclassified as consulting costs in Legal & Professional Fees (See note 4 below). The contractor was treating the overseas labor for A. Grechuck and A. Pavlenko as if those individuals were "employees", although they were actually acting in a consulting capacity. The contract terms specifically require that all consultants be pre-approved by the contracting officer; however, no approvals were provided. In addition, if the contractor does later demonstrate that pre-approvals were obtained, $32,750 of the $44,400 would still be questioned because it represents holdback costs. Again, accrued liabilities have been established for the "holdback" costs; however, since they still have not been paid to date, they would be considered unallowable. Also, of the $44,400, $40,700 is outside the contract period of performance and would therefore be questioned as well. Of the $20,119 balance of costs remaining ($258,968 - $194,449 - $44,400 = $20,119), eleven months were booked outside

the contract period of performance of January 30, 1998. These costs, in the amount of $18,442 ($20,119 x 11/12), although otherwise allowable, were questioned because they extended beyond the contract performance period.

b. Basis of Proposed Costs:

The direct labor of $258,968 is based on booked costs supported by employee timesheets and includes wages accrued (not yet paid) in CY 1998.

c. Audit Evaluation:

We obtained the contractor's summary, by employee, of gross salaries incurred and paid in CY 1998. Labor entries were randomly sampled utilizing multi-year audit techniques during the CY 1997 audit, where hours were traced to the employee's timesheets without exception. Gross wages paid were verified to each employee's W-2 Wage and Tax Statement. Total salaries were traced to the contractor's general ledger for CY 1998, as were accrued wages payable.

d. Contractor's Reaction:

The contractor's representative, Mr. Alan Frederickson, President, understood the basis of our adjustment, but did not agree the costs should be questioned. For the U.S. labor, Die Casters considers it to be both valid and incurred, regardless of whether or not it has been paid to date. Also, DCI stated that if and when outside financing is received, the wages would be paid. In respect to the overseas labor, DCI stated that since the company treated the individuals as if they were employees and not consultants, pre-approvals from the contracting officer were not required. With regard to the contract period of performance, DCI stated DTRA was aware they were still working on the contract; however, to date, DCI has not received a formal modification from DTRA extending the period of performance beyond the January 30, 1998 date.

e. Auditor's Response:

We informed the contractor that it is still our opinion that the holdback costs identified, because they have not been paid in the ordinary course of business, are considered unallowable. Noting that we issued DCAA Form 1s on prior year's operations for the same reason, we also informed the contractor we would again be issuing a DCAA Form 1, recommending the costs be disapproved on the contract. It is also still our opinion that pre-approvals for consulting costs should have been obtained from the ACO, and our opinion regarding the period of performance remains unchanged. We will also be issuing a separate DCAA Form 1, recommending the costs outside the contract performance period be disapproved on the contract.

2. Subcontracts (Equipment/Material)

a. Summary of Conclusions:

We adjusted the proposed subcontract costs upward by $29,402, as shown below:

| Cost Element | Proposed | Audit Adjusted | Questioned |
|---|---|---|---|
| Litmash | $ 5,000 | | $ 5,000 |
| Binom | (54,000) | | (54,000) |
| HPM | 19,598 | | 19,598 |
| Total Sub. (Equip./Mat'l) | $(29,402) | $ 0 | $ (29,402) |

( ) = Denotes upward adjustment.

The contractor reversed an entry of $54,000 recorded in CY 1997 for a portion of cost on the subcontract that they booked, per the purchase order value, but that portion was never exercised. Since we already questioned that cost in the CY 1997 audit, it should not be reversed out in the current year. In addition, we questioned the $5,000 of Litmash costs booked and $19,598 of HPM costs booked, since they extended beyond the contract performance period of January 30, 1998. Of the $19,598 questioned for HPM, $5,096 also represents payments withheld from the subcontractor on their invoice submitted for costs incurred. Although an accrued liability has been established for this cost, it has not been paid in the ordinary course of business; in fact, it has not been paid to date. Therefore, those costs are also considered unallowable per FAR 31.201-2 since, according to the contract terms (FAR 52.216-7(b)), the costs must be paid in the ordinary course of business.

b. Basis of Proposed Costs:

DCI included subcontract costs incurred in CY 1998 based invoices received and the reversal of a prior year cost that was booked but not incurred. A portion of the costs includes "holdback" costs not yet paid by DCI to the subcontractor and costs booked outside the contract period of performance.

c. Audit Evaluation:

We traced the subcontract costs to the general ledger. The invoices supporting the entries were obtained and reviewed. The difference between the amounts billed on the invoice and the amounts paid, per cancelled checks (which we also verified) or wire transfers was calculated. Subcontract purchase orders were also obtained and reviewed. Costs outside the contract performance period were identified and an accounts payable aging report was obtained to verify holdback amounts.

d. Contractor's Reaction:

The contractor does not agree with our results (with the exception of the elimination of the reversal of the $54,000 of Binom costs) and stated they will not sign a rate agreement letter. The contractor stated that both parties agreed to the holdback 26% of the invoice submitted and that the costs are valid and were incurred, regardless of whether or not they have been paid to date. Also, DCI
stated that if and when outside financing is received, the subcontractor will be paid for the holdback costs. With regard to the contract period of performance, DCI stated DTRA was aware they were still working on the contract, but, to date, DCI has not received a formal modification from DTRA extending the period of performance.

e. Auditor's Response:

We informed the contractor that it is still our opinion that the costs identified, because they have not been paid in the ordinary course of business, are considered unallowable. We also informed the contractor we would again be issuing a DCAA Form 1, recommending these costs be disapproved on the contract. In our opinion, with regard to the costs outside the performance period, the contractor should have obtained a modification to the contract extending the performance period, or halted effort on the contract until such modification was obtained. Therefore, we will also be issuing a separate DCAA Form 1, recommending the costs outside the contract performance period be disapproved on the contract.

3. Freight/ Misc. Office

a. Summary of Conclusions:

We questioned $2,064 of freight costs and $26,267 of miscellaneous office expenses, because, although otherwise allowable, they represent costs incurred outside of the contract performance period end date of January 30, 1998.

b. Basis of Proposed Costs:

The proposed costs are based on freight costs and other monthly office expenses, as booked by the contractor in CY 1998.

c. Audit Evaluation:

Our evaluation was limited to verifying the costs to the general ledger and identifying/adjusting the costs incurred that were outside the contract performance period.

d. Contractor's Reaction:

The contractor does not agree with our results and stated they will not sign a rate agreement letter. DCI stated DTRA was aware they were still working on the contract, but, to date, DCI has not received a formal modification from DTRA extending the period of performance.

e. Auditor's Response:

It is our opinion that the contractor should have obtained a modification to the contract extending the performance period, or halted effort on the contract until such modification was obtained. Therefore, we will recommend these costs be disapproved on the DCAA Form 1 (See Appendix 4).

