**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

-----------------------------------X

**DIE CASTERS INTERNATIONAL, INC.,**

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

-----------------------------------X

**No. 04-1113C**
**(Judge Braden)**

**REPLY AFFIDAVIT**

STATE OF NEW YORK )
) ss.:
COUNTY OF NASSAU )

**ALAN C. FREDERICKSON**, being duly sworn, deposes and says:

1. I am the principal shareholder, sole director, and President of the Plaintiff in the above-entitled action, and submit this affidavit in reply to Defendant's Response To Plaintiff's Amended Motion For Partial Summary Judgment and in opposition to Defendant's Cross-Motion For Summary Judgment ("Defendant's Brief").

2. For the reasons set forth in this affidavit and accompanying Reply Memorandum of Law, certain irrelevant, erroneous and unsupported facts and contentions set forth in Defendant's Brief must not be allowed to obscure the lack of a material dispute as to the basic issues raised by Plaintiff's Amended Motion for Partial Summary Judgment.

3. Notwithstanding the fact that Defendant alleges certain facts that are irrelevant, this affidavit and the accompanying Reply Memorandum of Law will respond to those irrelevant facts and allegations even though it is Plaintiff's position that they do not affect the outcome of this motion and should not complicate the issues and facts that are relevant to Plaintiff's Motion for Summary Judgment.

**Defendant's Unsupported Contention That There Is A Factual Issue Concerning Plaintiff's Financial Interest To The Equipment Is Not Supported By The Uncontroverted Facts, The Defendant's Admissions or The Defendant's Course Of Dealing.**

4. Plaintiff has, from the inception of the Contract, advised Defendant that Plaintiff intended to bill, and did in fact bill, Defendant for "full services received" but to hold back and not pay a portion of certain equipment acquisition cost and employee salaries until the "realization of permanent financing". The deferral of these costs were all pursuant to agreements with the respective vendors and employees A copy of a September 5, 1997 letter to Defendant summarized that procedure and memorializing the prior understandings and agreements is annexed Exhibit 11.

5. At a meeting held in March of 1996, Defendant's Contracting Officer, Scott Morton, approved Plaintiff's billing procedures including but not limited to the deferral of a portion of incurred costs of certain suppliers and employees.

6. In August and September of 1997, The Defense Contract Audit Agency ("DCAA") advised Plaintiff of its preliminary finding relating to some of Plaintiff's 1995 incurred costs that

were being questioned because they were deferred and unpaid. (Def. App. 20) Plaintiff disagreed and objected to the DCAA recommendations. *Id.* and Exhibit 12 p7. Although DCAA waited another year and a half, until February, 1999 to issue its Form 1 Report to the Plaintiff (Exhibit 13) and its Audit Report to DTRA (Def. App. 17), DTRA was undeniably cognizant of DCAA's recommendations in August of 1997. (Exhibit 11). Defendant's counsel inadvertency omitted pages 7-15 of the DCAA 1995 Audit Report and subsequently furnished it to Plaintiff's counsel when requested, a full copy of that report is Annexed hereto as Exhibit 12. A copy of DCAA's Form 1 Report for 1995 is annexed hereto as Exhibit 13.

7. On September 5, 1997, Plaintiff requested Defendant to issue a letter to DCAA advising DCAA that "DCI billing and payment procedures were conducted in full compliance and approval of DSWA". (Exhibit 11 p.2).

8. Although to Plaintiff's knowledge, Defendant did not issue such a letter, Defendant did nothing to accept DCAA's recommendations and continued to honor all of Plaintiff's public vouchers, as submitted, and otherwise did nothing to indicate to the Plaintiff that it would not abide by the agreement it had with Plaintiff concerning its approval of Plaintiff's billing practices.

9. Plaintiff, relying on its agreement with Defendant and Defendant's apparent refusal to adopt the DCAA recommendations, continued to incur the costs needed to perform under the Contract and otherwise expend its limited resources in furtherance of the Contract objectives.

10. Notwithstanding DCAA's recommendation, Plaintiff's method of billing utilizing these deferred payments was in compliance with all relevant laws and regulations (Def. App. 61), was consistent with Plaintiff's disclosures concerning same and was implemented as approved by and agreed to by the Defendant's Contracting Officer.

11. On July 1, 1999, DCAA as part of its audit of Plaintiff's 1996 incurred costs again questioned certain of Plaintiff's costs that were deferred and unpaid (Def. App. 24-34 and Exhibit 14) and discussed the matter with Herbert Thompson, Defendant's Contracting Officer, who "did not comment." (Exhibit 14 p. 3). A copy of the DCAA Form 1 for 1996 is annexed as Exhibit 14.

