# C O N T R A C T No. 58-66/97006-840

Tiraspol

April 4, 1997

"Die Casters International (DCI)", USA, hereinafter referred to as the "BUYERS" on the one, part and Kirov Plant, Tiraspol, hereinafter referred to as the "Sellers" on the other part, have concluded this Contract as follows:

## 1. SUBJECT OF TYHE CONTRACT

The Seller have sold and the Buyer have purchasedbought on conditions FCP (freight or carrier paid) Kiev the equipment listed in Appendix 1. Technical data and the composition of the equipment are specified in Appendix No. 3.

## 2. PRICES AND CONTRACT VALUE

2.1. The prices under items are quoted in Appendix No. 1.
2.2. The prices shall be fixed and never subject to changes.
2.3. The prices shall be understood FCP and include the costs of equipment packing, marking, handling and transportation to Kiev. The Seller shall pay every customs dues and fees within the territory of Moldova and the Buyer shall pay them within the territory of Ukraine.
2.4. Total value of this Contract shall be 296,691 USD.

## 3. TIME OF DELIVERY

3.1. The equipment shall be delivered in accordance with the terms indicated in Appendix No. 1.
3.2. To this time the equipment shall be manufactured, tested and accepted by the Buyer and delivered to Kiev.
3.3. The date of the bill of lading to the Consignee shall be considered as the time of delivery.

## 4. FORCE-MAJEURE

4.1. If any Party failed to filfil its proper obligations under this Contract either in full or in part as a result of force-majeur circumstances, namely: fire, flood, earthquake or war, and if such circumstance had directly affected Contract fulfilment, the time of fulfilment of obligations under this Contract shall be extended for a period within which such circumstances were operative.
4.2. The Party for which it becomes impossible to meet its proper obligations under this Contract, shall immediately but no later than within 10 days from the date of the onset of such circumstances advise the other Party as regards the onset and termination of the circumstances preventing from the fulfilment of its proper obligations. Inopportune adivise of the onset of force-majeure circumstances shall deprive the defaulting Party from the right to refer to them in future.
4.3. The confirmations issued by appropriate Chambers of Commerce shall be a sufficient proof of the above mentioned force-majeure circumstances.
4.4. If suct circumstances last more than 6 months, any Party shall have the right to cancell this Contract either in full or in part, and, if it is the case, neither Party shall have the right to claim for compensation of possible damages.

## 5. PAYMENTS

5.1. Amounts and terms of payments are indicated in Appendix No. 2.
5.2. Payments under this Contract shall be made as follows: upon the receipt of the Seller's invoice the Buyer shall pay 74% of the amount and 26% shall be transferred to an ordinary three-year note, its repayment conditions being as follows:

- the income at the rate of 8% per annum shall be repaied at the end of

each calendar quarter;

- major payments shall not be made within first four quarters of the term of the note;

- the major amount shall be paid in equal (eight) portions within the last eight quarters of the term of the note;

- the initial date of the bill is May 1,1998.

## 6. DRAWINGS AND TECHNICAL DOCUMENTATION

6.1. The Sellers shall render technical documentation (two sets per machine) together with the equipment. The composition of the set of documents is specified in Appendix No. 4.

6.2. The documentation specified in Appendix No. 4 shall be packed first in a water-proof bag and then in package No. 1, whereon an additional marking " "Documentation here" shall be applied.

6.3. Any text materials (manuals, instructions, etc.) as well as legends on drawings shall be prepared in Russian.

6.4. The Seller shall send to the Buyer specified lay-out drawings for die casting complexes no later than 2 months before the equipment delivery.

## 7. INSPECTING AND TESTING

7.1. The Buyer shall have the right to send its inspectors to the Seller plant to supervise the process of equipnment manufacturing, to inspect the quality of sampled assemblies and materials used as well as to participate in equipment testing.

7.2. The Seller shall test the ready-made and assembled equipment (with the use of meachanical devices) conformity to the availabler program of hot and cold testing.

