# Die Casters International, Inc.

*Quality and Service Worldwide*

One Spruce Terrace, Wayne, New Jersey, USA 07470
(973) 696 - 9100 Fax: 696 - 9194 DCIWayne@aol.com

17 November 1998

Mr. Harry Cook
Program Manager
Defense Threat Reduction Agency
Cooperative Threat Reduction Office
45045 Aviation Drive
Dulles, VA 20166

Via fax: (703) 326-8557 (4 pages)

Dear Harry:

The following proposal is in response to your request to have an update that shows how we plan to spend the $730,000 funds to get DCB formed and operating properly and to get the equipment installed at the plant that Burevestnik will be contributing.

On 3 August 1998, we met at the Center for Verification Research in Springfield, Virginia and reviewed our base plan for $500,000. The basic assumption in the creation of that budget was that DCI would receive notification that the project would be funded in time for DCI to contract with the general contractor in Kyiv (Giproselmash) to start its work in September and that the work could be accomplished in four months. However, issues totally out of DCI's control could not be resolved between the Ukraine and USA governments. These issues involved the Ukraine government's agreement with implementing procedures to give Nunn-Lugar projects such as DCI's joint venture preferential customs and taxation treatment. Because these issues were only recently resolved to the satisfaction of the US government, all the plant refurbishment work will involve the winter months which will cause delays in many of the work tasks. It has been estimated that it will now require up to six months through the winter before all the equipment can be installed, tested and fully commissioned. Also, the continuing delays have meant that all of our equipment has had to be continually stored, and we will probably have to repair seals, etc.

DCI will experience additional costs due to the longer time to complete the project once it is started and due to the delay in the start time itself. Therefore, DCI requested that its funding be increased from the baseline $500,000 it proposed in August to the total available funds of $730,000. The attached table provides DCI's new budget for completing this work. The table refers to the tables we submitted on 3 August, where we itemized the estimated tasks for plant refurbishment ($300,000) and for the other startup costs ($200,000 total).

Additional funds have also been requested due to the importance to install quality control labs with at least the capability to analyze the chemical content of the metal alloys being used. As we have discussed numerous times, a new customer with the potential to order well over $20 to $50 million of castings per year has been approached and is very interested in what DCI and DCB is trying to accomplish. Because the customer is in a very quality sensitive segment of the automotive industry, quality control at DCB is extremely important. The baseline budget for $500,000 did not include the investment required to establish the basic needs for such a quality lab in the plant.

Of the total budget, a majority of $400,000 is allocated to building refurbishment and equipment installation/training. The actual costs for this work will not be known until the general contractor has completed its initial study (about 6 weeks after start) and we renegotiate with the suppliers. The budgeted figures are based on recent evaluations, with discussions with suppliers and on work that DCI did with the general contractor to develop detailed plans that were included in DCI's joint venture business plan last year. Overall, DCI and its partners feel that the budget is as good as can be established without having the general contractor's more detailed analysis.

Expenditures and tasks have been prioritized into four categories: Top, High, Secondary and Low. DCI will organize its work to accomplish the highest priority tasks first and to commit to lower priority tasks only when DCI

determines that actual funds will be available. Once DCB is formed, many of the secondary and low priority tasks (all of which exceed the $730,000 funding level) will become capital investment decisions that DCB's board will undertake as operating cash flow can be reinvested. Should DCI and its partners be able to save costs in the highest two priority tasks, funds will be used to invest in secondary priority expenditures. Likewise, if actual costs for the highest tasks exceed the budget estimates, lower priority tasks will not be funded out of the contracted funds.

