Q Would that have been the auditor?
A That sounds like a name that I remember.
Q It was an auditor out of the New Jersey office of DCAA?
A They would have been cognizant, so yes, that's probably where it was out of.
Q Do you have any idea when these discussions may have taken place?
A I have no idea.
Q Do you know what the discussions entailed? What did she say to you and what did you say to her?
A I don't remember a specific conversation.
Q I'm going to show you this document which is marked as Exhibit 15. Can you review this document?
(Brief pause.)
Mr. Thompson, do you recognize that document?
A I don't specifically recognize it. I have probably looked at it, have seen it before.

Q Okay. Is it fair to say that it is an audit report by DCAA concerning the calendar year 1995 with respect to the DCI contract?
A Yes.
Q This document is dated February 10th, 1999. That seems to be approximately the same date that you took over responsibilities under this contract. Is that true?
A I don't know if that's the date that I took over.
Q It was approximately the time.
A Approximately.
Q Would this document have come to you in that role? It was addressed to Scott Morton, who you had testified was the prior Contracting Officer. Would this document have come to you as Mr. Morton's successor in interest?
A It's likely that it would have come to me, yes. I don't know why it would not have.
Q Okay. But your testimony is that you do not recall specifically receiving this document.
A Usually what happens when a file is

transferred, you get all of the documents associated with it. So this could have been one of the documents.

Q Okay. The cover letter to this document that was written by Peter Kornutick, the Branch Manager of DCAA, asks in the cover letter for a meeting with you, which was addressed to Scott Morton, who was the Contracting Officer, so I guess it would have been you as his successor, your counsel, and representative of the cognizant criminal investigative organization in an effort to reach a proper disposition of these issues in light of the requirements of DOD Directive 7050.5. What he was specifically referring to was the fact that this audit report addressed certain matters that raised a suspicion of potential fraud on the part of DCI. Did you ever respond to this audit report?

A Respond to whom?

Q Respond to Mr. Kornutick, who requested a meeting, it says with you, but addressed to the Contracting Officer. So did you as the Contracting Officer at that time or subsequently ever respond

to Mr. Kornutick's request for a meeting?
A I don't recall ever having a meeting with DCAA based on this letter.
Q Do you recall ever discussing this letter or this audit report with Mr. Morton?
A I don't recall having a discussion with Mr. Morton about this audit report specifically.
Q How about Mr. Archer?
A I don't recall.
Q I would like to turn your attention to page 12 of this audit report, in particular item four. It talks about "If the contractor disagrees" -- this is the Form 1 that was attached to the audit report -- "If the contractor disagrees with these determinations, the contractor may, one, request in writing the cognizant Contracting Officer to consider whether the unreimbursed costs should be paid and to discuss his or her findings with the contractor and/or, two, file a claim under the 'Disputes' clause of the contract."
Do you know if Mr. Frederickson or anybody else at DCI ever voiced their disagreement

with the findings in this report?

A I believe in the report it identifies the disagreement of Mr. Frederickson.

Q Did you ever receive any communications from Mr. Frederickson requesting that you discuss the contents of this report, either verbal or written?

A I don't recall.

Q As far as you know, did anybody from DTRA respond to this report from DCAA in any manner?

A Not that I know of.

Q Turning your attention back to the first page of the report, there is a reference to a cognizant criminal investigative organization. Do you see that reference?

A Yes.

Q What do you think Mr. Kornutick was referring to?

MR. GILLINGHAM: I object. That's beyond his knowledge.

MR. MARCUS: I don't think it is beyond

Q Did you ever ask anybody whether such a letter was ever written, any prior Contracting Officer?

A No. Our practice normally is when a Defense Criminal Investigative Service investigation has been launched already when I get it, that's normally something they do. I don't try to conduct independent investigations.

Q I would like to show you this document which was previously marked Exhibit 15 and ask you if you recognize it.

A It's from the DCAA auditors, but I don't have any specific recollection of the document.

Q This was addressed, this document from the Branch Manager of the Northern District -- I'm sorry -- Northern New Jersey Branch Office of DCAA, was addressed to Mr. Scott Morton, is that correct?

A That's what it says here.

Q It is dated February 10th, 1999. If I understood your testimony previously, Scott Morton was at that period of time no longer the cognizant Contracting Officer and that either you or somebody

under your supervision was.
A It transitioned in 1999. I don't recall the exact date in 1999 it transitioned. So I don't recall the date, but I don't believe it was 1 January.
Q Do you know whether anybody in your office received a copy of this, if you or anybody in your Contracts Office received a copy of this document?
A I don't have any specific recollection of receiving it.
Q But the contracts files from Mr. Morton were turned over to you.
A Yes.
Q So this document would have likely been part of the contracts files that were turned over?
MR. OLIVIER: Objection. Calls for speculation.
THE WITNESS: I don't know.
BY MR. MARCUS:
Q Where would you keep a document such as this? Would you keep it in the contracts files?

