# EXHIBIT A

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

------------------------------------------------------- X

**DIE CASTERS INTERNATIONAL, INC.,**

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

------------------------------------------------------- X

No. 04-1113C
(Judge Braden)

**REPLY AFFIRMATION IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR AN ORDER PURSUANT TO RCFC 37(a)(2)(A) COMPELLING DEFENDANT TO MAKE REQUIRED DISCLOSURES AND PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION TO COMPEL DISCLOSURES**

**GARY MARCUS,** an attorney duly admitted to practice law in the Courts of the State of New York, affirms the following under penalty of perjury:

1. I am an attorney associated with the law firm of Goldberg & Connolly, attorneys for Plaintiff, Die Casters International, Inc. ("DCI"), in the above-captioned action and I am familiar with the facts and circumstances set forth in herein.

2. I submit this Reply Affirmation in Support of Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for an Order Pursuant to RCFC 37(a)(2)(A) Compelling Defendant to Make Required Disclosures, and Plaintiff's Response to Defendant's Cross-Motion to Compel Disclosure.

3. I was a participant to a Status Conference held on January 11, 2005 with the Defendant's counsel, Judge Braden, and the Judge's Clerk, Elizabeth Clements with respect to this litigation. At that conference which resulted in a Scheduling Order filed by the Court on January 18, 2005, there was a discussion concerning the possible need of discovery in the Ukraine by Defendant's counsel. At that point, I suggested that if Defendant's counsel would supply me with a list of facts that he would like to determine that it was likely that I could stipulate to same and, therefore, alleviate the expense and time of traveling to the Ukraine. To date, I have not received any such list of facts from the Defendant's counsel. At that Status Conference there was never any discussion concerning the postponement of discovery proceedings pending the Court's decision on the cross-motions for summary judgment. In fact as evidenced by the Scheduling Order, the Court set a July 1, 2005 cutoff date for fact discovery.

4. Notwithstanding Defendant's counsel's characterization of Plaintiff's document disclosure as a "document dump" (Defendant's Response, p.4), Plaintiff and its counsel carefully reviewed all documents tendered to Defendant in response to its requests. The only thing Plaintiff may be guilty of is erring on the side of disclosing a document when there was any doubt as to its responsiveness. A large part of the problem of identifying responsive documents

was caused by Defendant's unreasonably broad document requests. Plaintiff and its counsel spent the better part of a week in the examination of the tendered documents.

5. The Defendant's complaints concerning the cost of producing the documents (Defendant's Response, p.5) are totally uncalled for. The Defendant has driven the Plaintiff to the edge of bankruptcy by illegally appropriating and disposing of its assets, and then has the gall to complain about not being reimbursed the insignificant costs of copying documents.

6. On February 25, 2004, Plaintiff filed a two volume certified claim that contained all the information and supporting documents to substantiate its claims. The fact that Defendant only produced a relatively minor portion of this critical document when it was clearly within Plaintiff's Document Request and then complains that "At the very least, Plaintiff should be required to disclose to the Government the documents and information from witnesses that led it to file suit against the Government in the first place" is incredulous. The information was handed to Defendant in a comprehensive and organized manner, apparently they just did not bother to read or analyze it.

7. Defendant's argument on page 8 of its Response that "When defendant voluntarily agreed to make copies of the documents in DTRA's files, defendant did not agree to also make copies of documents in the files of other agencies as well." totally lacks any merit. Not only did Plaintiff's First Request For The Production of Documents specify a number of times documents from "DTRA or any Department or Agency of the United States Government" (Plaintiff's

Motion, Exhibit A, ¶3, 5, 18, 19, 20, 22, 23, 24), but in the Defendant's Response to Plaintiff's First Request for Production of Documents each and every response states that it is providing "all reasonably available non-privileged documents responsive to this request that are within the Government's possession . . ." (Emphasis added). (Plaintiff's Motion, Exhibit B). When Mr. Rickard agreed to copy a "banker's box" of documents, there was no doubt in my mind that I was being tendered all responsive documents whether from DTRA or "from other agencies". My letter of December 17, 2004 to Defendant's counsel memorializes this understanding. (Plaintiff's Motion, Exhibit J).

