# In the United States Court of Federal Claims

No. 04-1113C
Filed: July 29, 2005
**TO BE PUBLISHED**

**************************************

| | | |
|---|---|---|
| | * | Equitable Distribution; |
| DIE CASTERS INTERNATIONAL, INC., | * | Summary Judgment; |
| | * | FAR § 31.201-2 (Allowable Costs), |
| Plaintiff, | * | 48 C.F.R. § 31.201-2; |
| | * | FAR § 52.202-1 (Definitions), |
| v. | * | 48 C.F.R. § 52.202-1; |
| | * | FAR § 52.232-20 (Limitation of Cost), |
| THE UNITED STATES, | * | 48 C.F.R. § 52.232-20; |
| | * | FAR § 52.245-5 (Cost-Reimbursement, |
| Defendant. | * | Time-and-Material, or Labor-Hour |
| | * | Contracts), 48 C.F.R. § 52.245-5; |
| | * | FAR § 52.249-6 (Termination Cost- |
| | * | Reimbursement), 48 C.F.R. § 52.249-6; |
| | * | RCFC 56(c). |

**************************************

**Gary Marcus**, Goldberg & Connolly, Rockville Centre, New York, for plaintiff.

**William K. Olivier**, United States Department of Justice, Washington, D.C., for defendant.

**David C. Rickard,** Deputy General Counsel, Defense Threat Reduction Agency.

## MEMORANDUM OPINION AND ORDER DENYING SUMMARY JUDGMENT AND SETTING TRIAL

**BRADEN,** ***Judge***

## FACTUAL BACKGROUND[1]

---

[1] The relevant facts recited herein were derived from the following portions of the record: Plaintiff's July 6, 2004 Complaint ("Compl."); Defendant's September 17, 2004 Answer ("Gov't Answer"); Plaintiff's September 21, 2004 Motion for Partial Summary Judgment ("Pl. S.J. Mot."); September 21, 2004 Affidavit of Alan C. Frederickson in Support of Plaintiff's Motion for Partial Summary Judgment ("Frederickson Aff."); Plaintiff's September 21, 2004 Statement of Proposed Findings of Uncontroverted Fact Pursuant to RCFC 56(h)(1) ("PFF"); Plaintiff's October 7, 2004 Amended Motion for Partial Summary Judgment ("Pl. Am. S.J. Mot.") and Memorandum of Law In Support ("Pl. Brief"); Defendant's November 18, 2004 Response to Plaintiff's Motion for Partial Summary Judgment ("Gov't Resp."); Defendant's November 18, 2004 Cross-Motion for Summary Judgment ("Gov't Cross S.J. Mot.") and Appendix thereto ("Gov't App."); Defendant's November 18, 2004 Response to Plaintiff's Proposed Findings of Uncontroverted Facts and Defendant's

Die Casters International, Inc. ("DCI"), organized in 1994 under the laws of the State of New Jersey, is a small business, as defined in the Federal Acquisition Regulations. *See* Frederickson Aff. ¶¶ 4, 5; *see also* DFF ¶ 2.

On October 27, 1995, the Defense Nuclear Agency ("DNA" or the "Government")[2] awarded DCI Contract No. DNA001-95-C-0169 (the "Contract") to provide assistance and investment, including capital, equipment, material, training and business assistance/advisory services to the Meridian Joint Stock Company, Kyiv, Ukraine ("Meridian")[3] and to a wholly-owned DCI subsidiary. *See* Frederickson Aff. Exh. 1 (Contract at Statement of Work ¶ 1.) The DCI subsidiary was to be located in Ukraine in order to market, retrofit and retool existing die cast manufacturing equipment, and support industrial restructuring to establish productive, commercially successful commercial enterprises in that country. *Id*. The Contract was awarded on a cost-share basis in the total amount of $4,100,427.00. *See* Frederickson Aff. Exh. 1 (Contract at 2, Section B ¶ 1a). DCI's share of the contract was $1,066,111.00, approximately 26 percent of the total contract amount; the Government's share of the Contract was $3,034,316.00, or approximately 74 percent of the total contract amount. *See* Frederickson Aff. Exh. 1 (Contract at 2, Section B ¶¶ 1a-c).

The primary objective of the Contract was to provide assistance to support the conversion and privitization of Meridian's defense-related manufacturing base into the production of consumer products, primarily die cast products, to meet demand in the Ukraine and for export. *Id*. (Contract at Statement of Work ¶ 1.2.). The Contract also provided that DCI would form at least two joint venture stock ownership companies ("JVs") to operate as the legal entities through which DCI would build relationships with Meridian. *Id*. The term was twenty-four months from October 27, 1995, the effective date of the Contract. *Id*. (Contract at 3, Section F ¶ 1).

---

Additional Proposed Findings of Uncontroverted Facts ("DFF"); December 1, 2004 Reply Affidavit of Alan C. Frederickson ("Frederickson Reply Aff."); Plaintiff's December 6, 2004 Reply Brief ("Pl. Reply"); Plaintiff's December 6, 2004 Reply to Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Facts and Defendant's Additional Proposed Findings of Uncontroverted Facts ("Pl. Reply to DFF"); December 23, 2004 Reply to Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment ("Gov't Reply").

[2] The Defense Nuclear Agency is the predecessor to the Defense Special Weapons Agency ("DSWA"), which in turn was the predecessor to the Defense Threat Reduction Agency ("DTRA"), a federal executive agency, established pursuant to 10 U.S.C. § 111. *See* Frederickson Aff. ¶ 6.

[3] Meridian was formerly known as Korolev Production Amalgamation. *See* Frederickson Aff. Exh. 1 (Contract ¶ 1.).

The Contract incorporated FAR § 52.232-20 (Limitation of Cost) that provides, in relevant part:

> (a) The parties estimate that performance of this contract, exclusive of any fee, will not cost the Government more than . . . (2) if this is a cost-sharing contract, the Government's share of the estimated cost specified in the Schedule. The Contractor agrees to use its best efforts to perform the work specified in the Schedule and all obligations under this contract within the estimated cost, which, if this is a cost-sharing contract, includes both the Government's and the Contractor's share of the cost.
>
> * * *
>
> (d) Except as required by other provisions of this contract, specifically citing and stated to be an exception to this clause –
>
> > (1) The Government is not obligated to reimburse the Contractor for costs incurred in excess of . . . (ii) if this is a cost-sharing contract, the estimated cost to the Government specified in the Schedule, and
> >
> > (2) The Contractor is not obligated to continue performance under this contract (including actions under the Termination clause of this contract) or otherwise incur costs in excess of the estimated cost specified in the Schedule, until the Contracting Officer (I) notifies the Contractor in writing that the estimated cost has been increased and (ii) provides a revised estimated total cost of performing this contract. If this is a cost-sharing contract, the increase shall be allocated in accordance with the formula specified in the Schedule.
>
> (e) No notice, communication, or representation in any form other than that specified in subparagraph (d)(2) above, or from any person other than the Contracting Officer, shall affect this contract's estimated cost to the Government. In the absence of the specified notice, the Government is not obligated to reimburse the Contractor for any costs in excess of the estimated cost or, if this is a cost-sharing contract, for any costs in excess of the estimated cost to the Government specified in the Schedule, whether those excess costs were incurred during the course of the contract or as a result of termination.
>
> * * *
>
> (h) If this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each.

48 C.F.R. § 52.232-20.

On January 30, 1996, Scott G. Morton, a DNA Contracting Officer ("Contracting Officer I"), issued Modification No. P00001 to incorporate 48 C.F.R. § 52.245-5[4] into the Contract, as required by 48 C.F.R. § 45.106(f)(1).[5] *See* Gov't App. at 74. That Modification stated that the clause was not included in the award document as required because of an "inadvertent oversite [sic]" and that the Modification was made as an administrative change. *Id*.

