IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DIE CASTERS INTERNATIONAL, INC.,**

Plaintiff,

- against -

**NO. 04-1113C**
(Judge Braden)

**UNITED STATES OF AMERICA,**

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFF'S AMENDED MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to RCFC Appendix A, ¶14, Plaintiff hereby submits its Amended Memorandum of Contentions of Fact and Law.

## STATEMENT OF FACTS PLAINTIFF EXPECTS TO PROVE

1. The United States Court of Federal Claims has jurisdiction to consider and determine this action pursuant to the Contract Disputes Act of 1978 U.S.C. §§ 601 - 613 and pursuant to 28 U.S.C. §1491.

2. The Complaint was timely as filed.

3. Plaintiff, DCI, is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Wayne, New Jersey, and is a small business

company that was formed to implement the formation of a die casting industry in the independent states of the former Soviet Union.

4. On October 27, 1995, the Defense Nuclear Agency ("DNA"), the predecessor in interest to the Defense Special Weapons Agency ("DSWA"), which in turn was the predecessor in interest to the Defense Threat Reduction Agency ("DTRA"), awarded the Contract DNA001-95-C-0169 (the "Contract") to Plaintiff.

5. The Contract was a cost sharing contract with total original estimated costs of $4,100,427.00 of which the Defendant's share was $3,034,316.00 and Plaintiff's share was $1,066,111.00.

6. Pursuant to the Statement of Work, dated 95JUN21 ("SOW"), which was incorporated by reference into the Contract, Plaintiff was to provide and invest "capital equipment, material, training and business assistance/advisory services" (hereinafter referred to collectively as the "Equipment") to a joint venture (hereinafter the "Joint Venture") to be established between Plaintiff and a Ukrainian Joint Venture Partner ("UJVP"). The UJVP was to supply an existing die casting factory (the "Facility") which was to be improved by the installation of the Equipment designed and provided by Plaintiff.

7. The Joint Venture was to own and operate the modernized die casting Facility.

8. The UJVP was identified in the SOW as Meridian Joint Stock Company ("Meridian"). The UJVP was subsequently changed to Burevestnik (in association with another Ukrainian entity, TechnoMet), (hereinafter collectively referred to as "Burevestnik").

9. Pursuant to a Joint Venture Agreement between Plaintiff and Meridian, Plaintiff was to receive a 50% interest in the Joint Venture as consideration for providing the Equipment and

installation of same and the UJVP was to receive a 50% interest in the Joint Venture as consideration for providing the Facility. Plaintiff was also to receive control of the Board of Directors of the Joint Venture and was to be the exclusive distributor of products produced by the Joint Venture.

10. Pursuant to a later agreement between Plaintiff and Burevestnik, Plaintiff was to originally receive a 51.2% interest in the Joint Venture as consideration for providing the Equipment, services, expenses and cash. Burevestnik was to contribute the facility, equipment, tooling and dies, a backlog of orders and cash for the remaining interest in the Joint Venture.

11. The SOW further provided that the Joint Venture and the improved Facility that it would create would "serve as the groundwork for future business and/or joint ventures." The Facility was to be the model for the establishment by the Plaintiff of other manufacturing facilities in the Ukraine.

12. These future business relationships would provide very substantial financial benefits to Plaintiff and were the consideration for Plaintiff making considerable investments pursuant to the cost sharing Contract with the Defendant.

13. Plaintiff's substantial investments included, but were not limited to, the continued development of its intellectual property that was incorporated in the design of the Equipment and the development and implementation of its business plan.

14. Both Plaintiff and Defendant knew and acknowledged that to complete the efforts as contemplated by the SOW additional investment capital would have to be provided by either outside investors or by the government.

15. In 1996, as a Contract requirement, Plaintiff submitted to Defendant its business plan detailing the "future business" activities of the Meridian Joint Venture. This business plan detailed the anticipated revenues to be derived by the Joint Venture from these "future business" activities.

16. In 1997, Plaintiff submitted a revised business plan ("DCB Business Plan") to Defendant reflecting the new UJVP and other revised circumstances. Plaintiff's DCB Business Plan detailed the operating and marketing plan for the Joint Venture based upon an additional $8,000,000 investment and provided detailed financial data including projected revenues and net income.

17. In 1999, Plaintiff supplemented its DCB Business Plan to include an additional $50,000,000 investment. Plaintiff shared this supplemented business plan with certain Department of Defense and other officials of the Defendant.

