IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DIE CASTERS INTERNATIONAL, INC., Plaintiff, | ) | No. 04-1113C |
| v. | ) | (Judge Braden) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S PROPOSED CONCLUSIONS OF LAW

Pursuant to Appendix A, ¶14, of the Rules of the Court of Federal Claims, defendant hereby submits is Proposed Conclusions of Law.

Contract Type

1. The contract between Die Casters, International ("DCI") and the Defense Threat Reduction Agency ("DTRA"), that is the subject matter of this dispute, is a cost-share contract, a type of cost-reimbursement contract. A cost reimbursement contract specifies an estimate of the total cost expected to be expended. The purpose of specifying an estimate is to obligate the necessary funds and to establish a ceiling that the contractor may not exceed without the approval of the contracting officer ("CO"). FAR 16.303. A cost-reimbursement contract permits the payment of the contractor's allowable incurred costs only to the extent specified in the contract. Id.

2. DCI's contract with DTRA contained the limitation of cost clause, FAR 52.232-20, a mandatory contract provision. See FAR 32.705-2(a). The limitation of cost clause specified that DTRA's "agreed upon portion of allowable costs" was 74 percent of DCI's allowable incurred costs, up to a maximum of $3,034,316. The maximum of $3,034,316 could not be increased

without the express written authorization of the CO. Because the CO never authorized an increase in the $3,034,316 maximum specified in the contract, DTRA's obligations to pay DCI's incurred costs ended when that ceiling had been reached. All costs incurred by DCI after the ceiling had been reached, were incurred at DCI's risk.

3. Under a cost-reimbursement contract the contractor receives no profit and is reimbursed only for an agreed-upon portion of its allowable costs. See FAR 16.301-1. Pursuant to DCI's contract with DTRA, therefore, DCI is not entitled to profit.

4. The initial period of performance under the contract was 24 months, that is, from October 27, 1995, the date the contact was award, until October 26, 1997. The period of performance was extended by the execution of a no-cost bilateral modification to January 30, 1998. DCI's obligation to continue performance under the contract, and DTRA's obligations to pay DCI's allowable incurred costs, ended on January 26, 1998.

Authority to Bind the Government

5. It is axiomatic that only those with actual authority to bind the Government may do so. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380 (1947). To the extent that DCI relied upon statements made by DTRA employees, other than the CO, DCI did so at its own risk. Only the CO had the authority to modify DCI's contract. See FAR 43.102(a). A contractor assumes the risk of accurately ascertaining the government representative's authority to bind the government, even where the government representative may be unaware of the limits of his authority. Federal Crop Insurance Corp., 332 U.S. at 384; Trauma Service Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). The only individual authorized by the CO to take any action whatsoever was the CO's representative ("COR"). The COR's authority, however,

was severely limited:

> The [Representative] is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract. FAR 43.102(a).

Breach of Contract

6. In a breach-of-contract case, the plaintiff bears the burden as to all elements of the claim. See G&H Machinery Company v. United States, 16 Cl Ct. 568, 571 (1989) ("The burden of proof stands as a threshold question. If the claimant fails to carry the burden of proof then, even in the absence of opposing evidence, he cannot recover on a breach of contract claim.").

7. Pursuant to the contract, DCI promised to make its best efforts to establish a joint venture with a Ukrainian partner and to contribute approximately $1M towards that effort. DTRA promised to reimburse DCI for 74 percent of DCI's allowable incurred costs, up t a maximum of $3,034,316.

8. DCI's failure to consummate a joint venture agreement with a Ukrainian partner was not due to a breach of the contract by DTRA; DTRA fulfilled its obligations under the contract by reimbursing DCI for its allowable incurred costs up to the contract maximum of $3,034,316.

9. DCI breached the contract when it failed to protect the equipment in Moldova and in Ukraine from possible seizure or confiscation by either the entities storing the equipment or by governmental authorities.

10. DCI breached the contract when it failed to provide the financial resources necessary to establish a joint venture.

11. DCI's breaches of the contract were the proximate causes of DCI's inability to form a joint venture.

12. DTRA did not breach the contract when it took steps necessary to protect the equipment when DCI indicated that it was either unwilling or unable to do so.

