IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DIE CASTERS INTERNATIONAL, INC., Plaintiff, | ) | No. 04-1113C (Judge Braden) |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF FACT

PROPOSED UNDISPUTED FACTS

History of the Cooperative Threat Reduction ("CTR") Program

1. Following the break-up of the Former Soviet Union in 1991, many defense enterprises in Russia's sizable military-industrial-complex were on the verge of economic collapse due to cuts in weapons manufacturing and insufficient funding to shift to non-military production. Many feared the collapse of these enterprises would lead to greater proliferation of nuclear weapons including the technology and expertise employed by them.

2. Congress passed the "Soviet Nuclear Threat Reduction Act of 1991" following a request by Soviet President Gorbachev for assistance in dismantling Soviet nuclear weapons. The legislation outlined the Government's proposed cooperation on the "storage, transportation, dismantling, and destruction of nuclear weapons in the former Soviet republics."

3. In November 1991, Congress authorized funding under the Nunn-Lugar Act to assist in this endeavor. The Soviet Nuclear Threat Reduction Act and Nunn-Lugar Act funds were expanded in 1992 and in 1993 it evolved into the Cooperative Threat Reduction ("CTR") program. The "Cooperative Threat Reduction Act of 1993" provided, among other things, support for A) the demilitarization of defense industries in the former Soviet Union, and (B) the

conversion of such industry and equipment to civilian purposes and uses.

4. On October 25, 1993, the Government also entered into a cooperative agreement with the Government of Ukraine regarding the elimination of strategic nuclear arms located in Ukraine and "the establishment of measures against the proliferation of nuclear weapons, and the technology and expertise related to such weapons." A subsequent agreement was reached on March 21, 1994 between DOD and the Ministry of Machine Building, Military-Industrial Complex and Conversion of Ukraine outlining possible assistance by DOD in the conversion of enterprises in Ukraine's military-industrial complex to non-military production facilities.

5. In May 1994, the Defense Nuclear Agency ("DNA") advertised a list of Ukraine defense enterprises considered for possible defense conversion with up to $15 million in Government assistance and requested business proposals from companies interested in "a long-term business relationship" with a Ukrainian partner and willing to "enter into a cost-sharing arrangement" with the Government. It also specified that Government funding "must be looked upon as seed money, and not the capital required to finance a whole venture." Initial program management responsibilities were delegated to DNA. DNA was later renamed the Defense Special Weapons Agency ("DSWA") in early 1996. In August 1998, DSWA was merged into a new agency named the Defense Threat Reduction Agency ("DTRA").

Overview of Ukraine History and Economic Climate during the 1990s

6. Ukraine declared its independence from the Soviet Union in August 1991. With one of the largest landmasses in Europe and a population nearing 50 million, Ukraine was one of the most important economic components of the former Soviet Union. Ukraine was deeply integrated into the former Soviet economy particularly in the agricultural and defense industries

and contributed substantially to the former Soviet Union's extensive military-industrial-complex.

7. Upon achieving independence, many analysts believed Ukraine was one of the best medium-term prospects for economic development of the former Soviet republics. However, throughout the 1990s Ukraine struggled to shift from a centrally planned economy to a market environment. While the Ukrainian Government quickly liberalized prices and created a process for privatization, resistance to reform within the government soon stalled the reform efforts.

8. The three years following Ukraine's independence witnessed the collapse of Ukraine's economy as mismanagement and hyperinflation devastated what once had been described as the industrial and agricultural "heartland" of the Soviet Union.

9. Throughout the early 1990s privatization was at standstill, real wages plummeted, and economic output was in a steep decline. Inflation exceeded 10,000 percent in 1993 alone. In July 1994, Ukraine elected a new President (Kuchma) who called for significant macroeconomic and structural reforms to instill financial discipline, reduce inflation and restore economic growth. The privatization process was renewed in 1995 through the USAID sponsored "Mass Privatization Program", whose objective was to: 1) quickly distribute ownership of state owned enterprises to Ukrainian citizens, 2) develop capital markets, and 3) create a critical mass of privately owned enterprises capable of restructuring Ukrainian industry.

10. However, Ukraine continued to suffer a protracted economic decline throughout most of the 1990s. During the decade from 1989 to 1999, the country's output is estimated to have declined by 54 percent including nine years of successive economic declines. High inflation and unemployment, stifling debt payments, corruption and state interference in the private sector, all contributed to a poor investment climate further hindering economic development. In 1997 more

than half of the population was estimated to be living below the poverty line.

