established markets nor on their extensive expertise producing specific products, they must turn to entrepreneurism as the means to forge ahead into the future. The important entrepreneurial characteristic required is the ability to assess and test markets and products quickly and to drop those that "fail" while maintaining a high energy level to accelerate those that work.

DCI offers just the right flavor of services to assist each of the potential partners inthe Ukraine. DCI has brought together a strong team of executive entrepreneurs with well blended expertise that will be able to effectively understand the problems of its partners and to develop strategies to resolve those problems without drastically affecting the culture of the company or its people. Because Korolev expressed a strong desire to work with DCI and because the chemistry for a strong partnership between the two companies seems right, DCI has prioritized its proposal to work with Korolev to expand its capabilities and to develop the first die cast joint venture as a model for future expansion.

__2. Scope:__ Within the funding restrictions of this solicitation, DCI's proposal addresses all the critical short term needs of the Ukraine enterprises, providing those companies with increasing sales and hard currency flow as well as with a partner that will consult with management on numerous matters from strategic planning to cost control and Total Quality Management (TQM). Because DCI has executives that have years of experience as operating managers __and__ as consultants, DCI will be a strong partner that can help each partner in most areas that are important to its future. Because DCI is entrepreneurial, it will not dictate inflexible solutions where the Ukraine companies' needs and environment are constantly changing.

To enhance the potential for success, DCI is working closely with Mr. James Ballentine (a director of DCI), who negotiated a joint venture in Ukraine that has been operating successfully for nearly three years. Mr. Ballentine will contribute his expertise and talents to DCI's efforts to successfully grow the partner's joint ventures. In addition, experienced operating executives, with talents similar to Mr. Ballentine's, will be used to provide on-the-job-training and on-site seminars to advance the skills and business acumen of each partner.

As DCI helps its partners develop its products, sales, and revenues through DCI's export channels (expanded to fit the Ukraine partner's capabilities) and through DCI's consulting services, each partner will become a stronger company, and the joint ventures will become an excellent model for other defense conversion projects.

__3. Needs Analysis__: A preliminary analysis of the needs of most CIS companies indicates that the following are important at this time. As there was not enough time to conduct a survey that was meaningful, the folowing is excerpted from the Belarus study for Minsk Computer (MPOVT). A similar study and resulting strategic plan will be made for each partner in the Ukraine.

**A.** __Need for Business Training__: They need business training in marketing and sales, general management, cost accounting and finance, and production/quality control. Because the executive and middle management team at the facilities are experienced and capable, training through concentrated course work, in-plant seminars, and on-the-job-training will be sufficient.

**B.** __Focusing on Korolev's Operations__, the following needs seemed apparent: **03148**

1. **Marketing and Sales Expertise**: MPOVT has a three-person import and export department out of 15,000 total employees. They need to increase their effective sales personnel, network, and assets.
2. Market analyses, a marketing strategy, distribution channels, marketing/sales literature, and other basic factors that we take for granted in our well established free markets need to be established.
3. **Production Control and Quality Control Procedures**: Management is very capable of managing the production process -- from production engineering to shipping. However, quality control procedures and reports are lacking as are other factors that need to be analyzed. To penetrate the free markets, especially in the technology markets such as automotive and computers, having a high quality rating (such as Europe's ISO-9000 or Ford's TQM Preferred Supplier) is extremely

important. MPOVT needs to develop the in-house procedures, manuals, and record keeping to achieve these ratings.

4. **Cost Accounting**: To survive, prices must be established that cover at least direct costs. Analyses have to be made of MPOVT's production processes and costs so that realistic price formulations can be generated.

5. **Strategic Planning**: Differentiated from market plans, strategic plans must be developed that take into account all the assets (people and equipment) and markets that are available to MPOVT. These procedures are not foreign to management, as the previous business culture used to function on five-year plans. The focus, analysis, and flexibility that must now be included can be a problem. The basics start with a capabilities analysis coupled with real market analyses that look at costs, margins, and the best ways to bring product to those markets..

6. **Product Design**: MPOVT's primary product line today is electrical fixtures. It was developed during the past ten years as a side line and is now producing most of their revenues (for the mechanical plant). It shows that they are quite capable of producing a product, once a design or idea is presented. However, they still need to develop the capability to design quality and aesthetics into the product under the constraints of cost control while meeting market demand.

7. **Other Common Needs**: Other factors common to all corporations became apparent during DCI's preliminary discussions with MPOVT. These include rational employment practices and pay policies, efficient organization and management control, project management, and similar issues.

## *C. Objectives:*

Based on the needs identified above and on the needs of the Republic of Ukraine in general, DCI feels that the following objectives are critical.

1. To assist in converting MPOVT's defense-related manufacturing base to production lines that manufacture high-quality, commercially acceptable, "demand-driven" consumer products through the specific action programs outlined in the following Section E.

2. To propose a technically feasible, realistic operating plan, based upon proven technology and past performance results. In other words, one that is not based upon "blue sky" concepts that yet have to be proven in the marketplace. The results of the plan should provide immediate, positive, and tangible benefits to MPOVT and should establish a solid foundation for future economic growth and development.

3. To provide the necessary personnel training for current MPOVT employees so as to insure the achievement of the objectives outlined in this proposal.

4. To provide employment and business opportunities to selected American companies through programs of supplying American made equipment ("Buy American") and supporting it with American resources as to training, entrepreneurial business services, market advice, and similar support programs.

5. To assist MPOVT in the development of its strategic plans and product development.

6. To address immediate manufacturing deficiencies and shortfalls by providing MPOVT with the production capability to meet current market needs and to allow MPOVT to satisfy growing consumer demand for its products.

7. To establish a solid foundation for an ongoing cooperative business relationship with MPOVT through a joint venture with DCI that utilizes American technical know-how and capital equipment.

8. To provide entrepreneurially driven market and business consulting assistance.

9. To open up foreign markets (outside of Ukraine and the CIS) for MPOVT products through DCI's extensive contacts and distribution network, thereby building an industrial market base for MPOVT and allowing them to realize hard currency for their export shipments.

10. To serve as a model for other industries to emulate in Ukraine. By proposing an operating plan that relies upon proven technical performance and capabilities that will lead to immediate "hands-on" results, this can be transferred to other industries, as well as serving as the "break-through" incentive barrier to encourage additional American financial investment in Ukraine.

11. To otherwise provide MPOVT with ongoing business support services that will allow it to compete in the marketplace. Such services include establishing financial control and budgeting procedures, developing the quality standards such as ISO-9000 required to compete internationally, providing market advice as to new product introductions and opening up new markets for MPOVT consumer products, and similar entrepreneurially driven business consulting services.

## *D. Strategic Plan:*

This proposal establishes a three-phase strategy as outlined below.

- **<u>Phase I (Start-up through the ninth month)</u>**: Following meetings with MPOVT, DCI and MPOVT have developed a strategy to increase MPOVT's production capacity in those areas where MPOVT has developed market demand: plastic injection molding and die casting. In addition, DCI will expand its marketing and sales network to sell MPOVT products in Europe and other free world markets. Throughout this period, DCI will work with MPOVT to help it develop the proper internal policies and procedures to become a leading worldwide competitor as a quality producer of products that make sense for MPOVT to produce. Currently, DCI is working with MPOVT as MPOVT's purchasing agent to buy parts and equipment from the United States. The objectives of Phase I are to build a strong relationship with MPOVT, to expand MPOVT's productive capacity, and to begin to develop hard currency cash flow for MPOVT to allow MPOVT to productively employ its people.

- **<u>Phase II (Months ten through twenty-four)</u>**: At the end of Phase I, the joint venture will be fully functional and MPOVT's critical capacity needs will have been met. In addition, cost accounting and capabilities analyses will have allowed DCI to begin to target and penetrate markets for MPOVT profitably. Phase II will be characterized by rapid growth and the stabilization of MPOVT's strategic direction. DCI will assist MPOVT with its strategic planning, both as a consultant and through on-the-job-training as it develops the budgets and strategic plans for the joint venture.

