IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DIE CASTERS INTERNATIONAL, INC., Plaintiff, | ) | No. 04-1113C |
| v. | ) | (Judge Braden) |
| UNITED STATES, Defendant. | ) | |

DECLARATION OF JOHN MICKOWSKI IN SUPPORT OF DEFENDANT'S MOTION FOR A JUDICIAL DETERMINATION OF THE ADMISSIBILITY OF A DOCUMENT

1. My name is John Mickowski.

2. I am the president and a founder of Tymac Controls Corp. Tymac's business is the design, manufacturing and marketing of computer networks, process controls and die casting equipment. Tymac has specialized in providing innovative and patented technology to the die casting industry since foundation in 1973. I also am president of a consulting firm called Matra, Inc. Matra's business primarily involves management and engineering consulting for the die casting industry.

3. On or about December 6, 1990, I met Alan C. Frederickson, President of Die Casters International, Inc. ("DCI"). He was introduced to me by Bernard Skown. The nature of our early relationship is as follows: Mr. Frederickson, owner of The BDC Group, Inc., offered management consulting services to raise growth capital for Tymac. Mr. Frederickson was unsuccessful in raising any funding for Tymac. However, as a result of reviewing Tymac's business plan and learning about Tymac's successes in providing technology and equipment to the international die casting industry, he became interested in the opportunity for marketing Tymac technology and products and setting up joint ventures to in the former Soviet Union to

make die castings using Tymac equipment and technology. BDC was granted exclusive marketing rights for that region in return for a 20% shareholding and directorship in BDC. I made trips to the former Soviet Union along with Mr. Frederickson for that purpose.

4. I became involved with Mr. Skown and Mr. Frederickson in the foundation of DCI (initially conceived of as "NEWCO") on or about January 15, 1992. My involvement in DCI consisted of the following: DCI succeeded the BDC Group as the focus of our efforts shifted to establishing a low-cost, high quality, die casting production operation in the former Soviet Union on the basis of the Nunn-Lugar funding program for Defense Conversion. I served as Chief Engineer, responsible for providing engineering and technical services to DCI. In addition, I hold the patents on the Tymac controls and equipment that DCI intended to use on the die casting equipment it intended to purchase under the contract DCI had with the United States.

5. I resigned from DCI on or about December 30, 1996. A copy of my letter of resignation is attached as Exhibit A.

6. At some point during my involvement with DCI, Mr. Frederickson provided me with a copy of an analysis done by David Konick. A copy of Mr. Konick's analysis is attached as Exhibit B.

7. At no time did Mr. Frederickson ever indicate to me that Mr. Konick's analysis was in any way privileged. Moreover, the document was not marked in a manner that would indicate that the information contained therein was privileged or confidential.

8. Mr. Konick's analysis was among the documents that I had in my possession at the time I left DCI.

9. At the time I left DCI, I had no agreement with DCI that required that I turn over documents in my possession pertaining to DCI to DCI.

10. At no time has DCI asked me to turn over documents in my possession pertaining to DCI to DCI.

11. I turned over copies of all documents in my possession pertaining to DCI to Leslie Ohta in response to a subpoena Ms. Ohta had served upon me.

I declare under penalty of perjury that to the best of my knowledge and belief, the foregoing is true and correct.

Executed on October 28, 2005.

John Mickowski

**John R. Mickowski**
**50 Walling Road**
**Warwick, NY 10990**
**914 258-1393 Fax: 914 258-5437**

Rec'd Sat.
4 Jan 97

December 30, 1996

by facsimile and certified mail

Alan C. Frederickson, Chairman
Board of Directors
Die Casters International, Inc.
One Spruce Terrace
Wayne, New Jersey

Dear Mr. Frederickson:

I hereby regretfully inform you of my resignation, effective immediately, from the board of Die Casters International, Inc.

My resignation is prompted by a number of factors. I have lost confidence in the management of the Company and in management's candor in dealing with the board. I have not been given access to all information I believe I need to act responsibly and effectively as a director. In addition to all this, I have doubts and concerns about the Company's continued viability.