4. Legal & Professional Fees:

a. Summary of Conclusions:

We questioned all of the $58,319 proposed legal and professional fees as summarized below:

| | | Questioned Due To: | | | |
|---|---|---|---|---|---|
| Consultant | Proposed | Holdback | Lack of Pre-Approval | Beyond Per. of Perf. | Total Questioned |
| Hintech, Int'l | $ 60,000 | $ 51,100 | $ 8,900 | | $ 60,000 |
| A. Pavlenko | (6,000) | | (6,000) | | (6,000) |
| Other/Misc. | 4,319 | | | $ 4,319 | 4,319 |
| Subtotal | $ 58,319 | $ 51,100 | $ 2,900 | $ 4,319 | $ 58,319 |
| Reclassified: | | | | | |
| From DL | | (32,750) | (11,650) | | (44,400) |
| To Consulting | | 32,750 | 11,650 | | 44,400 |
| Total | $ 58,319 | $ 51,100 | $ 2,900 | $ 4,319 | $ 58,319 |

( ) = Denotes Upward Adjustment

Hintech, Int'l costs of $60,000 were questioned in their entirety. The contract terms specifically require that all consultants be pre-approved by the contracting officer; however, no approvals were provided by the contractor for this consultant. In addition, the Hintech, Int'l consulting costs are unallowable per FAR 31.205-33 (f)(2)&(3), in that there were no timesheets, detailed invoices, or records of work products etc. as required to properly support these costs. Also, per FAR 31.201-3(a), no presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by a contracting officer or the contracting officer's representative, the burden of proof shall be upon

the contractor to establish that such cost is reasonable. The contractor offered no such proof. Also included in the $60,000 is $47,400 of unpaid Hintech "holdback" fees considered unallowable per FAR 31.201-2 since, according to the contract terms (FAR 52.216-7(b)), the costs must be paid in the ordinary course of business. Also included in the $60,000 is $55,000 of costs incurred after the contract period of performance, which would also be questioned for that reason. We eliminated the credit for A. Pavlenko's expenses of $6,000, which represents a reversal of CY 1997 expenses. Since we already questioned those expenses in our CY 1997 audit, they should not be removed again. In addition, we reclassified from Direct Labor to Legal & Professional Fees, the overseas direct labor, which was actually consulting costs, as discussed in note 1 above. The costs represent consulting fees of Alexander Grechuck and Alexander Pavlenko. The contractor was treating these costs as direct labor, when the individuals were actually acting in a consulting capacity. The contract terms specifically require that all consultants be pre-approved by the contracting officer; however, no approvals were obtained. Therefore, the reclassified costs were questioned in their entirety. It should be noted that of the $44,400 cost questioned, $32,750 is also questioned because it represents holdback that has not been paid to date. Also, of the $44,400, $40,700 is also outside the contract performance period and would be questioned for that reason as well. Lastly, we questioned 100% of claimed Other/Misc. expense of $4,319 because all of the costs, which are otherwise allowable, are questioned entirely because they were incurred after the contractor's period of performance of January 30, 1998.

b. Basis of Proposed Costs:

The proposed costs are based on monthly retainer fees, as booked by the contractor in CY 1998, and other miscellaneous booked expenses.

c. Audit Evaluation:

Our evaluation was limited to the Hintech legal fees, adjusting the reversal of A. Pavlenko fees, reclassifying overseas labor as consulting cost and quantifying any costs booked which were incurred after January 30, 1998 (the contract performance period end date). No further documentation regarding Hintech was available for review.

d. Contractor's Reaction:

The contractor does not agree with our results and stated they will not sign a rate agreement letter. With respect to the lack of obtaining pre-approvals, the contractor feels that although pre-approval letters may not have been obtained, the services provided were a necessary and allowable expense. For the reclassified labor, DCI feels that since the company treated the individuals as if they were employees and not consultants, pre-approvals from the contracting officer were not required. Also, DCI indicated that DTRA was aware DCI was utilizing these individuals. In terms of the holdback issue, as previously stated, DCI feels oral, and in some

cases written agreements were in place, in which both parties agreed to the hold back, and that the costs DCI submitted are valid, regardless of whether or not they have been paid to date. Lastly, with regard to the contract period of performance, DCI stated DTRA was aware they were still working on the contract, but, to date, DCI has not received a formal modification from DTRA extending the period of performance.

e. Auditor's Response:

It is still our opinion that pre-approvals for consulting costs should have been obtained from the ACO and that, in addition, Hintech consulting costs are not supported and are expressly unallowable per the FAR. The costs proposed as overseas labor should have been reclassified, because the individuals were not employees of the company (received no benefits & paid no taxes) and were being paid a fee, not a salary. With regard to the "holdback" issue, we informed the contractor that it is still our opinion that the costs identified, because they have not been paid in the ordinary course of business, are considered unallowable. Lastly, in our opinion, the contractor should have obtained a modification to the contract extending the performance period, or halted effort on the contract until such modification was obtained. Therefore, we will recommend all these costs be disapproved in the DCAA Form 1s.

5. Travel

a. Summary of Conclusions:

We questioned $18,690 of the claimed $21,758 ($22,291 – $533 = $21,758) direct travel costs in accordance with FAR 31.201-6(a). Of that amount, $2,952 represents travel costs incurred by Vladimir Hintze (President of Hintech Int'l) which are directly related to the unallowable professional fees claimed for Hintech (See Note 4 above). Also, included in that amount are $2,932 and $1,212 of travel costs incurred by Alexander Pavlenko and Alexander Grechuck, respectively, which are directly related to their unallowable labor and consulting costs (See Notes 2 and 4 above). Of the remaining $14,622 ($21,758 - $2,952 - $2,932 - $1,212 = $14,662) we questioned $11,594. This represents costs, although otherwise allowable, that were incurred outside the contract performance period of January 30, 1998.

b. Basis of Proposed Costs:

The proposed costs include transportation, lodging and other travel related costs which are supported by expense reports and invoices, as applicable.

c. Audit Evaluation:

Costs were traced to the contractor's detailed general ledger only, since the CY 1997 audit tested the costs back to expense reports, invoices and public vouchers without exception.

d. Contractor's Reaction:

As stated in Note 4 above, the contractor did not agree with the questioned direct costs, and therefore did not agree with the questioned related travel expenses. With regard to the contract period of performance, DCI stated DTRA was aware they were still working on the contract, but,to date, DCI has not received a formal modification from DTRA extending the period of performance.

e. Auditor's Response:

We still consider the Hintech consulting costs as not supported and expressly unallowable per the FAR. Also, we consider the Grechuck and Pavlenko costs to be unallowable since no required contracting officer approval for the costs was obtained, and that related travel costs should be considered unallowable per the FAR. Therefore, we will recommend those costs be disapproved on the DCAA Form 1. Also, the contractor should have obtained a modification to the contract extending the performance period or halted effort on the contract until such modification was obtained. Therefore, we will recommend those costs also be disapproved on the DCAA Form 1 (See Appendices 2 and 4).

OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE
3500 DEFENSE PENTAGON
WASHINGTON, DC 20301-2900

STRATEGY AND THREAT REDUCTION

5 May
Cited/Frank
Recommend you concur w/approach proposed.
Susan

MEMORANDUM FOR DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR THREAT REDUCTION POLICY

FROM: DIRECTOR OF COOPERATIVE THREAT REDUCTION POLICY, (S&TR/CTR)
Prepared by: Palevitz, CTR, 693-0289/West, DTRA

5/5/00

Yes
— No
— Other

SUBJECT: Provision of Additional Funding to Die Casters International, Inc. Defense Conversion Project in Ukraine

**BACKGROUND**: In your memo to Bill Taylor on February 11, 2000 you explained that it was necessary to proceed with the allocation of additional defense conversion funds to the DCI-Burevestnik joint venture to permit installation of previously purchased machinery and completion of this project (TAB A). You requested the benefit of Bill's views on this issue. Since the date of your memo we've had two separate discussions with Kim Savit, who has raised a number of concerns (in bold) addressed below. Also, the DoD IG has closed its investigation of DCI billing practices without any conclusion of wrongdoing, and no action will be taken against DCI.

Most immediately, however, **equipment for this project in storage in Moldova is now in imminent danger of being confiscated**. The approximately $1.4 million worth of equipment purchased with DoD and DCI funds was shipped to Moldova for DCI developed modification. These modifications were completed over two years ago. Due to the delays in project funding, however, DCI has been unable to ship the equipment from Moldova, and it has now been in Moldova far longer than the customs officials normally allow. Moldavian customs has declared that DCI must either ship the equipment, pay import duties, or they will confiscate the equipment. DCI does not have the funds to pay the import duties nor would we want to. If we are to prevent the equipment from being confiscated, we need to move quickly to fund DCI and ship the equipment to Kiev for installation.

**DISCUSSION**: The CTR Policy and DTRA/CT facts address the issues that Kim has raised.

- Issue: **Why are we responsible to prevent the equipment in Moldova from being confiscated? It should be DCI's responsibility, not the USG. Who owns the equipment? DoD or DCI? Why not just sell it off?** DoD is responsible because it has 75% ownership of the equipment until the completion of the contract. DCI is not responsible for protection of the equipment once the contract funding is exhausted. While it may be possible to sell the equipment, DoD does not have clear title to it and selling it does not achieve our defense conversion objectives.

- Issue: <u>Is the contract complete? Does DoD owe DCI any more funding?</u> No, the original contract is not complete. DoD does not owe DCI additional funding, but DCI can not complete the contract without additional funding. If DoD chooses not to fund the contract, DoD will have to close the contract and make a decision regarding disposition of the equipment. Since the equipment is approximately 75% government owned, DoD has a vested interest in its disposition.

- Issue: <u>Die Casters is untrustworthy and improperly billing the government.</u> In two and a half years of investigation DCAA and the DoD IG were unable to find any evidence of improper billing. Die Casters submitted $4 million in vouchers and was reimbursed in accordance with the contract $3 million for the work performed. Die Casters funded the remaining $1 million.

- Issue: <u>Die Casters put nothing of its own into the venture and DCI president Frederickson merely took out loans to fund DCI's portion of the work.</u> This was a cost share contract. DoD provided 75% of the funding; DCI provided the remaining 25%. DoD IG has verified the invoices submitted to the DoD for $4 million were valid expenses. Since DoD only reimbursed DCI for $3 million, DCI's investment was $1 million. If Die Casters took out loans to finance its portion of the work that is entirely allowable.

- Issue: <u>What happened to the other million</u>? Of the $4 million expended on this project to date, approximately $3 million went to equipment expenses and the remaining $1 million went to project development costs, DCI overhead, initial work with Meridian before that company withdrew from the project, and searching for and establishing a business relationship with a new partner (Burevestnik).

- Issue: <u>DoD spent $3 million and got nothing for it.</u> Die Casters went beyond normal expectations. When their first DoD approved partner opted out of the venture, DCI searched out another potential partner. DoD approved the new partner and DCI established a business relationship with the new partner. Of the $4 million expended, $2.97 million went for equipment purchases-the approximate value of the portion reimbursed by DoD . This equipment, once installed, will upgrade production and create additional employment at an existing die cast business that had $2.2 million in sales last year. This new die cast equipment will be housed in a building formerly devoted to military production.

- Issue: <u>Die Casters will just use follow-on DoD funding to pay previous debt.</u> In the two years of audit and investigation DCAA and the DoD IG found nothing improper. The contract with DCI will be structured, as all CTR contracts are, to pay the contractor after the work is complete.

- Issue: <u>Die Casters has no business plan and has been unable to get venture capital funding</u>. First, the state of the Ukrainian economy has been quite poor and not a major draw for venture capitalists. Second, it is unlikely venture capitalists would make an initial investment in a firm that is under investigation as Die Casters has been for the past two and a half years. Finally, DCI does have a business plan, which served as the basis for the DoD funding. The cost data in this plan, now several months old, will be revised to accurately

reflect the anticipated costs of the remaining activities for this project.

- Issue: **The State Department was told by the Defense Enterprise Fund that the DCI plan could not pass due diligence as a viable investment.** First, this project is not about investing. DoD does not expect a financial return on our investment. We expect conversion of former WMD production assets. Second, the DCI plan that the DEF reviewed was with Meridian, a company with no die cast experience and no viable contribution other than a building. Meridian pulled out of the project in 1997. The current project is with Burevestnik as a partner. Burevestnik has significant die cast experience, and skilled management, in an on-going, profitable die cast business. An independent IESC evaluation of the Ukrainian partner concluded that it was a viable business. In short, we have the opportunity to get $3.5 million worth of conversion for $560,000.

- Issue: **If DCI has been cleared of improper billing and is no longer under investigation, why not let it pursue venture capital funding?** The venture capital process is a lengthy one. It takes a significant length of time to perform due diligence on a newly formed venture such as DCB (the resulting venture). With the equipment in storage in Moldova now subject to confiscation, there is insufficient time available for venture capitalists to evaluate this project.

- Issue: **There is sufficient time available for venture capitalists to evaluate this project.** Timeliness is a factor. DoD must move to protect the equipment in Moldova immediately. DoD is not evaluating this as an investment. We are evaluating it as a conversion opportunity. A venture capital firm would take significant time negotiating over ownership or pay back terms with the venture partners. DoD is not worried about return on investment and can avoid this lengthy process.