12. Plaintiff, as it had done previously disagreed and objected to the DCAA recommendations. (Def. App. 24-34 and Exhibit 14).

13. Although DCAA waited more than a year until September, 2000 to issue its Form 1 Report to the Plaintiff (Exhibit 14) and its Audit Report to DTRA (Def. App. 24) for the 1996 audit, DTRA was undeniably cognizant of DCAA's recommendation in July of 1999 and continued to do nothing to indicate to the Plaintiff that it would not abide by the agreement it had with Plaintiff concerning its approval of Plaintiff's agreed to billing practices.

14. Notwithstanding subsequent DCAA Audit Reports for 1997 and 1998, issued in July and September 2001, respectively, which again questioned similar costs and made similar

recommendations, the Defendant has never adopted DCAA recommendations including the recovery of any alleged overpayments (Exhibit 14 p. 3 and Exhibit 15 p.3) or in anyway indicated to Plaintiff that it would not continue to abide by its agreement it had with Plaintiff concerning its approval of Plaintiff's billing practices. Annexed hereto as Exhibit 15 is the DCAA Form 1s for 1997.

15. None of the DCAA audits questioned the reasonableness, authenticity or allocability of Plaintiff 's costs that were charged to the Contract. DCAA only questioned the allowability of certain costs per its mistaken interpretations of the FARs and Cost Accounting Standards.[1] Defendant, in its May 5, 2000 Memorandum, states: "DOD IG has verified the invoices submitted to DOD for $4 million were valid expenses." (Def. App. 61).

16. By letter dated April 14, 2003, the Defendant advised the Plaintiff that "the contract is considered closed". A copy of the April 14, 2003 letter is annexed as Exhibit 16. To date DCAA has audited approximately 84% of Plaintiff's incurred costs and has refused to audit the balance. (Frederickson Moving Aff., ¶ 28, 29, 30).

17. Notwithstanding Defendant's misstatement that Defendant's admissions of Plaintiff's financial position predated the DCAA Audit Reports (Def. Brief p. 12), the Defendant knew and approved of DCI's billing procedures since 1995 and it was not until June of 2001, just prior to

---

[1]DCAA also questioned the allowability of certain other costs on some other mistaken rationale. These costs were minor and again these recommendations were not accepted nor acted upon by the Defendant.

Defendant's removal of the Equipment, in a letter from Defendant to Plaintiff that Defendant, for the first time, raised the specter that Plaintiff lacked a "financial interest". A copy of that letter is annexed as Exhibit 17. Even in that letter the expression of Defendant's position was a less than resounding "I have seen no documentation to support". (Exhibit 17). This letter was written almost three and one-half years after Plaintiff had invoiced the Defendant for incurred costs which comprised most of the Estimated Cost Ceiling of $4,100,427.00 and had been reimbursed by the Defendant for substantially all of the Defendant's cost limitation under the Contract.

18. Additionally, Defendant's attempt to distance itself form its own admissions of Plaintiff's interest in the Equipment is further refuted by its own memorandum dated May 5, 2000 (Def. App. 60 ) which states categorically that investigations "were unable to find any evidence of improper billing" and " Die Casters submitted $4 million in vouchers and was reimbursed in accordance with the contract $3 million for the work performed. Die Casters funded the remaining $1 million." *Id.* 61.

**Defendant's Claims that DCI is Barred By the Doctrine Of Estoppel**

19. The issue which the Defendant uses to justify its removal and disposition of the Equipment concerning possible confiscation by the Moldova Government (Def. App. 64, ¶6) did not arise for the first time in 2001, it was an issue in 1999 (Exhibit 18) and again in 2000 as detailed in the Director of Cooperative Threat Reduction Policy memorandum of May 5, 2000. (Def. App. 60). A copy of correspondence between Plaintiff and Defendant addressing the

possible confiscation in 1999 are annexed as Exhibit 18.

20. Each time this issue was raised the Plaintiff was successful in solving the problem and would have been successful again if the Defendant would have only accepted its offers to help and provided it with a fraction of the resources it utilized to illegally remove the Equipment.

ALAN C. FREDERICKSON

Sworn to before me this
1st day of December, 2004

Notary Public

CAROL A. HAGENS
NOTARY PUBLIC, State of New York
No. 4895084
Qualified in Nassau County
Commission Expires May 18, 19 2007