7.3. The equipment shall be tested at the Seller's plant in the presence of Buyer's inspector.

7.4. Prior to testing the equipment shall be checked and accepted by the Seller's quality control personnel.

7.5. On copmpletion of testing the Seller shall prepare a testing report and and acceptance certificate.

## 8. GUARANTEE

8.1. The Sellers shall guarantee that the delivered equipment confirms to the technical documentation elaborated and agreed both by the Seller and the Buyer;

8.2. Normal operation of the quipment, manufactured at its plant, within 12 months as from the darte of shipment, provided the service conditions are adhered to; the guaranty shall not apply to that portion of equipment which the Buyer shall deliver to the Seller's plant for installation and/or for assembling it jointly in Tiraspol (Appendix 3).

8.3. If within the guarantee period the equipment appears to be defective, the Seller shall at its own expense eliminate with no fail every revealed defect either by repairing or by replacing the defective equipment or its constituents by new and perfect quality equipment on the Buyer's demand.

8.4. All transit costs involved in return or/and replacement of defective equipment both within the territory of the Consignee's country and within the territory of the Seller's country shall be incurred by the Seller.

8.5. The above guarantee period concerning the repaired or/and new machines, assemblies, etc., delivered instead of defective ones, shall start from the date of their delivery to the Buyer. In the event of repair or replacement of assemblies, parts, the guaranty period for the basic equipment shall be extended for a period, within which the equipment was inoperative as a result of revealed defects.

## 9. PACKING

A P P E N D I X No. 1
to Contract No. 50-66/97006-840 dd. April 4, 1997

| No. | Names of goods | Q-ty | Price per unit, $ | Total, $ |
|---|---|---|---|---|
| 1. | Set of units for die casting machine model 711И09Д(400tf) without an electrical cabinet | 3 | 41,500 | 124,500 |
| 2. | Set of units for die casting machine model 711И10Д(630tf) without an electrical cabinet | 1 | 73,000 | 73,000 |
| 3. | Trimming press П25 (25tf) | 3 | 10,000 | 30,000 |
| 4. | Spares group | 1 | 12,700 | 12,700 |
| Equipment cost | | 8 | | 240,200 |
| Customs procedure | | | | 636 |
| Registration fee and licence | | | | 255 |
| Transportation costs of goods above | | | | 11,300 |
| Extra assembly works on the "SELLER"'s plant | | | | 10,950 |
| Units acceptance by the "SELLER"'s experts in USA | | | | 10,000 |
| Installation and adjustment in Kyiv at "CONSIGNEE" by the "SELLER"'s experts | | | | 23,350 |
| Contract value | | | | 296,691 |

Total value of the Contract is $296,691 (two hundred ninety six thousands six hundred ninety one)

Time of delivery - 1998.

This Appendix shall make an integral part of Contract No. 50-66/97006-840 dd. April 4, 1997.

The Buyer

The Seller

# APPENDIX No. 2
to Contract 50-66/97006-840 dd. April 4, 1997r.

1. Schedule of Payments under the Contract in $ in 1997

| Month | March | April | May | * | Total |
|---|---|---|---|---|---|
| Invoice value | 217,120 | 30,000 | 40,000 | 9,571 | 296,691 |
| Value of banking transfer | 160,669 | 22,200 | 29,600 | 7,081 | 219,550 |
| Value entered a bill | 56,466 | 7,800 | 10,400 | 2,490 | 77,141 |

* – upon installation and testing in Kiev but no later than one month from the darte of the latest shipment

2. Schedule of Bill Repayment in $

| 1998 | | | | 1999 |
|---|---|---|---|---|
| March-May | June-August | September-November | December-February | March-May |
| 1,543 | 1,543 | 1,543 | 1,543 | 11,186 |

| 1999 | | | 2000 | |
|---|---|---|---|---|
| June-August | September-November | December-February | March-May | June-August |
| 10,993 | 10,800 | 10,607 | 10,414 | 10,2 22 |

| 2000 | 2001 | Total |
|---|---|---|
| September-November | December-February | |
| 10,029 | 9,836 | 90,259 |

This Appendix No. 2 shall be an integral part of Contract No.50-66/97006-840 dd. April 4, 1997r.