As shown in the table on the next page, there are three stages of budgeted expenditures:

1. 3 August Original 4 Month Baseline: DCI presented its plans to utilize a $500,000 budget to get the plant ready, the equipment installed and the DCB joint venture formed. That baseline budget included three categories of expenses: 1) Capital improvements and expenditures, 2) Outside services and 3) Operating expenses. To accomplish the work required for the capital expenditures, DCI did not include an estimated $92,000 of the plant refurbishment and equipment tasks that are important but could not be accomplished within the $500,000 budget. These tasks were identified in the original $500,000 budget as "purchase through follow-on financing," and are now included as a high priority expenditure in the new budget.

Please note that many of the tasks identified in the 3 August table were included in the DCB Business Plan dated September 1997 (Page IX-18, First Quarter - Casting).

2. Added Costs Due to Delay: These are costs that DCI expects to incur to meet the basic requirements to get the plant prepared, the equipment installed, the joint venture formed and new sales orders booked.

- 2.1 and 2.2 (Equipment Inspection and Repair): The equipment has been stored in a warehouse and at Litmash. It needs to be rerun and inspected for such defects as leaks in the hydraulic systems and bad lining (in the furnaces). DCI will have to order extra spares to cover replacement of any defects. Until all the equipment is inspected, the costs for the repairs (labor and materials) cannot be determined.
- 2.3 (Supplier Increases and Warehousing): Additional funds may be required to cover higher costs that the suppliers may charge for their installation and training tasks and to cover extended warehousing costs in Kyiv. Supplier's original quotes were for the work to be completed by the end of 1997, which will now be accomplished in the first/second quarters of 1999. Discussions indicate that DCI may be able to negotiate to have the work accomplished at the original prices. When the new funds are released and we have received the general contractors preliminary analysis, DCI will secure firm quotes.
- 2.4 and 2.5 (Additional Operating Expenses): DCI will have additional operating costs because the project will require an estimated two extra months to complete during the winter. Extra legal and organizational costs may be incurred because of the project startup delay such as for potential costs for renegotiation, redrafting of the joint venture documents, and preparing new registration documents.
- 2.6 (Customer & Supplier Development): These are anticipated extra costs for DCI to make extra trips to customers and suppliers to reestablish its credibility with key customers and suppliers and to find new customers where old ones may have been lost due to the delay in DCI's being able to respond to their inquiries.

3. Additions Prioritized Out in Baseline: These are expenses that DCI believes are important to make DCB a viable and growing business as soon as possible. Where costs can be saved in the first two expense categories above, the extra funds will be used for these tasks. If there are cost overruns in the first two categories, less money will be spent for these tasks.

- 3.1 (Development and Growth Staff at the Joint Venture): The current operations need additional staff to support DCI's increased sales and marketing efforts, to establish proper QC procedures and manuals, and to provide in-house training.

- 3.2 and 3.3 (DCI Ukraine Operations): DCI's baseline plan was to establish a representative office in Ukraine (new task 2.5). Depending on available funds, DCI will evaluate establishing an office in the Kyiv area with a larger staff at its office as well as a wholly owned subsidiary.
- 3.4 (DCI-USA Operations): DCI's baseline plan included only a skeleton staff in the USA until new sales resulted in gross profits that can sustain the additional overhead. With additional funds, DCI can increase its operating expenses (including travel) which will allow DCI to expand sales faster.

The budget to accomplish the basic tasks above (top two priorities) is $730,000. As other financing is received and/or as operating cash flow from the business is generated sufficient to provide reinvestment capital, additional tasks and investments will be considered by the DCB board. At this time, DCI has developed the budget shown as the "Secondary" and "Low" priority categories as the use of proceeds for the reinvestment capital.

- 3.5 to 3.7 (Increased DCB Working Capital): To improve the business prospects at DCB, DCI needs additional working capital for building new dies (where customers do not finance the upfront costs), for training of new workers as they are hired, and for quality control equipment not purchased and installed in the Category 1 Baseline budget (such as an X-ray machine).