A These types of documents typically are filed in the contract file.

Q Can you check your files and see if you or anybody, one of your Contracting Officers that worked for you, ever received this document?

A I personally have no files on this. Everything to my knowledge would have been in the contract files. I don't keep independent records.

Q Can you check the contract files for your branch and see if there was ever receipt of this document?

A To my knowledge everything was turned over to our General Counsel, so....

MR. OLIVIER: For the record, I will state that the documents were produced as part of the contract file that was produced to plaintiff in this case.

MR. MARCUS: But I don't know if it was his contracts files or Morton's contracts files. All I got was a bunch, 7,500 pages of consecutively numbered documents.

MR. OLIVIER: Well, you can ask if there

is more than one contract file.

BY MR. MARCUS:

Q Okay. Is there more than one contract file?

A There is typically only one contract file. There may be several folders, but there is generally only one file.

Q So Mr. Morton, when he transferred the contract file to you, Mr. Morton, or whoever it was, gave you the entire file and then you continued to maintain that file?

A Correct. That would be our standard procedure.

Q Okay. I would like to draw your attention to the cover sheet of this notice. In particular I would like you to take a look at the last sentence that starts with "We are willing to discuss these matters with you, your counsel, and representative of the cognizant criminal investigative organization in an effort to reach a proper disposition of these issues in light of the requirements of DOD Directive 7050.5, Coordination

of Remedies for Fraud and Corruption Related to Procurement Activities." Are you familiar with DOD Directive 7050.5?

A No.

Q Did you or anybody subordinate to you discuss this report with either DCAA or your counsel or the representative of the cognizant criminal investigatory agency as requested?

MR. OLIVIER: I'm going to object to the extent it seeks to invade attorney-client privilege and conversations with his counsel.

MR. MARCUS: Okay. He can answer as to whether or not he had a discussion with counsel. I'm not asking him the contents of it.

THE WITNESS: I don't recall having any discussion.

BY MR. MARCUS:

Q Do you know if anybody who reported to you had a discussion, like Mr. Thompson?

A I can't say that for sure.

Q Do you deem a report like this to be a directive or do you deem it to be an opinion of

DCAA as to in this case the allowability or disallowance of particular costs?

MR. OLIVIER: Objection. Vague and ambiguous.

THE WITNESS: That's --

BY MR. MARCUS:

Q You can answer the question.

A I can't speak to the document itself, but I can say that generally the DCAA findings are for the most part recommendations to the agency.

Q That you as a contracts person, the Contracting Officer is free to adopt or not adopt as you please.

A They are generally recommendations.

Q Can you adopt them or not adopt them as you please?

A They are recommendations that we would consider for further actions. There is obviously constraints on how we proceed from that.

Q Have you ever disregarded a DCAA recommendation?

MR. OLIVIER: Objection. Vague and

ambiguous.

THE WITNESS: That's --

BY MR. MARCUS:

Q Okay. Can you recall any instance in which you may have rejected a DCAA recommendation?

A I can't recall.

Q Can you recall any instances where you may have not understood a DCAA recommendation and may have gone back to DCAA and asked for further edification?

A I don't have specific knowledge of any such situation.

Q I'm going to show you a document that was previously marked as Exhibit 16.

(Brief pause.)

Can you identify this document?

A Identify as in? I don't understand the question.

Q What is this document?

A In the subject line it says cautionary statement related to an audit report.

Q But it continues underneath. The

following pages are what?

A It is an audit of incurred costs.

Q Okay. For the calendar year 1996 with respect to DCI on the contract?

A Yes.

Q When was this audit report received?

A The audit report itself is dated September of 2000.

Q Do you recall ever receiving a copy of this report?

A I don't recall receiving it. But at that point in time I wasn't the Contracting Officer, so it probably would not have been brought to my attention ordinarily.

Q Who was the Contracting Officer?

A It says Herbert Thompson, and I believe over that time span Herb was the Contracting Officer.

Q Do you think Herb would have received a copy of this report?

A It's addressed to him.

Q Okay. I would like to have you look at

page 22 of this report. Make it 23. Have you read the list of distributees?

A Yes.

Q After having read this list of distributees, would you like to change your prior testimony about receiving a copy of the report?

A My prior testimony is I don't recall receiving it.

Q Right.

A I would say that I still don't recall receiving it.

Q Okay.

A My name is on the distribution list.

Q Okay. But you still don't recall receiving a copy of it.

A That's several years ago.

Q Okay. Did you ever discuss this report with Mr. Thompson?

A I don't recall discussing this with Mr. Thompson.