8. In response to Mr. Lewis' statement in ¶3 of his Affirmation concerning the production of documents from other Government Agencies, it is curious that he does not indicate when these requests were made.

9. With respect to the allegation in Mr. Lewis' Affirmation concerning Mr. Thompson's indication that he may have copies of e-mails related to Die Casters in his personal office computer. I have reviewed the transcript of the government depositions and can find no such indications, nor do I recall Defendant's counsel advising me of the possibility of other responsive documents being available. Additionally, the fact that Mr. Lewis may have been well intentioned with respect to asking the government witnesses to see if they had e-mails in personal files does not excuse the production of these documents when requested nor the disadvantage to Plaintiff by not having these documents available for the deposition of these witnesses.

10. With respect to Mr. Lewis' accusation concerning the production of the 9/28/2001 e-mail from Herbert Thompson (Def. App. 6 ¶5), what the government claims is the e-mail provided, is not the original e-mail but a copy of the e-mail forwarded by Mr. Archer on October 1, 2001. The Plaintiff is entitled to see the e-mail as it existed in Mr. Thompson's files, with all related forwarding and responses, not as a forwarded attachment from Mr. Archer.

11. With respect to Mr. Lewis' allegations concerning other examples of compliance (Def. App. 7, ¶5):

(a) The fact that small excerpts from the Plaintiff's certified claim were produced is no excuse for not producing the entire claim in its organized binders as filed. This copy of the claim and any reproduction may have contained notes and calculations vital to the Plaintiff's case. The Defendant's attitude of picking and choosing which parts of the claim it is producing is not acceptable. It is required to produce all portions of the claim documents as they were maintained in the ordinary course of business.

(b) The document Defendant claims shows an "analysis" of the Plaintiff's claim is an e-mail making a fleeting reference to DCI and its claim that valued the Equipment at $5,955,933.22 (Bates 00199) and a "Draft Statement of Fact" (Bates 04812 - 0481) which lacks any management, legal or financial analysis.

(c) The documents Defendant claims meet the requirement with respect to furnishing "the contractual documents by and between Defendant and Raytheon Technical Services" contain only one small part of the Contract DAMJ01-01-D-0194, to wit, Modification P00019. The balance of the Contracts were not produced and this Modification applied only to the Equipment in Moldova. There were no Contract documents produced with respect to the Equipment stored in Kiev or for the installation of the Equipment at Burevestnik (as requested in Plaintiff's Document Request Number 20).

(d) With respect to my request for production of a "position paper", the Defendant contends that it offered a "point paper". Mr. West's deposition, at page 54, indicates that he "provided him (Mr. Palevitz) the background data" and later Mr. West states in response to a question concerning a "position paper", that he forwarded one. There is a distinction between a bunch of undated, unsigned talking points and a formal "position paper". What the Defendant produced is talking points, they have still not produced a "position paper".

(e) With respect to the analysis of the Defendant that the Defendant paid 100% of the Equipment costs, Mr. Lewis' assertion that it was found at page 85-86 of the West Deposition is erroneous, it was at page 85-86 of Mr. Archer's deposition and the proof offered at Bates 5705-5706 is a self-serving letter from the Deputy Director of DTRA ("Bongiovi") and has no analysis; Bates Document 05769-05774 and 05990-05996 were sent by Defendant on April 15, 2005, two months after the depositions and only after Plaintiff indicated it was prepared to make

this Motion to Compel; and Bates 05769-06774 and 05990-05992 are merely drafts of the self-serving Bongiovi letters stated above.

(f) With respect to the November, 1998 letters, I agree with Mr. Lewis that the letters are not among the documents Defendant produced. The fact that the November 23, 1998 letter containing a notation by Mr. Frederickson that the "fax number still does not answer", merely indicates that was the reason he faxed it to Mr. West instead of Mr. Cook. It still does not refute the fact that Defendant did not produce the documents whether it went to Mr. West or Mr. Cook.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 31, 2005, at Rockville Centre, NY

/s/
GARY MARCUS