On March 15, 1996, DCI's Executive Vice President sent a letter to Contracting Officer I regarding the "project status, and certain financial and other matters relating to [DCI] that may impede or impair its ability to implement the contract, including . . . the resignation of certain key officers and employees." Gov't App. at 1-3. This letter also stated that DCI's 26 percent share of contract obligations was being financed by DCI making partial payments on employee's salaries and also stated that DCI was insolvent and had inadequate funds to proceed with procurement of equipment required under the Contract. *Id*. at 2-3. In fact, three of the four DCI full-time employees and one part-time employee intended to resign immediately, as they were no longer willing to perform services for less than full salaries. *Id*. at 1-2. As a result, DCI had no qualified officers or staff to implement the Contract. *Id*.

On March 28, 1996, the President of DCI, sent a letter to Contracting Officer I recapping the major issues discussed at a March 22, 1996 meeting regarding project status and DCI's Executive Vice President's March 15, 1996 letter. *See* Gov't App. at 4-6. This letter specifically stated that DCI was "poised to complete the contract on time." *Id*. at 6.

---

[4] FAR § 52.245-5(c)(2) provides, in part:

> Title to all property purchased by the Contractor for which the Contractor is entitled to be reimbursed as a direct item of cost under this contract shall pass to and vest in the Government upon the vendor's delivery of such property.

48 C.F.R. § 52.245-5(c)(2).

[5] "The contracting officer shall insert the clause at 52.245-5, Government Property (Cost-Reimbursement, Time-and-Material, or Labor-Hour Contracts), in solicitations and contracts when a cost-reimbursement, time-and-material, or labor-hour contract is contemplated[.]" 48 C.F.R. § 45.106(f)(1).

On April 4, 1997, DCI entered into a contract with Kirov Plant, Tiraspol ("Kirov Contract") to purchase the following equipment:

| Names of Goods | Qty | Price per unit | Total |
|---|---|---|---|
| Set of units for die casting machine model 711N09A(400tf) without an electrical cabinet | 3 | $41,500.00 | $124,500.00 |
| Set of units for die casting machine model 711N10A(630tf) without an electrical cabinet | 1 | $73,000.00 | $73,000.00 |
| Trimming press 1125 (25tf) | 3 | $10,000.00 | $30,000.00 |
| Spares Group | 1 | $12,700.00 | $12,700.00 |
| Equipment Cost | 8 | | $240,200.00 |
| Customs procedure | | | $636.00 |
| Registration fee and license | | | $255.00 |
| Transportation costs of goods above | | | $11,300.00 |
| Extra assembly works on the "Seller's" plant | | | $10,950.00 |
| Units acceptance by the "Seller's" experts in USA | | | $10,000.00 |
| Installation and adjustment in Kyiv at "Consignee" by the "Seller's" experts | | | $23,350.00 |
| Contract Value | | | $296,691.00 |

*See* Frederickson Reply Aff. Ex. 22. The payment terms of the Kirov Contract provided that: "upon the receipt of the Seller's invoice the Buyer shall pay 74% of the amount and 26% shall be transferred to an ordinary three-year note[,]" with 8% per annum interest, no payments in the first four quarters of the term of the note and eight equal payments during the last eight quarters of the note. *Id.*

In April 1997, Meridian, a company with no die cast experience and no viable contribution other than a building, pulled out of the project. *See* Gov't App. at 62. Subsequently, DCI proposed a new joint venture partner, State-Owned Enterprise Plant Burevestnik, Kiev, Ukraine ("Burevestnik"), a company with significant die cast experience, skilled management, and an on-going profitable die cast business. *See* Gov't App. 62.

On May 30, 1997, DCI and Burevestnik entered into a Protocol of Intention describing the proposed arrangements to enter into a joint venture and convert a portion of Burevestnik's plant to non-military production. *See* Frederickson Reply Aff. Ex. 21. On June 20, 1997, Supplement 1 to the Protocol of Intention was executed by DCI, Burevestnik, and Technomet. In Supplement 1, DCI

and Burevestnik agreed to add Technomet to the joint venture and Technomet agreed to contribute other assets to the joint venture. *Id*.

On July 25, 1997, the relevant Department of Defense ("DOD") Program Manager notified DCI that DOD certified DCI's new proposed partner Burevestnik and authorized DCI to proceed with Burevestnik to complete the work required under the Contract. *See* Frederickson Aff. Ex. 2.

On August 28, 1997, the Defense Contract Audit Agency ("DCAA") sent a letter to DCI setting the indirect cost rates for 1995 as: composite G&A 7.45%; allocation base total cost input. *See* Reply Aff. Ex. 11.

On September 5, 1997, DCI sent a letter to the DSWA Program Management Office requesting that DSWA send a letter to DCAA advising that DSWA "had accepted the manner in which DCI billed its direct expenses, and in particular, its direct costs for salaries and subcontracts." Frederickson Reply Aff. Ex. 11. DCI's employees and subcontractors had agreed to accept 74 percent of the amounts earned and/or billed to DSWA, with the remaining 26 percent to be accrued by DCI and paid back upon DCI's receipt of permanent financing. *Id*. DCI also "informed the [G]overnment that it was its intent to bill DSWA for full services received . . . on the assumption that DCI was in the process of obtaining financing at which time the 26% holdback would be paid to all parties, both employees and subcontractors." *Id*.

On October 8, 1997, DCI sent a letter to Contracting Officer I requesting a "No-Cost" extension of the Contract through January 1998. The letter stated that DCI was not requesting additional funding because "[DCI] can complete the contract within the allocated funds originally authorized." Gov't App. at 13. The letter also attached a Summary Schedule, Supporting Schedule A1, and Supporting Schedule B. *See* Gov't App. at 14-16. The Summary Schedule set forth billing totals through October 3, 1997 of $3,801,144.90, billings to complete of $299,282.10, contract totals, and other projected billings by month through January 1998. *Id*. at 14. Supporting Schedule A1 set forth Material-Equipment Purchases through October 3, 1997 and projected billings to complete Equipment Purchases. *Id*. at 15. According to Supporting Schedule A1, the total material billings, including major pieces of equipment, through October 3, 1997 was $2,448,504.08. *Id*. The estimated total billings to complete equipment purchases was: $166,451.00, *i.e.*, $45,000 in October 1997; $99,880.00 in November 1997; $21,571.00 in December 1997; and zero in January 1998. *Id*. In addition, Schedule B, a Project Milestone Schedule reported that: four machines were to be shipped to Burevestnik beginning November 10, 1997 through December 16, 1997; initial plant layout and equipment installation would take place between October 27, 1997 and December 15, 1997; equipment start-up and initial system testing would take place December 1, 1997 through January 5, 1997; in-country DCB-Burevestnik operator training December 15, 1997-January 19, 1998; and "real world" production runs would commence by January 26, 1997. *Id*. at 16.

On November 21, 1997, Contracting Officer I issued Modification No. P00002 extending the term of the Contract through January 30, 1998. *See* Gov't App. at 12. Modification P00002 incorporated DCI's October 8, 1997 letter, but specified that the total amount of the Contract

remained unchanged and there were no other changes to the Contract as a result of Modification P00002. *See* Gov't App. at 12.

On February 5, 1999, DCAA issued Form 1 relating to the DCAA Audit of DCI's 1995 costs reporting that $15,599 of direct labor and subcontract costs were questioned and "suspended." On February 8, 1999, DCI acknowledged receipt of Form 1.

On February 8, 1999, DCI sent a letter to Contracting Officer I regarding the "potential loss of $3 million of equipment" reporting:

> We are quickly reaching a critical time where we could lose the equipment we have had in storage in Kyiv and Moldova for over a year. This project may be a low priority for DTRA, but $3 million worth of equipment is important to DCI and to DCI's potential partners and should be for the US government that paid for 74 percent of it. . . . [T]he warehouse in Kyiv is closing and has told us that we need to move the equipment out by the end of this month. . . . DCI has been carrying the burden of paying for the storage and has informed you that it will not do so any longer. We have not received any response to our communications so that we can inform our people what to do. Not only do we have to pay for the last several months of fees and penalties, but we need to find another place to store the material and to arrange for shipment. If we do not resolve the issue with the warehouse, I can only assume what the warehouse will do with the equipment. . . . I am also told that the costs we will incur to release and move the equipment will be about $8,000.
>
> We are also running into problems with the storage of the equipment in Moldova. That equipment was imported duty-free based on a 'temporary in-transit for export' classification with the Moldovan customs authorities. That classification was for one year. The equipment has been in Moldova since September/October 1997, well over the year. We have been telling the factory that our new funding was imminent since last October. Customs is not willing to listen to more empty promises and wants a firm schedule or we could incur significant duties. We also need to respond to Modolva this week[.]
>
> Because we have no idea what is happening about our additional funding despite all the promises and expectations and because of the continual delays in a decision about our funding, our partners in Ukraine are certainly not going to encumber themselves with the burden to resolve the issues and to store the equipment. Since last March, we have known our situation and never expected that we would be left in the dark for such a long time[.]
>
> By Wednesday, I need a firm timetable about the funding or a decision that the funding will not be provided[.].