18. Defendant had knowledge of Plaintiff's DCB Business Plan, which included the establishment of Plaintiff's distributorship rights with respect to products produced by the Joint Venture's Facility and its anticipated interests in future business enterprises.

19. The changes required to obtain a new Facility, to replace the original Facility and the changed UJVP, substantially impacted both the cost and the schedule of the Contract and further precipitated the need to find additional funding beyond the $4,100,427 available under the Contract.

20. Plaintiff proceeded in accordance with the terms and conditions of the Contract to acquire the Equipment, but expended all the Contract funding prior to shipping and installing the Equipment in the Facility.

21. Plaintiff stored the Equipment for its own account in Kiev, Ukraine and Tiraspol, Moldova, awaiting the additional funds which had been promised by Defendant or from outside investors that were needed by Plaintiff to upgrade facilities and install the Equipment.

22. The Contract contains standard clause FAR 52.232-20 (Apr 1984), entitled Limitation of Cost.

23. Sub-section (h) of FAR 52.232-20 provides as follows:

> "If this contract is terminated or the estimated cost is not increased, the Government and the Contractor <u>shall negotiate an equitable distribution of all property produced or purchased under the contract</u> based upon the share of costs incurred by each." (Emphasis added)

24. Defendant's Contracting Officer advised Plaintiff that it would close out the Contract in due course and that it would negotiate an "equitable distribution" of "all property produced or purchased under the contract, based upon the share of costs incurred by each party."

25. Defendant, at numerous times, recognized that Plaintiff had a financial interest in the Equipment.

26. Although Plaintiff requested the negotiation of an "equitable distribution" Defendant failed and refused to enter into such negotiations or to provide Plaintiff with its share of an "equitable distribution".

27. The Contract contained under Section H - <u>SPECIAL CONTRACT REQUIREMENTS</u>, Paragraph 5 entitled <u>Use and Ownership/Disposition of Government - Provided Property</u>.

28. Sub-section (a) of Paragraph 5 provides:

> "a. <u>All property, equipment and materials acquired with United States (U.S.) Government funding under this Contract</u>

> shall be acquired solely for the use of the joint venture, or business arrangement formed by the U.S. Contractor and the Former Soviet Union (FSU) enterprise partner in performance of the terms of this contract." (Emphasis added)

Sub-section (b) of Paragraph 5 provides in part:

> "Title and ownership of all property, equipment and materials acquired with U.S. government funding under this Contract shall vest with the joint venture upon conclusion of the Contract, as determined by the Contracting Officer. Prior to conclusion of the Contract, the U.S. Contractor is accountable for said items in accordance with standard government property clauses cited under SECTION I of this contract. Title and ownership of all property, equipment and materials provided by the U.S. Contractor or the FSU enterprise partner shall be determined in accordance with the terms of the agreement between said parties."

29. At times subsequent to October of 2001, Defendant, acting through its authorized contractors, and without Plaintiff's consent, took possession and control of Equipment that was stored in Moldova and the Ukraine.

30. Defendant, again without Plaintiff's consent and in violation of the terms of the Contract, through its contractor, shipped and delivered possession and control of the Equipment to the UJVP and other third parties.

31. The Defendant's appropriation of the Equipment and delivery to a third-party precluded Plaintiff from contributing to the Joint Venture the Equipment and receiving its negotiated share of the Joint Venture and distribution rights.

32. By Defendant's wrongful and illegal removal and disposition of the Equipment to other than the Joint Venture, Plaintiff was deprived of the ability to implement its previously disclosed and detailed business plans, for utilizing the Equipment and the resultant Joint Venture

as Plaintiff's lynch pin in the formation of a die casting industry in the independent states of the former Soviet Union.

33. In April of 2003, Plaintiff was advised by Defendant's Contracting Officer that the contract "is considered closed".

34. Prior to the "closing" of the Contract, Defendant, by its negligent acts and failure to act, allowed an unwarranted investigation by the Defense Contract Investigative Service ("DCIS") into Plaintiff's billing practices to continue for almost thirty months, effectively precluding Plaintiff from attracting investment capital from sources outside the government.

35. In January of 2000, Defendant summarily rejected an offer from Brookhaven National Laboratories to provide additional funding for the Project, thereby further interfering with Plaintiff's ability to obtain the benefits contemplated under the Contract.