13. DTRA did not breach the contract when the CO refused to modify the contract to increase the maximum amount of $3,034,316 specified in the contract.

14. DTRA did not breach the contract when the CO refused to modify the contract to extend the period of performance beyond January 26, 1998.

Damages Attributable to a Breach of Contract

15. A plaintiff must prove that damages allegedly resulting from the Government's breach of a contract "was attributable solely to, and was therefore directly caused by, the [breach]." J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 456 F.2d 1315, 1330 (1972). See also Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) ("[T]he plaintiff can only recover those items of damage which are the proximate result of the acts of the Government. . . . For damages to be direct there must be no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably."); see also, Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353, 356 (1951), quoting Myerle; California Fed. Bank v. United States ("CalFed"), 54 Fed. Cl. 704, 711 (2002).

16. The decision in Krofft Entertainment, Inc. v. CBS Songs, 653 F. Supp. 1530 (S.D.N.Y. 1987), is instructive. In Krofft, plaintiff claimed that CBS's breach of a licensing agreement caused it to be unable to obtain financing to produce a Broadway play. CBS maintained that there could be no causation if it established that, even if it had not breached the license agreement, Krofft would still have been unable to obtain financing. The district court agreed. In

addressing the law of causation, the district court cited C. McCormack, Handbook on the Law of Damages § 73 at 261 (1935), for the proposition that in a breach of contract case a breaching party's act or omission ordinarily can only be considered a "substantial factor" in causing the damage "where the damage would not have occurred 'but for' the alleged wrongful act or omission . . . . " Id. at 1534. Similarly, the court cited 5A Corbin on Contracts §§ 992 at 6-7, and 997 at 21 (1964) for the proposition that "[i]t must be shown that but for the breach" the damages would not have been incurred. Id. "Corbin concludes that a plaintiff cannot charge the other party with losses and disappointments that would have occurred in the absence of any breach by the other party, since such losses were 'not caused by the other party's breach of duty.' Id. § 992 at 6." Id.

Lost Profits

17. DCI's claim for lost profits is without merit. DCI has failed to establish that the damages it seeks were actually or reasonably foreseeable, were caused by the breach of the contract at issue, and are not speculative.

18. To recover lost profits for breach of contract, plaintiff must establish by a preponderance of the evidence that (1) the loss was the proximate result of the breach, (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because defaulting party had knowledge of special circumstances at time of contracting, and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. Energy Capital Corp. v. United States, 302 F.3d 1314 (Fed. Cir. 2002). Thus, to recover under a lost profits claim, a plaintiff must prove by the preponderance of the evidence the following elements: 1) causation; 2) reasonable foreseeability; and 3) reasonable

certainty. Chain Belt Co. v. United States, 127 Ct. Cl. 38, 115 F. Supp. 701, 714-15 (1953); accord Landmark Land Co. v. United States, 46 Fed. Cl. 261, 270 (2000), aff'd in part, vacated in part, remanded by Landmark Land Co., Inc. v. F.D.I.C., 256 F.3d 1365 (Fed. Cir. 2001), rehearing and rehearing en banc denied Nov 15, 2001. "'To recover lost profits for breach of contract, the plaintiff must establish that . . . a sufficient basis exists for estimating the amount of lost profits with reasonable certainty." California Fed. Bank v. United States, 43 Fed. Cl. 445, 451 (1999) (discussing Chain Belt, 115 F. Supp. at 714), appeals argued, Nos. 99-5108, 99-5119 (Fed. Cir. July 7, 2000); see also Restatement (Second) of Contracts § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."). In applying the "reasonable certainty" standard, this the Federal Circuit has stated that "attempting to determine what would have happened if the [bank's leverage had not been affected by the breach] necessarily involves a highly speculative and conjectural inquiry." Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996); see Schonfeld v. Hilliard, 218 F.3d 164, 174 (2nd Cir. 2000) (plaintiff not entitled to recover lost profits because he "failed to establish the high degree of correlation between [his corporation] or the nonexistent operating entity and proffered firms (in terms of, inter alia, investors, management and cost structures) upon which the probative quality of this evidence depends").