11. A brief period of stabilization in 1998 ended abruptly following the Russian financial crisis in August 1998. Following the 1998 crisis, Ukraine defaulted on its debt to both public and private sector borrowers and the country went without significant external financial support until late 2000. In 1999, the Economic Intelligence Unit business environment index ranked Ukraine 59th out of 60 major world economies at that time.

12. The virtual collapse of the formal economy followed with the steady increase in the "shadow" or unofficial economy in Ukraine. A report by the World Bank stated that 51.7% of Ukraine's GDP in 1996 was not reported to the government. Some estimates put the shadow economy at between 50 and 70 percent of the official reported GDP in 2000.

13. As of 2000, business enterprises in Ukraine still faced "omnipresent bureaucracy, over-regulation, corruption, considerable legal uncertainty and stifling tax and customs structures." However, from 2000 forward, Ukraine began a slow process of stabilizing its economy and over the last three years has implemented significant and dramatic economic and legal reforms leading to positive economic indicators across the board.

14. The defense industries proposed for conversion were confronted with a vast range of problems including significant financial and logistical challenges with respect to conversion. Many had built up huge debts, lost critical supply chains and lacked the funding and expertise to retool their operations toward new products and markets.

15. During the 1990s, debt capital in Ukraine was scarce and prohibitively expensive; access to investment capital from strategic or portfolio investors was also severely limited by the inherent and perceived risks in the Ukrainian market. The Ukrainian market

during this time period was characterized by macroeconomic instability, slow progress in privatization, complex and burdensome taxes, as well as crime and corruption, among others, and investment into Ukraine was limited primarily to larger, well-established operations. The Ukrainian business environment throughout most of the 1990s presented significant business challenges including rapidly deteriorating economic conditions, rampant inflation, material and supply shortages, a large barter based and unofficial economy, and burdensome taxes and regulation, among others.

Formation of Die Casters International, Inc ("DCI")

16. DCI was incorporated as a New Jersey Domestic Profit Corporation on January 25, 1994. DCI was described as the result of a three-year effort by Alan Frederickson and his previous company The BDC Group, Inc. ("BDC Group") to establish a viable, long-term defense conversion strategy for the republics of the former Soviet Union. DCI was reportedly formed for the specific purpose of pursuing a contract under the defense conversion program. Mr. Frederickson was listed as the sole owner and president of DCI and the BDC Group.

17. Through the BDC Group, Mr. Frederickson had submitted earlier proposals to the Government related to defense conversion efforts in the former Soviet Union including an unsolicited $9.8 million dollar proposal submitted in December 1992; and subsequent conversion proposals in May 1994 involving plants in Belarus and Russia. Each proposal was unsuccessful for various reasons.

18. DCI also submitted a $5.7 million proposal related to the potential conversion of a plant in Kazakhstan that had die casting operations. The proposal was revised in January 1995 and led to a Best and Final Offer ("BAFO") negotiation but was ultimately rejected in mid-1995.

DNA's Request for Proposals under the CTR Program: The Solicitation

19. On June 27, 1994, DNA released RFP Solicitation No. DNA001-94-R-0084 related to its defense conversion efforts in Ukraine. The RFP provided, among other things, specific guidelines for submitting proposals to the Government including contract requirements, applicable Federal Acquisition Regulation ("FAR") contract clauses, and a Statement of Work ("SOW").

20. The primary objective outlined in the SOW was to support the transition of "portions of former weapons of mass destruction and military industries [in Ukraine] into private, commercially oriented industries." The SOW further described that the contract was expected to be a "first step in the eventual transformation of the enterprise into commercially viable producers of a product or products for the civilian sector."

DCI's Proposal for Defense Conversion in Ukraine

21. On September 15, 1994, DCI submitted a $20.2 million proposal in response to DNA's RFP for conversion of up to three plants in Ukraine. The Government's estimated cost-share portion under the proposal was $8.9 million with the remaining investment from DCI and prospective joint venture partners. At the time, Mr. Frederickson was the sole employee of DCI.

22. DCI's proposed business plan included: 1) die cast ventures with Meridian, the Mayak Plant ("Mayak"), and the Simferopol Fiolent Joint Stock Company ("Fiolent");
2) a wholly-owned DCI - Ukraine sales and service subsidiary; and 3) a DCI sales and marketing organization established in Europe and North America.