- **<u>Phase III (Year 3 and beyond)</u>**: It is DCI's intention to become a major distributor of a majority of MPOVT's products, and not just a distributor of the die cast products that are produced by the joint venture. DCI will expand the die cast operations to other facilities in Ukraine, using the MPOVT joint venture as a model. Similar to how franchises expand, DCI will use the policies, procedures, and operating manuals developed within the joint venture to immediately bring new joint ventures up to worldwide competitive standards. With the increased size and capabilities of DCI's worldwide marketing and sales network, the increased capacity presented by these new operations can be used to meet growing market demand. As the Ukrainesian infrastructure then begins to grow, DCI can be a strong partner to help MPOVT develop the products, sales, and distribution channels to meet the internal demand that will result. DCI intends to remain a strong and productive partner to help MPOVT grow and to meet the demands of both the worldwide free markets as well as the future demands that can be expected to increase "exponentially" within the CIS markets.

The primary products produced by the joint venture operations and, currently, by MPOVT are die cast and plastic parts. The markets for these products are extensive. The worldwide market for die cast products alone is $20 billion. As can be seen by the uses or applications that use die castings, the products are used by almost all major industries. The same is true for plastic parts. Therefore, the potential for MPOVT and the joint venture is very large. Neither operation has to penetrate a significant portion of its markets to generate substantial revenues. For instance, a one percent penetration of the die cast markets is equivalent to $200 million

in sales. Because the DCI team will have focused production and focused marketing/sales operations, the potential to identify and penetrate that small a percent of the market successfully given the "competitive-free" nature of the current market and following the strategies outlined above is very high.

## *E. Operating Plan:*

DCI will implement its strategy with MPOVT through a specific set of operating plans that are targeted to accomplish the strategic objectives outlined above. The key elements of the plan are:

1. Modernize and expand MPOVT's die cast production capacity. Install TYMAC control systems on seven current die cast machines. Purchase four remanufactured die cast machines to replace four obsolete russian machines.
2. Increase MPOVT's plastic injection molding capacity purchasing up to two new machines.
3. Increase MPOVT's tool and die capabilities to support the die cast and injection molding operations.
4. Establish the MPOVT joint venture and DCI's wholly-owned service and sales subsidiary that will be located in Kyiv.
5. Expand DCI's market and supplier network.
6. Provide on-the-job-training, seminars, and United States-based training.
7. Develop MPOVT's capability to achieve a ISO-9000 or Ford TQM quality rating.
8. Develop and improve MPOVT's production control and management capabilities.
9. Develop the marketing capability to sell products that can be produced by MPOVT.

<u>1 Modernization And Expansion of MPOVT's Die Casting Capacity</u>: While MPOVT has a large number of machines, it is important that a modernization program be implemented so that MPOVT's quality and productivity becomes competitive on a worldwide basis. Working with MPOVT, a modernization plan was established to upgrade the production facilities that are producing the most revenues for MPOVT at the current time: its die cast operations and its plastic injection molding operations.

For the die cast facilities, MPOVT needs to increase its capacity and productivity by purchasing used or remanufactured machines, both to increase the number of machines and to replace obsolete machines. TYMAC's systems will be a very important and integral part of this expansion. The technology will allow the joint venture to rapidly become competitive in the world markets and will allow the joint venture to quickly achieve TQM and even ISO-9000 ratings.

Following a presentation in Kyiv to a classroom of MPOVT technicians and executives, TYMAC demonstrated that its technology can increase productivity and quality substantially. Therefore, a two-phased program was established: 1) Install a TYMAC control system on a machine and verify its improvement in productivity and quality. While TYMAC felt that it could double the operating capacity of the machine, it was agreed to make the threshold only a 50 percent improvement – a goal TYMAC will have no trouble surpassing. TYMAC has proven results from many other installations that makes their claims creditable. 2) Following the trial, DCI will either continue to upgrade six other machines if TYMAC was successful or will use the remaining funds to competitively source remanufactured machines.

Because demand for die cast products was increasing above current capacity or for products that could not be produced using the current machines, it is necessary to also increase capacity by purchasing new machines. It was determined that the best strategy was to purchase remanufactured machines that could later be modernized by installing TYMAC systems rather than purchasing new equipment. This would allow MPOVT to increase capacity with the least funds and still be competitive in the future markets.

**2. Tool And Die Machines**: A critical variable in the success formula for die cast and injection molding operations is the capability and capacity of the tool and die facilities. Parts produced by die casting and injection molding are only as good as the dies and molds used to produce the parts. As MPOVT tries to expand into higher technology markets (computers, automotive, aircraft, electronics, to name a few), the dimensional tolerances of the dies and molds become very critical. Also, as tolerances shrink, the metals used for the dies and molds becomes more difficult to machine. Therefore, MPOVT must increase its capabilities in this area. Two electro-erosion or EDM machines were requested by MPOVT, both of which were given primary priority. If funds are provided, DCI will source these machines for MPOVT by soliciting competitive quotes from various suppliers. This activity will also require on-site inspections during production and prior to shipment.

**3. Joint Venture and DCI Subsidiary:** MPOVT and DCI agreed to a basic understanding that the two companies would form a joint venture that incorporates all of MPOVT's current die cast operations. DCI's capital contribution would be the TYMAC systems (one of which DCI currently owns). DCI would be the exclusive export distributor of the products. DCI would develop operating and production manuals with the near-term objective to get the joint venture ISO-9000 qualified and/or TQM qualified by at least one major automotive manufacturer (European or American).

To properly support the TYMAC systems installed on the seven joint venture machines as well as future systems there and in other joint ventures, it is critical that DCI establish a wholly-owned subsidiary and train the personnel at TYMAC. In addition, as DCI expands sales, the nature of each sale requires a local presence by DCI near the factory -- in this case, next to the MPOVT joint venture. Therefore, DCI's subsidiary will function as a sales administrative office for MPOVT's and the joint ventures export sales, a technical service and maintenance operation for TYMAC systems installed -- or to be installed -- in Ukraine, and as a potential sales office for products that MPOVT wants sold in Ukraine and/or the CIS. DCI plans to staff the subsidiary with an in-country manager, three technicians, a secretary, and a general office assistant/driver, all of whom will be local nationals capable of speaking both Russian and English.

**4. Expand DCI's Market and Supplier Network**: DCI plans to sell products in Europe and, in some cases, in North America acting as MPOVT's and the joint venture's exclusive export distributor and to source products for MPOVT from American suppliers. Therefore, DCI plans to travel through Europe several times to re-establish old business relationships (Mr. Frederickson, President of DCI, had been responsible for five European subsidiaries and two sales offices for an American exporter), to locate and contract with local representatives capable of marketing and selling die cast and related products, and to evaluate the economics and feasibility of opening a subsidiary office in Europe sometime during the next twelve months. At the same time that Mr. Frederickson is traveling around Europe setting up new marketing relationships, he will be generating new sales prospects for MPOVT products and/or capabilities. While the sales process for die cast products takes an average of three to six months between identification and closing, markets will be targeted for low technology, fast closing products. In that way, DCI may be able to start building export sales for the joint venture and MPOVT within the first four or five months, or sooner.

As MPOVT's purchasing agent for American products, DCI will also build its network within the United States. In many cases, this will open opportunities for DCI to sell MPOVT products in competition with foreign (generally Far East) competitors.

**5. Training**: As stated in the solicitation and in this proposal, training is very important for the success of any of the three targeted companies. DCI will provide basic consulting services to MPOVT as its joint venture partner as well as on-the-job-training (OJT) as DCI works with MPOVT to grow the joint venture operations. In some cases, seminars will be provided at MPOVT as part of its services to upgrade the business acumen of MPOVT.

As part of this proposal, DCI recommends that funds be awarded to allow DCI to conduct at least four three- to five-day seminars in Kyiv during the first twelve months after contract award. DCI has also been working with the National Institute of World Trade (NIWT), which has agreed to set up an intensive four weeks of classroom instruction at its headquarters in Long Island, New York. A copy of NIWT's proposal is attached with Part II.

03152

Cost Proposal, and includes a brief description of the training to be provided. The president of NIWT, Mr. Spencer Ross, is a director-nominee of DCI. DCI will be the project manager of the NIWT training (through Mr. Ballentine), and all aspects of the USA-based training will be managed by NIWT.