Finally, I am concerned about potential conflicts of interest I may have because of the substantial debt of the Company to Tymac Controls Corp., a company I own and control, and because of the current and potential business dealings between the Company and Tymac.

I wish DCI all the best in its future endeavors.

Very truly yours,

John Mickowski

JM/cab



A

Die Casters International, Inc.
*Quality and Service Worldwide*

David L. Konick
Telephone (540) 937-5067 Fax (540) 937-8286
E-mail: 75541.2244@Compuserve.com

MEMORANDUM

**To:** Alan C. Frederickson
**cc:** Maillefert, Engh, Mickowski, Michaely
**From:** David L. Konick
**Date:** 6 March 1996
**Re:** Status of Business Plan for DCI

On January 25, 1996, we presented an "Executive Summary" of DCI's Business Plan to representatives of Annapolis National Bank ("ANB") and the U.S. Export Assistance Center. This memorandum addresses various items that must be investigated, researched, confirmed and/or further documented before proceeding with the completion of the Corporation's Business Plan and submission to ANB, the European Bank for Reconstruction and Development ("EBRD") or other prospective lenders or investors. As I am sure you are aware, the standard for a prospectus or private placement memorandum is that it should not contain any false or misleading information, and should disclose all material facts so that none of the statements in the document are misleading. The Business Plan, in its current form, does not satisfy this standard.

TYM0450

MARKET ANALYSIS AND STRATEGY

This section of the Executive Summary lacks any meaningful documentation in a number of critical areas. First, the general market overview indicating a worldwide market of $16 - 20 billion is unsupported by any objective statistical analysis that I have seen. As best I have been able to determine, you guesstimated those numbers based on an article in a die casting manufacturers' publication that is at least a year out of date. Whether these numbers are still valid I do not know, but the business plan needs to cite more than one objective source for these numbers before it can be submitted to anyone in good faith.

Second, there is no information on which to base assertions in the Business Plan concerning the western European markets that DCI-Meridian intend to target. To my knowledge, other than Black and Decker and T-Fal, no other prospective die cast customers have been identified -- much less investigated to determine their level of potential demand for die castings from DCI-Meridian. I note that in his February 8, 1996 fax to you, John Mickowski noted that even assuming we landed an order from Black and Decker, "none of the parts they have requested quotes on by itself would keep one of DCI's machines occupied for more than a few months production." This raises the question of where DCI-Meridian's excess capacity would be sold, and at what price. It also indicates that the following statement in the current draft of the Executive Summary, viz.

B

TYM0451

"Based on initial negotiations with Black & Decker and other prospective customers to date, DCI believes that the entire production output capacity of the Meridian die casting facility will be fully utilized within 3 months from installation and commencement of production . . ."

is without any foundation and will not withstand the scrutiny of any due diligence review. I have no idea who the referenced "other prospective customers" might be. Absent some reliable documentation, this statement appears to contradict John Mickowski's analysis in his February 9, 1996 memorandum.

I also note, parenthetically, that even Black and Decker's "expression of possible interest" was conditional. Referring to correspondence dated 28 July 1995, although Black & Decker recognizes the potential "cost saving opportunities," Mr. Walters made a point of conditioning this interest on DCI "successfully executing the main 'risk reducing' elements of [its] plan" including, *inter alia,* **establishing multiple production facilities** and ISO 9000 certification in all NIS operations. At this point in time, although ISO 9000 certification is a goal, we have a very long way to go to achieve it, and DCI has no concrete or credible means of establishing multiple production facilities, anytime in the near future. Similarly, in his December 18, 1995 letter, the expression of interest is expressly conditional, noting that "although the first piece of the jigsaw is nearly in place, there are still some other actions, referred to in my 28th July letter that require pulling through to complete the strategy." Hence, a due diligence inquiry into the very optimistic assertions currently in the Executive Summary of the Business Plan would reveal that sales projections based on an contingent orders from Black and Decker are at best misleading, to the extent they suggest we have any firm commitment from B&D at the present time, or that we can satisfy their conditions in the foreseeable future.