CONCLUSION: After reviewing these issues, we are persuaded that we can best accomplish our defense conversion objectives by the allocation of additional funding ($560,000) to complete the DCI project. We also note that the U.S.-Ukraine Business Council has strongly endorsed additional funding to complete the DCI project (TAB B). Although Kim is still not convinced, her written comments to us, which we have incorporated into this memo, state that she is prepared to defer to DoD's judgement on this issue.

RECOMMENDATION: Authorize CTR Policy to direct DTRA to contract with DCI to transport and install the previously purchased equipment (TAB C).

Approve JPM Disapprove ____________

Other:

for ELW

5 May 2000

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DIE CASTERS INTERNATIONAL, INC., Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1113C |
| | ) | (Judge Braden) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## DECLARATION OF MARK E. WEST

I, Mark E. West, declare as follows:

1. I am the Program Manager for Strategic Offensive Arms Elimination. I also have responsibility for remaining Defense Conversion efforts. The contract that is the subject of this litigation was part of the Defense Conversion/Ukraine Program.

2. I have been involved in Defense Conversion in various capacities since 1994.

3. I have personal knowledge of the following facts as a result of my participation in the procurement under Contract No. DNA001-95-C-0169 and from my review of the contract file.

4. Die Casters International, Inc. ("DCI") acquired equipment and arranged for part of it to be shipped to Tiraspol, Moldova for modification. DCI also acquired equipment that needed no substantial modification and it was shipped to Kiev, Ukraine, to await installation. DCI's stated intention was to install the modified equipment at a facility owned by Burevestnik, its proposed joint venture partner. The Burevestnik facility is located outside of Kiev, Ukraine.

5. The equipment that was temporarily imported into Moldova by or on behalf of DCI was modified, but it was never shipped to Ukraine.

6. On or about August 2, 2001 DTRA was notified by DCI that the equipment was in imminent danger of confiscation by the customs authorities in Moldova because it had been retained in Moldova for a period in excess of that permitted by its temporary import license.

7. On or about August 10, 2001 DTRA initiated action to protect its interest in the equipment by directing its logistics support contractor go to Moldova, take possession of the equipment, transport it to Kiev, and deliver it to Burevestnik.

8. Custody of the equipment was transferred to the Ministry of Industrial Policy of Ukraine in accordance with the Umbrella and Implementing Agreements for the beneficial use of Burevestnik. The United States spent $188,120 for shipping, an amount that probably includes payment of storage charges.

9. The transfer of custody of the equipment that had been stored in Moldova occurred effective December 21, 2001. A copy of the document affecting this transfer is Attachment 1, hereto.

10. The equipment stored in Kiev, Ukraine at the expense of the United States, was delivered to Burevestnik on January 24, 2002 and January 10, 2003. A copy of the documents affecting these transfers is Attachment 2, hereto.

11. The US Government currently retains title to the equipment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 16, 2004, at Fort Belvoir, Virginia.

MARK E. WEST
Program Manager

# REPORT OF TRANSFER OF U.S. GOVERNMENT EQUIPMENT
# АКТ ПЕРЕДАЧИ ОБОРУДОВАНИЯ АМЕРИКАНСКОГО ПРАВИТЕЛЬСТВА

Date: 21 December 2001
Дата: 21 декабря 2001 г.

This report is concluded by the undersigned representatives of the governments of the United States of America and Ukraine. The property consisting of die casting equipment as noted on one page of the attached inventory, has been delivered to Kiev State-Owned Enterprise Plant "Burevestnik" (Ministry of Industrial Policy of Ukraine) under shipment R0025-50100 in its entirety in accordance with Defense Threat Reduction Agency's direction. Exceptions and discrepancies, if any, are noted next to the items on the inventory page.

Настоящий акт составлен между нижеподписавшимися представителями правительств Соединенных Штатов Америки и Украины. Имущество, состоящее из литейного оборудования, указанного на одной странице прилагаемого акта инвентаризации, было доставлено на Киевское государственное предприятие завод «Буревестник» Министерства промышленной политики Украины (номер поставки - R0025-50100), в соответствии с распоряжением Агенства по Уменьшению Угрозы (АУУ) Министерства обороны США. Замечания, если таковые имеются, отмечены на странице акта инвентаризации.

Responsibility for the property has been transferred from the U.S. Department of Defense - Defense Threat Reduction Agency to the Ministry of Industrial Policy of Ukraine, Kiev State-Owned Enterprise Plant "Burevestnik". The total value of the property is 1,411,652.60 USD.

Ответственность за это имущество снимается с Агентства по Уменьшению Угрозы Министерства обороны США и возлагается на Киевское государственное предприятие завод «Буревестник» Министерства промышленной политики Украины. Общая стоимость этого имущества составляет 1411652,60 долларов США.

For the Defense Threat Reduction Agency (DTRA)
За Агенство по Уменьшению Угрозы (АУУ) Министерства обороны США

21 December 2001
Signature/Date

Tatiana Retivov
Printed

American representative
Представитель США
Tel. (044) 490-6666

For Kiev SOE Plant "Burevestnik", Ministry of Industrial Policy, Ukraine
За Киевский завод «Буревестник» Минпромполитики Украины

Подпись/Дата

Манко Виталий Иванович
Ф.И.О.

Ukrainian representative
Представитель Украины
Тел. (044) 553-0514

Ref: DTRA/CTR Program: Defense Conversion
OEM: HPM/DCI/Litmash
Equipment Desc.: Die Casting Machines and Trim Presses
Delivery Date: 14 December 2001



ATTACHMENT 1

| DTRA Shipment Number | Site Name/Location | DTRA Contract/PO Number (If available) | Project Name | Project Charge Account | Team Leader/Inventoried By | Date Inventoried |
|---|---|---|---|---|---|---|
| *R0025-50100* | *Kiev SOE Plant "Burevestnik"* | *DAM01-01-D-0194, K-S000006090* | *Defense Conversion* | *EB91U08AA* | *Ilya Segeda* | *12/20/01* |