The Buyer

The Seller

К О Н Т Р А К Т
No. 50-66797006 - 840

Тирасполь 4 апреля 1997 г.

Фирма "Die Casters International, Inc.(DCI)", США, именуемая в дальнейшем "ПОКУПАТЕЛЬ", с одной стороны, и Завод литейных машин им.С.М.Кирова, г.Тирасполь, именуемый в дальнейшем "ПРОДАВЕЦ", с другой стороны, заключили настоящий контракт о нижеследующем:

1. Предмет контракта

1.1."ПРОДАВЕЦ" продал, а "ПОКУПАТЕЛЬ" купил на условиях поставки FCP г.Киев (фрахт или провозная плата оплачены до г.Киева) оборудование, перечисленное в ПРИЛОЖЕНИИ N 1, технические характеристики и состав оборудования оговорены в ПРИЛОЖЕНИИ N 3.

2. Цены и общая сумма контракта

2.1.Цены по позициям указаны в Приложении N 1.

2.2.Цены твердые и не подлежат изменению.

2.3.Цены понимаются FCP г.Киев и включают стоимость упаковки, маркировки, погрузки, крепежа и транспортировки оборудования в г.Киев.Все таможенные сборы, а также таможенные пошлины и плату за выполнение таможенных формальностей на территории Молдовы оплачивает "ПРОДАВЕЦ", на территории Украины - оплачивает "ГРУЗОПОЛУЧАТЕЛЬ".

2.4.Общая сумма контракта составляет 296.691 (двести девяносто шесть тысяч шестьсот девяносто один) доллар США.

3. Сроки поставки

3.1.Оборудование должно быть поставлено в соответствии со сроками, оговоренными в ПРИЛОЖЕНИИ N 1.

3.2.К указанным срокам оборудование должно быть изготовлено, испытано, принято "ПОКУПАТЕЛЕМ" и доставлено в г.Киев.

3.3.Датой поставки считается дата автонакладной, выписанной на имя "ГРУЗО- ПОЛУЧАТЕЛЯ".

4. Форс-мажор

4.1.Стороны освобождаются от ответственности за частичное или полное неисполнение обязательств по настоящему контракту, если оно явилось следствием обстоятельств непреодолимой силы, а именно: пожара, наводнения, землетрясения и войны, и если эти обстоятельства непосредственно повлияли на исполнение контракта. исполнение контракта.

При этом срок исполнения обязательств по контракту отодвигается соразмерно времени, в течение которого действовали такие обстоятельства.

4.2.Сторона, для которой создалась невозможность исполнения обязательств по контракту, обязана о наступлении и прекращении вышеуказанных обстоятельств немедленно, однако не позднее десяти дней с момента их наступления, в письменной форме известить другую сторону.

Несвоевременное извещение об обстоятельствах непреодолимой силы лишает соответствующую сторону права ссылаться на них в будущем.

4.3.Надлежащим доказательством наличия указанных выше обстоятельств и их продолжительности будут служить свидетельства соответствующих Торговых Палат. Палат.

4.4.Если эти обстоятельства будут длиться более 6-ти месяцев, то каждая из сторон будет вправе аннулировать контракт полностью или частично, и в этом случае ни одна из сторон не будет иметь права потребовать от другой стороны возмещения возможных убытков.

5. УСЛОВИЯ ПЛАТЕЖА

5.1.Размеры и сроки платежей указаны в ПРИЛОЖЕНИИ N 2.