**Revised DCI Budget For Stage I Completion ($000)**

| | | Priorities | | | |
|---|---|---|---|---|---|
| | | **Top** | **High** | **Secondary** | **Low** |
| **1** | **3 August Original 4 Month Baseline Budget** | | | | |
| 1.1 | Capital Building, Equipment & Refurbishment | 300 | 92 | | |
| 1.2 | Outside Services | 100 | | | |
| 1.3 | DCI Operating Expenses | 100 | | | |
| **2** | **Added Costs Due to Delay** | | | | |
| 2.1 | Additional Spares for Hydraulics/Linings | 10 | 6 | | |
| 2.2 | Recheck Equipment Operations | 5 | | | |
| 2.3 | Supplier Increases and Warehousing | 4 | | | |
| 2.4 | Added DCI USA/NIS Operating Expenses | 48 | | | |
| 2.5 | DCI Rep Office & JV Formation | 10 | 5 | | |
| 2.6 | Customer & Supplier Development | 5 | | | |
| **3** | **Additions Prioritized Out in Baseline** | | | | |
| 3.1 | Development/Growth Staff at JV | | 7 | 5 | 5 |
| 3.2 | DCI Subsidiary Formation & Office | | 0 | 15 | |
| 3.3 | DCI Ukraine Operations | | 17 | 20 | 20 |
| 3.4 | DCI-USA Operations | | 23 | 40 | 25 |
| 3.5 | Die Development Inventory | | | 50 | 50 |
| 3.6 | Training at JV | | | 20 | 20 |
| 3.7 | JV QC Labs & Equipment | | | 50 | 50 |
| 3.8 | Contingency | | (2) | | |
| | Subtotals: | 582 | 148 | 200 | 170 |
| | **Cumulative By Priority:** | | 730 | **930** | **1100** |

DCI has established its operating budget for the six months it anticipates it will take to complete the plant refurbishment and equipment installations, testing and training. Based on preliminary estimates of the monthly costs for refurbishment, the following monthly budget has been estimated:

| (US$ 000) | Months From Startup | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | |
| Plant Refurbishment & Installations | 55 | 75 | 120 | 67 | 49 | 26 | 392 |
| Services & DCB Formation | 29 | 29 | 4 | 20 | 33 | 33 | 148 |
| Operating Expenses | 37 | 35 | 29 | 31 | 27 | 31 | 190 |
| Total Monthly Expenditures | 121 | 139 | 153 | 118 | 109 | 90 | 730 |

It is anticipated that the general contractor's preliminary plan for the plant refurbishment and equipment installations will be completed in approximately six weeks. Likewise, it is anticipated that by the seventh week, all of the joint venture negotiations and documents will have been completed and will be ready for submission at the State Property Fund and Antimonopoly Committee. Prior to those two milestones, DCI will minimize its commitments to start the capital improvements at the plant and will minimize growth in overhead expenses. Therefore, a management milestone will exist around the end of the second month where a decision can be made to continue with the project or to stop all further work. Based on the monthly estimates shown above, approximately only $260,000 of the total $730,000 will have been expensed at that time.

Harry, I did not repeat all of the information provided with the 3 August review. If you need more information, please let me know and I will do my best to provide it to you as soon as possible.

As I have said before, it is critical that a decision be made immediately to provide us with the additional funding. We have been covering all of the extra costs to keep this project alive this long and, as has been stated before, can no longer do so. For instance, DCI has told the warehouse that it will not cover extra warehousing costs and the warehouse may take drastic action that will not be in anyone's best interests. In addition, relations with suppliers and customers have become strained because of all the delays. Your soonest action to expedite a decision in this regard will be appreciated.