Q Turning your attention back to the first page, this document has a similar cover page to the

prior report that we looked at. It has a similar writing in the last sentence offering that DCAA was willing to discuss this report with your counsel or a representative of the cognizant criminal investigative organization. Do you recall ever discussing the contents of this report with either your counsel or a representative of the cognizant criminal investigative organization?

A No. I believe actually that the DCIS report actually had been issued before we received this report. But I don't recall discussing it with anyone.

Q And if I showed you similar language for the calendar year '97 and '98, would your answer be the same?

A That I don't recall receiving it?

Q That you don't -- first thing is did you discuss it with anyone?

A No, I did not have discussions to my knowledge.

Q Now I'm going to ask the other question that you tried to answer first.

A The specific reports I did not have discussions.

Q I will show you what has been previously marked Exhibits 19 and 20 and ask you if you recall receiving either of those two audit reports.

A I do not have a specific recollection.

Q Okay. Let's go back to Exhibit 16 for a second. I would like you to turn to page 29. This page is page 3 of 3 of a Form 1, is that correct?

A That's what it says.

Q The first paragraph on this page indicates that the purpose of this form is to initiate Contracting Officer action in rendering a final decision on the questioned costs associated with the issue described herein with which the contractor does not agree. Do you know if you or Mr. Thompson or any of your subordinates acting as a Contracting Officer ever issued a final decision rendering a decision with respect to the questioned costs in this report?

A I do not recall a final decision on the Form 1.

Q What do you recall?
A All I can say is I don't recall a final decision on the Form 1.
Q Is it possible that one was never issued?
A If I don't recall it, then it could be possible.
Q Okay. Then this Form 1 goes on to say "It is our opinion that the contractor has been fully paid for the suspended costs and should be required to reimburse the government for same." Did you or Mr. Thompson or any one of your subordinates ever request DCI to reimburse the government based upon the findings in this report?
A Based on the findings in this report, I don't recall such demand for payment.
Q Can you recall any demand for payment from DCI?
A I don't recall any demand for payment.
Q Okay. The next line says "Mr. Herbert Thompson, Contracting Officer, was notified of our position and our intent of issuing a Form 1 on July

1, 1999. Mr. Thompson did not comment regarding our position and the issuance of this Form 1." Did Mr. Thompson ever discuss his conversation with DCAA with you on or about July 1, 1999?

A I don't have a recollection of a discussion some years ago with Mr. Thompson.

Q Did you ever discuss in general any of the issues raised by DCI's accounting practices and DCAA's recommendation to disallow certain costs with Mr. Thompson?

A Mr. Thompson. I would certainly discuss with the Contracting Officer that there was a criminal investigative service action in process.

Q Right. And what did you discuss? Just that it was in process?

A That it's in process, yes.

Q And did you advise him to do anything, to take any actions?

A I don't recall any specific actions that he was requested to undertake.

Q We can assume for the sake of moving this deposition along that the audit reports for

the calendar years '97 and '98, which I will show you as Exhibit 19 and 20, contained similar language in the Form 1s and have a similar distribution as the prior report that we looked at.

MR. OLIVIER: Is that a question?

BY MR. MARCUS:

Q I guess I will finish with a question. Would your responses to the prior questions concerning the '96 report be the same with respect to these reports concerning your contacts with Mr. Thompson and your knowledge of any contact with DCAA in response to these reports?

A As in I don't have a specific recollection of receiving the reports.

Q Okay.

A Nor do I recall a specific discussion I had with DCAA. I wouldn't be able to say what Mr. Thompson had discussed with them.

Q Okay. If Mr. Thompson received these reports and did not issue a final decision and you later learned about it, would you have taken some disciplinary action concerning Mr. Thompson?

MR. OLIVIER: Objection. Calls for speculation.

THE WITNESS: I don't understand the question.

BY MR. MARCUS:

Q The question is as Mr. Thompson's supervisor, if he had received a report such as this that asked him to issue a final decision with respect to the Form 1 and he had not, would you reprimand him?

MR. OLIVIER: Objection. Calls for speculation. Vague and ambiguous. And mischaracterizes the evidence.

THE WITNESS: It all depends on the situation.

BY MR. MARCUS:

Q Okay. If the Contracting Officer did not issue a final decision with respect to these reports, these Form 1s, as requested, would the matter ever get resolved?

A Every contract is closed out, so by closeout you are always going to at some point

resolve what has not been paid in terms of sums certain.

Q Do you know if Mr. Thompson or yourself or anybody who was your subordinate had ever invoked the procedures under the FAR with respect to disallowed costs? Are you aware that there is a procedure under the FAR with respect to resolving disallowed costs?

A I don't specifically have specific knowledge of it. I mean we always, whenever we run into, have an unusual contract administration issue, we will of course research the Federal Acquisition Regulations. I couldn't quote chapter and verse today how that process works.

Q I would like to show you this document that was previously marked as Exhibit 17. Do you recognize that document?