Frederickson Reply Aff. Ex. 18.

On February 10, 1999, DCAA's Northern New Jersey Branch Office prepared a Audit Report, No. 6201-97B10250006 of DCI's incurred costs for calendar year 1995. *See* Frederickson Reply Aff. Ex. 12; *see also* Gov't App. at 17-23. The Audit questioned $15,599 of proposed direct costs, representing 26 percent of the submitted labor and subcontract costs and stated that those amounts were payments withheld from employees and the subcontractor based on oral agreements. *See* Gov't App. at 22. Since those amounts were not paid in the ordinary course of business, as of the date of the Audit, they were unallowable. *See* FAR § 31.201-2.[6] According to the terms of the Contract, costs must be paid in the ordinary course of business. *See* Frederickson Aff. Ex. 1 at (Contract at 9, Part II Contract Clauses, Section I); *see also* Gov't App. at 22; FAR § 52.216-7. *Id.* In addition, the Audit adjusted the proposed indirect cost rate of 6% upward to 7.45%. *See* Gov't App. 22. DCI did not concur in the proposed adjustments. *Id*. at 20, 22.

On May 5, 2000, the Director of Cooperative Threat Reduction Policy sent a Memorandum to the Deputy Assistant Secretary of Defense for Threat Reduction Policy requesting additional funding for the DCI Defense Conversion Project in Ukraine. *See* Frederickson Aff. Ex. 3; *see also* Gov't App. at 60-62. The Memorandum stated that approximately $1.4 million worth of equipment, purchased with DOD and DCI funds had been shipped to Moldova for DCI-developed modification; the modifications was completed two years earlier, but the equipment was in "imminent danger of being confiscated." Gov't App. at 60. The Memorandum also represented that the Moldavian customs officials declared that "DCI must either ship the equipment, pay import duties, or [customs] would confiscate the equipment." *Id*. In addition, DOD was advised of its responsibility to prevent the equipment from being confiscated since DOD had a 75% ownership of the equipment until the Contract was completed. *Id*. DCI, however, was not responsible for protection of the equipment once contract funding was exhausted because DOD did not have title to the equipment. *Id*. In addition, the Memorandum reported that: "the original contract is not complete. DOD does not owe DCI additional funding, but DCI can not complete the contract without additional funding. If DOD chooses not to fund the contract, DOD will have to close the contract and make a decision regarding

---

[6] FAR § 31.201-2 provides, in relevant part:

> (a) A cost is allowable only when the cost complies with all of the following requirements:
>
> > (1) Reasonableness.
> > (2) Allocability.
> > (3) Standards promulgated by the CAS Board, if applicable, otherwise generally accepted accounting principles and practices appropriate to the circumstances.
> > (4) Terms of the contract.
> > (5) Any limitations set forth in this subpart.

48 C.F.R. § 31.201-2(a).

disposition of the equipment. Since the equipment is 75% government owned, DOD has a vested interest in its disposition." *Id*. at 61. Further, the Memorandum noted that, after a prior two and a half years of investigation, the DOD Inspector General was unable to find any evidence of improper billing regarding $4 million of expense vouchers, of which DCI was reimbursed for $3 million. *Id*. The Memorandum further advised that "[i]f DCI took out loans to finance its portion of the work that is entirely allowable." *Id*. Of the $4 million expense vouchers, $2.97 million was for equipment purchases, with the approximate value of the portion reimbursed by DOC. *Id*.

The Memorandum concluded: "After reviewing these issues, we are persuaded that we can best accomplish our defense conversion objectives by the allocation of additional funding ($560,000) to complete the DCI project." *Id*. at 62. The Memorandum recommended "CTR Policy to direct DTRA to contract with DCI to transport and install the previously purchased equipment[.]" *Id*.

On May 31, 2000, Herbert A. Thompson, Jr., a DTRA Contracting Officer ("Contracting Officer II"), sent a letter to DCI stating:

> To ensure that the equipment now located in Moldova is safeguarded and available should the decision be made to continue the project, it has been determined that DTRA will retrieve the equipment and place it in storage in Ukraine. DTRA will hire and pay the cost of the shipping contractor.
>
> In taking this action it is understood that DCI and others may have a financial interest in the equipment. Therefore, I request that your provide me with the names of all parties with a financial interest in the equipment. Please provide this information to me by June 2, 2000.
>
> No decision to provide funds to DCI has been made. The decision on whether to provide funds to DCI is still under consideration and as soon as it is made I will let you know.

Gov't App. at 73.

On June 2, 2000, Contracting Officer II responded to a DCI June 1, 2000 letter and May 31, 2000 DCI e-mail to Mr. Mark Palevitz.[7] Contracting Officer II's letter responded to DCI's assertion that DCI "has continued to operate under the original contract which still remains in effect and under which I continue to incur costs." *See* Frederickson Aff. Ex. 5. The letter further advised DCI that, since FAR Clause 52.232-20 was incorporated into the Contract, the Government was not obligated to reimburse DCI for costs incurred in excess of the estimated costs in the Contract, unless DCI was notified in writing by the Contracting Officer that the estimated cost of the Contract had been increased.

---

[7] The May 31, 2000 Frederickson e-mail to Mark Palevitz and June 1, 2000 Frederickson letter to Mr. Thompson were not included in the summary judgment record.

On June 8, 2000, DCI's counsel sent a letter to Mr. Edward Archer, another DTRA Contracting Officer ("Contracting Officer III"), following up on a June 6, 2000 telephone conversation. *See* Frederickson Aff. Ex. 6. That letter stated that, during the telephone conversation, Contracting Officer III "acknowledged that, under the . . . contract, DCI has ownership rights in certain equipment obtained pursuant to the contract and currently located in a factory in Moldova." *Id*. The letter also stated that Contracting Officer III acknowledged that DTRA had not provided DCI with:

> (1) an explication of the legal authority under which it intends to relocate the equipment to Kyiv; (2) the reasons for the relocation; (3) the terms and circumstances of the relocation; (4) the site in Kyiv to which DTRA intends to move the equipment; (5) assurances that the equipment will be properly inspected, handled and maintained; and (6) the status of the contract. You promised to respond to these questions, and to provide further considered evaluation of DTRA's actions. . . . DCI continues to demand both an immediate response to the above questions and that DTRA cease and desist from any efforts to relocate the equipment unless and until it receives written consent from DCI to do so.

*Id*.

On June 13, 2000, Contracting Officer III sent a letter to DCI in response to the June 5 and 8, 2005 letters,[8] advising that DTRA would take no further action to secure or protect the equipment located in Moldova. *See* Compl. Ex. B. The letter also stated that no funds remained on the contract and that "the Government will not modify the subject contract to increase funding. . . . The contract will be closed out in due course." *Id*. The letter requested that DCI submit an Inventory Schedule of all items of equipment procured with Government funding under the Contract that were not consumed during performance, and that DTRA would "negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each party." *Id*.

On July 14, 2000, Contracting Officer II also sent a letter to DCI stating that the Contract was in the process of being closed out and requested that DCI provide: (1) a complete list of equipment purchased under the Contract; (2) documentation reflecting the cost of the equipment at the time of purchase; and (3) documentation reflecting the percentage of funding DCI contributed to the purchase of each item of equipment. *See* Frederickson Aff. Ex. 7.