36. Defendant, on numerous occasions, failed to perform its contractually mandated duties and obligations under the Contract, including but not limited to issuing a final decision required under numerous Form 1s that were issued by DCAA.

37. The total costs incurred by Plaintiff under the Contract are $5,955,969.49, of which the Defendant reimbursed the Plaintiff only $3,034,316.00, leaving Plaintiff's investment in the Contract of $2,921,653.49.

38. In February of 2004, Plaintiff filed its certified Claims together with pertinent information with respect to the Claims and requested Defendant's Contracting Officer to file a final decision on the Claims.

39. In June of 2004, Defendant's Contracting Officer advised Plaintiff of his "final decision" denying all of Plaintiff's claims "in their entirety".

40. Plaintiff's accounting and billing systems and procedures were in conformity with all applicable regulations and were reviewed with and consented to by the Defendant.

41. Plaintiff performed all its obligations under the Contract, including but not limited to the contribution of its cost share.

42. Plaintiff is entitled to damages of $2,921,653.49 representing what it would have received had the Defendant negotiated an equitable distribution as required under FAR 52.232-20(h) plus a reasonable profit of $438,248.02.

43. Plaintiff is entitled to recover the reasonable value of its contribution to the Joint Venture, which in turn would have been reflected in its ownership interest in the Joint Venture, the reasonable value of which would not be less than the total costs incurred of $5,955,969.49 plus a reasonable profit of $893,395.42.

44. Plaintiff is entitled to recover damages equal to its lost profits in a sum not less than $103,147,275.80.

**PLAINTIFF'S POSITION WITH RESPECT TO THE FACTS ON WHICH DEFENDANT IS EXPECTED TO RELY**

45. Plaintiff does not believe Defendant is going to dispute any of the facts that will relate directly to Defendant's liability.

46. Plaintiff believes that Defendant may rely on certain facts to establish its affirmative defenses of failure of consideration and estoppel.

47. One of the facts Defendant may raise concerns a change in the management of Plaintiff in March of 1996 and a letter one of the disgruntled DCI managers wrote to the Defendant. Plaintiff's position is that many of the allegations in that letter were false and that at

a meeting with the Plaintiff, the Defendant accepted Plaintiff's explanation, approved Plaintiff's plans and procedures and Defendant elected to continue the Contract and not to terminate the Contract.

48. The balance of the facts Plaintiff believes Defendant will rely upon relate to the amount of damages and not liability. These facts, concerning the Plaintiff's interest in the Equipment, the value of Plaintiff's interest in the Joint Venture, and the viability of its lost profit claims, will not be based on facts but upon its expert's opinions. With respect to the Plaintiff's interest in the Equipment, the Defendant admitted the Plaintiff had an interest, see paragraphs 24 and 25 above, and the value of Plaintiff's interest is best measured by the incurred costs and Plaintiff's investment in the Contract, see paragraphs 37 and 43 above. With respect to the value of Plaintiff's interest in the Joint Venture, also see paragraph 37 above. With respect to the amount of the Lost Profit Claim, see paragraphs 70-74 below.

## ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

49. Was the Defendant's taking of the Equipment a violation of FAR 52.232-20(h) and a breach of the Contract?

Sub-issues identified by the Court in its decision of Plaintiff's Motion for Partial Summary Judgment filed July 29, 2005.[1]

a) Was the Government's taking of the Equipment a termination of the Contract?

b) Did the Defendant admit that DCI was entitled to an equitable distribution?

---

[1]Plaintiff believes that additional facts elicited during discovery subsequent to the filing of this motion have resolved most of these issues.

c) Did Plaintiff have any financial interest in the property produced or purchased under the Contract?

d) Did the Defendant waive the completion date?

e) Did the Contracting Officer approve Plaintiff's billing practices?

50. Were the Defendant's multiple failures to perform its obligations and duties under the Contract a breach of the Contract?

51. Were the Defendant's appropriation and distribution of the Equipment a breach of Contract?

52. Were the Defendant's actions in wrongfully taking the Equipment a breach of the implied covenant of good faith and fair dealing?

53. Was the Defendant's interference with the Plaintiff's efforts to raise investment capital or to obtain additional funding from DOE a breach of the Contract?

54. Were the Defendant's actions of interfering with the Plaintiff's efforts to raise investment capital a breach of the implied covenant of good faith and fair dealing?