19. There are essentially two methods by which DCI could attempt to prove lost profits in this case. The first is to rely on DCI's past history of performance in order to estimate with a reasonable degree of certainty the amount of profits that would have been made but for the alleged breach. See 3 Dobbs, Law of Remedies, § 12.4(3) at 72 (2d ed.1993); Independent Business Forms, Inc. v. A-M Graphics, Inc., 127 F.3d 698, 703 (8th Cir. 1997) ("In order to

recover lost profits, plaintiff must produce proof of the business' income and expenses during a reasonable period of time prior to the interruption of the business."); McDermott v. Middle East Carpet Co., Associated, 811 F.2d 1422, 1428 (11th Cir. 1987) (claimant may recover lost profits if it can show a "track record" of profitability). Since DCI, a startup venture, specially created to bid on this and similar contracts, had no previous history of performance in the die casting industry, DCI, as a matter of law, can not sustain its burden of proving lost profits under this theory.

20. The second potential method of proving lost profits is through a competitor's and other's comparable experience, referred to as "yardstick evidence." 3 Dobbs, Law of Remedies, § 12.4(3) at 73; see Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc., 213 F.3d 198, 207 (5th Cir. 2000) (yardstick test consists of a study of the profits of business operations that are closely comparable to the plaintiff's); G.M. Brod & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1538-1539 (11th Cir. 1985). Yardstick evidence may be relevant to establish lost profits when: "the plaintiff's business bears a close comparison to another business which furnishes the yardstick, where the products or services involved are standardized, do not depend heavily on local or personal management skills, and where the plaintiff can show his share of the total market before breach." Id.; see Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc., 213 F.3d at 207 ("Although allowances can be made for differences between the firms, the business used as a standard must be as nearly identical to the plaintiff's as possible.") However, "[w]hen the business profits depend on highly individualized elements, the plaintiff's own past experience may be the only reliable guide." Dobbs, Law of Remedies, § 12.4(3) at 73.

21. Since DCI has not identified any die casting business that is similar, let alone identical to,

the one that DCI intended to create, DCI, as a matter of law, can not sustain its burden of proving lost profits under this theory.

22. DCI's wholly speculative claim for lost profits must be dismissed because speculative expectancy damages may not be awarded against the United States. Wells Fargo Bank N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996) ("remote and consequential damages are not recoverable in a common-law suit for breach of contract ... especially ... in suits against the United States for the recovery of common-law damages."). According to Wells Fargo, [i]f the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement.... But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit. 88 F.3d 1012, 1022-23 (Fed. Cir.1996) (quoting Ramsey v. United States, 101 F. Supp. 353, 121 Ct. Cl. 426 (1951)).

23. Since DCI's contract with DTRA did not contemplate that DCI would make any profit whatsoever under that contract, as a matter of law DCI can not sustain its burden of proving lost profits.

24. DCI failed, as an evidentiary matter, to establish entitlement to such profits. See L'Enfant Plaza Properties, Inc. v. United States, 3 Cl. Ct. 582, 590-91 (1983) (finding that the evidence was insufficient to show all three prongs of reasonable certainty, causation, and foreseeability); Northern Paiute Nation v. United States, 9 Cl. Ct. 639, 646 (1986) (stating that "the problem of

speculation is insurmountable"); see also Bluebonnet Savings Bank, F.S.B. v. United States, 266 F.3d 1348, 1358 (Fed. Cir. 2001) (affirming the Court of Federal Claims' decision not to award lost profits because "the evidence was insufficient to determine the quantum of ... damages to a reasonable certainty."). DCI failed to demonstrate with any degree of certainty, let alone a reasonable degree of certainty, that DCI lost profits as a result of DTRA's alleged breach. As a matter of law, therefore, DCI is not entitled to lost profits.

Formation of the Joint Venture

25. Moreover, DCI's calculation of lost profits is fundamentally flawed as a matter of law. In calculating its lost profits, DCI assumed that it would have had a 40 percent ownership share in the joint venture it intended to form with Burevestnik and Technomet, based, in part, upon the value of the equipment purchased with Government funds. As a matter of law, the value of the equipment could not be considered part of DCI's contribution to the joint venture because the contract provided as follows:

> 5. USE AND OWNERSHIP / DISPOSITION OF GOVERNMENT-PROVIDED PROPERTY
>
> b. All property, equipment and materials acquired with U.S. Government funding under this contract is considered a third-party contribution which is separate and distinct from property, equipment, or materials contributed by the U.S. Contractor or the FSU enterprise partner. Title and ownership of all property, equipment and materials acquired with U.S. Government funding under this Contract shall vest with the joint venture upon the conclusion of the Contract, as determined by the Contracting Officer. Prior to conclusion of the Contract, the U.S. Contractor is accountable for said items in accordance with standard government property clauses cited under SECTION I of this Contract. Title and ownership of all property, equipment and materials provided by the U.S. Contractor of the FSU enterprise partner shall be determined in accordance with the terms of the agreement between said parties.