23. DNA subsequently evaluated the proposals received under the competitively bid contract including conducting a "pre-award survey" of DCI as a prospective contractor. The Defense

Contracting Audit Agency ("DCAA") also audited the price proposal submitted by DCI and prepared reports dated April 11 and April 24, 1995.

24. On June 16, 1995 DNA requested a Best and Final Offer ("BAFO") from DCI. DCI submitted it's BAFO proposal on June 21, 1995 for a total price of $13.5 million of which $6.7 million was to be the Government's cost share portion under the contract. DCI's revised proposal limited its focus to joint ventures with just Meridian and Fiolent.

25. Subsequent analysis and negotiations between DCI and DNA limited the DNA funded effort to just one plant, Meridian and a total contract value of $4.1 million dollars.

26. Included in the contract was a SOW prepared by DCI that stated its primary objective under the contract was to provide capital equipment, material, training and business assistance/advisory services to Meridian.

The specific tasks outlined in the SOW included providing:

a) Training, investment and technical assistance to produce marketable products;
b) Business services, patented USA technology and capital equipment;
c) Marketing assessment and advice related to the products produced;
d) Business development assistance and strategic planning services;
e) Modernization of die cast production facilities through equipment purchases;
f) Transfer of manufacturing technology appropriate for the intended commercial products and install die casting equipment and technology;
g) Technical support in developing in-house logistics systems, quality assurance and quality control, and storage and distribution systems; and
f) Institute necessary cost accounting and financial controls.

DCI's Contract with the Government

27. On October 27, 1995, the United States Department of Defense ("DOD") awarded DCI Contract DNA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 (“contract”), a $4.1 million contract to assist in the conversion of the Korolev Radioprylad Plant ("Korolev"), a former Soviet military-industrial-enterprise

headquartered in Kiev, Ukraine, from military to non-military production facility. The Koroloev plant later became known as the Meridian Joint Stock Company ("Meridian"). The schedule specified the contract's term as the period extending 24 months following award, that is, through October 26, 1997.

28. The contract was a cost sharing arrangement. The schedule specified an estimated cost ceiling of $4,100,427. Of that amount, DCI agreed to contribute 26 percent, or $1,066,111. The remaining 74 percent was the estimated cost to the Government, or $3,034,316.

29. The "accounting and appropriation data" in the contract obligated Government funds in the amount of $3,034,316 -- the full amount of the Government's portion of the cost ceiling.

30. The contract contained FAR 52.232-20, entitled "LIMITATION OF COST (APR 1984)," that provides in pertinent part as follows:

> (a) The parties estimate that performance of this contract…will not cost the Government more than…the Government's share of the estimated cost specified in the Schedule…
>
> (b) The Contractor shall notify the Contracting Officer in writing whenever it has reason to believe that—
> (1) that costs the contractor expects to incur under this contract in the next 60 days, when added to all costs previously incurred, will exceed 75 percent of the estimated cost specified in the Schedule; or
> (2) The total cost for the performance of the Contract will be either greater or substantially less than had been previously estimated.
>
> (c) As part of the notification, the Contractor shall provide the Contracting Officer a revised estimate of the total cost of performance.
>
> (d) (1) The Government is not obligated to reimburse the Contractor for costs incurred in excess of…(i) if this is a cost-sharing contract, the estimated cost to the Government specified in the Schedule…"
> (2) The Contractor is not obligated to continue performance under this contract…or otherwise incur costs in excess of the estimated cost specified in the Schedule, until the Contracting Officer (i) notifies the Contractor in writing that

the estimated cost has been increased and (ii) provides a revised estimated total cost of performing the contract…

(e) No notice, communication, or representation in any form other than that specified in paragraph (d)(2) above, or from any person other than the Contracting Officer, shall affect this contract's estimated cost to the Government. In the absence of the specified notice, the Government is not obligated to reimburse the Contractor…for any costs in excess of the estimated cost to the Government specified in the Schedule, whether those costs were incurred during the course of the contract or as a result of termination.

(g) Change orders shall not be considered an authorization to exceed the estimated cost to the Government specified in the Schedule, unless they contain a statement increasing the estimated cost.

(h) If this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each.