DCI felt that it was very important to train personnel but not to take them out of the work environment for any protracted period of time. Therefore, DCI has developed the strategy to teach MPOVT personnel in Kyiv as much as possible. For the NIWT training, of the nine recommended (that number is directly related to the funds that are allocated for this service), at least one or two should be attending purely so that they can return to Kyiv and begin teaching others. NIWT has experience assisting with these types of activities. DCI and NIWT are prepared to produce a proposal (separately or expanding this proposal) to train far more than nine people.

**6. Quality Control Ratings**: As already mentioned, it is becoming more important daily for manufacturers of all types to invest in the quality of their production and the quality of the products produced. All competition is moving in that direction, and it is extremely critical for both MPOVT and the joint venture to become ISO and/or TQM qualified. To ensure that the proper procedures and policies are established so that MPOVT can seek certification as soon as possible, DCI has asked IMAX to participate in this proposal. IMAX has a long list of companies that its staff has assisted, and it is well qualified to help MPOVT obtain ISO-9000 certification.

Besides IMAX, DCI is uniquely qualified to make this happen within a reasonable timeframe. Mr. Ballentine was instrumental in getting his joint venture in Kyiv ASME qualified. Mr. Frederickson (DCI's president) was the Chairman of a British subsidiary during the time that it became ISO-9000 qualified. Mr. Skown, a vice president of DCI, has extensive experience dealing with quality issues and with production procedures. And, Mr. Kuhlman, a potential new hire for DCI who will be responsible for oversight of all the die cast operations, was raised in a die cast facility and has gone through the process of becoming quality qualified by Ford and General Motors. The process is not easy, and it takes a long time not only to develop the procedures and manuals, but also to document results and to build the records and database necessary to prove that the highest standards of quality are consistently met. Backgrounds of each of the above personnel are attached.

DCI's program to qualify MPOVT's Machining and Plating Departments with TQM and/or ISO rated facilities will be designed so that MPOVT can manage the same process by itself in other areas of its vast operations. The higher the overall QC ratings become, the easier it will be for DCI to sell MPOVT products worldwide, and everyone benefits. DCI feels that this additional service is very critical if the grant funds are truly meant to improve the long term health and commercial viability of MPOVT.

**7. Improve Production Control Procedures**: Similar to the improvements necessary in quality control procedures to achieve international standards for quality control, MPOVT's and the joint venture's production control procedures have to be improved to meet international norms. DCI has included this function as part of its proposal. It will be accomplished directly by DCI working closely with MPOVT on the die cast operations and on a consulting basis for the rest of Plant 2. The benefits that IMAX will bring to the table while it is in-country helping develop the QC procedures in all three plants will also help improve production control/management.

**8. Develop the Marketing Tools to Sell the Capabilities of MPOVT's Mechanical Plant**: To sell a product that has a long history in service and for which a customer can readily touch, feel, and see what it does is easy. What is difficult is to sell the intangible. That is where MPOVT has a major problem. Not only are the operations and people inexperienced as marketers and salespersons, but also the products have no history, have poor designs in the commercial sense, and/or are not yet produced. Therefore, it is very critical that the proper marketing materials and procedures be developed to DCI's capability to sell MPOVT's products in the world's competitive markets. Recognizing this, DCI has included a proposal to develop the cost accounting, pricing, and marketing literature to enable DCI to sell the tremendous capacity that currently lies dormant within MPOVT's facilities. This would be above and beyond the work DCI would do to begin marketing products that will be produced by the joint venture. As a beneficial by-product, improvements in MPOVT's machining and plating capabilities will add value to the die cast products and to other products MPOVT (and DCI) can sell, increasing MPOVT ability to employ more people and to increase its infrastructure.

Similar to the ISO/TQM part of this proposal, DCI will structure the development of cost accounting, pricing, and marketing literature through in-plant seminars and OJT so that MPOVT can do the same thing with its other dormant assets (i.e., Plant 3) with little guidance from DCI. Long term, this proposal will benefit both parties, as it will give DCI more products (tangible or, while intangible, salable) to sell which, in turn, will produce greater revenues and jobs for MPOVT.

**9. Overall**: DCI has developed a set of operating plans that are all targeted to help MPOVT convert from defense markets to commercial markets. In addition, DCI will be creating the model that will be used in other regions to commercialize other operations quickly. Through the model, the controls, policies, manuals, and operating procedures will be established to fit the unique culture that makes countries like Ukraine potentially significant contributors to the world's economy and peace.

**10. DCI's Executive and Management Team**: DCI has pulled together a highly skilled, experienced group of executives who will contribute to DCI's success as operating executives, as Board directors, and as consultants. The companies and personnel are highlighted in the attached Excerpts, and resumes of key managers are also attached.

**That Something Extra**:

The solicitation asked for cost sharing and for other unique ideas that will contribute to successful long-term relationships that will be generated by the grant funds. In the spirit of this request, DCI has several special goals that it will meet if most of DCI's proposal is funded. DCI will fulfill these goals at its own expense without the use of grant funds. Targeted at the social responsibilities that should be met to be successful as a business in Ukraine, these goals include:

Veteran Requalification Programs for Veterans Being Demobilized: As highlighted in this proposal, DCI has established excellent working relationships with Militran and I-COM, both of which have developed and implemented plans that can significantly improve the chances that demobilized veterans can find well-matched jobs and obtain training for productive new employment. DCI will assist the Republic of Ukraine Ministry of Defense, free of charge, to work with either company (or both) to gain the benefits that can be provided. DCI has discussed Militran with the Ministry of Defense, with a very enthusiastic response. This wil benefit everyone, as veterans as a group can be an excellent source of highly competent managers and employees within Ukraine.

Cross Cultural Exchange Programs and Kyiv Concert Hall: Mr. Frederickson is chairman of one of the premier professional, non-profit choral groups in the New York City area, The New York Virtuoso Singers. Through the relationships that this volunteer activity has generated, he is currently working with the Tolstoy Foundation in New York City to develop a USA/CIS cultural exchange program through music. DCI will donate funds from its own profits to develop exchange programs that will see American performers, such as the New York Virtuoso Singers, entertaining Ukrainesian audiences and Ukrainesian performers entertaining American audiences. Also, during DCI's trip to Kyiv, the concert hall was closed, apparently because of a lack of funds to pay performers, the stage crew, and utilities. Once operating, DCI will contribute some of its net profits to the concert hall.

Jazz to End Hunger: This is a California nonprofit that wants to establish concerts in key cities in the United States and pay net proceeds directly to groups dedicated to serving the homeless and the hungry. Several CIS experts have indicated that American jazz is quite popular in the CIS, and the director of Jazz to End Hunger has indicated a willingness to vary his concerts to meet different demands that might exist in Ukraine and the other CIS republics. Net proceeds could be used to help the homeless and hungry of both countries. DCI plans to donate, from profits, funds to Jazz to End Hunger to help set up a concert series.

Joint Venture Collective Farm Support: Similar to MPOVT's desire to continue to support nine collective farms, DCI will agree to contribute a portion of the joint venture's and wholly-owned subsidiary's net profits to similar groups, at the direction of MPOVT.

## SECTION IV: STRATEGIC FINANCIAL PLAN

The current financial strategy includes four financings:

- Initial working capital funds for market research and for the purchase of the first system. This has been accomplished through private financing for the purchase of DCI's first system and through sweat equity, DCi has been capitalized and has raised the financing to purchase FTI.
- Government grant for up to $5 million to: A) Convert the Ukriane companies under the Nunn-Lugar program; B) Establish DCI's model die cast, machine shop, and finishing operations as a joint venture; C) Establish the model operating procedures; D) Identify and train CIS personnel; and E) Begin to replicate the model operations by converting other defense industry assets and personnel.
- Private outside capital financing of an additional $2 to $5 million to continue with the first-year operations, to establish the growth trends modernizing the CIS by expanding the die cast operations, to purchase two related companies, to institute lease programs financed by DCI, and to penetrate the worldwide markets for die cast products.