Third, (and directly related to the validity of Black & Decker's "expression of interest") much of the sales strategy for market penetration in the draft Business Plan is predicated on DCI's ability to offer customers not only superior quality, but substantial price discounts of up to 20 percent initially. Based on our discussions at Meridian or other materials I have reviewed, I am not aware of any factual basis on which to project production costs with any reasonable degree of certainty, nor am I aware of any reliable projections of the cost of materials or operations that would support the assertion in the Business Plan that DCI-Meridian will be able to offer its products at such discounts. Among other things that we discovered on our recent trip, the income tax holiday for ventures with foreign investment expired on January 1, 1995, and will not be available to DCI-Meridian. Costs of raw materials, transport and energy all have escalated substantially in the two years since DCI's original "Strategic Overview" was developed and written, and it does not appear to reflect the current reality. To my knowledge, we have no back-up documentation that establishes the basis for costs assumed in your "pro-forma" projections, nor can we reasonably base such projections on estimated prices for raw materials or energy someone told you sitting at Meridian's conference room table.

.. need up-to-date price data from the suppliers, backed up by enforceable supply contracts, precedent agreements or at least current price lists. To my knowledge, there is no meaningful written documentation to support any of the supply input factors, nor, to my knowledge, has anyone been assigned to ferret out this information and obtain or generate the back-up to document whatever assumptions are in the Business Plan for raw material and operations costs.

Likewise, with respect to capital costs, TochlitMash representatives informed us on 23 February 1995 that their material costs are growing exponentially, that the die cast machine prices they quoted are nearly twice what they were merely 6 months ago, and that they could not project what their costs or prices will be 3 months from now. As noted in my Progress Report, DCI is a long way from having a firm contract with TochlitMash for the 4 machines required at Meridian. In addition, as noted below, we do not, as yet, have a reliable projection of the capital costs of reconstructing and refurbishing the Meridian manufacturing facility.

In view of the foregoing, it is uncertain at best whether or to what extent any of the assumptions underlying DCI's claimed ability to offer substantial price discounts remain valid or can be reliably expected to remain valid for the foreseeable future. If these assumptions are no longer valid, it calls into serious question the validity of the assumptions concerning marketing and sales projections, particularly with respect to Black and Decker. It is for this reason I requested you to provide copies of your notes on these and related topics you discussed in separate meetings while in Kyiv recently I still do not have them.

Another unsupported assertion in the Executive Summary relates to NIS markets. I do not see any back-up information for the claim that DCI will develop markets in the NIS, and certainly no market studies or other reliable statistics to support this claim, or the projected sales volumes we might reasonably anticipate.

With regard to expanding die casting operations beyond Meridian, the Executive Summary states that:

> "DCI has well established relationships in the NIS and a favorable reputation for building commercially viable joint enterprises, and has generated strong interest in joint venture activities with numerous other NIS enterprises that have established die cast production facilities."

So far as I have been able to determine, there is no basis in fact for the assertion that DCI has "a favorable reputation for building commercially viable joint enterprises" because, as we have become so painfully aware over the past month, the company has insufficient operating funds, and its current senior executive lacks the planning, organizational or management skills to effectively marshal and direct the Company's limited resources in an efficient manner. It is questionable -- based on the progress (or lack of progress) to date -- whether the Meridian project will be viable, even with the $3 million injection from DNA. Nor am I aware of any other "commercially viable joint enterprise" with which DCI has any relationship at all, much less one for which DCI can claim any credit

i whole or in part -- for its commercial viability. Therefore, there appears to be very little useful purpose to retaining this obviously inflated and insupportable claim in the Business Plan.

You have not provided any specifics identifying the "numerous other enterprises" nor any material to document their claimed "strong interest" in collaborating with DCI. I assume that this statement is based on the visits in 1994 made by Mr. Kuhlman (who is no longer associated with DCI) and Mr. Hintze to investigate interest in joint manufacturing operations with existing die casting facilities in connection with formulating DCI's original DNA proposal. As you know, any expressions of interest at that time were predicated on DCI's promise of DNA funding and the plant's inclusion in a defense conversion project. These assumptions are no longer valid. If these representations are to be included in the Business Plan, we need to confirm whether there is, in fact, any current interest by these "other enterprises" in such projects with DCI (without DNA funding support), and to determine whether and on what terms and conditions they might be willing to enter into joint operations with DCI. Those terms and conditions would need to be set forth in a memorandum of understanding, protocol of intent or otherwise memorialized before such statements could be included in the Business Plan. Otherwise these unsubstantiated claims should be eliminated from the Business Plan. In general, it might be a good idea to focus on getting the Meridian venture up and running successfully before charging off to start other joint ventures elsewhere in the CIS.