| Line Item No. | "Asset Code" Equipment= E Component=C Spares = S Materials = M | Item Description | Описание | OEM (Manufacturer) | Part Number | Qty | Unit of Measure | Unit Cost | Total Cost | Remarks | Комментарии |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | E | DIE CASTING MACHINE 400 TON, CONSISTS OF: | МАШИНА ЛИТЬЯ ПОД ДАВЛЕНИЕМ 400 ТС, СОСТОЯЩАЯ ИЗ: | | | 3 | SE | | | | |
| 1.1 | E | DIE CASTING PRESS UNIT | УЗЕЛ ПРЕССОВАНИЯ | HPM | HPM-400 | 3 | EA | $170,000.00 | $510,000.00 | | |
| 1.1.1 | C | PRESS UNIT CONTROL SYSTEM | СТАНЦИЯ УПРАВЛЕНИЯ УЗЛА ПРЕССОВАНИЯ | LITMASH | 71109T.80.00.600 | 3 | EA | $60,000.00 | $180,000.00 | | |
| 1.2 | S | ASSEMBLY SET | СБОРОЧНЫЙ КОМПЛЕКТ | LITMASH | 711I09D.00.00.000 | 3 | EA | $50,000.00 | $150,000.00 | | |
| 1.3 | S | COOLING SYSTEM | СИСТЕМА ОХЛАЖДЕНИЯ | LITMASH | 711I11E.46.00.000 | 3 | EA | $1,000.00 | $3,000.00 | | |
| 1.4 | C | TRIM PRESS | ПРЕСС ОБРЕЗНОЙ | LITMASH | P25IR.00.00.000 | 3 | EA | $10,000.00 | $30,000.00 | | |
| 2 | E | DIE CASTING MACHINE 600 TON, CONSISTS OF: | МАШИНА ЛИТЬЯ ПОД ДАВЛЕНИЕМ 600 ТС, СОСТОЯЩАЯ ИЗ: | | | 1 | SE | | | | |
| 2.1 | E | DIE CASTING PRESS UNIT | УЗЕЛ ПРЕССОВАНИЯ | HPM | HPM-630 | 1 | EA | $309,472.60 | $309,472.60 | | |
| 2.1.1 | C | PRESS UNIT CONTROL SYSTEM | СТАНЦИЯ УПРАВЛЕНИЯ УЗЛА ПРЕССОВАНИЯ | LITMASH | 71110T.80.00.600 | 1 | EA | $60,000.00 | $60,000.00 | | |
| 2.2 | S | ASSEMBLY SET | СБОРОЧНЫЙ КОМПЛЕКТ | LITMASH | 711I10D.00.00.000 | 1 | EA | $55,489.00 | $55,489.00 | | |
| 2.2.1 | S | STAND | СТАНИНА | LITMASH | 71110T.11.00.000 | 1 | EA | $26,000.00 | $26,000.00 | | |
| 2.2.2 | S | LOCKING SYSTEM | МЕХАНИЗМ ЗАПИРАНИЯ | LITMASH | 71110T.30.00.000 | 1 | EA | $55,000.00 | $55,000.00 | | |
| 2.2.3 | S | GUARD | ОГРАЖДЕНИЕ | LITMASH | 71110T.41.00.000 | 1 | EA | $15,000.00 | $15,000.00 | | |
| 2.2.4 | S | COOLING SYSTEM | СИСТЕМА ОХЛАЖДЕНИЯ | LITMASH | 711I11E.46.00.000 | 1 | EA | $1,000.00 | $1,000.00 | | |
| 2.3 | S | SPARE PARTS | НАБОР КОМПЛЕКТУЮЩИХ (ЗИП) | LITMASH | N/A | 1 | EA | $16,691.00 | $16,691.00 | | |
| | | | | | | | | TOTAL | $1,411,652.60 | | |

66

Inventory by: И. Сеге Ilya Segeda

# REPORT OF TRANSFER OF U.S. GOVERNMENT EQUIPMENT
# АКТ ПЕРЕДАЧИ ОБОРУДОВАНИЯ АМЕРИКАНСКОГО ПРАВИТЕЛЬСТВА

Date: 24 January 2002
Дата: 24 января 2002 г.

This report is concluded by the undersigned representatives of the governments of the United States of America and Ukraine. The property consisting of die casting equipment components as noted on one page of the attached inventory, has been delivered to Kiev State-Owned Enterprise Plant "Burevestnik" (Ministry of Industrial Policy of Ukraine) under shipment KIE075IPU in its entirety in accordance with Defense Threat Reduction Agency's direction. Exceptions and discrepancies, if any, are noted next to the items on the inventory page.

Настоящий акт составлен между нижеподписавшимися представителями правительств Соединенных Штатов Америки и Украины. Имущество, состоящее из компонентов литейного оборудования, указанных на одной странице прилагаемого акта инвентаризации, было доставлено на Киевское государственное предприятие завод «Буревестник» Министерства промышленной политики Украины (номер поставки - KIE075IPU), в соответствии с распоряжением Агенства по Уменьшению Угрозы (АУУ) Министерства обороны США. Замечания, если таковые имеются, отмечены на странице акта инвентаризации.

Responsibility for the property has been transferred from the U.S. Department of Defense - Defense Threat Reduction Agency to the Ministry of Industrial Policy of Ukraine, Kiev State-Owned Enterprise Plant "Burevestnik". The total value of the property is 613,674.80 USD

Ответственность за это имущество снимается с Агентства по Уменьшению Угрозы Министерства обороны США и возлагается на Киевское государственное предприятие завод «Буревестник» Министерства промышленной политики Украины. Общая стоимость этого имущества составляет 613674.80 долларов США.

| For the Defense Threat Reduction Agency (DTRA)<br>За Агенство по Уменьшению Угрозы (АУУ) Министерства обороны США | For Kiev SOE Plant "Burevestnik", Ministry of Industrial Policy, Ukraine<br>За Киевский завод «Буревестник» Министр. политики Украины |
|---|---|
| T. Retivova 24.01.02<br>Signature/Date | 24.01.02<br>Подпись/Дата |
| Tatiana Retivov[a]<br>Printed | Мойко Виталий Иванович<br>ФИО |
| American re[presentative]<br>Представит[ель]<br>Tel. (044) 490 | Ukrainian representative<br>Представитель Украины<br>Тел. (044) 553-0514 |

Ref: DTRA/CTR Program: Defense Conversion
OEM/Vendor: Lindberg/Advance Products/HPM/BINOM/DCI
Equipment Desc.: Furnaces and Auxiliary Equipment
Delivery Date: 18 January 2002



ATTACHMENT 2

| DTRA Shipment Number | Site Name/Location | DTRA Contract/PO Number (if available) | Project Name | Project Charge Account | Team Leader/Inventoried By | Date Inventoried |
|---|---|---|---|---|---|---|
| *KIE075IPU* | *Kiev SOE Plant "Burevestnik"* | *Vendor PO ## DCI97-013, DCI97-014, DCI97-017* | *Defense Conversion* | *EB91U08AA* | *Vladimir Taran* | *1/18/02* |