5.2.Оплата по контракту будет проходить следующим образом - получив от "ПРОДАВЦА" инвойс "ПОКУПАТЕЛЬ" оплачивает 74% от суммы, а 26% идут на простой трехгодичный вексель со следующими условиями оплаты:

а)доход из расчета 8% годовых выплачивается ежеквартально;

б)основные выплаты не будут производиться в течение первых четырех кварталов срока векселя;

в) последние восемь кварталов срока векселя будут выплачиваться

ежеквартально основная сумма равными (восемью) суммами;

г)срок векселя начинается с 01.05.98г.

6. Чертежи и техническая документация

6.1. "ПРОДАВЕЦ" обязуется передать вместе с оборудованием комплекты технической документации (по два на каждую машину), состав комплекта оговорен в ПРИЛОЖЕНИИ N 4.

6.2. Документация, перечисленная в ПРИЛОЖЕНИИ N 4, должна находиться в водонепроницаемой упаковке, на которую наносится дополнительная маркировка: "документация здесь".

6.3. Все текстовые материалы (инструкции, описания и т.п.), а также надписи на чертежах должны быть выполнены на русском языке.

6.4. "ПРОДАВЕЦ" высылает "ПОКУПАТЕЛЮ" уточненные компоновочные чертежи и строительное задание на литейные комплексы не позднее 2-х месяцев до срока поставки оборудования.

7. Инспектирование и испытание

7.1. "ПОКУПАТЕЛЬ" имеет право посылать своих инспекторов на завод "ПРОДАВЦА" для наблюдения за ходом изготовления оборудования, для проверки качества отдельных его узлов и используемых материалов, а также для участия в испытаниях оборудования.

7.2. "ПРОДАВЕЦ" обязан испытать изготовленное и собранное оборудование в соответствии с существующей программой холодных и горячих испытаний в собранном виде (с механизацией).

7.3. Испытание оборудования должно производиться на заводе "ПРОДАВЦА" в присутствии инспектора "ПОКУПАТЕЛЯ".

7.4. До испытания оборудования в присутствии инспектора "ПОКУПАТЕЛЯ" оно должно быть проверено и принято контрольным персоналом завода.

7.5. По окончании испытаний "ПРОДАВЕЦ" оформляет протокол испытаний и акт о приемке.

8. Гарантии

8.1. "ПРОДАВЕЦ" гарантирует, что поставляемое оборудование соответствует технической документации, разработанной и согласованной между "ПРОДАВЦОМ" и "ПОКУПАТЕЛЕМ".

8.2. "ПРОДАВЕЦ" гарантирует нормальную работу оборудования, изготовленного на заводе, в течение 12 месяцев с даты отгрузки при условии соблюдения технических условий эксплуатации; гарантия не распространяется на часть оборудования, которую "ПОКУПАТЕЛЬ" будет поставлять на завод "ПРОДАВЦА" для ее установки и/или совместной сборки в Тирасполе, см. ПРИЛОЖЕНИЕ 3.

8.3. Если в течение срока гарантии оборудование окажется дефектным, то "ПРОДАВЕЦ" обязуется по требованию "ПОКУПАТЕЛЯ" незамедлительно и за свой счет устранить обнаруженные дефекты путем исправления либо замены дефектного оборудования или его частей новым доброкачественным оборудованием.

8.4. Все транспортные расходы, связанные с возвратом и/или заменой дефектного оборудования как на территории страны "ГРУЗОПОЛУЧАТЕЛЯ", так и на территории страны "ПРОДАВЦА", несет "ПРОДАВЕЦ".

8.5. Указанный выше гарантийный период в отношении исправленных и/или новых машин, узлов и т.п., поставленных взамен дефектных, начинается снова с момента их поставки "ПОКУПАТЕЛЮ". В случае исправления или замены узлов, частей срок гарантии основного оборудования продлевается на время, в течение которого оборудование не использовалось вследствие обнаруженного дефекта.