Very truly yours,

Alan C. Frederickson
President

cc: Mr. Alexander V. Pavlenko, DCI Ukraine

# Die Casters International, Inc.

*Quality and Service Worldwide*

One Spruce Terrace, Wayne, New Jersey, USA 07470
(973) 696 - 9100 Fax: 696 - 9194 DCIWayne@aol.com


19 November 1998

Mr. William Taylor
Coordinator of United States
Assistance to the NIS
Room 4419, Department of State
Washington, DC 20520

Via fax: (202) 647-2636

RE: KHARKIV INITIATIVE

Dear Mr. Taylor:

Recently, I understand that Mr. Kempton Jenkins, President of the Ukraine-United States Business Council of which Die Casters Internaional (DCI) is a member, talked to you about DCI's project. I am following up by fax as time is important and as I beleive that the project can contribute positively to our interests in the Newly Independent States. DCI is currently seeking additional funding of $730,000 to complete its Nunn-Lugar project in Kyiv, Ukraine. Such funding will have a direct benefit to the Kharkiv Initiative through our business plan to replicate the Kyiv joint venture in other areas such as Kharkiv. I am asking for your support of our project.

In 1997, with the concurrence of both the Ukraine and United States governments, we reviewed numerous Ukraine defense factories and selected Burevestnik, located in Kyiv, as the best partner for us to generate manufacturing operations in Ukraine. This decision was carefully made considering business factors as well as national interests involving Nunn-Lugar objectives and diplomatic concerns such as relationships with Kommunar. The Kharkiv Initiative was not an issue at that time.

Our business strategy is to develop a successful joint ventured factory with the following goals:

- Utilize indigenous management and train that management in Western business practices.
- Incorporate American technologies in the production process and entrepreneurism in the management culture.
- Build a foundation focusing on a basic manufacturing process that builds on the strengths of the Ukraine management and workforce supplemented by the American technologies and Western business practices.
- Keeping it simple, make that foundation the building block for expansion of the factory itself.
- Similar to the successful business practice developed in America -- franchising -- use the first joint venture as the model for expansion into additional joint ventures elsewhere.
- Marry the positive aspects of the joint venture structure under an umbrella organization that allows executive management to focus resources and capital to extract the maximum from the assets of the Ukraine and American team we bring together.
- Use the operations as a show case to promote technology exchanges as well as export sales of American equipment.

The Burevestnik plant, management and workforce are ideally suited as that model. The DCI/Burevestnik team that is now in place maximizes the probability that all of the goals above will be successfully achieved. The joint venture we establish in Kyiv ("DCB") will provide us with the model operation and practices that can be replicated

in the Kharkiv region. As with franchising, our expansion into new joint ventures will have a much greater potential for success because we will be transferring business practices and production techniques that have been tried and tested within the Ukraine environment at DCB. It may appear that our operations are small and not worthy of the extra investment we are requesting from the United States government. However, that appearance is precisely why we can successfully expand into multiple joint ventures that can cumulatively employ well over a thousand workers in Ukraine alone. In essence, we are focused on what appears to be a little factory now so that we ensure the model will work and can be easily replicated into a large chain of factories.

For the Kharkiv Initiative, I propose that you consider an investment in DCB today as an excellent way to leverage future investments in Kharkiv tomorrow. A successful DCB will allow us to move into the Kharkiv region much faster with a greater chance for success and growth.

Under our current contract we have designed and manufactured Moldovan/American machinery and other equipment to establish DCB as a world class factory that will use leading American technologies. The DCI team that we have organized during our contract includes experts from Ukraine, Russia, Moldova and the United States and will later include personnel in Europe as we begin to penetrate the markets there. Wherever possible, we will build on the local assets that are available in each region into which we grow which will strengthen that team. As we enter the Western markets exporting DCB's products, we will have tremendous synergism to bring those markets to the growing infrastructure of joint ventured production facilities. As we develop our relationships with investment and commercial banks as part of the replication process, the availability and cost of new capital for each new joint venture will improve significantly. And, similar to franchising, our growth will be with people who will have ownership interests in their joint venture and will be dedicated to making that joint venture a success. And, the entrepreneurial environment created will foster a network that can become a show case of how American and Ukrainian businesses and people can thrive together.