A This document?

Q Yeah.

A It says FAR Part 42.8 on it.

Q Okay. And it deals with what?

A Title is "Disallowance of Costs."

Q Do you know if you or Mr. Thompson or anybody, any other person under your supervision, ever instituted any of the procedures outlined here with respect to the disallowed costs in the DCAA reports I've just shown you?

A I don't recall invoking this procedure, but again, the contract was already out of money by the time we received it.

Q Okay. Was this contract ever closed?

A It was -- the contract was open when I had -- that is we were looking to close it when I left, that is in April of 2003, I believe it was 1 April, when I was transferred to another area. So I can't say specifically I have specific knowledge of when it was closed out.

Q As of the time that you had left, had these issues concerning the audit reports been resolved as preliminary to a closeout of the contract?

A I could say the contract wasn't closed out before I left.

Q But were the issues concerning the

BY MR. MARCUS:

Q. You can answer the question.

A. I have no knowledge of -- of any particular disapproval.

Q. Did you personally ever disapprove any invoice --

A. Not that I recall.

Q. And you never told Mr. Cox to disapprove any invoice?

A. Not that I recall.

Q. You never told Mr. Cook to disapprove any invoice?

A. Not that I recall.

Q. Mr. Cook never had any conversations with you or to your knowledge Mr. Cox, to disapprove any invoices?

A. No. I don't remember any conversations about that, that doesn't mean that none occurred, but I don't recall any.

Q. I would like to show you this document.

**(Deposition Exhibit Number 15 was marked for identification.)**

BY MR. MARCUS:

Q. Mr. Morton, do you recognize this document?

A. I understand what the document is, I don't necessarily recognize it from memory.

Q. Even though it's addressed to you?

A. Correct.

Q. Did you receive it?

A. The time frame, I believe, would have been outside when I was -- I would have been the cognizant contracting officer on this contract.

Q. So, but you were still at DTRA?

A. I would still have been at DTRA, correct.

Q. So, if it came in the mail to you, what would you have done with it?

A. I would have given it to whoever the cognizant contracting officer would have been at that time.

Q. And who do you think that might have been?

A. As I indicated before, I thought that

it might have been Mr. Shires, but that may be incorrect.

Q. Was Mr. Cook still involved in this contract?

A. I can't answer that for that time period.

Q. When you moved over, did he move over with you, or did he stay behind?

A. He would have remained as a contract negotiator, basically doing the same kind of thing.

Q. Is it your understanding from the cover letter to this weather report, which is what the document is. Let's start with that, is this an audit report for the calendar year 1995 with respect to DCI, from DCAA?

A. Yes, it's an incurred cost report.

Q. And does the branch manager of DCAA flag this as being a matter that has raised suspicion of potential fraud on the part of DCI?

A. Yes.

Q. And does he further ask or state that

he is willing to discuss with you, your counsel, and representatives of the cognizant criminal investigative organization in effort to reach a proper disposition of the issues in light of the requirements, DOD directive 70-50.5?

A. Yes.

Q. Did you ever partake in any such meeting?

A. Not that I recall.

Q. To your knowledge, did anybody at DTRA ever partake of any such meetings?

A. Not to my knowledge.

Q. Did you ever have any discussions with any cognizant criminal investigative organization concerning this?

A. Not that I recall.

Q. I would like to turn your attention to page 12 of this report, which is the so-called form 1. In item number 4, in the printed version, it says, "If the contractor disagrees with these determinations," meaning the DCAA determinations, do you see where it says that?

A. Um-hmm.

Q. "The contractor may request in writing the cognizant contracting office to consider whether or not the unreimbursed cost should be paid or discuss his and her findings with the contract; and two, file a claim under the disputes clause of the contract."

Do you know if DCI ever disputed these findings?

A. I do not have specific knowledge whether they did or did not.

Q. So, it's your testimony that by the time this first audit report came in, because this was the first year of the contract, correct? Calendar year '95 was the first year of the contract?

A. Calendar year '95 was the first year of the contract performance.

Q. So, by the time this audit report came in on February 10, 1999, you were no longer the cognizant contracting officer and you have no idea what happened to this report?

A. I do not believe that I was a cognizant contracting officer at this time. And I don't have specific knowledge of what went on as a result of this report.

Q. Who do you think would have knowledge of what happened with respect to this incident?

MR. OLIVIER: Objection, calls for speculation.

BY MR. MARCUS:

Q. But answer it.

A. I really -- I don't know who would have had knowledge, the cognizant contracting officer would likely have had knowledge, whoever that would have been.

Q. Do you understand what DCAA's position was with respect to these costs as to why they disallowed them?

A. Based on the written record, I could summarize what I think.

Q. Okay.

A. Basically their concern is that DCI billed the government for the entire amount of