On July 21, 2000, DCI responded by an email to Contracting Officer II with a Lotus file containing unaudited information, including: (1) a summary table showing itemized equipment costs by piece of equipment and the location of each piece of equipment; (2) a table with detailed costs by supplier; (3) summary costs for the equipment by storage location; (4) "general ledger table"

---

[8] Although the June 8, 2000 letter is in the record, the June 5, 2005 letter from DCI is not in the record.

showing costs by vendor and year; (5) summary showing all years and totals including estimates for commissioning; (6) table by year with total through March 2000; and (7) table with totals including commissioning estimates. *See* Frederickson Aff. Ex. 7.

On September 21, 2000, DCAA prepared DTRA Audit Report No. 6201-1996B10100865 of DCI's incurred costs for calendar year 1996. *See* Gov't App. at 24-34. The Audit reviewed: $198,945 of direct costs, a significant portion of which resulted from DCI's inclusion of accrued costs not yet paid, including: $91,858 of direct labor; $65,607 of legal and professional fees; and $27,040 of subcontract equipment. *Id*. at 25. The Audit questioned $10,413 of proposed overhead expenses of $24,402 and net adjustments to G&A resulting in a rate reduction from 11.78% to 9.92%. *Id*. The Audit concluded that, since the accrued liabilities had not been paid in the ordinary course of business, the costs were unallowable, pursuant to FAR § 31.201-20. *Id*. at 29. The Audit Report noted that DCI did not agree with a majority of the findings and recommendations. *Id*. at 26.

On June 5, 2001, DTRA's Director of Acquisition Management sent a letter to correct DCI's apparent belief that additional funding was promised. *See* Frederickson Reply Aff. Ex. 17. The letter indicated that DCI was informed on several occasions that no one other than the Contracting Officer was authorized to obligate funds on behalf of the Government. *Id*. The letter also stated that DTRA and the Office of the Secretary of Defense had been working in the past year to bring the project to closure, but that DCI's accounting practices and financial status had exacerbated the situation:

> The Government was made aware of DCI's accrual accounting system during pre-award reviews conducted by Defense Contract Management Command and Defense Contract Audit Agency. Accrual accounting systems are acceptable for purposes of government contracts, and prior to contract award, DCI's specific accounting systems were determined to be acceptable. That fact did not absolve DCI of its responsibility to contribute its 26% share as stipulated in the cost-share arrangement in the contract. . . . Irrespective of the type of accounting system utilized by DCI, I have seen no documentation to support that DCI has contributed any amount toward its required 26% share. It is this lack of contribution toward the cost-share arrangement, not the accrual accounting system, which has rendered this situation so difficult to resolve. The lack of documented contribution toward the cost-share arrangement is also a factor in our assessment of title for the property purchased under this contract. . . . Although it has taken a long time for us to reach this point, I am confident we will be able to definitively articulate a closure plan by the end of this month.

*Id*.

On July 2, 2001, DCAA prepared DTRA Audit Report No. 6201-1997B10100865 of DCI's incurred costs for calendar year 1997. *See* Gov't App. at 35-46. The Audit questioned $897,189 of booked direct costs proposed under the Contract since "[a] significant portion resulted from [DCI's]

inclusion in its proposal of accrued costs not yet paid." *Id*. at 37. The majority of direct costs questioned were $206,838 of direct labor, $587,193 of subcontract equipment, and $82,820 of legal and professional fees. *Id*. at 36. With respect to $167,763 of U.S. labor costs, the Audit concluded that "[a]lthough accrued liabilities have been established for these costs, they have not been paid in the ordinary course of business; nor have they been paid to date. Therefore, the costs are considered unallowable under FAR § 31.201-2 since, according to the contract terms (FAR § 52.216-7(b)), the costs must be paid in the ordinary course of business." *Id*. at 40. In addition, $38,075 of overseas labor were questioned for lack of pre-approval. *Id*. The Audit also questioned $587,193 of proposed subcontract costs, representing payments withheld from the subcontractors on invoices submitted. *Id*. at 42. Similar to direct costs, the Audit concluded that, since the costs were not paid in the ordinary course of business and not paid to date, they were unallowable. *Id*. DCI also did not agree with this Audit's findings and recommendations. *Id*. at 38.

On August 2, 2001, DCI again notified DTRA that the equipment was in imminent danger of being confiscated by the Muldova Customs authorities since the equipment had been held for a longer period than authorized by the temporary import license. *See* Gov't App. at 64. On August 10, 2001, DTRA directed a logistics support contractor to go to Moldova to take possession of the equipment for transport to Kiev and delivery to Burevestnik. *Id*. The Government spent $188,120 for shipping and storage charges. *Id*.

On December 21, 2001, the following equipment was transferred from the United States Government to the Ministry of Industrial Policy of Ukraine and then delivered by the Government of Ukraine to Burevestnik:

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | E | Die Casting Machine 400 Ton Consists of: | | 3 | SE | | |
| 1.1 | E | Die Casting Press Unit | HPM-400 | 3 | EA | $170,000.00 | $510,000.00 |
| 1.1.1 | C | Press Unit Control System | 71109T.80.0 0.600 | 3 | EA | $60,000.00 | $180,000.00 |
| 1.2 | S | Assembly Set | 71109D.00. 00.000 | 3 | EA | $50,000.00 | $150,000.00 |
| 1.3 | S | Cooling System | 71111E.46. 00.000 | 3 | EA | $1,000.00 | $3,000.00 |
| 1.4 | C | Trim Press | P25R.00.00. 000 | 3 | EA | $10,000.00 | $30,000.00 |
| 2 | E | Die Casting Machine 600 Ton Consists of: | | 1 | SE | | |
| 2.1 | E | Die Casting Press Unit | HPM-630 | 1 | EA | $309,472.60 | $309,472.60 |

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 2.1.1 | C | Press Unit Control System | 71110T.80.0 0.600 | 1 | EA | $60,000.00 | $60,000.00 |
| 2.2 | S | Assembly Set | 71110D.00. 00.000 | 1 | EA | $55,489.00 | $55,489.00 |
| 2.2.1 | S | Stand | 71110T.11.0 0.000 | 1 | EA | $26,000.00 | $26,000.00 |
| 2.2.2 | S | Locking System | 71110T.30.0 0.000 | 1 | EA | $55,000.00 | $55,000.00 |
| 2.2.3 | S | Guard | 71110T.41.0 0.000 | 1 | EA | $15,000.00 | $15,000.00 |
| 2.2.4 | S | Cooling System | 71111E.46. 00.000 | 1 | EA | $1,000.00 | $1,000.00 |
| 2.3 | S | Spare Parts | N/A | 1 | EA | $16,691.00 | $16,691.00 |
| | | | | | | Total | $1,411,652.60 |

Gov't App. at 65-66.

On September 19, 2001, DCAA prepared DTRA Audit Report, No. 6201-1998B10100865 of DCI's incurred costs for calendar year 1998. *See* Gov't App. at 47-59. The Audit questioned $333,229 of booked direct costs, $257,291 of which was for direct labor and $58,319 for legal and professional fees, but questioned $6,793 of the contractor's proposed overhead expenses of $17,824 and reduced the direct labor base. *Id*. at 48. With respect to the direct costs, the Audit concluded that, although accrued liabilities had been established for the costs, the costs had not been paid in the ordinary course of business nor paid to date and thus were unallowable under FAR § 31.201-2. *Id*. at 52. The Audit also concluded that subcontract costs incurred in 1998 were unallowable because the "holdback" costs had not been paid by DCI to the subcontractor and were also booked outside the contract period of performance. *Id*. at 54. With respect to freight or miscellaneous charges, the Audit concluded that the costs also were unallowable because they were incurred outside the contract performance period end date of January 30, 1998. *Id*. at 55. Legal and professional fees and related travel expenses were not allowed because they lacked pre-approval. *Id*. at 56. DCI disagreed with a majority of these findings and recommendations. *Id*. at 49.