55. Were the Defendant's actions in not performing its contractually mandated obligations a breach of contract?

56. Were the Defendant's actions in not performing its contractually mandated obligations a breach of the implied covenant of good faith and fair dealing?

57. Was the Defendant's actions of taking the Equipment a "taking" for which just compensation is due Plaintiff under the Fifth Amendment of the Constitution of the United States?

58. What are the damages due Plaintiff by reason of Defendant's breaches of Contract?

59. What was the value of the "property produced or purchased under the Contract"?

60. What would have been the value of Plaintiff's interest in the Joint Venture?

61. Is the Plaintiff entitled to expectancy damages in the form of Lost Profits?

62. What is the amount of the Lost Profit damages?

## PLAINTIFF'S DISCUSSION OF THE LEGAL PRINCIPLES

63. As stated previously in this Memorandum, Plaintiff believes this case turns on damages, not liability. Plaintiff believes that the Defendant does not have and is not going to argue any facts that negate Defendant's liability with respect to its breaches of the Contract. This case will ultimately be litigated on the issues of damages and, in particular, the expectancy damages of Lost Profits.

64. The critical facts are brief, simple and undisputed. The Defendant, without the Plaintiff's consent, somehow was able to surreptitiously appropriate the Equipment the Plaintiff acquired under this Contract. This appropriation was accomplished notwithstanding the fact that the Equipment was stored in Plaintiff's name in Moldova and Kiev. The Defendant then, again without Plaintiff's consent, delivered the Equipment to Plaintiff's proposed Joint Venture Partner.

65. The terms and conditions of the Contract do not provide or allow for any such actions by the Defendant. The terms and conditions of the Contract did provide for other remedies, but the Defendant chose to ignore them and, instead, utilized its own self-imposed remedy in violation of the Contract terms.

66. This breach, together with the Defendant's other breaches of 1) failure to negotiate an equitable distribution (pursuant to FAR 52.232-20(h), 2) failure to perform its obligations under the contract, and 3) its interference with Plaintiff's attempts to attract additional capital investments or funding are clear and unequivocal breaches of contract.

67. The acts enumerated above are also breaches of the implied covenants of good faith and fair dealing. It is well-settled case law that a breach of the duty of good faith and fair dealing will result when the government interferes with the performance of a contract or where one party to a contract prevents its performance. *See* Tecom *v.* U.S., 2005 U.S. Claims LEXIS 195, *124-125 (Fed. Cl. 2005). *See also* Northrop *v.* Grumman Corp., 47 Fed. Cl. 20, 78-90 (Fed. Cl. 2000) (stating that the government's failure to respond to Plaintiff, provide adequate documentation and failure to provide adequate supervision on a project resulted in serious delay and interference with performance of the contract and constituted breach of good faith and fair dealing); *Peter Kiewit Sons' Co.* *v.* U.S., 151 F. Supp. 726, 138 Ct. Cl. 668, 674 (Fed. Cl. 1957) (the government has the duty not to willfully or negligently interfere with performance of a contract); *see* Malone *v.* U.S., 849 F.2d 1441 (Fed. Cir. 1988) (ruling that the government violated its duty of good faith where it interfered with Plaintiff's contract performance by refusing to answer Plaintiff's requests for information and misleading the plaintiff into believing that it accepted plaintiff's work).

68. The taking of the Equipment was a taking for which compensation is due under the Constitution of the United States. A "taking" under the Fifth Amendment of the United States Constitution occurs when the government takes private property "for public use, without just compensation." *U.S. Const. Amend. V.* In order to succeed in an action under the takings clause,

"a claimant must establish that he was the owner of property and that some portion of the property was taken for public use." *Public Water Supply District No. 3* v. *United States,* 133 Ct. Cl. 348, 135 F. Supp. 887, 890 (1955). *See also Norman* v. *United States,* 63 Fed. Cl. 231 (2004) (stating that a taking occurs where the government physically occupies the property of another by taking possession of it).

69. Notwithstanding the above-enumerated issues and points, Plaintiff, as stated above, believes the critical issue will ultimately be the awardability of expectancy damages by way of Lost Profits.