PART I - THE SCHEDULE, SECTION H – SPECIAL CONTRACT REQUIREMENTS

Claims of Misrepresentation

26. To the extent DCI claims that DTRA employees made misrepresntations regarding the availability of additional funding, DCI's claim sounds in tort. Claims sounding in tort must be dismissed for lack of jurisdiction. Whether DCI's alleges fraud, misrepresentation, conversion of property, or some other tort, it is axiomatic that this Court's Tucker Act jurisdiction does not extend to tort claims. Block v. United States, 66 Fed. Cl. 68 (2005) ("It is well settled that a claim for conversion of property or for misappropriation of trade secrets sounds in tort…it is equally well settled that the Court of Federal Claims does not have jurisdiction over matters sounding in tort. 28 U.S.C. § 1491(a)(1)"), citing Keene Corp. v. United States, 508 U.S. 200,214 (1993), Brown v. United States, 105 F.3d 621,623 (Fed. Cir. 1997), and Tree Farm Dev. Corp. v. United States, 218 Ct. Cl. 308, 585 F.2d 493, 498 (1978). Defenses to Performance

27. To the extent DCI alleges that the Defense Criminal Investigative Services's ("DCIS") investigation into its accounting practices interfered with its performance of the contract or establishes a breach of DTRA's duty to cooperate, its claims must fail. It is well settled that the Government's actions in fulfilling its sovereign powers does not provide a basis for relief, even where those actions otherwise interfere with a contractor's performance. See Orlando Helicopter Airways, Inc. v. Widnall, 51 F.3d 258, 262 (Fed. Cir. 1995) (contractor not entitled to relief as a result of DCIS investigation, even though Federal authorities declined to prosecute). As the Federal Circuit has unambiguously stated

> …the government's exercise of police powers in its law enforcement capacity. Such powers are an ancient and fundamental indicia of sovereignty [citations omitted]…It does not matter whether the particular infraction under investigation happens to transpire during a government contract.

Id. at 262.

Value of the Property Acquired under the Contract

28. DCI claims, alternatively, approximately $6M, consisting of all of its incurred costs, or approximately $3M, consisting of the difference between its incurred costs and the amount provided by DTRA, as an equitable distribution of the equipment purchased under the contract, pursuant to the equitable distribution clause. According to DCI, the equipment's value for purposes of equitable distribution, includes all of its incurred coats on the theory that they were incurred in the acquisition of "intellectual property."

The clause pertaining to the equitable distribution of property reads as follows:

> If this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each.

(FAR 52.232-20(h), Limitation of Cost).

29. While defendant is unaware of any cases specifically interpreting this clause, the standards for contract interpretation govern. See, e.g., Jacobs Eng'g., Inc. v. U.S., 63 Fed. Cl. 451, 456-57 (2005). While Jacobs involved a cost share contract that was terminated for convenience ("T4C"), the Court held that the contractor was not entitled to T4C costs, that is, all incurred costs plus profit, and that the cost-sharing clause, including its no-profit provision, served as a limit on T4C costs. Id., at 457.

30. The decision in Breed Corp., ASBCA Nos. 14523 and 15163, 86-3 BCA ¶ 19,086 (May 21, 1986), is instructive. In Breed, the board found that the clause primarily applies to non-severable property that is produced or purchased in part before and in part after the

cost limit is reached. According to the ASBCA opinion, the property produced or purchased entirely with the funds of one party can be distributed equitably only to that party.

31. DCI's claim that it is entitled to all of its incurred costs under the contract's's equitable distribution of property clause must fail as a matter of law. The word "property" in the clause must be given its ordinary meaning. Even giving the term "property" an expansive meaning so as to include both the actual cost of the property and the value of the "intellectual property" that resulted in an increase in the value of the property, DCI is not entitled to all of its incurred costs.