31. The Schedule contained a paragraph entitled "USE AND OWNERSHIP/DISPOSITION OF GOVERNMENT-PROVIDED PROPERTY," which provided, in part as follows:

b. All property, equipment and materials acquired with U.S. Government funding under this contract is considered a third-party contribution which is separate and distinct from property, equipment, or materials contributed by the U.S. Contractor or the FSU partner. Title and ownership of all property, equipment and materials acquired with U.S. Government funding under this Contract shall vest with the joint venture upon conclusion of the Contract, as determined by the Contracting Officer. Prior to the conclusion of the Contract, the U.S. Contractor is accountable for said items in accordance with standard government property clauses cited under SECTION I of this contract…

<u>Departure of Key Employees from DCI</u>

32. Within months of the agreement with Meridian, three key officers and one part–time employee of DCI resigned citing "irreconcilable differences with senior management."

33. In a March 15, 1996 letter to DNA CO Scott Morton, Christopher W. Maillefert, DCI Executive Vice President responsible for finance and contract administration; George P.

Michaely, Secretary and Corporate Counsel; David L. Konick, a Russian speaking attorney knowledgeable of legal affairs in the NIS, and Robert Engh, Vice President Ukraine Operations all resigned from DCI.

34. The specific reasons listed included personnel issues, concerns with Mr. Frederickson's management ability, and concerns over how resources were being obligated and utilized in the project. Mr. Maillefert's letter further explained how DCI had been effectively financing its portion of the cost-share contract through partial payments on employee salaries and described DCI's "demonstrable lack of progress in obtaining financing" the employees' "grave concerns about the Company's viability and ability to perform under the contract."

35. At the end of 1996, John Mickowski, described as DCI's Chief Engineer and a DCI Director, also resigned citing similar concerns as those expressed in Mr. Maillefert's letter earlier that year. Mr. Mickowski specifically cited "a loss of confidence in the management of DCI" and overall "doubts and concerns about [DCI's] continued viability."

<u>DCI Failed to Consummate a Joint Venture with Meridian</u>

36. Due to the unavailability of certain facilities at Meridian, the departure of management personnel at DCI, delays in engineering studies of Meridian's facilities, and ultimately DCI's failure to attract additional outside financing consistent with the DCM business plan, the relationship between DCI and Meridian was terminated.

<u>DCI Failed to Consummate a Joint Venture with Burevestnik</u>

37. The scope of the contract changed in July 1997 from Meridian to Zavod Burevestnik ("Burevestnik"), another military industrial enterprise also located in Kiev, Ukraine, as a result of complications between Meridian and DCI in concluding the joint venture.

38. DCI signed a Protocol of Intention to form a joint venture with Burevestnik. The May 30, 1997 agreement stipulated that DCI would contribute equipment and services necessary to create a die casting operation and Burevestnik would contribute equipment and facilities at its plant in Kiev. The new joint venture was to be called Die Casters Burevestnik ("DCB").

39. On June 20, 1997, DCI signed a supplemental Protocol of Intention with Burevestnik and Technomet, Ltd. ("Technomet") providing for Technomet's participation in the proposed DCB joint venture. Shortly thereafter, DCI drafted an "Agreement on Establishing the Joint Venture "DCB" and a "Charter of the Joint-stock company "DCB".

DCI's Business Plan for DCB

40. In September 1997, about one year after the award of the two-year contract, DCI submitted its official DCB business plan to DSWA for review. DCI's proposed contribution to DCB was new machinery, state-of-the-art control systems, production and quality control management, and Western business practices. Burevestnik and Technomet were to contribute "facilities, machinery, management personnel, labor, die casting expertise and a backlog of export orders."

41. DCI's business plan also included plans to raise $6.0 million in debt capital and another $2 million in equity for the joint venture. As with the proposed DCM joint venture, the success of DCI's business plan was dependent on its ability to raise the additional $8 million dollars in investment capital.

42. By October 1997, DCI was in the process of shipping the equipment that had been purchased under the contract to Kiev and Tiraspol, Moldova. However, formalization of the joint venture stalled while awaiting DCI's efforts to obtain additional financing necessary to

complete facility renovations and install equipment at the Burevestnik plant.

Expiration of the Contract

43. On October 8, 1997 DCI formally requested a "No-Cost" extension of the contract through January 1998. DCI claimed to have $299,282 remaining to be billed under the contract and projected that they could have the equipment installed and running by January 1998.

44. Pursuant to the terms of the contract, the period of performance was to expire 24 months from the date of the contract, which would have been October 27,1997.