DCI's primary organization will be marketing, distribution, and aftermarket operations to install and service the control systems in the CIS and to provide technical sales and support of die cast products worldwide. Minimal investments in fixed assets will be necessary because the CIS die cast operations will be using the already established fixed asset base in the CIS. In the future, the majority of the assets on DCI's balance sheet are expected to be leased assets where DCI will generate returns from the lease payments as well as from the export of the die cast products. Therefore, significant returns on investment should be possible.

The Long Term Potential: The following are "top-down" projections which show the very positive benefits that are possible developing the die cast economy in the CIS (both in the sense of generating high value-added export and of generating indigenous productivity). The projections are not meant to be used to evaluate any investment or financial alternatives. The preliminary numbers are "blue sky" and cannot be substantiated at this time, other than by "plausibility." Even so, the proformas do show the large potential involved.

**A. Two Proformas**:

Without knowing the exact terms of an award, it is not possible to project detailed monthly proformas to show the near term revenues and profits. As discussed previously, DCI expects to be able to generate sales equivalent to the established capacity of the die cast operations ($11 million) on a booking basis within 18 months following the startup. Sales will lag this growth by approximately three months. Long term growth is DCI's primary strategy and is what DCI's new investors will be evaluating. The revenue generation that can be developed is depicted by the following two proformas, where Year 1 follows the establishment of the joint venture operations and the beginning of expansion through "franchising."

- **Case I: 2.5 percent Penetration**. This case assumes that systems are installed on 5 percent of the installed base of 12,000 die cast machines (600 systems) by the end of the fifth year. To accomplish this, DCI has to penetrate 2.5 percent of the European and North American markets and export 50 percent of the CIS's productive capacity. The assumptions result in revenues of ***$480 million*** and results in new, competitive CIS productive capacity of ***$1.1 billion***.

- **Case II: Below 1 percent Penetration**. This case assumes a much lower expansion than Case I where DCI only installs 200 systems (1.7 percent of the installed CIS machine base) by the end of the fifth year. Using Case I's assumptions for market growth, productivity, and production exported results in ***$164 million*** in sales, or 0.8 percent of the European/USA die cast products market. It also generates a smaller, but still important new, competitive CIS productive capacity of ***$375 million***.

**Several reasons exist to be optimistic about the upside potentials:**

1. DCI will specialize in marketing/engineering, concentrating financial and organizational resources on sales. With DCI's potential gross profits, these resources can be substantial.

2. Competitors will have other priorities, such as maintaining margins to produce acceptable returns on assets, which will restrict their capability to compete (especially against DCI on price and service), and many will need cash flow to invest in new assets.

3. DCI will be generating a major economic benefit within the CIS and should have the support and visibility of the government, hopefully mitigating potential greed and corruption factors.

4. At this time, DCI expects the CIS will gain "most favored nation" status where exports will not be encumbered with excessive import duties in European or North American markets.

B. Basic Assumptions:

➢ Market Growth: DCI believes a 5 percent or 10 percent European/USA die cast market growth is plausible. Reportedly, 75 percent of the worldwide demand for die castings is for aluminum alloys, and 40 percent of that demand is from the automotive sector. Therefore, automotive demand for aluminum die castings can be extrapolated as 30 percent of $16 billion, or nearly $5 billion. Forecasts indicate that automotive demand for aluminum will increase nearly four fold. If half of that increase is for aluminum die castings (versus extrusions or other processes), that new demand alone would result in a $7.5 billion, or 47 percent, increase. In addition, European die cast machine manufacturers have predicted that the European automotive die cast market demand will exceed Europe's current production capacity by the mid to late 1990's.

➢ System Installed Base. These are the cumulative numbers of systems installed in CIS die cast operations by the end of each year. The resulting penetration of the current installed base of 12,000 die cast machines is then calculated. DCI should have significantly higher CIS demand for systems, especially if lease financing is offered. DCI will control the number of installations in proportion to its success selling die cast products so that DCI does not become over extended/exposed relative to DCI's capability to generate hard currency flow.

➢ Production Capacity. A die cast machine can produce from $1 to $8 million of die cast parts annually, depending on the size of the machine and assuming an average of about 100 hours production per week (5 days at 20 hrs/day). Assumes that DCI will initially utilize smaller machines rather than try to compete in the world markets against major die casters who have made large investments in their asset base and are probably well entrenched and competent. As DCI's reputation and production capabilities grow, DCI will install systems on larger machines, and the average capacity per system will increase.

➢ CIS Productivity. This is a "fudge-factor" that compensates for the fact that the CIS productivity is questionable. Therefore, estimating the productive capacity of each machine above, the estimate is reduced to reflect the capability of the CIS worker and management system to produce at an equivalent rate. Productivity should improve as DCI provides training and as the CIS's culture accepts free market/capitalistic dynamics.

➢ Production Exported. This ratio reflects the proportion of the installed base of productive capacity that is used for export (sold through DCI). It is assumed that the CIS market itself will begin to grow and that die cast partners (joint ventures) will begin to use systems to produce die cast products for internal consumption (i.e., for parts to the CIS automobile manufacturers). In the "Optimistic" case, it was assumed that the export ratio would remain higher than 50 percent because the government will want the foreign exchange and because DCI will be successful penetrating the world's die cast product markets.

**C. Calculations**:

- **Revenues**: Revenues are calculated on the average installed base for each year assuming installations and the resulting increases in production are spread evenly across the year.

- **CIS Export Volume**: This will be the value of the export trade out of the CIS to DCI. It is not equal to DCI's sales due to DCI's costs. It should not be compared directly with the CIS production capacity, which is measured in terms of the final or "retail" price paid by the die cast consumer. Capacity should be measured in consistent terms to calculate penetration -- a retail valuation in this case.

## *Postscript*

The revenue potentials are significant. DCI has identified a current CIS industry with a large, well-established asset base where DCI will be one of the first in with a comprehensive and very timely strategic plan for that industry's development. Through its strategy, DCI will play a major role to help the CIS establish an export economy and, ultimately, to establish a large, viable indigenous market.

There will be many risks and hurdles involved. However, the financial exposure is minimal compared with the upside monetary and humanistic returns available. DCI doesn't invest in the primary plant and machinery (only in the control system technology), nor in the production labor pool (except in training). DCI provides the CIS with considerable advantages now, which will diminish in value over the years as the CIS becomes more experienced in the free markets as capitalists. The "window of opportunity" is open and highly favorable at this time.

DCI will generate its income from the sale or lease of control systems and from the related services that will be provided in the CIS. As the installed base of systems increases, the revenues generated will be appreciable. But, more importantly, the potential revenues from the export sales of the die cast products will be much larger. For instance, the sale of one control system on one machine might mean $150,000 in one-time revenues. However, that same machine with the control system can produce as much as $2,000,000 in revenues every year. The ancillary services provided to support the installed base of systems will be managed primarily by DCI-CIS; the billings will be in rubles; and most, if not all, the profits will be reinvested in the CIS.

The human aspects of the strategy will be important for the CIS (and for the rest of the Free World) as DCI will not only develop hard currency flow from the export markets, it will create productive jobs with state of the art technology that controls quality and, in many aspects, productivity. Because of this technology, the CIS industry will become highly competitive and will be able to produce high quality products immediately without significant investments in new equipment. This, in turn, will create long-term employment opportunities in the CIS that would otherwise take much longer to generate.

Timing is extremely important. Because of today's political instability, positive actions by Western Governments and by private sector industries are crucial. Those actions will be a visible means of support for the democratic forces in Russia and in the rest of the CIS. The vacuum which exists will not endure, and initiatives such as DCI's, particularly in the short-term, are invaluable for stability. This makes DCI's strategy important today as:

- It can be initiated and implemented immediately and can produce positive results rapidly.
- It is comprehensive from the identification and selection of trainees, to training, to job creation, to market development, and to generation of hard currency cash flows.