The last point under this section involves the assumption that Meridian (or any of the "numerous other enterprises" with whom DCI intends to initiate similar ventures) will ultimately agree to your proposed scheme to give a DCI sales and marketing subsidiary 20 percent of the gross sales revenues realized on their production. With respect to Meridian, I have serious concerns that the State Property Fund, which will continue to be a "player" as the largest post-privatization shareholder of Meridian, is going to acquiesce in DCI's proposed plan to siphon 20 percent of gross sales revenues right off the top as sales commissions, particularly if the manufacturing operations are not going to produce any positive net revenues. This key element of DCI's overall strategy was not mentioned in the December 5, 1995 Protocol of Intent with Meridian, nor have I heard it discussed with Meridian representatives. Given the political realities in Ukraine, even if it was discussed and agreed to by Meridian, it would be premature and dangerous to assume the SPF will allow Meridian to agree to such terms until such time as such an exclusive sales and distribution agreement is memorialized in writing and approved by SPF and the other shareholders of Meridian. Absent any binding agreement or, for that matter, any written indication of any kind that any prospective joint venture partner will agree to those extremely favorable (for DCI) terms, revenue projections based on the assumption that a DCI sales subsidiary will capture 20 percent of the gross revenue stream generated by manufacturing operations are not very realistic, and unlikely to withstand due diligence review.

## ·YMAC SYSTEMS TECHNOLOGY

As noted in the Business Plan, use of the TYMAC control system is the key to DCI's overall business strategy. Despite a number of requests, you never provided me with a copy of DCI's "exclusive distribution agreement." I need to see it to complete the detailed sections of the Business Plan on this topic. It will have to be provided to prospective lenders virtually immediately. We need to review it to see what, if anything, in the agreement is confidential and proprietary, such as price terms, that should not be disclosed without appropriate confidentiality agreements in place. Where is this agreement?

## MANUFACTURING/OPERATIONS

There are a number of assertions in this section that appear to be incorrect, based on what I learned during the recent trip to Kyiv. First, there is a reference that Meridian has agreed to furnish "plant facilities in Kyiv adequate for installation of up to ten die cast machines, melting and holding furnaces and related equipment required to estab..sh a state-of-the-art die casting facility as well as facilities for use by the joint venture entity to remanufacture die cast machines." It .. my understanding that new melt and holding furnaces (as well as other related equipment such as ladlers, etc.) have to be acquired and contributed to the venture by DCI, not Meridian. In Kyiv, you indicated to me that you wanted me and Bob Engh to pursue contracting for this equipment back here in the States.

Second, the Business Plan currently states that the $3+ million DNA funding "will enable DCI to refurbish the dedicated portion of Meridian's plant to western standards . . . ." However, as I presently understand it, there is *no* money in DCI's DNA approved budget for refurbishing the Mer.dian facilities, and DCI is expecting Meridian to assume the entire cost burden for reconstruction of the physical plant. To my knowledge ..is important topic was never raised by you or discussed with Meridian during th.. ..bruary trip, and we still do not know whether Meridian has the financial wherewithal to effect the necessary plant modifications or will agree to do so without contribution from D.. .

Likewise, the Business Plan states the refurbished facility and new equipment will be on line by the fourth quarter of 1995. Based on what was learned during the February trip (1) it is not c..ar whether Building 14, the premises proposed for die casting operations by M.. ..an, is even suitable for the intended purpose; (2) until the technical/engineering review that is underway to determine what will have to be done to prepare that buildin.. ..or the intended purpose, we cannot establish either a time line or cost projection of what will be required to reconstruct the building. Nevertheless, it does appear that the time and costs required to bring the converted facilities on line will be substantially in excess of anyone's earlier projections. I believe Bob Engh is preparing

a more detailed report summarizing these factors -- but it is my understanding that the reconstruction could take up to a year.