| Line Item No. | "Asset Code" Equipment= E Component=C Spares = S Materials = M | Item Description | Описание | OEM (Manufacturer) | Part Number | Qty | Unit of Measure | Unit Cost | Total Cost | Remarks | Комментарии |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | E | FURNACE, HOLIMESY HOLDING, 2,220 LB ALUMINIUM HOLDING CAPACITY, 18 KW, 240/480V, 50HZ, SINGLE PHASE | ПЕЧЬ, РАЗДАТОЧНАЯ, ЕМКОСТЬ ПО АЛЮМИНИЮ 2,200 ФУНТОВ, 18 КВТ, 240/480В, 50 ГЦ, 1 ФАЗА | LINDBERG MPH | 62-SH1816-L | 4 | EA | $28,188.00 | $112,752.00 | | |
| 1.1 | S | ELEMENT, HEATING, 240V, 3 KW, SIDE LOADING, HOLIMESY | ЭЛЕМЕНТ, НАГРЕВАТЕЛЬНЫЙ, 240В, 3 КВ, БОКОВАЯ ЗАГРУЗКА | LINDBERG MPH | SL3000HE | 12 | EA | $87.00 | $1,044.00 | | |
| 1.2 | S | BRACKET, SUPPORT, HEATING ELEMENT | КРОНШТЕЙН, ОПОРНЫЙ, ДЛЯ НАГРЕВАТЕЛЬНОГО ЭЛЕМЕНТА | LINDBERG MPH | SL1006H | 24 | EA | $17.45 | $418.80 | | |
| 1.3 | S | T/C K-1861.5-T ASSEMBLY, TX COATED | T/C K-1861.5-T В СБОРЕ, С ПОКРЫТИЕМ TX | LINDBERG MPH | K-1861.5-T | 6 | EA | $97.00 | $582.00 | | |
| 1.4 | S | GASKET, 8.5" X 48", FELT | ПРОКЛАДКА, 8.5" X 48", ВОЙЛОЧНАЯ | LINDBERG MPH | D1007H | 22 | EA | $10.91 | $240.00 | | |
| 1.5 | S | SET, SPARE FUSE, 250V | КОМПЛЕКТ ЗАПАСНЫХ ПРЕДОХРАНИТЕЛЕЙ, 250В | BUSS | FNM-2/FNQ-R-1/FNR-R-90 | 2 | SE | $27.00 | $54.00 | | |
| 1.6 | S | SET, PARTITION WALL ASSEMBLY | КОМПЛЕКТ ПЕРЕГОРОДОК | LINDBERG MPH | 62-H1816-L | 1 | SE | $1,350.00 | $1,350.00 | | |
| 1.7 | S | CONTROLLER | КОНТРОЛЛЕР | LINDBERG MPH | HNWL DC-300-E-E-200-10-0A00-0 | 1 | EA | $410.00 | $410.00 | | |
| 1.8 | S | CEMENT, CRUCIBLE, DRY POWDER MIX | ЦЕМЕНТ, ДЛЯ ТИГЛЕЙ, СУХОЙ ПОРОШОК | LINDBERG MPH | PLISTIX 900 | 4 | EA | $3.00 | $12.00 | | |
| 1.9 | S | WIRE, AWG 4 SRML, 500 FT | ПРОВОД, AWG 4 SRML, 500 ФУТОВ | LINDBERG MPH | AWG 4 SRNL | 1 | RO | $750.00 | $750.00 | | |
| 2 | E | SYSTEM, SPRAY, GEMINI 155 | СИСТЕМА СМАЗКИ, GEMINI 155 | ADVANCE PRODUCTS | GEMINI 155 | 3 | EA | $34,811.00 | $104,433.00 | | |
| 2.1 | S | LUBRICATOR, SHOT SLEEVE | СМАЗЧИК | ADVANCE PRODUCTS | SLV | 3 | EA | $1,194.00 | $3,582.00 | | |
| 3 | E | LADLER, AUTOMATIC | КОВШ, АВТОМАТИЧЕСКИЙ | ADVANCE PRODUCTS | SL1200 | 3 | EA | $31,075.00 | $93,225.00 | | |
| 4 | S | SPARE PARTS, FOR DIE CASTING MACHINES | ЗАПАСНЫЕ ЧАСТИ, ДЛЯ ЛИТЕЙНЫХ МАШИН | HPM | N/A | 1 | SE | $14,502.00 | $14,502.00 | | |
| 5 | E | FURNACE, ELECTRIC, DPPTU-0.5I1 | ЭЛЕКТРОПЕЧЬ, ДППТУ-0.5И1 | BINOM | DPPTU-0.5I1 | 2 | EA | $80,100.00 | $160,200.00 | | |
| 6 | E | CONTROL CABINET | ШКАФ УПРАВЛЕНИЯ | BINOM | N/A | 3 | EA | $7,600.00 | $22,800.00 | | |
| 7 | E | TRANSFORMER, TRSP-630.05 | ТРАНСФОРМАТОР, ТРСП-630.05 | BINOM | TRSP-630/0.5 | 2 | EA | $18,900.00 | $37,800.00 | | |
| 8 | E | REACTOR, SROS-800.05 | РЕАКТОР, СРОС-800.05 | BINOM | SROS-800/0.5 | 4 | EA | $14,880.00 | $59,520.00 | | |
| | | | | | | | | TOTAL | $613,674.80 | | |

Inventory by: Виталий Майко

Инвентаризация проведена: Vladimir Taran

# REPORT OF TRANSFER OF U.S. GOVERNMENT EQUIPMENT
# АКТ ПЕРЕДАЧИ ОБОРУДОВАНИЯ АМЕРИКАНСКОГО ПРАВИТЕЛЬСТВА

Date: 10 January 2003
Дата: 10 января 2003 г.

This report is concluded by the undersigned representatives of the governments of the United States of America and Ukraine. The property consisting of six heating and cooling appliances with spare filter cartridges as noted on one page of the attached inventory, has been delivered to Kiev State-Owned Enterprise Plant "Burevestnik" (Ministry of Industrial Policy of Ukraine) under shipment L0091-20800 in its entirety in accordance with Defense Threat Reduction Agency's direction. Exceptions and discrepancies, if any, are noted next to the items on the inventory page.

Настоящий акт составлен между нижеподписавшимися представителями правительств Соединенных Штатов Америки и Украины. Имущество, состоящее из шести устройств для нагрева и охлаждения с запасными картриджами, указанных на одной странице прилагаемого акта инвентаризации, было доставлено на Киевское государственное предприятие завод «Буревестник» Министерства промышленной политики Украины (номер поставки - L0091-20800), в соответствии с рспоряжением Агенства по Уменьшению Угрозы (АУУ) Министерства обороны США. Замечания, если таковые имеются, отмечены на странице акта инвентаризации.

Responsibility for the property has been transferred from the U.S. Department of Defense - Defense Threat Reduction Agency to the Ministry of Industrial Policy of Ukraine, Kiev State-Owned Enterprise Plant "Burevestnik". The total value of the property is 42,360.67 USD.

Ответственность за это имущество снимается с Агентства по Уменьшению Угрозы Министерства обороны США и возлагается на Киевское государственное предприятие завод «Буревестник» Министерства промышленной политики Украины. Общая стоимость этого имущества составляет 42 360,67 долларов США.