9. Упаковка

9.1. Оборудование поставляется в упаковке, соответствующей характеру поставляемого оборудования, подготовленное для перевозки грузовым транспортом.

9.2. Упаковка должна быть приспособлена к крановым перегрузкам.

9.3. На каждое место в отдельности "ПРОДАВЕЦ" обязан составить упаковочный лист, один экземпляр упаковочного листа в водонепроницаемом конверте вкладывается в ящик с оборудованием и один экземпляр прикрепляется с наружной стороны ящика или оборудования, если оно поставляется без упаковки.

# П Р И Л О Ж Е Н И Е 1
к контракту N 50-66/97006-840 от 4 апреля 1997г.

| Номер | Наименование товара | Кол-во | Цена за един. $ | Сумма $ |
|---|---|---|---|---|
| 1. | Комплект узлов к машине литья под давлением мод. 711И09Д (400тс) | 3 | 41.500 | 124.500 |
| 2. | Комплект узлов к машине литья под давлением мод. 711И10Д (630тс) | 1 | 73.000 | 73.000 |
| 3. | Пресс обрубной П25 (25тс) | 3 | 10.000 | 30.000 |
| 4. | ЗИП | 1 | 12.700 | 12.700 |
| Стоимость оборудования | | 8 | | 240.200 |
| Таможенная процедура | | | | 636 |
| Лицензионный и регистрационный сбор | | | | 255 |
| Транспортные расходы на вышеперечисленное оборудование | | | | 11.300 |
| Дополнительные монтажные работы на заводе "ПРОДАВЦА" | | | | 10.950 |
| Приёмка узлов специалистами "ПРОДАВЦА" в США | | | | 10.000 |
| Пуско-наладочные работы в Киеве у "ГРУЗОПОЛУЧАТЕЛЯ" | | | | 23.350 |
| Сумма контракта: | | | | 296.691 |

Сумма контракта составляет 296.691 (двести девяносто шесть тысяч шестьсот девяносто один) доллар США.

Срок поставки - 1998 г.

Данное ПРИЛОЖЕНИЕ N 1 является неотъемлемой частью контракта N 50-66/97006-840 от 4 апреля 1997г.

"ПОКУПАТЕЛЬ"

"ПРОДАВЕЦ"

# П Р И Л О Ж Е Н И Е N 2
к контракту 50-66/97006-840 от 4 апреля 1997г.

1. График выполнения платежей по контракту в 1997 г. в долларах США

| Месяц | март | апрель | май | * | ВСЕГО |
|---|---|---|---|---|---|
| Инвойс на сумму | 217.120 | 30.000 | 40.000 | 9.571 | 296.691 |
| Банковский перевод на сумму | 160.669 | 22.200 | 29.600 | 7.081 | 219.550 |
| Сумма, зачисляемая на вексель | 56.466 | 7.800 | 10.400 | 2.490 | 77.141 |

* - после установки и проведения испытаний в Киеве, но не позже одного месяца с даты последней отгрузки

2. График выполнения платежей по векселю в долларах США

| 1998 г. | | | | 1999г. | |
|---|---|---|---|---|---|
| март-май | июнь-август | сентябрь-ноябрь | декабрь-февраль | март-май | июнь-август |
| 1.543 | 1.543 | 1.543 | 1.543 | 11.186 | 10.993 |

| 1999 г. | 2000 г. | | | |
|---|---|---|---|---|
| сентябрь-ноябрь | декабрь-февраль | март-май | июнь-август | сентябрь-ноябрь |
| 10.800 | 10.607 | 10.414 | 10.222 | 10.029 |

| 2000 г. | 2001 г. | ИТОГО |
|---|---|---|
| декабрь-февраль | | |
| 9.836 | | 90.259 |

Данное ПРИЛОЖЕНИЕ N 2 является неотъемлемой частью контракта 50-66/97006-840 от 4 апреля 1997г.

"ПОКУПАТЕЛЬ"

"ПРОДАВЕЦ"