The initial building block at DCB will employ over 300 people in Kyiv when it is fully operational. We have an established customer base in Europe and significant new customers lined up for growth. We have proven production and engineering talent and high technology equipment designed specifically for the Ukraine environment that is ready to be installed. We have growth plans for DCB that will give it a chance to expand internally well beyond 300 workers. We have a potential customer that could be the catalyst for expansion into four or five additional joint ventures. And, we have the management team that is fully capable of expanding the operations beyond DCB. What we do not have is the capital to make that first building block operational. That is why we have requested the full $730,000 of funds available under the current Nunn-Lugar program.

Ambassador Taylor, time is very critical for us. Everyone of DCI's team members have been dedicated to the success of the project and have been supporting everything asked of them without pay for most of 1998. That cannot continue any longer. Mr. Jenkins is very familiar with our project and may be able to answer some of your questions. I would be pleased to discuss our project with you at your earliest convenience.

Thank you for your considerations and the best of luck in your new assignment.

Very truly yours,

Alan C. Frederickson
President

cc: Mr. Kempton Jenkins, Ukraine-United States Business Council
Mr. Harry Cook, Defense Threat Reduction Agency (DCI's Program Manager)

**Die Casters International, Inc.**

***Quality and Service Worldwide***

One Spruce Terrace, Wayne, New Jersey, USA 07470
(973) 696 - 9100 Fax: 696 - 9194 DCIWayne@aol.com

23 Nov To: Mark West (CVR)
(703) 658-3446 Please send to Harry, his fax number still does not answer. Alan

23 November 1998

Mr. Harry Cook
Cooperative Threat Reduction Office
Defense Threat Reduction Agency
45045 Aviation Drive
Dulles, Virginia 20166

Via fax: (703) 326-8557 (1 page)

Dear Harry:

It has become clear that a decision to fund our project has not been made. From Mr. Shulepov's questions that seemed to be structured for him to justify our existence and from your indication that no determination had been made about how the funds will be distributed nor who will be responsible for that decision, I just see more delays. In my opinion, all the business facts relating to our project are the same as they were nine or twelve months ago, except that I am much poorer and my personnel have been bled without compensation.

DCI is not a "General Motors" and has never claimed to be. I cannot finance any further our government's effort to help develop an small economic base for Ukraine and to provide some form of conversion. While the decision to provide funds (or not) has been delayed, my people have been supporting the project without pay. We have proven our dedication and that we can get Congressional and Ukraine ministerial support. While we may not be a "General Motors," we have the professional acumen and can get things accomplished.

Without a written decision that indicates how much DCI will receive under terms that are acceptable, at the end of this month I must close my office and tell all my people to find other work. I will not be closing DCI as an entity as DCI has liabilities accrued that are tied to the assets relating to our portion of the equipment in Kyiv and Moldova.

As indicated in my 17 November proposal, I have told Pavlenko that he must inform the Kyiv warehouse that DCI will not pay any further storage costs for the equipment in Kyiv. I am told that the warehouse previously imposed an additional daily charge for storage (like a penalty) because the equipment has been in storage for nearly one year, and the customs warehouse wants it removed. Without the extra funding, I cannot correct that problem. While we have paid for warehousing in Kyiv, we have not paid for storage of the equipment at Litmash. However, I have not talked with Litmash and have no idea what Litmash will do when they are told that DCI will no longer be involved with them and with a joint venture in Kyiv.

While the equipment is both DCI's and the US government's, the government effectively promised to contribute their portion to the Ukraine government for installation in Ukraine. Installation was supposed to be at DCI's joint venture, DCB, where DCI agreed effectively to contribute its portion of the equipment (currently approximately $770,000 worth) in return for equity in the joint venture. Without the extra funding, DCB will not happen. DCI, as a corporate entity, expects to get a return on that equipment whatever happens to it.

I will appreciate it greatly if you can expedite a decision.

Very truly yours,

Alan

Alan C. Frederickson