On January 24, 2002, additional die casting equipment was transferred from the United States Government to the Ministry of Industrial Policy of Ukraine and delivered by the Government of Ukraine to Burevestnik. *See* Gov't App. at 67. The equipment delivered included:

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | E | Furnace, HolmesY Holding, 2,220lb Aluminium Holding Capacity, 18 KW, 240/480V, 50HZ, Single Phase | 62-SH1B16-L | 4 | EA | $28,188.00 | $112,752.00 |
| 1.1 | S | Element, Heating, 240V, 3 KW, Side Loading, HolmesY | SL3000HE | 12 | EA | $87.00 | $1,044.00 |
| 1.2 | S | Bracket, Support, Heating Element | SL1006H | 24 | EA | $17.45 | $418.80 |
| 1.3 | S | T/C K-1861.5-T Assembly, TX Coated | K-1861.5-T | 6 | EA | $97.00 | $582.00 |
| 1.4 | S | Gasket, 8.5" x 48," Felt | D1007H | 22 | EA | $10.91 | $240.00 |
| 1.5 | S | Set, Spare Fuse, 250V | FNM-2/FNQ-R-1/FNR-R-90 | 2 | SE | $27.00 | $54.00 |
| 1.6 | S | Set, Partition Wall Assembly | 62-H1816-L | 1 | SE | $1,350.00 | $1,350.00 |
| 1.7 | S | Controller | HNWL DC-300-E-E-200-10-0A00–0 | 1 | EA | $410.00 | $410.00 |
| 1.8 | S | Cement, Crucible, Dry Powder Mix | PLISTIX 900 | 4 | EA | $3.00 | $12.00 |
| 1.9 | S | Wire, AWG 4 SRML, 500 FT | AWG 4 SRNL | 1 | RO | $750.00 | $750.00 |
| 2 | E | System, Spray, Gemini 155 | Gemini 155 | 3 | EA | $34,811.00 | $104,433.00 |
| 2.1 | S | Lubricator, Shot Sleeve | SLV | 3 | EA | $1,194.00 | $3,582.00 |
| 3 | E | Ladler, Automatic | SL1200 | 3 | EA | $31,075.00 | $93,225.00 |
| 4 | S | Spare Parts for Die Casting Machines | N/A | 1 | SE | $14,502.00 | $14,502.00 |
| 5 | E | Furnace, Electric, DPPTU-0.51 | DPPTU-05 1 | 2 | EA | $80,100.00 | $160,200.00 |
| 6 | E | Control Cabinet | N/A | 3 | EA | $7,600.00 | $22,800.00 |

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 7 | E | Transformer, TRSP-630.05 | TRSP-630/0.5 | 2 | EA | $18,900.00 | $37,800.00 |
| 8 | E | Reactor, SROS-800.05 | SROS-800/0.5 | 4 | EA | $14,880.00 | $59,520.00 |
| | | | | | | Total | $613,674.80 |

Gov't App. at 68.

On January 10, 2003, additional equipment was transferred from the United States Government to the Ministry of Industrial Policy of Ukraine and delivered by the Government of Ukraine to Burevestnik. *See* Gov't App. at 69, 71. The equipment delivered included:

TABLE 1

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number/ Serial Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9, with 2 Spare Filter Cartridges | HK15-9/ 591092 | 1 | EA | $7,060.11 | $7,060.11 |
| 2 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9 With 2 Spare Filter Cartridges | HK15-9/ 592092 | 1 | EA | $7,060.11 | $7,060.11 |
| 3 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9 With 2 Spare Filter Cartridges | HK15-9/ 593092 | 1 | EA | $7,060.11 | $7,060.11 |
| 4 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9 With 2 Spare Filter Cartridges | HK15-9/ 594092 | 1 | EA | $7,060.11 | $7,060.11 |
| 5 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9 With 2 Spare Filter Cartridges | HK15-9/ 595092 | 1 | EA | $7,060.11 | $7,060.11 |

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number/ Serial Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 6 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9 With 2 Spare Filter Cartridges | HK15-9/ 596092 | 1 | EA | $7,060.11 | $7,060.11 |
| | | | | | | Total | $42,360.67 |

TABLE 2

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number/ Serial Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | E | Compressor, Air, Fan, Stationary, Atlas Copco GA30P-7.5 | GA30P-7.5/ All 381334 | 1 | EA | $9,486.00 | $9,486.00 |
| 2 | E | Compressor, Air, Fan, Stationary, Atlas Copco GA30P-7.5 | GA30P-7.5/ All 381362 | 1 | EA | $9,486.00 | $9,486.00 |
| | | | | | | Total | $18,972.00 |

Gov't App. at 70, 72.

On April 14, 2003, Michael L. Benavides, still another DTRA Contracting Officer ("Contracting Officer IV") sent a letter to DCI stating that no funds remained on the Contract and that the Government would not modify the Contract to increase funding. *See* Compl. Ex. C. The letter also stated:

> All information available to DTRA indicates that the only payments made for the equipment purchased under this contract were funded by DTRA. Consequently, as the only party contributing to the cost of the equipment, DTRA determined title to vest in the Government. DTRA took possession and has disposed of the equipment. Based on the above, no further action is usefull [sic] at this point, and the contract is considered closed.

Compl. Ex. C.

On February 25, 2004, DCI sent a letter to Contracting Officer IV asserting three claims: (1) in the amount of $3,359,901.51, representing DCI's incurred costs of $2,921,653.49, plus a reasonable profit of $438,248.02, for DCI's equitable adjustment claim, pursuant to FAR § 52.232-20(h), Limitation of Cost; (2) a claim in the amount of $109,996,640.71 for alleged damages with

respect to the value of the Equipment of $5,995,969.49, plus a reasonable profit of $893,395.41 attributable to the Equipment, and lost profits of $103,147,275.80 based upon the Government's breach of contract resulting from the alleged wrongful and illegal disposition by DTRA of the property produced or purchased under the Contract; and (3) a claim for entitlement to settlement expenses. *See* Compl. Ex. D; *see also* Frederickson Aff. Ex. 8, 9.

The following schedule of total incurred costs, by year, was attached to the February 25, 2004 claim letter:

| | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| Total Incurred Costs | $118,688.58 | $750,178.45 | $3,139,236.43 | $391,871.41 | $292,018.01 |
| Government's Share of Claimed Costs | $86,950.94 | $547,308.70 | $2,298,449.24 | $101,607.13 | |
| DCI's Share of Claimed Costs | $30,550.33 | $192,297.65 | $807,563.24 | $35,699.77 | |
| DCI Additional Incurred Costs | $1,187.31 | $10,572.10 | $33,223.95 | $254,564.51 | $292,018.01 |
| Cumulative Total Incurred Costs Audited Percent of Total | $118,688.58 | $868,867.03 | $4,008,103.46 | $4,399,974.87 | $4,691,992.88 |

| | 2000 | 2001 | 2002 | 4/14/2003 | Total - All Years |
|---|---|---|---|---|---|
| Total Incurred Costs | $309,804.21 | $312,278.10 | $548,519.79 | $93,338.34 | $5,955,933.32 |
| Government's Share of Claimed Costs | | | | | $3,034,316.00 |
| DCI's Share of Claimed Costs | | | | | $1,066,111.00 |
| DCI Additional Incurred Costs | $309,804.21 | $312,278.10 | $548,519.79 | $93,338.34 | $1,855,506.32 |
| Cumulative Total Incurred Costs Audited Percent of Total | $5,001,797.09 84% | | | | |

Frederickson Aff. at 9.

On April 14, 2004, Mr. Robert J. Bemben, Contracting Officer, DTRA ("Contracting Officer V") sent a letter to DCI requesting additional time to evaluate the February 25, 2004 claim and indicating that a Final Decision would be issued on or before June 30, 2004. *See* Compl. Ex. E.

On June 25, 2004, Contracting Officer V sent a Final Decision to DCI's counsel denying all of the claims cited in DCI's February 25, 2004 claim letter. *See* Gov't App. at 7-11. The letter

stated that the Contract was completed, albeit unsuccessfully, because DCI was unable to meet certain Contract objectives, *i.e.*, namely, the failure to form a joint venture. *Id*. at 9. The letter also stated that, since the joint venture was not formed as required by the Contract, special Contract requirement Number 5[9] had no effect, and the Government Property Clause of the Contract governed the accountability and ownership for the purchased equipment. *Id*. at 9. Since DCI did not have the resources to protect the property, the letter stated that the Government was forced to take action to prevent seizure and loss of the property. *Id*. at 9-10. In addition, the letter stated that no evidence had been presented that DCI funds were used to make payments on any of the costs that comprised DCI's 26 percent share of the Contract. *Id*. at 10.