70. The issue of the award of expectancy damages and, in particular, lost profits, has been addressed numerous times by this Court and the Court of Appeals for the Federal Circuit. In *Standard Federal Bank* v. *U.S.,* 62 Fed. Cl. 265 (2004) at page 272, this Court citing *Hansen Bank Corp., Inc.* v. *U.S.* 367 F.3d 1297, 1308 (Fed. Cir. 2004) stated: "in the event of a breach, contract law recognizes that the promisee has three enforceable interests: expectation, reliance and restitution". (Emphasis added) The Court explained that the "granting of expectation damages is one method of making the non-breaching party whole" because the remedy gives the non-breaching party "the benefits he expected to receive had the breach not occurred." *(Id.)* Citing *Energy Capital Corp.* v. *United States,* 302 F.3d 1314, 1324 (Fed. Cir. 2002). (quoting *Glendale Fed. Bank, F.S.B.* v. *United States,* 239 F.3d 1374, 1380 (Fed. Cir. 2001) citing Restatement (Second) of Contracts § 344(a) (1981), reh'g denied (2002).

With respect to expectancy damages by way of Lost Profits, this Court has delineated the standard, which must be met by a plaintiff to recover lost profits. In *Globe Savings Bank, F.S.B. and Phoenix Capital Group, Inc.* v. *The United States, 59 Fed. Cl. 86 (2003),* this Court at

pages 92, 93, citing *Energy Capital, supra,* stating "the standard governing recovery of lost profits is stated as a three-part test: (1) The loss was the proximate result of the breach; 2) the loss of the profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and 3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty."

The Federal Circuit has adopted this standard. See *Energy Capital Corp., supra.* This Court has recently affirmed and applied this standard in *Globe Savings Bank, F.S.B. and Phoenix Capital Group, Inc. v. U.S.*, 65 Fed. Cl. 330 (Apr. 1, 2005) at page 345.

71. Applying this standard to these facts, it is indisputable that the breaches, including the Defendant's unauthorized appropriation of the Equipment was the proximate cause of Plaintiff not being able to achieve the anticipated benefits under the Contract.

72. Given the fact that the SOW specifically referenced that the Joint Venture would "serve as the groundwork for further business and/or joint ventures", it is indisputable that the loss was foreseeable and within the contemplation of the parties.

73. The ultimate decision point is reduced to the third prong that "a sufficient basis exists for estimating the amount of the lost profits with reasonable certainty". This is where Plaintiff believes Defendant will make its stand. As Defendant's expert reports indicate, the Defendant's experts deem Plaintiff's lost profits claims to be speculative and remote (Expert Report of Todd Lester).

74. This Court will have to weigh the Defendant's consultant's critique of the DCB Business Plans against the Plaintiff's claims that that plan is a reasonable basis for establishing

Lost Profits. It should be kept in mind that the Plaintiff's DCB Business Plan was created long before any litigation between the parties was initiated or even contemplated. This Plan was prepared and submitted to the Defendant and third-party investment sources to raise investment capital. This DCB Business Plan and the projections contained therein should not be subject to the usual skepticism given some Lost Profit analysis, which are usually created expressly for or at least in contemplation of litigation. This Court should put this lost profit claim on an entirely different level than the typical lost profit analysis prepared for litigation that Court's have at times deemed not susceptible to reasonable proof or speculation in nature. (See Standard Federal, U.S. 62 Fed. Cl. 265 (2004) at page 272).

The DCB Business Plan and the projections incorporated therein were prepared contemporaneously with the Plaintiff's solicitation of investment funds and not as an afterthought in preparation of proving its damages for a litigated matter, and its credibility and viability cannot be put into question by the Defendant's expert witnesses who prepared their analysis eight years after the fact, relying upon incorrect and incomplete information, baseless assumptions, and were prepared solely to defend this litigation.

## OBJECTIONS TO WITNESSES OR EXHIBITS LISTED UNDER PARAGRAPH 13

75. On the basis of Attorney-Client privilege, Plaintiff hereby objects to Defendant calling David Konnick as a witness and the introduction of documents 0045, 0046, 0047, 0345 and 0364 on Defendant's Exhibit List.

## BIFURCATION

76. For the reasons set forth above, Plaintiff believes that bifurcation will not be necessary because the parties may very quickly arrive at the damage qualification issues.

Respectfully submitted,

By:__________________________

Gary Marcus, Esq. (3853)
Goldberg & Connolly
Attorneys for Plaintiff
66 North Village Avenue
Rockville Centre, NY 11570
(516) 764-2800
(516) 764-2827 (Facsimile)

Dated: October 12, 2005