32. Before proving the value of any "intellectual property" incorporated into the design of the equipment, or in the formulation of the business plan, DCI must prove the specific property it added and that it was indeed intellectual property. In other words, DCI must prove that each item of "property" for which it seeks its incurred costs, "intellectual property" is incorporated therein.

The term "intellectual property" has been defined as follows:

> A commercially valuable product of the human intellect, in a concrete or abstract form, such as a copyrightable work, a protectable trademark, a patentable invention, or a trade secret.

Black's Law Dictionary 813 (7th ed. 1999).

33. Inherent in the definition of intellectual property is the protection of it from use by others or the power to exclude. In general, a right of "property" is the power to exclude; intellectual property shares the exclusionary aspect of all forms of property. Patents protect the innovative principles of new products, processes, compositions of matter, and

improvements. Copyrights cover expressive aspects of recorded information, including written works, music, audiovisual works, computer programs, certain labels, and other works of authorship. All of these various sources of law have one thing in common: by providing the right to exclude others from certain activities, they create limited property rights in abstract concepts, information symbols, or expression. In short, they create property rights in products of the mind; hence the name "intellectual property." Jay Dratler, Jr., Intellectual Property Law: Commercial, Creative, and Industrial Property § 1.01 (1999, through Release 27, issued in 2005).

34. DCI failed to prove by the preponderance of evidence that the equipment's value was enhanced by the addition of intellectual property. DCI failed to demonstrate that all of its incurred costs, including costs associated with travel, drafting the various iterations of its business plan, attempting to raise capital, overhead expenses, and salaries, constitutes "intellectual property incorporated into the design of the equipment."

Implications of Ukrainian Law

35. Legal impediments made it highly unlikely that the proposed joint venture between DCI and Burevestnik could ever have been consummated because, according to the Decree of the Cabinet of Ministers of Ukraine On Regularizing the Activities of Business Entities Formed with the Participation of the State, No 25-92, dated December 21, 1992, there was a prohibition against Ukrainian state-owned enterprises, such as Burevestnik, participating in joint ventures. The prohibition could not be waived by the consent of any governmental agency, except for a countermanding decree from the Cabinet of Ministers.

36. In its business plan for the proposed DCB joint venture, DCI failed to acknowledge

that Burevestnik, as a state-owned enterprise, could not participate in the joint venture. Burevestnik could only have participated in the proposed joint venture if it had become privatized. Privatization is the process of transferring ownership of state-owned enterprises and assets to private ownership usually through the sale of an asset at auction, the sale of an enterprise as a going-concern, or through the sale of shares in the enterprise to be privatized, again usually in a competitive bid process.

37. In order for a Ukrainian state-owned enterprise to become privatized, the enterprise first had to be included on the annual list of companies subject to privatization, a list enacted and approved by the Verkhovna Rada, Ukraine's parliament. Enterprises not on the list of companies subject to privatization are either exempt or deemed to be “strategic” enterprises and therefore could not be privatized.

38. From March 1995 to November 1996, Burevestnik was classified as a strategic enterprise and could not be privatized. In January 1998, Burevestnik was included on a list of companies subject to privatization, but no steps were taken toward privatization. In July 1999, Burevestnik was removed from the list and again classified as a strategic enterprise and exempt from privatization.

39. Under Ukrainian law, DCI would not have been able to acquire 40 percent ownership rights and would not have been able to exercise control over the proposed joint venture with Burevestnik. Ukrainian law provides for a proportionality of capital shares to capital contributions, and the number of votes held by a shareholder must be proportional to that shareholder's capital share. In other words, under Ukrainian law one share carries one vote and the number of shares a shareholder receives in a new venture must be

proportional to the amount of capital that shareholder contributes to the joint venture. In addition, Ukrainian law provides that most decisions can be made by a simple majority of the shareholders. Thus, if DCI contributed less than 50% of the capital of proposed joint venture, DCI would have received less than 50% of the voting shares and, therefore, would not have had effective control over the joint venture.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Mark A. Melnick.
MARK A. MELNICK
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street NW
Washington, D.C. 20530

October 17, 2005

Attorneys for Defendant