45. DSWA executed a modification to DCI's contract on November 21, 1997 granting an additional three-month period of performance through January 30, 1998.

46. By January 12, 1998, DCI had made no additional progress toward completing it's performance under the contract and requested a second "No-Cost" contract extension through April 1998. DCI's reason for the requested extension was a lack of sufficient funds to properly prepare the Burevestnik plant for acceptance of the equipment. As of December 28, 1997 DCI had reportedly billed $3,990,128 or over 97% of the funds provided under the contract.

47. The contract period of performance expired on January 30, 1998 with no further contract extensions.

DCI Continued to Request a Contract Extension and Additional Funding

48. DCI continued to request a further extension of the contract to allow them the opportunity to raise an additional $500,000 for plant preparation and equipment installation and various other start-up costs.

49. By mid-1998, DCI turned it's attention for additional funding to the Government and submitted a proposal to DTRA on August 18, 1998 outlining its needs for $500,000 to "complete

the project."

50. DCI revised its request for funds to $730,000 in November 1998 and subsequently met with DTRA in early 1999 to discuss the request and the proposed use of the funds.

51. DCI continued to make requests to the Government for additional funding throughout 1999 and into 2000, including requests that the funding be provided as a grant versus the cost-sharing arrangement under the original contract. The CO did not tell DCI that additional funds would be added to the contract.

52. On June 13, 2000, the CO informed DCI that "the Government will not modify the subject contract to increase funding." This was further reiterated in a subsequent letter on June 16, 2000 where the CO clarified that it had been determined that "no further funding will be provided to DCI by any financial instrument, to include contract, grant, or other transaction."

<u>Disposition of the Equipment Purchased by DCI Under the Contract</u>

53. The period of performance under the contract expired on January 30, 1998 with virtually all of the contract funds being disbursed. However, DCI had failed accomplish the formation of a joint venture with Burevestnik.

54. DCI purchased equipment for the contract using Government funds. DCI shipped some of the equipment to Litmash in Moldova for the purpose of modification for use in the Burevestnik facility.

55. DCI did not ship the equipment to Burevestnik. DCI notified DTRA that Moldovan customs intended to confiscate the equipment because it had been retained in Moldova for a period longer than permitted under a temporary import license and that it (DCI) had no funds available to ship the equipment on to Burevestnik.

56. DCI shipped other equipment to Kiev, where it was stored in a warehouse not affiliated with Burevestnik.

57. DCI did not ship this equipment to Burevestnik. DCI informed the Government that it (DCI) lacked funds to pay outstanding storage fees to the Kiev warehouse.

58. Given DCI's lack of available funds, DCI was unable to take any further action with regard to the equipment and it remained in storage until 2001.

59. In July 2001, the Government stepped in and informed the Ukrainian government that it intended to release the equipment in Kiev to them and to initiate a sale of the equipment located in Moldova. In response, the Ukrainian government questioned the intent to sell the equipment located in Moldova and requested further discussion. The Government acquiesced and agreed to pay the outstanding storage fees and customs fines and ship the equipment to Kiev.

60. In November 2001, the Ukrainian government further requested that the Government ship the equipment to Burevestnik and to consider providing an additional $730,000 in funding to have the equipment installed.

61. The Government's logistical contractor, Raytheon Technical Services Company, subsequently shipped the equipment in late 2001; that had been stored in Kiev, Ukraine, and in Tiraspol, Moldova, that had been purchased by DCI with contract funds. The equipment was delivered to Burevestnik in January 2002, and was later installed.

62. The Government paid to ship the equipment from Moldova to Ukraine and paid Litmash the amounts it was due under its contract with DCI.

63. The Government paid the storage warehouse its fees for the equipment that had been stored in Ukraine.

DCI was Unable to Raise Additional Equity or Debt Capital Critical to It's Success

64. DCI's business plans were entirely dependant upon raising outside capital. Besides the economic, industry and business challenges faced by DCI, DCI's lacked the ability to obtain debt and/or equity capital from any financial or investment source.

65. Credit availability in the private debt sector of Ukraine was scarce throughout the 1990s and what was available was typically short-term and prohibitively expensive.

66. Credit availability from private equity sectors was also scarce; DCI's risk profile severely limited interest from major sources of equity investment capital actively funding projects in Ukraine during this period.