# CIS Die Cast Market Proformas

| CASE I: 2.5% Penetration | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| ***Basic Assumptions:*** | | | | | |
| Europe/USA Die Cast Market Growth | 0% | 5% | 5% | 5% | 5% |
| System Installed Base (Yr End) | 30 | 110 | 250 | 425 | 600 |
| Production Capacity/System ($M) | $2.0 | $2.0 | $2.0 | $3.0 | $3.0 |
| CIS Productivity (% Total Capacity) | 50% | 55% | 63% | 70% | 75% |
| Production Exported (% Productivity) | 95% | 75% | 65% | 55% | 50% |
| ***Resulting Capacity:*** | | | | | |
| CIS Productive Capacity (Yr. End, $M) | $30.0 | $121.0 | $315.0 | $893.0 | $1,350.0 |
| ***Resulting Revenues:*** | | | | | |
| DCI-USA Die Cast Product Sales ($M) | $14.0 | $58.0 | $147.0 | $390.0 | $577.0 |
| CIS Export Sales to DCI-USA ($M) | $12.0 | $49.0 | $122.0 | $327.0 | $490.0 |
| ***Resulting Penetration:*** | | | | | |
| CIS Machine Penetration (of 12,000) | 0.3% | 0.9% | 2.1% | 3.5% | 5.0% |
| Europe/USA Market ($M) | $16,000 | $16,800 | $17,640 | $18,522 | $19,448 |
| Europe/USA Die Cast Mkt Penetration | 0.1% | 0.3% | 0.8% | 2.1% | 3.0% |

| CASE II: Below 1% Penetration | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| ***Basic Assumptions:*** | | | | | |
| Europe/USA Die Cast Market Growth | 0% | 5% | 5% | 5% | 5% |
| System Installed Base (Yr End) | 20 | 50 | 100 | 150 | 200 |
| Production Capacity/System ($M) | $2.0 | $2.0 | $2.0 | $3.0 | $3.0 |
| CIS Productivity (% Total Capacity) | 50% | 55% | 63% | 70% | 75% |
| Production Exported (% Productivity) | 95% | 75% | 65% | 55% | 50% |
| ***Resulting Capacity:*** | | | | | |
| CIS Productive Capacity (Yr. End, $M) | $20.0 | $55.0 | $126.0 | $315.0 | $450.0 |
| ***Resulting Revenues:*** | | | | | |
| DCI-USA Die Cast Product Sales ($M) | $10.0 | $29.0 | $61.0 | $144.0 | $197.0 |
| CIS Export Sales to DCI-USA ($M) | 8.1 | $24.0 | $51.0 | $121.0 | $167.0 |
| ***Resulting Penetration:*** | | | | | |
| CIS Machine Penetration (of 12,000) | 0.2% | 0.4% | 0.8% | 1.3% | 1.7% |
| Europe/USA Market ($M) | $16,000 | $16,800 | $17,640 | $18,522 | $19,448 |
| Europe/USA Die Cast Mkt Penetration | 0.1% | 0.2% | 0.3% | 0.8% | 1.0% |

Die Casters International, Inc.
*Quality and Service Worldwide*

David L. Konick
Telephone (540) 937-5067 Fax (540) 937-8286
E-mail: 75541.2244@Compuserve.com

## MEMORANDUM

**To:** Alan C. Frederickson
**cc:** Maillefert, Engh, Mickowski, Michaely
**From:** David L. Konick
**Date:** 6 March 1996
**Re:** Status of Business Plan for DCI

On January 25, 1996, we presented an "Executive Summary" of DCI's Business Plan to representatives of Annapolis National Bank ("ANB") and the U.S. Export Assistance Center. This memorandum addresses various items that must be investigated, researched, confirmed and/or further documented before proceeding with the completion of the Corporation's Business Plan and submission to ANB, the European Bank for Reconstruction and Development ("EBRD") or other prospective lenders or investors. As I am sure you are aware, the standard for a prospectus or private placement memorandum is that it should not contain any false or misleading information, and should disclose all material facts so that none of the statements in the document are misleading. The Business Plan, in its current form, does not satisfy this standard.

TYM0450

### MARKET ANALYSIS AND STRATEGY

This section of the Executive Summary lacks any meaningful documentation in a number of critical areas. First, the general market overview indicating a worldwide market of $16 - 20 billion is unsupported by any objective statistical analysis that I have seen. As best I have been able to determine, you guesstimated those numbers based on an article in a die casting manufacturers' publication that is at least a year out of date. Whether these numbers are still valid I do not know, but the business plan needs to cite more than one objective source for these numbers before it can be submitted to anyone in good faith.

Second, there is no information on which to base assertions in the Business Plan concerning the western European markets that DCI-Meridian intend to target. To my knowledge, other than Black and Decker and T-Fal, no other prospective die cast customers have been identified -- much less investigated to determine their level of potential demand for die castings from DCI-Meridian. I note that in his February 8, 1996 fax to you, John Mickowski noted that even assuming we landed an order from Black and Decker, "none of the parts they have requested quotes on by itself would keep one of DCI's machines occupied for more than a few months production." This raises the question of where DCI-Meridian's excess capacity would be sold, and at what price. It also indicates that the following statement in the current draft of the Executive Summary, viz.

B

TYM0451

> "Based on initial negotiations with Black & Decker and other prospective customers to date, DCI believes that the entire production output capacity of the Meridian die casting facility will be fully utilized within 3 months from installation and commencement of production . . ."

is without any foundation and will not withstand the scrutiny of any due diligence review. I have no idea who the referenced "other prospective customers" might be. Absent some reliable documentation, this statement appears to contradict John Mickowski's analysis in his February 9, 1996 memorandum.

I also note, parenthetically, that even Black and Decker's "expression of possible interest" was conditional. Referring to correspondence dated 28 July 1995, although Black & Decker recognizes the potential "cost saving opportunities," Mr. Walters made a point of conditioning this interest on DCI "successfully executing the main 'risk reducing' elements of [its] plan" including, *inter alia,* **establishing multiple production facilities** and ISO 9000 certification in all NIS operations. At this point in time, although ISO 9000 certification is a goal, we have a very long way to go to achieve it, and DCI has no concrete or credible means of establishing multiple production facilities, anytime in the near future. Similarly, in his December 18, 1995 letter, the expression of interest is expressly conditional, noting that "although the first piece of the jigsaw is nearly in place, there are still some other actions, referred to in my 28th July letter that require pulling through to complete the strategy." Hence, a due diligence inquiry into the very optimistic assertions currently in the Executive Summary of the Business Plan would reveal that sales projections based on an contingent orders from Black and Decker are at best misleading, to the extent they suggest we have any firm commitment from B&D at the present time, or that we can satisfy their conditions in the foreseeable future.

Third, (and directly related to the validity of Black & Decker's "expression of interest") much of the sales strategy for market penetration in the draft Business Plan is predicated on DCI's ability to offer customers not only superior quality, but substantial price discounts of up to 20 percent initially. Based on our discussions at Meridian or other materials I have reviewed, I am not aware of any factual basis on which to project production costs with any reasonable degree of certainty, nor am I aware of any reliable projections of the cost of materials or operations that would support the assertion in the Business Plan that DCI-Meridian will be able to offer its products at such discounts. Among other things that we discovered on our recent trip, the income tax holiday for ventures with foreign investment expired on January 1, 1995, and will not be available to DCI-Meridian. Costs of raw materials, transport and energy all have escalated substantially in the two years since DCI's original "Strategic Overview" was developed and written, and it does not appear to reflect the current reality. To my knowledge, we have no back-up documentation that establishes the basis for costs assumed in your "pro-forma" projections, nor can we reasonably base such projections on estimated prices for raw materials or energy someone told you sitting at Meridian's conference room table.

- need up-to-date price data from the suppliers, backed up by enforceable supply contracts, precedent agreements or at least current price lists. To my knowledge, there is no meaningful written documentation to support any of the supply input factors, nor, to my knowledge, has anyone been assigned to ferret out this information and obtain or generate the back-up to document whatever assumptions are in the Business Plan for raw material and operations costs.

Likewise, with respect to capital costs, TochlitMash representatives informed us on 23 February 1995 that their material costs are growing exponentially, that the die cast machine prices they quoted are nearly twice what they were merely 6 months ago, and that they could not project what their costs or prices will be 3 months from now. As noted in my Progress Report, DCI is a long way from having a firm contract with TochlitMash for the 4 machines required at Meridian. In addition, as noted below, we do not, as yet, have a reliable projection of the capital costs of reconstructing and refurbishing the Meridian manufacturing facility.