Aside from these concerns, the Business Plan is misleading to the extent it implies that the DNA funding alone is sufficient to proceed with the manufacturing operations. Even assuming that Meridian goes forward and refurbishes the physical plant, DCI cannot proceed to order any of the required equipment until it obtains financing in an amount required to cover its cost share under the DNA contract. As of this date, we have no financing prospects for DCI's cost share on the horizon.

Taking all of the foregoing factors into consideration, the projected start of operations date in the Business Plan is not realistic. I do not know what other "pro-forma" projections you have made based on a 4th quarter 1996 start up date, but these need to be revised.

Third, information we received in the meeting with TochlitMash on 23 February calls into question certain aspects of the section of the Business Plan on rebuilding die cast machines. As you will recall, when the matter of assembling the die cast machines from Tiraspol was discussed, it was mentioned that Meridian apparently does not have adequate facilities to lift the pieces of nachine as required for assembly. If I understood this correctly, it raises a que whether there are adequate facilities on site to permit disassembly and rebuilding of equipment. I am also unclear as to exactly where in the dedicated premises this a y is planned to take place. I am also not aware of any back-up for any project on what rebuilding costs would be, even assuming the facilities and equipment are uate to do it.

Based on the 23 February discu f prices with TochlitMash, I do not know whether the projections of 20% cost s on new equipment remains valid. As noted elsewhere, TochlitMash indicated a 10 ncrease in its production costs over the past 6 months, and they were unwilling to mit to what prices might be even 3 months from now. Hence, the representations concerning price advantage of new TYMAC equipped TochlitMash equipment may be misleading. Given the extremely negative course of discussions on 23 February with TochlitMash (which caused Mr Bolshakov to question whether DCI was "serious" abou going forward with the purchase of the four die cast machines for Meridian) couple with the fact that you failed to bring up for discussion -- much less advance -- te nd conditions of the so-called "distributor agreement," there is some question as to whether there is any reasonable basis on which to include sales of TYMAC equipped TochlitMash equipment in the Business Plan at all.

## MANAGEMENT, ORGANIZATION AND PERSONNEL

Based on the current state of affairs, it appears that this section will need to be completely revised in the very near future, for reasons that we need not belabor here.

CONCLUSION

The current Business Plan needs major reworking -- and not just cosmetic redrafting. Many -- if not most -- of the assertions and assumptions on which various representations are based are not adequately documented if they are documented at all, and there are serious questions whether many of these assumptions or representations have (or retain) any validity whatsoever. Without proper documentation, these assertions are mere cant and will not withstand due diligence review, nor will any "pro-forma" numbers based on them. Based on the preliminary evaluations of technical/engineering and legal matters that Bob Engh and I made in February, it is advisable to rethink many of the short and mid-term goals and objectives in the Business Plan.

While in some cases, failure to revise or properly document the claims in the Business Plan will lead only to a negative response from investors or lenders, with respect to EBRD, there are more serious fiscal consequences. As you know, Mr. Kinach, EBRD's Kyiv representative, advised us at our 22 February 1996 meeting that even assuming DCI's proposal passed the first "Concept Clearance" stage of review, the Company would be required to execute a written undertaking to cover all of EBRD's due diligence review costs. These costs would be substantial, and leaving aside from the question of where the funds to cover these costs would come from, unless and until we are confident the Business Plan has a reasonable chance to pass muster under EBRD's rigorous standards, it would not be prudent to submit anything to them.

Finally, submission of a Business Plan that does not meet commonly accepted standards will undermine whatever credibility DCI and its representatives may have. For the reasons outlined above, the current plan utterly fails to meet those standards by a wide berth.

In view of the foregoing, it is imperative that DCI's senior management meet at the earliest possible date to re-evaluate the entire Business Plan, establish goals and objectives we all agree are reasonable and achievable, identify what needs to be done to correct the deficiencies and fill in the gaps, assign responsibility for those tasks, and establish realistic deadlines for accomplishing them.