For the Defense Threat Reduction Agency (DTRA)
За Агенство по Уменьшению Угрозы (АУУ) Министерства обороны США

Signature/Date

Vladimir Tara[...]
Printed

American representative
Представитель США
Tel. (044) 490-6666

For Kiev SOE Plant "Burevestnik", Ministry of Industrial Policy, Ukraine
За Киевский завод «Буревестник» Минпромполитики Украины

Подпись/Дата

Синицкий Игорь Георгиевич
Ф.И.О.

Ukrainian representative
Представитель Украины
Тел. (044) 553-0514

КИЇВСЬКИЙ ДЕРЖАВНИЙ ЗАВОД БУРЕВІСНИК
код 14312358

| | |
|---|---|
| Ref: DTRA/CTR Program: | Defense Conversion |
| OEM/Vendor | Thermobiehl Apparatebau GmbH |
| Equipment Desc. | Heating and cooling appliances (6) with spares |
| Delivery Date: | 03 January 2003 |

| DTRA Shipment Number | Site Name/Location | DTRA Contract/PO Number (if available) | Project Name | Project Charge Account | Team Leader/Inventoried By | Date Inventoried |
|---|---|---|---|---|---|---|
| L0091-20800 | Kiev SOE Plant "Burevestnik" | DTRA01-00-C-0007, PO # K-T000008004 | Defense Conversion | EB91U08AA | Vladimir Taran | 1/10/2003 |

| Line Item No. | "Asset Code" Equipment= E Component=C Spares = S Materials = M | Item Description | Описание | OEM/Manu-facturer | Part Number | Model Number | Serial Number | Qty К-во | Unit of Measure | Unit Cost | Total Cost | Remarks | Комментарии |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | E | APPLIANCE, HEATING AND COOLING, SINGLE CIRCUIT, THERMOBIEHL HK 15-9, WITH 2 SPARE FILTER CARTRIDGES | УСТРОЙСТВО, НАГРЕВАТЕЛЬНОЕ И ОХЛАДИТЕЛЬНОЕ, ОДНОКОНТУРНОЕ, THERMOBIEHL HK 15-9, С 2 ЗАПАСНЫМИ КАРТРИДЖАМИ | THERMOBIEHL APPARATEBAU GMBH | HK15-9 | | 591092 | 1 | EA | $7,060.11 | $7,060.11 | | |
| 2 | E | APPLIANCE, HEATING AND COOLING, SINGLE CIRCUIT, THERMOBIEHL HK 15-9, WITH 2 SPARE FILTER CARTRIDGES | УСТРОЙСТВО, НАГРЕВАТЕЛЬНОЕ И ОХЛАДИТЕЛЬНОЕ, ОДНОКОНТУРНОЕ, THERMOBIEHL HK 15-9, С 2 ЗАПАСНЫМИ КАРТРИДЖАМИ | THERMOBIEHL APPARATEBAU GMBH | HK15-9 | | 592092 | 1 | EA | $7,060.11 | $7,060.11 | | |
| 3 | E | APPLIANCE, HEATING AND COOLING, SINGLE CIRCUIT, THERMOBIEHL HK 15-9, WITH 2 SPARE FILTER CARTRIDGES | УСТРОЙСТВО, НАГРЕВАТЕЛЬНОЕ И ОХЛАДИТЕЛЬНОЕ, ОДНОКОНТУРНОЕ, THERMOBIEHL HK 15-9, С 2 ЗАПАСНЫМИ КАРТРИДЖАМИ | THERMOBIEHL APPARATEBAU GMBH | HK15-9 | | 593092 | 1 | EA | $7,060.11 | $7,060.11 | | |
| 4 | E | APPLIANCE, HEATING AND COOLING, SINGLE CIRCUIT, THERMOBIEHL HK 15-9, WITH 2 SPARE FILTER CARTRIDGES | УСТРОЙСТВО, НАГРЕВАТЕЛЬНОЕ И ОХЛАДИТЕЛЬНОЕ, ОДНОКОНТУРНОЕ, THERMOBIEHL HK 15-9, С 2 ЗАПАСНЫМИ КАРТРИДЖАМИ | THERMOBIEHL APPARATEBAU GMBH | HK15-9 | | 594092 | 1 | EA | $7,060.11 | $7,060.11 | | |
| 5 | E | APPLIANCE, HEATING AND COOLING, SINGLE CIRCUIT, THERMOBIEHL HK 15-9, WITH 2 SPARE FILTER CARTRIDGES | УСТРОЙСТВО, НАГРЕВАТЕЛЬНОЕ И ОХЛАДИТЕЛЬНОЕ, ОДНОКОНТУРНОЕ, THERMOBIEHL HK 15-9, С 2 ЗАПАСНЫМИ КАРТРИДЖАМИ | THERMOBIEHL APPARATEBAU GMBH | HK15-9 | | 595092 | 1 | EA | $7,060.11 | $7,060.11 | | |
| 6 | E | APPLIANCE, HEATING AND COOLING, SINGLE CIRCUIT, THERMOBIEHL HK 15-9, WITH 2 SPARE FILTER CARTRIDGES | УСТРОЙСТВО, НАГРЕВАТЕЛЬНОЕ И ОХЛАДИТЕЛЬНОЕ, ОДНОКОНТУРНОЕ, THERMOBIEHL HK 15-9, С 2 ЗАПАСНЫМИ КАРТРИДЖАМИ | THERMOBIEHL APPARATEBAU GMBH | HK15-9 | | 596092 | 1 | EA | $7,060.11 | $7,060.11 | | |
| | | | | | | | | | | TOTAL | $42,360.67 | | |

Not listed

Inventory by: Vladimir Taran

Инвентаризация проведена: Синицкий И.Г.

10.01.03 г.



10

# REPORT OF TRANSFER OF U.S. GOVERNMENT EQUIPMENT
# АКТ ПЕРЕДАЧИ ОБОРУДОВАНИЯ АМЕРИКАНСКОГО ПРАВИТЕЛЬСТВА

Date: 10 January 2003
Дата: 10 января 2003 г.

This report is concluded by the undersigned representatives of the governments of the United States of America and Ukraine. The property consisting of two one-stage fan stationary compressors as noted on one page of the attached inventory, has been delivered to Kiev State-Owned Enterprise Plant "Burevestnik" (Ministry of Industrial Policy of Ukraine) under shipment L0090-20800 in its entirety in accordance with Defense Threat Reduction Agency's direction. Exceptions and discrepancies, if any, are noted next to the items on the inventory page.

Настоящий акт составлен между нижеподписавшимися представителями правительств Соединенных Штатов Америки и Украины. Имущество, состоящее из двух стационарных воздушных компрессоров, указанных на одной странице прилагаемого акта инвентаризации, было доставлено на Киевское государственное предприятие завод «Буревестник» Министерства промышленной политики Украины (номер поставки - L0090-20800), в соответствии с распоряжением Агенства по Уменьшению Угрозы (АУУ) Министерства обороны США. Замечания, если таковые имеются, отмечены на странице акта инвентаризации.