With respect to Claim 2, the Government asserted that DCI had no right to possess and utilize the equipment and therefore denied DCI's claim for lost profits. *See* Gov't App. at 10. The letter also stated that DCI's claim for lost profits was "extremely speculative, at best, and inappropriate for payment by the Government." *Id*. at 10.

As to Claim 3 for settlement expenses, the Final Decision stated that, since there was no need for additional settlement activities, that claim also was denied. *Id*.

Currently, the Government retains title to the equipment. *See* Gov't App. at 64 (Declaration of Mark E. West, Program Manager).

---

[9] Clause 5 states, in part:

> a. All property, equipment and materials acquired with United States (U.S.) Government funding under this Contract shall be acquired solely for the use of the joint venture, or business arrangement formed by the U.S. Contractor and the Former Soviet Union (FSU) enterprise partner in performance of the terms of this contract.
>
> * * *
>
> b. All property, equipment and materials acquired with U.S. Government funding under this contract is considered a third-party contribution which is separate and distinct from property, equipment or materials contributed by the U.S. Contractor or the FSU enterprise partner. Title and ownership of all property, equipment and materials acquired with U.S. Government funding under this Contract shall vest with the joint venture upon conclusion of the Contract, as determined by the Contracting Officer. Prior to the conclusion of the Contract, the U.S. Contractor is accountable for said items in accordance with standard government property clauses cited under SECTION I of this contract[.]

Frederickson Aff. Ex. 1 (Contract at 7, Section H ¶ 5).

## PROCEDURAL HISTORY

On July 6, 2004, DCI filed a Complaint in the United States Court of Federal Claims asking for a review of the June 25, 2004 Final Decision of the Contracting Officer that denied DCI's certified claims with respect to the Contract, pursuant to 41 U.S.C. § 601 *et seq.*, The case was assigned to Judge Victor J. Wolski. On July 12, 2004, the case was reassigned to the undersigned judge.

On September 17, 2004, the Government filed an Answer, including the affirmative defenses of failure of consideration and estoppel. On September 21, 2004, DCI filed a Memorandum of Law In Support of Plaintiff's Motion for Partial Summary Judgment, an Affidavit in Support of Partial Summary Judgment, Exhibits, and Proposed Findings of Uncontroverted Facts. DCI, however, did not file a Motion for Partial Summary Judgment. On October 6, 2004, the court issued an Order that DCI file a Motion for Partial Summary Judgment to accompany the earlier-filed summary judgment materials and striking DCI's Memorandum of Law In Support Plaintiff's Motion for Summary Judgment, because the original filing had missing pages.

On October 7, 2004, DCI filed an Amended Motion for Partial Summary Judgment and a completed Memorandum of Law In Support. DCI's Amended Motion seeks a summary judgment for the Government's breach of the Contract as to Count One of the Complaint and an equitable distribution of property produced or purchased under the Contract, as required by FAR § 52.232-20(h), and for $3,359,901.51 in damages.

On November 18, 2004, the Government filed a Response to DCI's Amended Motion for Partial Summary Judgment and a Cross-Motion for Summary Judgment. On the same date, the Government also filed a Response to DCI's Proposed Findings of Uncontroverted Facts and Additional Proposed Findings of Uncontroverted Facts. On December 6, 2004, DCI filed a Reply Brief, together with a Reply Affidavit. On the same date, DCI also filed a Reply to the Government's Response to DCI's Proposed Findings of Uncontroverted Fact and to the Government's Additional Proposed Findings of Uncontroverted Facts.

On December 13, 2004, the court held a status conference. On December 23, 2004, the Government filed a Reply to DCI's Response to the Government's Cross-Motion for Summary Judgment. On January 7, 2005, the parties filed a proposed Scheduling Order. The court held another status conference on January 11, 2005 and on January 18, 2005, the court entered a Scheduling Order for fact discovery and expert discovery and established a trial commencing on November 14, 2005.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States* v. *Testan*, 424 U.S. 392, 398 (1976)). Therefore, in order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action, . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under . . . the Contract Disputes Act of 1978, including a dispute concerning . . . rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2); *see Alliant Techsystems, Inc.* v. *United States*, 178 F.3d 1260, 1270 (Fed. Cir. 1999) (holding that "the Tucker Act grants the United States Court of Federal Claims jurisdiction to grant nonmonetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms.").

Section 6 of the Contract Disputes Act provides that claims[10] relating to a contract by a contractor or the Government shall be submitted to the contracting officer for a decision and that the

---

[10] Although the Contract Disputes Act does not define "claim," that term is defined in the Federal Acquisition Regulation as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101. For claims exceeding $100,000, the contractor must certify that: the claim is made in good faith; the supporting data is accurate and complete; and the amount requested accurately reflects the amount for which the contractor believes the Government is liable. *See* 41 U.S.C. § 605(c)(1). Government claims, however, do not require certification. *See Placeway Constr. Corp.* v. *United States*, 920 F.2d 903, 906-07 (Fed. Cir. 1990) (holding that Government claim seeking incidental and consequential damages for plaintiff's alleged breach of contract did not require certification).

contracting officer's decision shall be in writing and furnished to the contractor, stating the reasons for the decision and informing the contractor of its rights thereunder." *See* 41 U.S.C. § 605(a); *see also Alliant Techsystems, Inc.*, 178 F.3d at 1267. The Contract Disputes Act also provides that the "contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter." 41 U.S.C. § 605(b).

The United States Court of Appeals for the Federal Circuit has "enforced the strict limits of the [Contract Disputes Act] as 'jurisdictional prerequisites to any appeal.'" *England* v. *The Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) (citing *Sharman Co.* v. *United States*, 2 F.3d 1564, 1569 n.6 (Fed. Cir. 1993), *overruled on other grounds by Reflectone, Inc.* v. *Dalton*, 60 F.3d 1572 (Fed. Cir. 1995)). Accordingly, "jurisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim." *The Swanson Group*, 353 F.3d at 1379; *see also James M. Ellett Constr. Co.* v. *United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996) ("Thus for the [United States Court of Federal Claims] to have jurisdiction under the [Contract Disputes Act], there must be both a valid claim, a term the act leaves undefined, and a contracting officer's final decision on that claim.").

In this case, DCI seeks review of the Contracting Officer's June 25, 2004 Final Decision. There is no dispute that a contract existed between DCI and the Government. *See* Frederickson Aff. Ex. 1; *see also* PFF ¶ 3; DFF ¶ 3; *Trauma Service Group* v. *United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To show jurisdiction . . . [Plaintiff] must show that either an express or implied-in-fact contract underlies its claim."). Moreover, DCI's claim against the Government was presented to the Contracting Officer and a Final Decision was rendered. *See* Frederickson Aff. Exs. 8, 9. Accordingly, the court has determined that it has jurisdiction to adjudicate DCI's breach of contract claims in this case.

## B. Standard For Decision On Summary Judgment.

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Moden* v. *United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); *see also* RCFC 56(c). In the United States Court of Federal Claims, summary judgment, albeit interlocutory in nature, may be rendered on the issue of liability alone even if a genuine issue of fact exists as to the amount of damages. *See Winstar Corp.* v. *United States*, 518 U.S. 839, 910 (1996) (affirming grant of partial summary judgment on contract liability and remanding the determination of the appropriate measure or amount of damages, if any.); *see also* RCFC 56(c).

Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id*. Therefore, there is no issue for the court to adjudicate unless the nonmoving party puts forth evidence sufficient for a jury to return a verdict for that party; but "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (citations omitted).

The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding the moving party must meet its burden "by 'showing' – that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."); *see also Riley & Ephriam Constr. Co., Inc.*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact."). A summary judgment may be made without supporting affidavits and rely "solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Celotex Corp.*, 477 U.S. at 324. Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to show the existence of a genuine issue for trial. *See Novartis Corp.* v. *Ben Venue Laboratories*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial.").