67. The challenges faced by DCI in raising additional capital were numerous and included the following: DCI did not have a legally established joint venture with its Ukrainian partner; the proposed DCB joint ventures was effectively start-up businesses; the proposed joint venture did not have established operations with a track record of manufacturing, sales and effective management; DCI and its principals had no demonstrated successful track record of operating in the die cast industry; the base die casting equipment had not been installed or tested and the work force had not been trained on its use; DCI did not have any capital or cash to put into the operation and therefore had little tangible risk in the project; DCI was effectively insolvent during the contract with significant outstanding liabilities and the inability to pay its debts as they came due; DCI's proposed joint venture partners were not in good financial standing; and DCI had no guaranteed source of revenues including contract orders or strategic relationships with potential customers.

68. Despite attempts to solicit interest from over 40 different potential investors, DCI failed

to obtain even sufficient capital to meet its cost-share portion under the contract.

Administrative Contract Closeout

69. The contract was administratively closed on April 14, 2003.

70. The CO made no modifications to the contract following the no-cost extension granted by modification P0002. The CO never increased the estimated cost specified in the contract. The CO did not increase the percentage of allowable costs the Government would reimburse DCI.

71. DCI submitted vouchers during the course of the contract. DCI's vouchers reflected its total expenses for the applicable calendar years as follows: $108,123 for 1995; $637,259 for 1996; $3,010,548 for 1997; and $340,362 for 1998. The total amount billed was $4,096,292. Of that amount, the Government reimbursed DCI in the total amount of $3,034,316, the full amount of the Government's portion of the cost ceiling and the maximum amount the Government was required to reimburse DCI under the contract.

PROPOSED DISPUTED FACTS

1. DCI's analysis of it's alleged damages for lost profits in this matter is flawed, based on unreasonable and unrealistic assumptions, and relies upon information that is unduly speculative.

2. DCI's success in establishing the proposed DCB joint venture in Ukraine depended upon its ability to overcome numerous business risks and uncertainties in establishing a new business venture, many of which DCI was poorly equipped to handle.

3. DCI's ability to address these challenges was limited by a critical lack of liquidity and investment capital, little operating experience in the die cast industry or with starting up and running a business in Ukraine, as well as a lack of full-time management.

4. Due to Ukraine's investment climate, DCI's status as a startup, it's lack of history with die

casting businesses or successful operations in Ukraine, and DCI's lack of capital to put into the proposed joint venture, DCI failed to raise any additional debt or equity capital for its proposed business venture.

5. During the period of performance under the contract, DCI was not a financially viable business, and without additional funding did not have the capability to successfully implement its business plan for the proposed DCB joint venture.

6. DCI's projections of alleged lost profits are based on an un-established business and an unproven business plan, both of which are an unreasonable and unreliable basis for projecting lost profits.

7. DCI's claim for lost profits is primarily dependent on DCI's ability to raise additional funding to support the proposed joint venture, which DCI demonstrated it was unable to do.

8. There is no evidence to support the contention that if DCI had been provided an additional $500,000 in connection with the contract (DCI's Phase I analysis) that it would have been able to establish a commercially viable joint venture nor that the proposed joint venture would have realized any profits.

9. DCI has failed to provide any basis or support for many of the assumptions included in its business plans and projections and they are not a reliable basis for a reasonable estimate of what DCI's lost profits might have been, if any.

10. DCI's use of a 10% discount rate to discount its projected lost profits is also inadequate to account for the risk associated with DCI's business and the status of the Ukrainian market during this period of time.

11. DCI's claim for lost profits in its Phase 2 and 3 analyses are completely speculative and rely

primarily on DCI's projected ability to raise up to $8 million in additional capital (Phase 2 analysis) and between $50-$100 million (Phase 3 analysis). There is no evidence to support DCI's ability to do so.

12. DCI's business assumptions for its Phase 2 and 3 analyses are so remote from the original intent of the Government under the contract to provide "seed capital" for the establishment of one joint venture, that it is impossible to reasonably evaluate them in the context of the contract and as a claim for lost profits.

13. Given that DCI was financially unable to protect the equipment in Moldova and in Kiev from possible confiscation by either the entities that were in possession of the equipment or by governmental authorities, the Government's decision to move the equipment to Burevestnik was reasonable.

14. The CO never indicated to DCI that it was the CO's intention to modify the contract to increase the Government's financial obligations under the contract.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Mark A. Melnick.
MARK A. MELNICK
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street NW
Washington, D.C. 20530

October 17, 2005

Attorneys for Defendant