In view of the foregoing, it is uncertain at best whether or to what extent any of the assumptions underlying DCI's claimed ability to offer substantial price discounts remain valid or can be reliably expected to remain valid for the foreseeable future. If these assumptions are no longer valid, it calls into serious question the validity of the assumptions concerning marketing and sales projections, particularly with respect to Black and Decker. It is for this reason I requested you to provide copies of your notes on these and related topics you discussed in separate meetings while in Kyiv recently I still do not have them.

Another unsupported assertion in the Executive Summary relates to NIS markets. I do not see any back-up information for the claim that DCI will develop markets in the NIS, and certainly no market studies or other reliable statistics to support this claim, or the projected sales volumes we might reasonably anticipate.

With regard to expanding die casting operations beyond Meridian, the Executive Summary states that:

> "DCI has well established relationships in the NIS and a favorable reputation for building commercially viable joint enterprises, and has generated strong interest in joint venture activities with numerous other NIS enterprises that have established die cast production facilities."

So far as I have been able to determine, there is no basis in fact for the assertion that DCI has "a favorable reputation for building commercially viable joint enterprises" because, as we have become so painfully aware over the past month, the company has insufficient operating funds, and its current senior executive lacks the planning, organizational or management skills to effectively marshal and direct the Company's limited resources in an efficient manner. It is questionable -- based on the progress (or lack of progress) to date -- whether the Meridian project will be viable, even with the $3 million injection from DNA. Nor am I aware of any other "commercially viable joint enterprise" with which DCI has any relationship at all, much less one for which DCI can claim any credit

i whole or in part -- for its commercial viability. Therefore, there appears to be very little useful purpose to retaining this obviously inflated and insupportable claim in the Business Plan.

You have not provided any specifics identifying the "numerous other enterprises" nor any material to document their claimed "strong interest" in collaborating with DCI. I assume that this statement is based on the visits in 1994 made by Mr. Kuhlman (who is no longer associated with DCI) and Mr. Hintze to investigate interest in joint manufacturing operations with existing die casting facilities in connection with formulating DCI's original DNA proposal. As you know, any expressions of interest at that time were predicated on DCI's promise of DNA funding and the plant's inclusion in a defense conversion project. These assumptions are no longer valid. If these representations are to be included in the Business Plan, we need to confirm whether there is, in fact, any current interest by these "other enterprises" in such projects with DCI (without DNA funding support), and to determine whether and on what terms and conditions they might be willing to enter into joint operations with DCI. Those terms and conditions would need to be set forth in a memorandum of understanding, protocol of intent or otherwise memorialized before such statements could be included in the Business Plan. Otherwise these unsubstantiated claims should be eliminated from the Business Plan. In general, it might be a good idea to focus on getting the Meridian venture up and running successfully before charging off to start other joint ventures elsewhere in the CIS.

The last point under this section involves the assumption that Meridian (or any of the "numerous other enterprises" with whom DCI intends to initiate similar ventures) will ultimately agree to your proposed scheme to give a DCI sales and marketing subsidiary 20 percent of the gross sales revenues realized on their production. With respect to Meridian, I have serious concerns that the State Property Fund, which will continue to be a "player" as the largest post-privatization shareholder of Meridian, is going to acquiesce in DCI's proposed plan to siphon 20 percent of gross sales revenues right off the top as sales commissions, particularly if the manufacturing operations are not going to produce any positive net revenues. This key element of DCI's overall strategy was not mentioned in the December 5, 1995 Protocol of Intent with Meridian, nor have I heard it discussed with Meridian representatives. Given the political realities in Ukraine, even if it was discussed and agreed to by Meridian, it would be premature and dangerous to assume the SPF will allow Meridian to agree to such terms until such time as such an exclusive sales and distribution agreement is memorialized in writing and approved by SPF and the other shareholders of Meridian. Absent any binding agreement or, for that matter, any written indication of any kind that any prospective joint venture partner will agree to those extremely favorable (for DCI) terms, revenue projections based on the assumption that a DCI sales subsidiary will capture 20 percent of the gross revenue stream generated by manufacturing operations are not very realistic, and unlikely to withstand due diligence review.

## TYMAC SYSTEMS TECHNOLOGY

As noted in the Business Plan, use of the TYMAC control system is the key to DCI's overall business strategy. Despite a number of requests, you never provided me with a copy of DCI's "exclusive distribution agreement." I need to see it to complete the detailed sections of the Business Plan on this topic. It will have to be provided to prospective lenders virtually immediately. We need to review it to see what, if anything, in the agreement is confidential and proprietary, such as price terms, that should not be disclosed without appropriate confidentiality agreements in place. Where is this agreement?

## MANUFACTURING/OPERATIONS

There are a number of assertions in this section that appear to be incorrect, based on what I learned during the recent trip to Kyiv. First, there is a reference that Meridian has agreed to furnish "plant facilities in Kyiv adequate for installation of up to ten die cast machines, melting and holding furnaces and related equipment required to estab[l]ish a state-of-the-art die casting facility as well as facilities for use by the joint venture entity to remanufacture die cast machines." It [is] my understanding that new melt and holding furnaces (as well as other related equipment such as ladlers, etc.) have to be acquired and contributed to the venture by DCI, not Meridian. In Kyiv, you indicated to me that you wanted me and Bob Engh to pursue contracting for this equipment back here in the States.

Second, the Business Plan currently states that the $3+ million DNA funding "will enable DCI to refurbish the dedicated portion of Meridian's plant to western standards . . . ." However, as I presently understand it, there is ***no*** money in DCI's DNA approved budget for refurbishing the Mer[i]dian facilities, and DCI is expecting Meridian to assume the entire cost burden for reconstruction of the physical plant. To my knowledge [th]is important topic was never raised by you or discussed with Meridian during th[e Feb]ruary trip, and we still do not know whether Meridian has the financial wherewithal to effect the necessary plant modifications or will agree to do so without contribution from D[CI].

Likewise, the Business Plan states the refurbished facility and new equipment will be on line by the fourth quarter of 1996. Based on what was learned during the February trip (1) it is not [cl]ear whether Building 14, the premises proposed for die casting operations by M[eridi]an, is even suitable for the intended purpose; (2) until the technical/engineering review that is underway to determine what will have to be done to prepare that buildin[g f]or the intended purpose, we cannot establish either a time line or cost projection of what will be required to reconstruct the building. Nevertheless, it does appear that the time and costs required to bring the converted facilities on line will be substantially in excess of anyone's earlier projections. I believe Bob Engh is preparing

TYM0454

a more detailed report summarizing these factors -- but it is my understanding that the reconstruction could take up to a year.

Aside from these concerns, the Business Plan is misleading to the extent it implies that the DNA funding alone is sufficient to proceed with the manufacturing operations. Even assuming that Meridian goes forward and refurbishes the physical plant, DCI cannot proceed to order any of the required equipment until it obtains financing in an amount required to cover its cost share under the DNA contract. As of this date, we have no financing prospects for DCI's cost share on the horizon.

Taking all of the foregoing factors into consideration, the projected start of operations date in the Business Plan is not realistic. I do not know what other "pro-forma" projections you have made based on a 4th quarter 1996 start up date, but these need to be revised.

Third, information we received in the meeting with TochlitMash on 23 February calls into question certain aspects of the section of the Business Plan on rebuilding die cast machines. As you will recall, when the matter of assembling the die cast machines from Tiraspol was discussed, it was mentioned that Meridian apparently does not have adequate facilities to lift the pieces of ... machine as required for assembly. If I understood this correctly, it raises a que... whether there are adequate facilities on site to permit disassembly and rebuilding of ... equipment. I am also unclear as to exactly where in the dedicated premises this ac... is planned to take place. I am also not aware of any back-up for any project... on what rebuilding costs would be, even assuming the facilities and equipment are ...uate to do it.