Responsibility for the property has been transferred from the U.S. Department of Defense - Defense Threat Reduction Agency to the Ministry of Industrial Policy of Ukraine, Kiev State-Owned Enterprise Plant "Burevestnik". The total value of the property is 18,972.00 USD.

Ответственность за это имущество снимается с Агентства по Уменьшению Угрозы Министерства обороны США и возлагается на Киевское государственное предприятие завод «Буревестник» Министерства промышленной политики Украины. Общая стоимость этого имущества составляет 18 972,00 долларов США.

| For the Defense Threat Reduction Agency (DTRA)<br>За Агенство по Уменьшению Угрозы (АУУ) Министерства обороны США | For Kiev SOE Plant "Burevestnik", Ministry of Industrial Policy, Ukraine<br>За Киевский завод «Буревестник» Минпромполитики Украины |
|---|---|
| Signature/Date | Подпись/Дата |
| Vladimir Taran<br>Printed | Синицкий Игорь Геннадьевич<br>Ф.И.О. |
| American representative<br>Представитель США<br>Tel. (044) 490-6666 | Ukrainian representative<br>Представитель Украины<br>Тел. (044) 553-0514 |

Stamp: КИЇВ * УКРАЇНА * КИЇВСЬКИЙ ДЕРЖАВНИЙ ЗАВОД «БУРЕВІСНИК» ідентифікаційний код ... ДЕРЖАВНЕ ПІДПРИЄМСТВО

| Ref: | |
|---|---|
| DTRA/CTR Program: | Defense Conversion |
| OEM/Vendor | Atlas Copco |
| Equipment Desc. | Air compressors (2) |
| Delivery Date: | 23 December 2002 |

| DTRA Shipment Number | Site Name/Location | DTRA Contract/PO Number (if available) | Project Name | Project Charge Account | Team Leader/Inventoried By | Date Inventoried |
|---|---|---|---|---|---|---|
| *L0090-20800* | *Kiev SOE Plant "Burevestnik"* | *DTRA01-00-C-0007, PO # K-T000007978* | *Defense Conversion* | *EB91U08AA* | *Vladimir Taran* | *1/10/2003* |

| Line Item No. | "Asset Code" Equipment= E Component=C Spares = S Materials = M | Item Description | Описание | OEM/Manu-facturer | Part Number | Model Number | Serial Number | Qty K-во | Unit of Measure | Unit Cost | Total Cost | Remarks | Комментарии |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | E | COMPRESSOR, AIR, FAN, STATIONARY, ATLAS COPCO GA30P-7.5 | КОМПРЕССОР, ВОЗДУШНЫЙ, ВИНТОВОЙ, СТАЦИОНАРНЫЙ, ATLAS COPCO GA30P-7.5 | ATLAS COPCO | GA30P-7.5 | | AII 381334 | 1 | EA | $9,486.00 | $9,486.00 | | |
| 2 | E | COMPRESSOR, AIR, FAN, STATIONARY, ATLAS COPCO GA30P-7.5 | КОМПРЕССОР, ВОЗДУШНЫЙ, ВИНТОВОЙ, СТАЦИОНАРНЫЙ, ATLAS COPCO GA30P-7.5 | ATLAS COPCO | GA30P-7.5 | | AII 381362 | 1 | EA | $9,486.00 | $9,486.00 | | |
| | | | | | | | | | | TOTAL | $18,972.00 | | |

72

Inventory by: Vladimir Taran

Инвентаризация проведена: 10.01.03г. Синицкий И.Г.

**Defense Threat Reduction Agency**
45045 Aviation Drive
Dulles, VA 20166-7517

MAY 31 2000

Mr. Alan C. Frederickson
Die Casters International, Inc.
One Spruce Terrace
Wayne, New Jersey 07470

Dear Mr. Frederickson:

To ensure that the equipment now located in Moldova is safeguarded and available should the decision be made to continue the project, it has been determined that DTRA will retrieve the equipment and place it in storage in Ukraine. DTRA will hire and pay the cost of the shipping contractor.

In taking this action it is understood that DCI and others may have a financial interest in the equipment. Therefore, I request that you provide me with the names of all parties with a financial interest in the equipment. Please provide this information to me by June 2, 2000.

No decision to provide funds to DCI has been made. The decision on whether to provide funds to DCI is still under consideration and as soon as it is made I will let you know.

If you have any questions, please contact me at (703) 810-4684.

Sincerely,

Herbert A. Thompson, Jr.
Herbert A. Thompson, Jr.
CONTRACTING OFFICER

cc:
Proj. Mgr.-Harry Cook/CTO

REFERENCE B

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE 1 OF 1 PAGES

| | | | |
|---|---|---|---|
| 2. AMENDMENT/MODIFICATION NO. P00001 | 3. EFFECTIVE DATE See Block 16c | 4. REQUISITION/PURCHASE REQ. NO. N/A | 5. PROJECT NO. *(If applicable)* N/A |

6. ISSUED BY CODE HD2001

HEADQUARTERS
DEFENSE NUCLEAR AGENCY (AM)
6801 TELEGRAPH ROAD
ALEXANDRIA, VA 22310-3398

ATTN: THOMAS L. COX (703) 325-1196

7. ADMINISTERED BY *(If other than Item 6)* CODE S3101A

DCMAO, SPRINGFIELD
955 SOUTH SPRINGFIELD AVENUE
SPRINGFIELD, NJ 17801-3544

(FOR: PROPERTY ADMINISTRATION & PLANT CLEARANCE ONLY)

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

DIE CASTERS INTERNATIONAL, INCORPORATED
ONE SPRUCE TERRACE
WAYNE, NEW JERSEY 07470

CODE 03VE3 | FACILITY CODE

(X) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

X 10A. MODIFICATION OF CONTRACT/ORDER NO. DNA001-95-C-0169

10B. DATED *(SEE ITEM 13)* 95OCT27

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. Accounting and Appropriation Data *(If required)*
N/A

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (X) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| X | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc).* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER *(Specify type of modification and authority)* |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

SUBJECT: FAR Clause 52.245-5 Government Property (Cost Reimbursement, Time & Material, or Labor Hour Contract)

Due to an inadvertant oversite the subject clause was not included in the award document. This amendment is to correct that error. Under Section 1. clause 45.106 (f) (1) 52.245-5 is hereby added.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| | |
|---|---|
| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | 16A. NAME AND TITLE OF SIGNER *(Type or print)* SCOTT G. MORTON CONTRACTING OFFICER |

| | | | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR *(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA BY [signature] *(Signature of Contracting Officer)* | 16C. DATE SIGNED JAN 30 1996 |

NSN 7540-01-152-9070
PREVIOUS EDITION UNUSABLE

Created using PerForm Pro software.

74

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243