A trial court is required to resolve all doubt over factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). And, all reasonable inferences and presumptions must be resolved in favor of the non-moving party. *See Anderson*, 477 U.S. at 255; *see also Moden*, 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in favor of the party opposing summary judgment.").

The fact that both parties have moved for summary judgment does not relieve the trial court of its responsibility to determine the appropriateness of summary disposition. *See Stratos Mobile Networks USA, LLC* v. *United States*, 213 F.3d 1375, 1379 (Fed. Cir. 2000) (quoting *Prineville Sawmill Co., Inc.* v. *United States*, 859 F.2d 905, 911 (Fed. Cir. 1988)) ("[The court] determines for itself whether the standards for summary judgment have been met."). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *See California* v. *United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001) ("The mere fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion[.]"). The court must evaluate each party's motion on its own merits. *Id.*

### C. Resolution Of DCI's October 7, 2004 Amended Motion For Partial Summary Judgment.

#### 1. Genuine Issues Of Material Fact Exist As To Whether The Government Breached The Contract By Failing To Negotiate An Equitable Distribution, Pursuant To FAR § 52.232-20.

The substance of DCI's October 7, 2004 Amended Motion for Partial Summary Judgment is that the Government breached the Contract by failing to negotiate an equitable distribution as required by FAR § 52.232-20.[11] *See* Pl. Am. S.J. Mot. at 7-9. As discussed herein, numerous genuine issues of material fact exist concerning the elements of an equitable distribution.[12] Therefore, as a matter of law, the court is precluded from granting DCI's Motion for Partial Summary Judgment.

##### a. A Genuine Issue Of Material Fact Exists As To Whether The Government's Appropriation And Disposition Of Equipment Was "Wrongful" Or "Illegal."

The Contract incorporates FAR § 52.232-20 as a term thereof. *See* Frederickson Aff. Ex. 1 (Contract at 10, Part II Contract Clauses, Section I). DCI argued that the Government effectively terminated the Contract by "wrongfully and illegally" removing equipment from DCI's bailee and disposing of such equipment, thus requiring the Government to make an equitable distribution. *See* Frederickson Aff. ¶¶ 19-20; *see also* Pl. Am. S.J. Mot. at 7-9. The Government countered that since

---

[11] FAR § 52.232-20(h) provides, in relevant part:

> If this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each.

48 C.F.R. § 52.232-20(h).

[12] The United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims have not addressed the elements required for an equitable distribution. The Armed Services Board of Contract Appeals, however, has held that proof of a claim for equitable distribution of non-severable property, pursuant to FAR § 52.232-20, has five elements: "(1) the contractor incurred allowable costs that overran the contract's total estimated cost on a given date, (2) the [Contracting Officer] did not fund such cost overrun, (3) the contractor produced or purchased property of an identifiable value in part before and in part after the cost limit was reached, (4) such property is not severable from other property delivered under the contract without making the item or system unworkable, and (5) the Government retained and continued to use such property." *International Technology Corporation*, ASBCA No. 54,136, 04-1 BCA ¶ 32,607 (2004); *see also SMS Agoura Sys., Inc.*, ASBCA Nos. 51,441, 51,442, 51,496, 99-2 BCA ¶ 30,524 (1999).

the equipment was in jeopardy of being seized by Moldova, the Government's actions were necessary to protect the equipment and thus not wrongful or illegal. *See* Def. App. 60, 63-64; *see also* Gov't Response at 11. Moreover, the Government asserted that the reason the equipment was in jeopardy of being confiscated was DCI's failure to comply with customs requirements and ship the equipment to the Ukraine in a timely manner. *See* Gov't Resp. at 11. Accordingly, the Government raises material facts that can only be resolved at trial. *Compare* Pl. Ex. 4 ("To ensure that the equipment now located in Moldova is safeguarded and available should the decision be made to continue the project, it has been determined that DTRA will retrieve the equipment[.]"); Frederickson Aff. Ex. 5 ("[B]y taking actions to secure and move the equipment, DTRA is protecting the interest of all parties concerned.") *with* Frederickson Reply Aff. ¶ 20 ("Each time [confiscation by the Moldavian government] was raised the [DCI] was successful in solving the problem and would have been successful again if the Defendant would have only accepted its offers to help and provided [DCI] with a fraction of the resources [the Government] utilized to illegally remove the Equipment."); Pl. Ex. 6 (requesting that "DTRA cease and desist from any efforts to relocate the equipment unless and until it receives written consent from DCI to do so").

Therefore, the court has determined that a genuine issue of material fact exists as to whether the Government's appropriation and disposition of certain equipment was wrongful or illegal.

**b. A Genuine Issue Of Material Fact Exists As To Whether The Estimated Cost Of The Contract Was Increased.**

The Government and the contractor must negotiate an equitable distribution "if the estimated cost [of the Contract] is not increased." FAR § 52.232-20. The Affidavit of Mr. Alan C. Frederickson, submitted in support of the Motion for Partial Summary Judgment, states that DCI was promised funds in addition to the estimated cost amounts set forth in the Contract. *See* Frederickson Aff. ¶ 14 ("Awaiting the additional funds which had been promised by Defendant[.]"); *see also* Frederickson Reply Aff. Ex. 18 ("Because we have no idea what is happening about our additional funding despite all the promises and expectations[.]"); Frederickson Aff. Ex. 17 (June 5, 2001 Letter to DCI from DTRA) (responding to assertion that DCI was "promised funding."). The Government, however, proffered evidence that the Contract ceiling was never increased above the original amounts provided in the Contract. *See* Gov't App. 73 (May 31, 2000 Letter to DCI from Contracting Officer II) ("The decision on whether to provide funds to DCI is still under consideration[.]"); Gov't App. at 9 (June 25, 2004 Final Decision Letter to DCI) ("[T]he Contracting Officer never promised or authorized additional funding[.]"); *see also* Frederickson Aff. Ex. 5 (June 2, 2000 Letter to DCI from Contracting Officer II) ("No decision has been made by DTRA to provide DCI with additional funds in any amount.").

Therefore, because a genuine issue of material fact exists whether the estimated cost of the Contract was increased and thereby trigger an equitable distribution, the court is precluded from granting summary judgment.

**c. A Genuine Issue Of Material Fact Exists As To Whether The Government Terminated The Contract.**

The Government argued that the Contract was not "terminated,"[13] but rather ended when the Government paid all of the amounts due thereunder. Therefore, the Government was not required to make an equitable distribution. *See* Gov't Reply at 3, 5. On the other hand, DCI contends that the Government's "actions of wrongfully and illegally removing the Equipment . . . effectively terminated the Contract and triggered the provisions of FAR § 52.232-20." *See* Pl. Am. S.J. Mot. at 7. DCI countered that the Government continued to encourage DCI to perform various activities under the Contract and did not "terminate" the Contract with DCI, until the Government removed the equipment. *See* Pl. Reply at 13.

---

[13] The Contract incorporated FAR § 52.249-6 that provides:

> (a) The Government may terminate performance of work under this contract in whole or, from time to time, in part, if–
>
> (1) The Contracting Officer determines that a termination is in the Government's interest; or
>
> (2) The Contractor defaults in performing this contract and fails to cure the default within 10 days (unless extended by the Contracting Officer) after receiving a notice specifying the default. "Default" includes failure to make progress in the work so as to endanger performance.

48 C.F.R. § 52.249-6. Further, the Contract also incorporated FAR 52.202-1 that provides:

> When a . . . contract clause uses a word or term that is defined in the Federal Acquisition Regulation (FAR), the word or term has the same meaning as the definition in FAR 2.101 in effect at the time the solicitation was issued[.]

48 C.F.R. § 52.202-1. FAR § 2.101 defines "termination for convenience" and "termination for default":

> Termination for convenience means the exercise of the Government's right to completely or partially terminate performance of work under a contract when it is in the Government's interest.
>
> Termination for default means the exercise of the Government's right to completely or partially terminate a contract because of the contractor's actual or anticipated failure to perform its contractual obligations.