Based on the 23 February discu... of prices with TochlitMash, I do not know whether the projections of 20% cost s... on new equipment remains valid. As noted elsewhere, TochlitMash indicated a 10... increase in its production costs over the past 6 months, and they were unwilling to ... mit to what prices might be even 3 months from now. Hence, the representations concerning price advantage of new TYMAC equipped TochlitMash equipment may be misleading. Given the extremely negative course of discussions on 23 February with TochlitMash (which caused Mr Bolshakov to question whether DCI was "serious" about going forward with the purchase of the four die cast machines for Meridian) coupled with the fact that you failed to bring up for discussion -- much less advance -- te... and conditions of the so-called "distributor agreement," there is some question as to whether there is any reasonable basis on which to include sales of TYMAC equipped TochlitMash equipment in the Business Plan at all.

## MANAGEMENT, ORGANIZATION AND PERSONNEL

Based on the current state of affairs, it appears that this section will need to be completely revised in the very near future, for reasons that we need not belabor here.

TYM0455

## CONCLUSION

The current Business Plan needs major reworking -- and not just cosmetic redrafting. Many -- if not most -- of the assertions and assumptions on which various representations are based are not adequately documented if they are documented at all, and there are serious questions whether many of these assumptions or representations have (or retain) any validity whatsoever. Without proper documentation, these assertions are mere cant and will not withstand due diligence review, nor will any "pro-forma" numbers based on them. Based on the preliminary evaluations of technical/engineering and legal matters that Bob Engh and I made in February, it is advisable to rethink many of the short and mid-term goals and objectives in the Business Plan.

While in some cases, failure to revise or properly document the claims in the Business Plan will lead only to a negative response from investors or lenders, with respect to EBRD, there are more serious fiscal consequences. As you know, Mr. Kinach, EBRD's Kyiv representative, advised us at our 22 February 1996 meeting that even assuming DCI's proposal passed the first "Concept Clearance" stage of review, the Company would be required to execute a written undertaking to cover all of EBRD's due diligence review costs. These costs would be substantial, and leaving aside from the question of where the funds to cover these costs would come from, unless and until we are confident the Business Plan has a reasonable chance to pass muster under EBRD's rigorous standards, it would not be prudent to submit anything to them.

Finally, submission of a Business Plan that does not meet commonly accepted standards will undermine whatever credibility DCI and its representatives may have. For the reasons outlined above, the current plan utterly fails to meet those standards by a wide berth.

In view of the foregoing, it is imperative that DCI's senior management meet at the earliest possible date to re-evaluate the entire Business Plan, establish goals and objectives we all agree are reasonable and achievable, identify what needs to be done to correct the deficiencies and fill in the gaps, assign responsibility for those tasks, and establish realistic deadlines for accomplishing them.

TYM0456

05/18/00 15:27 ☎703 325 1069 HQ DNA GC 001

# Die Casters International, Inc.

*Quality and Service Worldwide*

One Spruce Terrace, Wayne, New Jersey, USA 07470
(201) 696-0100 Fax (201) 696-9194

DIE CASTERS INTERNATIONAL INC. faxed 11:26 3/15/96

March 15, 1996

Mr. Scott Morton
Contracting Officer (AM)
Defense Nuclear Agency
6801 Telegraph Road
Alexandria, VA 22310

***Via facsimile and certified mail***

Subject: DNA Contract No. DNA 001-95-C-0169

Dear Mr. Morton:

As you know, the above referenced contract provides partial funding for conversion of the Meridian (formerly Korlyev) defense plant in Kyiv, Ukraine. The purpose of this letter is to inform you of project status, and certain financial and other matters relating to Die Casters International ("DCI" or "the Company") that may impede or impair its ability to implement the contract, including, *inter alia*, the resignation of certain key officers and employees.

As a result of irreconcilable differences with senior management over personnel matters, the manner in which resources are being obligated and overall implementation of the project, together with the demonstrable lack of progress in obtaining financing required to cover DCI's cost share and to pay salaries, three of the Company's four full time employees and one of its part time employees intend to resign immediately. These employees include:

Captain Christopher W. Maillefert, USN (Retired), Executive Vice President, responsible for finance and contract administration, a former Assistant Director of Naval Intelligence for Resources (finance and personnel);

George P. Michaely, Secretary of the Corporation and Corporate Counsel, a former Chief Counsel to the Division of Corporation Finance for the U.S. Securities and Exchange Commission;

David L. Konick, a Russian speaking attorney and acknowledged expert on legal affairs in the NIS, who has been responsible for various legal matters pertaining to the Company's operations in Ukraine, including creating the legal framework for the Meridian joint venture; and

OPTIONAL FORM 99 (7-90)

| FAX TRANSMITTAL | # of pages ▶ 2 |
|---|---|
| To H. Thompson | From D. Rich |
| Dept./Agency | Phone # |
| Fax # 810-4691 | Fax # |
| NSN 7540-01-317-7368 5099-101 | GENERAL SERVICES ADMINISTRATION |

02206

C

Commander Robert Engh, USN (Retired), Vice President Ukraine Operations, a former manager in ship/shore overhaul and maintenance, who has been responsible for management of implementation of the Meridian facility rehabilitation, equipment procurement and installation, and training of Meridian personnel.

The resignation of these employees will effectively leave DCI with no qualified officers or staff, other than Mr. Frederickson, to implement the DNA contract. Moreover, without these positions to bill against (and employees in those positions willing to accept only a fraction of their actual salaries as they accrue), DCI has inadequate resources with which to remain in operation or proceed effectively with the Meridian conversion project.

DCI has billed the U.S. Government a total of $140,733.89 as of our invoice 96-07 dated February 22, 1996. This represents 74 percent of the obligations incurred under subject contract. Unfortunately, DCI has been unable to finance its 26 percent share of these obligations as of this date. The company has been financing its portion of operations by making partial payments on employees' salaries. This was agreed to in November 1995 by certain employees, with the stipulation that Mr Frederickson, the President, CEO and principal stockholder of DCI, would diligently pursue efforts to obtain the $1,062,687 needed to meet our cost share under the DNA contract.

To date, no real progress has been made in obtaining all or any part of these funds, other than some informal discussions with potential lenders or investors. Very little progress has been made on developing a realistic business plan -- one that would withstand the scrutiny of a due diligence review by any potential lender. Further, it was recommended to me in a memo dated March 2, 1996 by the President of DCI that discussions be suspended with the only lending institution that had offered to assist us in obtaining a loan through the Small Business Administration and U.S. Export Assistance Center. The reason given for the suspension was that the principal stockholders of DCI apparently are unwilling to submit personal financial statements or signatures against such a loan. At this juncture, it does not appear likely that DCI will be able to meet its obligation to raise the necessary funds at any time in the near future.

DCI's apparent inability to secure financing for its $1.06 million cost share under the DNA contract raises grave concerns about the Company's viability and ability to perform under the DNA contract. Since the inception of the DNA contract and currently there are no means to support DCI's 26 percent cost share of these operating expenses, except by billing DNA for salaries and diverting those funds, once paid by DNA, to other operating expenses. Certain employees agreed to this arrangement, *strictly as an interim measure*, based on assurances from Mr. Frederickson that timely action would be taken by him to obtain financing required for DCI's cost share. As noted above, this has not occurred, does not appear likely to occur in the foreseeable future, and the Company's current employees are no longer willing to perform services for less than their full salaries.

Cost of operations are approximately $11,500 per month, taking into account $7,500 per month for U.S. operations and the anticipated operations costs for a representative office in Kyiv that

are estimated at $4,000 per month. These monthly operations costs do not include salaries or employee benefits, which through the end of February totaled an additional $30,000 per month. No Kyiv representative office has yet been established. Although DCI representatives who visited Kyiv in February found suitable premises for such purposes, they were without adequate funds or authority to execute a long term lease. Questions have been raised about DCI's ability to implement the contract without such a representative office in Kyiv.