48 C.F.R. § 2.101.

Based on the current record, which consists largely of argument by counsel, a genuine issue of material fact exists as to whether the Contract was "terminated," as that term is defined in FAR § 52.249-6.

**d. A Genuine Issue Of Material Fact Exists As To Whether The Government Admitted That DCI Was Entitled To An Equitable Distribution.**

DCI argued that the Government admitted through a series of communications that DCI was entitled to an equitable distribution of the property produced under the Contract. *See* Frederickson Aff. Ex. 3, 4, 5, 6; *see also* Compl. Ex. B. The Government countered that DCI "*may* have a financial interest in the equipment," however, any acknowledgment that the Government was required to make an equitable distribution occurred before the Government became aware of DCI's questionable billing practices, was made by someone other than the Contracting Officer, and/or was based on hearsay. *See* Gov't App. at 73; *see also* Gov't Response at 12. In any event, any such communications do not affect DCI's obligations under the Contract, which goes to the issue of whether DCI has an interest in the property. *See* Gov't Resp. at 12.

Again, a genuine issue of material fact is at issue precluding summary judgment.

**e. A Genuine Issue Of Material Fact Exists As To Whether DCI Had Any Financial Interest In The Property Produced Or Purchased Under The Contract.**

The Government claimed it had no duty to make an equitable distribution, because DCI had no financial interest in the property produced or purchased under the contract. *See* Gov't Response at 11. Without a financial interest in the property, there would be nothing to negotiate or distribute. Moreover, according to the Government, the DCAA Audits reveal that the total allowable costs submitted by DCI was $2,645,849 and that the Government paid $3,034,316, which was $388,467 less than the Government's 74 percent share, set by the Contract. *See* Gov't App. at 17-59. The Government also cites a letter from DTRA's Director of Acquisition Management questioning DCI's lack of financial interest in property produced under the Contract. *See* Frederickson Aff. Ex. 17 (June 5, 2001 Letter to DCI from DTRA Director of Acquisition Management) ("I have seen no documentation to support that DCI has contributed any amount toward its required 26% share.").

DCI countered that the DCAA Audits were only "recommendations" that the Contracting Officer was free to accept or reject and that the Contracting Officer, by words and actions, rejected such recommendations. *See* Frederickson Aff. ¶¶ 4-18. DCI also argued that the Government accepted DCI's billing practice of making only 74 percent payments to vendors and employees and deferring DCI's 26 percent share for later payment. Therefore, the Government is precluded from challenging DCI's billing practice. *Id*. DCI also contented that DCI's investment in the property produced or purchased under the Contract is $3,359,901.51. On the other hand, a May 5, 2000

Memorandum from the Director of Cooperative Threat Reduction Policy stated that DCI's investment was $1 million. *See* Frederickson Aff. Ex. 5; *see also id.* ¶ 15A.

Accordingly, the court has determined that a genuine issue of material fact exists as to whether DCI had any financial interest in the property produced or purchased under the Contract and the amount, if any, of such interest.

**f. A Genuine Issue Of Material Fact Exists As To Whether The Government Waived The Contract Completion Date.**

DCI also argued that, as a matter of law, the Government waived the January 30, 1998 contract completion date, established by Modification P00002 and that the Government has never established a new completion date. *See* Pl. Reply at 12-13 (citing *DeVito* v. *United States*, 188 Ct. Cl. 979, 991-992 (1969)). The Government "did not terminate [DCI] and continued to encourage [DCI] to perform various activities under the Contract." *Id*. at 13. DCI, however, has not cited any evidence to support the assertion that the Government encouraged DCI to perform activities under the Contract for the five-year period after the completion date established in Modification P00002. On the other hand, the record is not clear whether the Contract was terminated and therefore whether the Government waived the contract completion date.

Since a genuine issue of material fact exists, the court is precluded from granting summary judgment that the Government waived the Contract completion date, as a matter of law.

**2. The Government Is Not Barred By The Doctrine Of Estoppel From Claiming That DCI Lacked A Financial Interest In The Equipment.**

DCI argued that the doctrine of estoppel barred the Government from claiming that DCI had no financial interest in the property produced or purchased under the Contract. *See* Pl. Reply at 11-12. The elements of equitable estoppel are: "(1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury." *Jana, Inc.* v. *United States*, 936 F.2d 1265, 1270 (Fed. Cir. 1991); *see also Rumsfeld* v. *United Technologies Corp.*, 315 F.3d 1361, 1377 (Fed. Cir. 2003) (citations omitted) (emphasis in original) ("Adjudication of the estoppel issue must proceed under the 'well settled [rule] that the Government may not be estopped on the same terms as any other litigant.' Beyond a mere showing of facts giving rise to an estoppel, [a party] must show '*affirmative misconduct* [as] a prerequisite for invoking equitable estoppel against the government."); *Am. Elec. Labs., Inc.* v. *United States*, 774 F.2d 1110, 1113 (Fed. Cir. 1985) (same).

The Government countered that DCI had no financial interest in the property produced under the Contract because of an issue as to whether DCI paid the 26 percent share required by the Contract. *See* Gov't Reply at 6-7. After a series of DCAA Audits, the Government discovered that

DCI had a practice of paying subcontractors and employees 74 percent of the total amount due and deferring payment of DCI's 26 percent share due. *Id*. at 7. Those costs were not allowed because, even though accrued liabilities were established for the costs, they were not paid in the ordinary course of business, as required by the Contract. *See* FAR § 31.201-2. At this stage of the litigation, however, DCI has presented no evidence that the 26 percent deferred amounts were paid or are still owed by DCI.

Although DCI states that the Government approved this deferred billing practice, a genuine issue of material fact exists as to whether the Contracting Officer, as the Government's authorized representative, was aware of or approved such practice and therefore had knowledge of "true facts." For that reason alone, the Government is not equitably estopped from asserting that DCI does not have a financial interest in property produced under the Contract.

**D. Resolution Of The Government's November 18, 2004 Cross-Motion For Summary Judgment.**

The Government argued that DCI's claim that DTRA wrongfully removed the equipment and failed to negotiate an equitable share thereof is barred by the doctrine of estoppel. *See* Gov't Response at 14-16. The elements are the same as when a party is asserting estoppel against the Government, although affirmative misconduct is not required when asserting estoppel against a non-government litigant. *See e.g.*, *Rumsfeld*, 315 F.3d at 1377; *Jana, Inc.*, 936 F.2d at 1270; *see also Am. Elec. Labs., Inc.*, 774 F.2d at 1113;.

Since DCI affirmatively represented that it could successfully complete the Contract despite DCI's Executive Vice President's March 15, 1996 letter to the contrary, the Government argued that DCI was estopped from claiming that the Government wrongfully removed the equipment and failed to negotiate an equitable distribution. *See* Gov't Response at 15-16; *see also* Gov't App. at 4-6 (March 28, 1996 Letter to Contracting Officer I from DCI). In addition, when requesting a no-cost Contract extension in October 1997, DCI again reaffirmed that it could successfully complete the Contract by January 1998. Therefore, the Government concluded that DCI is again estopped from claiming that the Government wrongfully removed the equipment and failed to negotiate an equitable distribution. *See* Gov't Response at 15-16; *see also* Gov't App. at 12-13. The Government claimed that it relied on DCI's representations when it allowed DCI to continue the Contract and later when it granted the Contract extension.

The Government's argument, however, does not take into consideration DCI's assertions that the Government continued to encourage DCI to perform various activities under the Contract after the date of completion set in Modification P00002. Therefore, the Government has not affirmatively established all of the elements of estoppel and the Government's motion for summary judgment in this regard is denied.

## CONCLUSION

For the foregoing reasons, DCI's October 7, 2004 Amended Motion for Partial Summary Judgment and the Government's November 18, 2004 Cross-Motion for Summary Judgment are denied. Trial will proceed on November 14, 2005, as established by the June 30, 2005 Amended Scheduling Order.

**IT IS SO ORDERED.**

**s/SUSAN G. BRADEN**
**Judge**