Nor can DCI reasonably be expected to proceed with procurement of the necessary die casting machines and other equipment required for the Meridian plant conversion in Kyiv because the Company has insufficient funds with which to make the required advance payments for such procurement and related services. For example, in order to proceed with the purchase of the die casting equipment DCI had hoped to procure from a manufacturer located in the Republic of Moldova, the Company was recently informed that it would be required to make an advance payment of approximately $120,000. Of this amount approximately $30,000 would have to be provided directly by DCI. These amounts do not include the cost of hydraulic, electronic controls, or the TYMAC control systems, all of which would have to be procured and paid for separately. As noted below, without financing for its 26 percent cost share under the contract the Company currently does not have the resources to cover any of these payments.

Although no formal bankruptcy proceedings have been initiated against the Company, DCI is insolvent and unable to meet its current obligations as they become due. As of March 14, 1996 DCI's current assets total approximately $18,700, including $6,200 in cash and $12,500 in computers and peripherals, valued at cost. The Company's current liabilities amount to approximately $156,900 (including accrued salary obligations to employees totaling approximately $100,823) of which only approximately $35,000 remains unbilled to DNA. In other words, the Company's outstanding liabilities currently exceed its cash reserves by approximately $115,700, even assuming that all current liabilities included in these totals are properly billable to, and payable by, DNA under the contract.

I have been advised that under the circumstances described above, as the Company's Executive Vice President and chief financial officer, I am under an obligation to report these matters to you before my resignation becomes effective, so that you may take whatever action, if any, you deem appropriate. Should you have any questions concerning the matter, please feel free to contact me at your convenience.

Yours truly,

C. W. Maillefert

C. W. Maillefert
Executive Vice President

cc: Mr. Alan Frederickson
DCI Board of Directors

**DAVID L. KONICK**
*Attorney at Law*
P. O. Box 57
Washington, Virginia, USA 22747
8-101-(540) 937-5067
TELEPHONE

**ДЭВИД Л. КОНИК**
юрист
п/я 57
Вашингтон, Виргиния 22747
8-101-(540) 937-8286
FACSIMILE

March 15, 1996

Mr. Alan C. Frederickson
Die Casters International, Inc.
One Spruce Terrace
Wayne, New Jersey 07470

<u>**VIA FACSIMILE and FIRST CLASS MAIL**</u>

Dear Alan,

Reference is made to the correspondence we exchanged dated January 19, 1996 as well as my memorandum to the Board of Directors ("the Board") of Die Casters International, Inc. (hereinafter "DCI" or "the Corporation") of March 2, 1996.

As stated in my recent memorandum to the Board, over the past two months it has become apparent that representations you made concerning DCI's long term viability and potential profitability that were the basis for our understanding are completely without merit. DCI has no "exclusive distribution agreement" or other binding written agreement with TYMAC Control Systems, nor does it appear that the Corporation has made meaningful progress toward reaching binding agreements with Meridian or Tochlitmash. DCI has serious financial and management problems that are undermining its ability to perform under the DNA contract, and hence, its very survival. The Corporation is insolvent, and contrary to your prior representations, there are apparently no realistic prospects to obtain the $1.06 million required to meet DCI's current or projected near term operating costs or procurement obligations under the DNA contract.

No contract of employment reflecting the terms and conditions we agreed to in principle in Media, Pennsylvania on January 18, 1996 was ever prepared, nor have you taken any action to amend the bylaws of the Corporation or to obtain Board approval to implement the terms and conditions of my employment, including, *inter alia*, my election as a Vice President of the Corporation and approval of an ESOP plan. In addition, it appears that you repeatedly and deliberately misrepresented Mr. Hintze's status as an officer and employee of the Corporation and the "fact" that he would no longer be involved in the Meridian project or implementation of the DNA contract.

Accordingly, this letter is formal notice that I have suspended all services to the Corporation effective as of March 10, 1996, and to the extent it remains operative, I hereby withdraw my offer to accept employment or to become an officer of the Corporation upon the terms and conditions set forth in the correspondence we exchanged dated January 19, 1996. This notice is without waiver of, or prejudice to, any claims or causes of action I have or may have against you personally, Die Casters International, Inc. or any of its other officers or directors.

Very truly yours,

David L. Konick

D

TYM0381

1. two page Memorandum "Scope of Work (Legal / Consulting Activities)" dated January 9, 1996 marked "Privileged & Confidential"

2. 5 page facsimile from Bob Engh dated January 10, 1996 entitled "Planned Objectives and Milestones"

3. two page Facsimile/Memorandum to Al Frederickson from DLK dated January 19, 1996 entitled "DNA Contract – DCI Employment Agreement"

4. 1/8th page "Welcome Aboard" note from Al Frederickson postmarked January 23, 1996

5. copy of a two page letter from Frederickson to Chris Maillefert dated 23 January 1996 entitled "Vladimir's Revised Relationship" marked "STRICTLY CONFIDENTIAL"

6. seven page draft DCI Business Plan – dated January 25, 1996

7. copy of a one page letter (faxed and badly faded) from Frederickson to Vladimir Hintze dated 12 February 1995, faxed to DLK 1/23/95

8. one page cover memo to "AC, BE, GM and DK" from Chris Maillefert dated January 30, 1996 with five page DNA progress report attached

9. two page electronic mail message from Allan J. Hammerschmidt to DLK dated 2 February 1996 entitled "Your visit to Kiev."

10. two page facsimile from Alan Frederickson to DLK dated 4 February 1996 entitled "Ukraine Trip Agenda 12 Feb 1996"

11. two page letter from John R. Mikowski to DLK dated 5 February 1996

12. seven page facsimile from George Michaely to DLK dated February 8, 1996 with draft Employment Agreement attached

13. one-quarter page fax from C.W. Maillefert to Frederickson and DLK dated 02/15/96 entitled "Miscellaneous"

14. draft of a three page memorandum on DCI letterhead from DLK to C.W. Maillefert dated 24 February 1996 entitled "Progress Report – February Ukraine Trip"

15. copy of a one page fax from DLK in Kiev to Chris Maillefert dated "Tuesday 15 Feb" entitled "Misc."

E

16. copy of a one page fax from DLK in Kiev to Chris Maillefert dated "Tuesday" and attached transmission report dated February 27, 1996 entitled "Misc."

17. draft of a seven page memorandum on DCI letterhead from DLK to "Board of Directors c/o C.W. Maillefert" dated March 1, 1996

18. copy of a one page fax from Michaely to Al Frederickson dated March 2, 1996 entitled "Status of DCI"

19. copy of a one page fax from Frederickson to Maillefert dated March 2, 1996 entitled "Status of DCI"

20. one page memo to Al Frederickson from DLK dated March 4, 1996 entitled "Your memo to CWM of March 2, 1996" [cc'd to Michaely, Mickowski, Ballentine, Maillefert and Engh]

21. copy of a one page fax from Engh to Al Frederickson dated March 5, 1996 entitled "EMPLOYEE CONTRACT"

22. seven page memorandum to Al Frederickson dated 6 March 1996 entitled "Statius of Business Plan for DCI" [cc'd to Maillefert, Engh, , Mickowski, Michaely]

23. two page facsimile to "Chris" from Alan dated March 9, 1996

24. four page facsimile from DLK (cover + 3) to George Michaely dated March 9, 1996 re: internal DCI corporate documents, proposed draft "unanimous consent"

25. one page facsimile to "Chris, David and George" from Bob (Engh) dated March 10, 1996

26. two page Facsimile/Memorandum to Al Frederickson from DLK dated March 11, 1996 marked "Privileged & Confidential / For Settlement Purposes Only"

27. one page facsimile from "Chris to GM, DLK and RHE" from dated March 12, 1996 with draft letter to Scott Morton attached

28. two page facsimile from "Chris" entitled "Cash Summary 3/12/96"

29. two page Facsimile/Memorandum to Al Frederickson from DLK dated March 13, 1996 marked "Privileged & Confidential / For Settlement Purposes Only"

30. one page letter from Al Frederickson to DLK dated March 13, 1996 marked "Privileged & Confidential"

31. two page Facsimile/Memorandum to Al Frederickson from DLK dated March 14, 1996 marked "Privileged & Confidential / For Settlement Purposes Only" re: Die Casters International, Inc.

32. one page letter from Alan Frederickson to DLK re: acceptance of resignation dated March 18, 1996