**UNITED STATES COURT OF FEDERAL CLAIMS**

----------------------------------------------------------------------------X

**DIE CASTERS INTERNATIONAL, INC.,**

Plaintiff,

**No. 04-1113C**
(Judge Braden)

-against-

**UNITED STATES OF AMERICA,**

Defendant.

----------------------------------------------------------------------X

# PLAINTIFF'S POST-TRIAL MEMORANDUM OF LAW

**GOLDBERG & CONNOLLY**
**Attorneys for Plaintiff**
**66 North Village Avenue**
**Rockville Centre, New York 11570**
**(516) 764-2800**

# TABLE OF CONTENTS


PAGE

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 2

STATEMENT OF THE FACTS ..... 2

A. Contract Award ..... 2

B. Additional Contract Funding Required ..... 4

C. The Billing Controversy and the DCIS Report ..... 5

D. Disposition of the Property ..... 7

E. Plaintiff's DCB Business Plan ..... 8

ARGUMENT ..... 10

POINT I

PLAINTIFF IS ENTITLED TO DAMAGES UNDER COUNT ONE OF THE COMPLAINT IN THE AMOUNT OF $2,921,653.49 BASED UPON THE DEFENDANT'S ADMITTED FAILURE TO NEGOTIATE AN EQUITABLE DISTRIBUTION OF "ALL PROPERTY PRODUCED OR PURCHASED UNDER THE CONTRACT" AS REQUIRED BY FAR 52.232-20 (h) ..... 10

A. Defendant Admitted That It Breached The Contract ..... 10

B. Plaintiff Is Entitled To Damages Equal To Its Share Of The Value Of All Of The Property Produced Or Purchased Under The Contract As Calculated Utilizing Plaintiff's Pro Rata Share Of The Total Costs Incurred ..... 11

POINT II

PLAINTIFF IS ENTITLED TO DAMAGES UNDER COUNT TWO OF THE COMPLAINT IN THE AMOUNT OF $5,955,933.32 REPRESENTING THE VALUE OF THE EQUIPMENT AND OTHER PROPERTY PLAINTIFF PROCURED UNDER THE CONTRACT THAT WAS WRONGFULLY APPROPIATED BY THE DEFENDANT ....................34

POINT III

PLAINTIFF IS ENTITLED TO RECOVER DAMAGES WHICH RESULTED FROM DEFENDANT'S BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ....................41

POINT IV

PLAINTIFF IS ENTITLED TO RECOVER DAMAGES THAT RESULTED FROM DEFENDANT'S TAKING OF PLAINTIFF'S PROPERTY AND RIGHTS, WHICH TAKING CONSTITUTED A TAKING FOR WHICH JUST COMPENSATION IS DUE TO PLAINTIFF UNDER THE FIFTH AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES ....................45

POINT V

THE PLAINTIFF'S DAMAGES ARISING FROM THE DEFENDANT'S BREACHES OF CONTRACT AND TAKING INCLUDE THE LOSS OF ITS FUTURE PROFITS THAT IT WOULD HAVE EARNED IF THE DEFENDANT HAD NOT BREACHED THE CONTRACT AND TAKEN THE PROPERTY THEREBY PREVENTING THE PLAINTIFF FROM FORMING THE CONTRACTUALLY CONTEMPLATED JOINT VENTURE AND SUBSEQUENT "BUSINESSES AND/OR JOINT VENTURES" AND REALIZING THE BENEFITS ENURING FROM THOSE "BUSINESSES AND JOINT VENTURES" AS MORE PARTICULARLY DESCRIBED IN THE PLAINTIFF'S DCB BUSINESS PLAN ....................50

CONCLUSION ....................60

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Abcon Assocs. v. United States*, 49 Fed. Cl. 678 (Fed. Cl. 2001) ) .......... 42

*Aircraft Inventory Corp. v. Falcon Jet Corp.*, 18 F. Supp.2d 409 (D.N.J. 1998) .......... 29

*Alarm Device Mfg. Co. v. Arnold Industries,* 417 N.E.2d 1284 (Ohio App. Ct. 1979) .......... 29

*American Parts Co. v. American Arbitration Association,* 154 N.W.2d 5 (Mich. Ct. App. 1967) .......... 29

*American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110 (Fed. Cir. 1985) .......... 17, 18

*Basset, New Mexico LLC v. United States,* 55 Fed. Cl. 63 (Fed. Cl. 2002) .......... 48, 49

*Boston Edison Co. v. United States,* 64 Fed. Cl. 167 (Fed. Cl. 2005) .......... 43, 44

*Breed Corporation v. United States*, 650 F.2d 286 (Ct. Cl. 1980) .......... 17, 18

*Centex Corporation v. United States,* 49 Fed. Cl. 691 (Fed. Cl. 2001) .......... 41, 42, 44

*Centex Corporation v. United States,* 395 F.3d 1283 (Fed. Cir. 2005) .......... 41

*Chrysler Corp. v. Majestic Marine, Inc.,* 192 N.W.2d 507 (Mich. Ct. App.1971) .......... 30

*Cohn v. Fisher,* 118 N.J. Super. 286 (N.J. Super. Ct. 1972) .......... 27, 31

*Commercial Factors Corp. v. Zephyr Awning Corp.*, 91 N.W.2d 511 (Mich. 1958) .......... 24

*Demarco Durzo Development Co. v. United States,* 60 Fed. Cl. 632 (Fed. Cl. 2004) .......... 46

*Eleven Line, Inc. v. North Texas State Soccer Ass'n. Inc.,* 213 F.3d 198 (5th Cir. 2000) .......... 59

*Emco Industries, Inc. v. United States,* 485 F.2d 652 (Ct. Cl. 1973) .......... 17

*Energy Capital Corp. v. United States,* 302 F.3d 1314 (Fed. Cir. 2002) .......... 51, 57, 59

*Franconia Associates v. United States,* 61 Fed. Cl. 718 (Fed. Cl. 2004) .......... 53, 55, 57

*Glendale Fed. Bank, F.S.B. v. United States,* 239 F.3d 1374 (Fed. Cir. 2001) .......... 52

*H & S Manufacturing, Inc. v. United States,* 66 Fed. Cl. 301 (Fed. Cl. 2005)........................41, 42, 44

*Hiller v. Manufacturers Product Research,* 59 F.3d 1514 (5th Cir. 1995)..........................................56

*Hubbard v. United States,* 52 Fed. Cl. 192 (Fed. Cl. 2002)...........................................................42

*Huyler Paper Stock Co. v. Information Supplies Corp.,* 117 N.J. Super. 353
(N.J. Super. Ct. Law Div. 1971) ...........................................................................29, 32

*Independent Business Forms, Inc. v. A-M Graphics, Inc.,* 127 F.3d 698
(8th Cir. 1997)...........................................................................................................58

*International Telepassport Corp. v. USFI,* 89 F.3d 82 (2d. Cir. 1996) ..............................................57

*In re Merritt Logan, Inc.*, 901 F.2d 349 (3rd Cir. 1990) ....................................................................58

*J.D. Hedin Construction Co., Inc. v. United States,* 456 F.2d 1315 (Ct. Cl. 1972)............................47

*Kelly-Stehney & Associates, Inc. v. MacDonald's Indus. Products*,
693 N.W.2d 394 (Mich. 2005).........................................................................................25

*Landskroner v. Landskroner*, 154 Ohio App.3d 471 (Oh. Ct. App. 2003)..........................................25

*LaSalle Talman Bank v. United States,* 317 F.3d 1363 (Fed. Cir. 2003)............................................56

*LaSalle Talman Bank, F.S.B. v. U.S.,* 64 Fed. Cl. 90 (Fed. Cl. 2005) .......................................... 53-56

*Leonard v. Roth,* 130 N.W. 208 (Mich. 1911).....................................................................................31

*Locke v. United States,* 283 F.2d 521 (Ct. Cl. 1960) ...................................................................55, 59

*Lorenz Supply Co. v. American Standard, Inc.,* 358 N.W.2d 845 (Mich. 1984)................................27

*McAusland v. Rieser,* 82 N.J. Eq. 614 (N.J. 1914) ...........................................................................27

*Mid-Am. Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353 (7th Cir. 1996)................................58

*Miller v. United States,* 140 F. Supp. 789 (Ct. Cl. 1956)...................................................................47

*MindGames, Inc. v. Western Publishing Co.,* 218 F.3d 652 (7th Cir. 2000).......................................57

*Norman v. United States,* 63 Fed. Cl. 231 (Fed. Cl. 2004) ......................................................... 45-47

*Olin Jones Sand Co. v. United States,* 225 Ct. Cl. 741 (Ct. Cl.1980)................................................59

*Osprey Pacific Corp. v. United States,* 41 Fed. Cl. 150 (Fed. Cl. 1998) ............................................47

*Pitts v. Monaco Coach Corp.*, 330 F. Supp.2d 918 (W.D. Mich. 2004) ....................28

*Public Water Supply District No. 3 v. United States,* 133 Ct. Cl. 348 (Ct. Cl. 1955)....................45

*Puritan Systems, Inc. v. M.G. Industries, Inc.*, 1997 Ohio App. LEXIS 4758 (Ohio Ct. App. 1997)....................29

*R.B. Sales Company v. JHS of Tennessee, Inc.*, 1996 Ohio App. LEXIS 3495 (Ohio Ct. App. 1996)....................28

*R.G. Moeller Co. v. Van Kampen Constr. Co.*, 225 N.W.2d 742 (Mich. Ct. App. 1975) ....................32

*Raymond Constructors of Africa, Ltd. v. United States*, 411 F.2d 1227 (Ct. Cl. 1991) ....................14, 15

*Rocky Mountain Construction Co. v. United States,* 218 Ct. Cl. 665 (Ct. Cl.1978)....................59

*Ross Construction Corp. v. United States*, 392 F.2d 984 (Ct. Cl. 1968) ....................15

*Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320 (Fed. Cir. 2003) ....................59

*Seery v. United States,* 127 F. Supp. 601 (Ct. Cl. 1955)....................48

*Societe Cotonniere Du Tonkin v. United States,* 171 F. Supp. 951 (Ct. Cl. 1959) ....................47

*Skyline Steel Corp. v. A.J. Dupuis Co.*, 648 F. Supp. 360 (E.D. Mich. 1986) ....................28

*Scherr & McDermott, Inc. v. United States*, 360 F.2d 966 (Ct. Cl. 1966)....................16, 17

*Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573 (Fed. Cir. 1993) ....................46

*Solar Turbines, Inc. v. United States*, 23 Cl. Ct. 142 (Ct. Cl. 1991) .................... 14-16

*Standard Federal v. United States*, 62 Fed. Cl. 265 (Fed. Cl. 2004)....................51, 52

*Steel Products. v. Sharon Steel Corp.*, 705 F.2d 134 (6th Cir. 1983)....................30

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1991)....................56

*TK-7 Corp. v. Estate of Barbouti,* 993 F.2d 722 (10th Cir. 1993)....................57

*Tecom v. United States,* 66 Fed. Cl. 736 (Fed. Cl. 2005) ....................44

*The Globe Savings Bank, F.S.B. v. United States,* 59 Fed. Cl. 86 (Fed. Cl. 2003) ....................53

*The Globe Savings Bank, F.S.B. v. United States,* 65 Fed. Cl. 330 (Fed. Cl. 2005)....................54, 56

*Thomson Printing Machinery v. B.F. Goodrich Co.*, 714 F.2d 744 (7th Cir. 1983) ....................29

*Turney v. United States,* 126 Ct. Cl. 202 (Ct. Cl. 1953) ....................46, 48

*United States v. Cartwight,* 411 U.S. 546 (1973) ....................49

*Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012 (Fed. Cir. 1996) ....................53

*Yankee Atomic Electric Co. v. United States,* 112 F.3d 1569 (Fed. Cir. 1997) ....................42

**STATUTES**

Disputes Act of 1978, 41 USCS § 601 (2002) ....................2

Mich. Comp. Laws § 440.2201 (2005) ....................26

Mich. Comp. Laws § 440.2201(1)(2005) ....................27

Mich. Comp. Law § 440.2201(2)(2005) ....................28

Mich. Comp. Laws § 440.2201(3)(2005) ....................30, 31

Mich. Comp. Laws § 1302.04 (2005) ....................28

Mich. Comp. Laws § 400.2725 (2005) ....................32

Mich. Comp. Laws § 566.132(1) (2005) ....................25

N.J. Stat. Ann. § 12A: 2-201 (2005) ....................26, 27

N.J. Stat. Ann. § 12A:2-201(1)(2005) ....................27

N.J. Stat. Ann. § 12A:201(2)(2005) ....................28

N.J. Stat. Ann. § 12A:2-201(3) ....................30, 31

N.J. Stat. Ann. § 12A: 2-725 (2005) ....................32

N.J. Stat. Ann. § 25:1-5 (2005) ....................24

Ohio Rev. Code Ann. § 1302.04(2005) ....................26

Ohio Rev. Code Ann. § 1302.04(A)(2005) ....................27

Ohio Rev. Code Ann. § 1302.04(B)(2005) ....................28, 30

Ohio Rev. Code Ann. § 1302.04(C)(3)(2005) ....................31

Ohio Rev. Code Ann. § 1302.98 (2006) .......... 32

Ohio Rev. Code Ann. § 1335.04 (2005) .......... 25

Uniform Commercial Code 2-401 .......... 40

Uniform Commercial Code 2-702 .......... 40

United States Constitution Amendment V .......... 45

**REGULATIONS**

Federal Acquisition Regulations 33.2 .......... 2

Federal Acquisition Regulations § 45.101 .......... 12

Federal Acquisition Regulations § 52.216-7 .......... *passim*

Federal Acquisition Regulations § 52.216-7(b)(1)(i) .......... 22

Federal Acquisition Regulations § 52.216-7(b)(1)(ii) .......... 22, 23

Federal Acquisition Regulations § 52.216-7(c) .......... 6

Federal Acquisition Regulations § 52.232-20 .......... *passim*

Federal Acquisition Regulations § 52.232-20(h) .......... *passim*

Federal Acquisition Regulations § 52.245-2 .......... 36

Federal Acquisition Regulations § 52.245-5(e)(2) .......... 37

Federal Acquisition Regulations § 52.245-5 (f) .......... 37

Restatement (Second) of Contracts § 344(a)(1981) .......... 52

Restatement (Second) Contracts § 351 .......... 55

Restatement (Second) Contracts § 352 .......... 56

## PRELIMINARY STATEMENT

Pursuant to the Disputes Act of 1978 (41 USC 601 *et. seq.*) and Federal Acquisition Regulation ("FAR") Subparagraph 33.2 (FAR 33.201 *et. seq.*), on February 25, 2004, Die Casters International, Inc. ("DCI" or "Plaintiff") filed with Defendant its certified claims that are the basis for this action. On June 25, 2004, the Defendant's Contracting Officer issued his "final decision" denying all of Plaintiff's claims. Plaintiff filed the complaint in this action on July 6, 2004. Defendant filed an answer on September 17, 2004.

The trial of this matter took place on November 14-17, 2005.

At trial, Defendant admitted that Defendant had breached its obligation to negotiate an Equitable Distribution pursuant to FAR § 52.232-20(h) of "all property produced or purchased under the contract." (Trans. p. 24, 666 lines 20-22; Trans. p. 607-608). Plaintiff submits this Brief to further support the evidence produced at trial that it is entitled to damages of $2,921,653.49 under Count I of the Complaint as a result of this admitted breach by Defendant.

In addition, Plaintiff submits this Brief in further support of its claims as set forth in Counts II through V of the Complaint.

## STATEMENT OF THE FACTS

### A. Contract Award

Plaintiff is and has always been a "small business" as that term is utilized in the FAR (Trans. p. 63). After a competitive procurement, on October 27, 1995, Plaintiff was awarded Contract DNA001-95-C-0169 for Defense Conversion For The Ukraine (the "Contract") (Plaintiff's Exhibit 2). The Contract was a Cost Sharing Contract with total Original Estimated

Costs of $4,100,427.00, of which Defendant's Share was $3,034,316.00 and Plaintiff's Share was $1,066,111.00. *Id.*

Pursuant to the Statement of Work ("SOW") i*d.*, which was incorporated into the Contract, Plaintiff was to provide capital equipment, material, training and business assistance/advisory services (hereinafter referred to collectively as the "Property") to a joint venture ("Joint Venture") that was to be established between Plaintiff and a Ukrainian Joint Venture Partner ("UJVP"). The UJVP was to supply an existing factory (the "Facility") that was to be improved by the installation of the Property provided and created by Plaintiff. The Joint Venture was to own and operate the resulting modernized die casting Facility.

The UJVP identified in the SOW was Meridian Joint Stock Company ("Meridian"). Subsequently, another Ukrainian company, Burevestnik (in association with another Ukrainian, entity TechnoMet), was substituted for Meridian and became the UJVP. (Plaintiff's Exhibit 2 and Trans. p. 194).

The SOW provided that the Joint Venture and the modernized Facility that would "serve as the groundwork for future business and/or joint ventures." *Id.* The Facility was to be the model for the establishment by the Joint Venture of other die casting facilities in the Ukraine. These future business relationships would have a very substantial financial benefit to Plaintiff and were the consideration for Plaintiff entering into this cost-sharing Contract. (Plaintiff's Exhibit 2, Trans. pp. 329-341). Plaintiff was required to and did make substantial investments into the Joint Venture, which included the continued development of its intellectual property and the incorporation of such intellectual property into the design of the Equipment and its business plans. (Trans. pp. 31-33, 174). The fact that the Plaintiff was making this sizable investment and the Plaintiff's reliance on the receipt of the very substantial future benefits, as well as the

extent of those benefits from the Joint Venture, was well documented by the Plaintiff and known to the Defendant. (Plaintiff's Exhibits 7 and 8*)*.

**B. Additional Contract Funding Required**

From the very inception of the Contract, it was understood that there would be a need for an additional funding over and above the four million one hundred thousand dollar and four hundred and twenty-seven ($4,100,427.00) Contract amount. It was understood that this funding was to come from either outside investment or, in the alternative, from the United States Government increasing its Cost Share under the Contract. (Plaintiff's Exhibit 3 and Trans. pp. 132-133).

Defendant, through its actions and inactions, blocked or otherwise obstructed the efforts Plaintiff made to acquire additional funding, and thereby guaranteed the ultimate inability of the Plaintiff to complete the SOW, including the establishment of the Joint Venture and Plaintiff's receipt of the financial benefits therefrom. Defendant did this by (1) failing to commit additional available, authorized and appropriated funds to the Contract because of its blind reliance upon an inaccurate and erroneous Defense Contract Investigative Services ("DCIS") report ("DCIS Report") (Trans. pp. 460-468 and Plaintiff's Exhibits 53 p.19 and 58 (hh)); (2) preventing the Plaintiff from attracting any outside investment by allowing the ill-founded and unwarranted investigation to be initiated by the Defense Contract Investigative Services ("DCIS") and to be continued for a period of over 30 months, which led to the DCIS Report (Plaintiff's Exhibit 28); and (3) summarily rejecting an offer by Brookhaven National Laboratories to provide funding for the Joint Venture (Plaintiff's Exhibit 47 and Trans. pp. 268-270, 369). To make matters worse, during the course of the DCIS investigation and the Defendant's procrastination in making a decision with respect to future funding of the Contract, Defendant encouraged and

cajoled Plaintiff to continue to perform under the Contract, utilizing Defendant's very limited resources, knowing that Plaintiff was relying on these representations of future funding to its detriment. (Trans. pp. 214-216 and Plaintiff's Exhibits 14, 15, 17).

## C. The Billing Controversy and the DCIS Report

As detailed above, the Contract was a Cost Sharing Contract with Original Estimated Costs of $4,100,427.00 of which the Government's Share was $3,034,316.00 and Plaintiff's Share was $1,066,111.00. (Plaintiff's Exhibit 2). As early as the pre-award survey, Plaintiff disclosed to the Defendant, pursuant to the FAR, that it was utilizing the accrual method of accounting that reflected as Plaintiff's incurred costs certain deferred payment arrangements with suppliers and employees for 26% of the cost of the goods and services they provided under the Contract. These accounting and billing practices were disclosed to and approved by the Defendant's Contracting Officer at a meeting held on March 22, 1996 and no objection by any Defendant representative was raised at that or any subsequent time. (Trans. pp. 165, 166; Plaintiff's Exhibit 2000 and Plaintiff's Exhibit 22). Relying upon its agreement with the Defendant, Plaintiff submitted public vouchers seeking reimbursement for approximately 74% of all incurred costs, whether paid or deferred. The Defendant, in keeping with its agreement with Plaintiff and the FAR, paid its full share of these public vouchers, without objection. These accounting and billing practices were disclosed to the Defense Contract Audit Agency ("DCAA")(Plaintiff's Exhibit 22).

In August of 1997, the Defense Contract Audit Agency ("DCAA") advised Plaintiff of its preliminary audit findings relating to two months of Plaintiff's 1995 incurred costs, which questioned the allowability of certain portions of Plaintiff's claimed costs. The portion of costs that DCAA questioned was the deferred payments by Plaintiff of 26% of the sums due to

suppliers and employees. DCAA questioned these costs notwithstanding an agreement between the Plaintiff and Defendant that Plaintiff could bill such costs and Defendant would pay such vouchers. In fact, at that time, this course of dealing had been in effect for almost two years. (Plaintiff's Exhibit 22).

DCAA claimed that these deferred costs were not to be considered as allowable simply because they were not paid. *Id.* From the very inception of this recommendation by DCAA, Plaintiff has refuted DCAA's position on the bases that (1) Plaintiff's invoicing was in compliance with all applicable regulations[1] and (2) Plaintiff's long standing agreement with Defendant concerning this aspect of Plaintiff's Contract billing. (Plaintiff's Exhibit 22).

On September 5, 1997, the Plaintiff wrote to the Defendant addressing the finding of the DCAA audit, reminding the Defendant of Defendant's agreement concerning the allowability of the DCAA questioned billing procedure, and the fact that the billing procedure was permissible under the relevant regulations. *Id.* That letter also asked the Defendant to prepare a letter to DCAA addressing the DCAA findings and advising DCAA that "DCI billing and payment procedures were conducted in full compliance and approval of the" Defendant. This simple but critical request by the Plaintiff was ignored by the Defendant. Defendant's inexcusable failure to respond to this request began a series of events, which were further exasperated by Defendant's continuing mismanagement of the Contract, that allowed an incorrect DCAA finding to spiral out of control and eventual led to the Defendant's wrongful appropriation and disposition of the Equipment, and breach of the Contract. These acts included issuing responses to DCAA audit

---

[1] FAR 52.216.7(c) provides "Small business concerns. A small business concern may be paid more often than every 2 weeks and <u>may invoice and be paid for recorded costs for items or services purchased directly for the Contract, even though the concern has not yet paid for those items or services</u>." (Emphasis added).

reports, which reports requested further action by the Contracting Officer concerning the DCAA findings. (Trans. pp. 350-360; Plaintiff's Exhibits 58(o), 58(p), 58(s) and 58(t).

The DCIS Investigation was terminated by the Inspector General of DCIS issuing his report dated March 13, 2000 ("DCIS Report"). Paragraph 11 of the DCIS Report stated that the Assistant United States Attorney, Civil Division, ("AUSA"), after being briefed on February 14, 2000 on the investigation, "related that his office would not be interested in pursuing the investigation due to lack of company assets and the actions of the procuring activity". (Plaintiff's Exhibit 58 (hh)). This poorly thought out and prepared report contained numerous errors and omissions (Trans., pp. 460-468) and was relied upon blindly and heavily by the Contracting Officer in his decision not to add funding and to appropriate the Property. *Id.*

**D. Disposition of the Property**

Plaintiff proceeded to acquire the Property and stored the Property for its own account in Kiev, Ukraine and Tiraspol, Moldavia, awaiting additional funds, that were needed by Plaintiff to install the Equipment at the Facility. While the Equipment remained in storage in Kiev, Ukraine and Tiraspol, Moldavia, awaiting Defendant's decision on further funding or termination of the Contract, Defendant acknowledged and admitted, in a series of communications, that Plaintiff had rights in the Equipment and that, if the Contract was not continued, Plaintiff was entitled to an "equitable distribution" of the Property as required under FAR 52.232-20(h). (Plaintiff's Exhibits 21, 32, 34).[2]

At times, subsequent to October of 2001, Defendant, acting through its authorized contractors, and without Plaintiff's consent, illegally and wrongfully took possession of Property

[2] Defendant admitted at trial that its failure to negotiate an equitable distribution was a breach of contract (Trans. p. 24, 666 Lines 20-22, 607-608).

that was stored in Moldavia and the Ukraine. Furthermore, and again without Plaintiff's consent, Defendant, through its contractors, illegally and wrongfully shipped and delivered possession of the Equipment to the UJVP and other third parties. Thereafter, by letter dated April 14, 2003, Plaintiff was advised by Defendant that the Contract "is considered closed." (Plaintiff's Exhibit 40). Furthermore, Defendant, as it admitted at trial, breached its obligations to Plaintiff by failing to negotiate an Equitable Distribution of "all property produced or purchased under the contract." (Trans. pp. 24, 266, 607-608).

**E. Plaintiff's DCB Business Plan**

The calculation of lost profits as set forth in Attachment A, Part B of Plaintiff's Exhibit 1B, is divided into three phases: Phase One relates to the loss of profits attributable to the Joint Venture between DCI and UJVP without any further investment other than the $500,000.00 to install the Equipment; Phase Two relates to the additional lost profits that would have resulted if DCI had received additional investment in the amount of $8,000,000.00 as projected in the DCB Business Plan (Plaintiff's Exhibit 7); and Phase Three relates to the additional loss of profits that would have resulted if DCI had received an additional $50,000,000.00 investment as projected in the August, 1999 business plan (Plaintiff's Exhibit 8 and Trans. pp. 342-349).

The loss of profits for Phase One is made up of three components, they are:

1. DCI's 40% interest in the start-up assets of the Joint Venture which were valued at $6,356,000.00;

2. The net present value of DCI's 40% ownership interest in the Joint Venture's net income and residual value for a projected five (5) year period; and

3. The net present value of DCI's net income and residual value attributable to DCI's distribution rights for a projected five (5) year period.

The loss of profits calculation for Phase Two is made up on two components. They are:

1. The net present value of DCI's 20% ownership interest in the Joint Venture's additional net income and residual value for a projected five (5) year period generated by the additional $8,000,000.00 investment;

2. The net present value of DCI's added net income and residual value attributable to DCI's distribution rights for a projected five (5) year period generated by the additional $8,000,000.00 investment.

The loss of profits calculated for Phase Three is made up of two components. They are:

1. The net present value of DCI's ownership interest in the Joint Venture's additional net income and residual value for a projected period of five (5) years generated by the additional $50,000,000.00 investment;

2. The net present value of DCI's added net income and residual value attributable to DCI's distribution rights for a projected five (5) year period generated by the additional $50,000,000.00 investment.

## ARGUMENT

## POINT I

## PLAINTIFF IS ENTITLED TO DAMAGES UNDER COUNT ONE OF THE COMPLAINT IN THE AMOUNT OF $2,921,653.49 BASED UPON THE DEFENDANT'S ADMITTED FAILURE TO NEGOTIATE AN EQUITABLE DISTRIBUTION OF "ALL PROPERTY PRODUCED OR PURCHASED UNDER THE CONTRACT" AS REQUIRED BY FAR 52.232-20 (h)

### A. Defendant Admitted That It Breached The Contract.

The Contract incorporated by reference FAR 52.232-20 (Apr 1984) entitled *Limitation of Cost* ("LOC"). Sub-section (h) of FAR 52.232-20 provides as follows:

> If this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each. (emphasis added).

The Defendant in its opening statement (Trans. p. 24-25), at various other points during the trial of this matter (including Trans. p. 666, lines 20-22) and again during its Rule 52 (c) motion (Trans. pp. 607 and 608), admitted that, although the estimated cost of the Contract was "not increased," the Defendant failed to negotiate with Plaintiff an Equitable Distribution ("Equitable Distribution") of "all property produced or purchased under the contract" ("Property") as required by the above referenced FAR provision, and as a result, breached the Contract. (Trans. p. 737).

**B. Plaintiff Is Entitled To Damages Equal To Its Share Of The Value Of All Of The Property Produced or Purchased Under The Contract As Calculated Utilizing Plaintiff's Pro Rata Share Of The Total Costs Incurred.**

Since Defendant admitted that it breached the Contract, the sole issue to be determined by this Court under Count I of Complaint is the amount of damages that Plaintiff is entitled to recover, which is controlled by FAR 52.232-20(h).[3] Equitable Distribution of all of the Property in kind is no longer a viable option because the Property is no longer in either parties' possession. Therefore, Plaintiff is entitled to money damages in lieu thereof. As stated in this section of the FAR, these damages are to be calculated utilizing Plaintiff's pro rata share of the value of all Property produced or purchased under the Contract based upon Plaintiff's share of the total costs incurred.

**1. The Value Of Property**

FAR 52.232-20(h) required the Government to negotiate with plaintiff an Equitable Distribution of "<u>all property produced or purchased under the contract</u>." (emphasis added). This provision does not limit the term "property" to property acquired by any particular party or to any type of property, as is found in other sections of the FAR. Accordingly, this term must be given its clear and unambiguous meaning to include any kind of property, tangible and intangible, including intellectual property as conceded by the Defendant (Trans. p. 708), regardless of how it was acquired. Defendant's arguments at trial that the term "property" as utilized in this

---

[3] The Court recognized that this was the sole issue when it stated that, "it seems to me that the only plausible liability is the one the government concedes [which is that it breached the contract by failing to negotiate equitable distribution]. And then the issue is what are the damages for that, looking at the language of the FAR." (Trans. p. 737).

provision only includes the value of the equipment (Trans. p. 709) and is limited to only tangible property (Trans. pp. 722-28) is contrary to the language of the regulations and must be rejected.[4]

The Contract and the costs incurred under the Contract included tangible goods, intellectual property, personal property and services and expertise provided by Plaintiff. Indeed, the very purpose of Defendant's entering into the Contract with the Plaintiff was to acquire the services, expertise and intellectual property of the Plaintiff, as well as the Equipment and other tangible Property to be acquired by the Plaintiff. If the Court were to disregard the value of any of the goods and services, it would essentially be undermining the purpose of the Contract. If the measure of Equitable Distribution was equipment, as argued by Defendant, FAR 52-232-20(h) would read "equipment" not "all property." [5] In addition, were Equitable Distribution calculated in accordance with the Defendant's argument, the Defendant would get the benefit of the services and other property contributed by the Plaintiff without compensating Plaintiff therefor. Such a windfall to the Defendant is unfair and unjustified.

The only evidence in the record reflecting the actual monetary value of "all property" as of the closeout date of the contract on April 14, 2003 (Plaintiff's Exhibit 40) (the last date the Defendant could have negotiated an Equitable Distribution under the contract) is the amount of the total incurred costs as of that date of $5,955,933.32.[6] (Plaintiff's Exhibit 49, 1000, 2001 and

---

[4] The Government attempted to define property "as used in this part [as] all property, both real and personal. It includes facilities, material, special tooling, equipment, and agency - peculiar property." (Trans. p.722). That is the definition of "property" in FAR Part 45 (in particular, FAR 45.101). That definition only applies to Part 45; it does not apply to Part 32 or Part 52 (in particular, FAR 52.232-20) which is at issue in this litigation).

[5] The Court acknowledged this point. (Trans. p. 709). Furthermore, the Defendant concedes that the Plaintiff was to supply knowledge and the Business Plan under the Contract. (Trans. p. 174).

[6] At trial, the government conceded that the total costs incurred by both parties combined equals $5,900,000.00. (Trans. p. 719).

Trans. pp. 288-289). Under the Equitable Distribution clause, Plaintiff was entitled to its share of this amount based upon the ratio of the parties' incurred costs.

**2. Plaintiff's Share Of Incurred Costs**

**a. Plaintiff Is Entitled To Forty-Nine Percent Of The Total Value Of All Of The Property Produced Or Purchased Under The Contract.**

The Contract was a Cost Sharing Contract with an Original Estimated Cost of $4,100,427.00, of which the Defendant's Cost Share was $3,034,316.00 and Plaintiff's Cost Share was $1,066,111.00. The LOC provision in the Contract provides that the Government was not required to reimburse Plaintiff for any amount over and above Defendant's Cost Share of $3,034, 316.00. Nor is Plaintiff required to incur costs in excess of its Lost Share of $1,066,111.00, however, there is no contractual restriction preventing Plaintiff from spending more than its Cost Share of $1,066,111.00 in executing its performance of the Contract. As of April 14, 2003 (the Contract closeout date), Plaintiff had incurred additional costs over and above its $1,066,111.00 Cost Share in the amount of $1,855,542.49, making Plaintiff's total share of incurred costs under the Contract $2,921,653.49 or 49% of the total incurred costs of $5,955,933.32. (Plaintiff's Exhibit 49, 1000, 2001 and Trans. pp. 288-289).

A careful reading of subsection (h) of FAR 52.232-20, which controls the computation of Equitable Distribution, shows that the division of Property acquired under the Contract is "based upon the share of costs incurred by each" party (emphasis added). This provision does not state that the division of the Property shall be based upon the Original Estimated Cost Share of each party. This language is a very logical, precise and correct with respect to the implementation of the purpose of this clause. This clause properly recognizes that if the Plaintiff has incurred costs above its Cost Share, these extra expenditures have increased the total value of "all property

produced or purchased under the contract." Under these circumstances, if the Contract does not go forward, the Plaintiff should be allowed to recover all its increases in the value of the property by calculating its share of the Equitable Distribution of the Property using all of its incurred costs, even if they exceed the Plaintiff's Cost Share.

For example, if the Total Estimated Contract Cost was $4, the Plaintiff's Cost Share was set as $1 and the Defendant's Cost Share was set as $3, Plaintiff would be entitled to an Equitable Distribution equal to 25% of all of the "property produced or purchased under the contract." However, if the Plaintiff invested an additional $96 over its Cost Share, the value of all of the Property would be $100 and upon Equitable Distribution it is only right that Plaintiff get $97 and Defendant get $3. To award Plaintiff $75 simply because of the LOC clause would be an unfair and unjustifiable windfall to the Defendant.

Indeed, the well-settled case law recognizes that the LOC clause is inapplicable to the issue of calculating damages for breach of the contract. "Contractual provisions such as the LOC clause, which limits a contractor's recovery of costs, have been interpreted not to control when the contractor alleges that it suffered damages above the limitation as a result of a breach of a contractual duty by the government." *Solar Turbines, Inc. v. United States,* 23 Cl. Ct. 142, 157 (Ct. Cl. 1991). Thus, the LOC clause did not apply in *Raymond Constructors of Africa, Ltd. v. United States*, 4ll F.2d 1227 (Ct. Cl. 1969), where the United States Court of Claims allowed plaintiff to recover for costs it incurred in excess of the maximum cost limitation in the contract when the Government's delay in furnishing equipment caused the overrun. The Court reasoned that "maximum limitations ... 'do not ordinarily control where the contractors suffer additional costs because of the Government's fault.'" *Id.* at 1237. The LOC clause contained in the contract was not designed and did not contemplate to cover damages sustained

beyond the LOC clause. In such cases, a plaintiff, as the case here, is not seeking to get reimbursed, which is what the LOC clause bars, but rather is seeking damages, which are not limited by the LOC or any other provision of the contract. *See Ross Construction Corp. v. United States*, 183 Ct. Cl, 694 (Ct. Cl. 1968).

In *Solar Turbines, Inc. v. United States,* 392 F.2d 984 (Ct. Cl. 1991), the contract between plaintiff and the Government contained an LOC clause which placed a $55 million ceiling on the Government's liability and essentially relieved the Government of any obligation to reimburse the contractor for any costs beyond the estimated cost in the contract unless the Government was notified and consented to an increase in the contract price. When Plaintiff realized that the project was going to exceed the original estimated amount, it requested additional funding from the Government. A modification to the contract increasing its amount was negotiated but never formalized. Thereafter, the Government terminated the contract and plaintiff sought payments for costs it incurred beyond the original estimated amount arguing that the Government violated its duty of good faith and fair dealing. The United States Claims Court concluded that the LOC clause in such a case does not apply:

> [C]ontractual provisions such as the LOC clause that set a limit on potential contractor recovery of costs have been interpreted ordinarily not to control where, as here, the contractor alleges that it suffered damages above the limitation as a result of the breach of a contractual duty by the government. *See, e.g., Raymond Constructors of Africa, Ltd. v. United States,* 188 Ct. Cl. 147, 166, 411 F.2d 1227, 1237 (1969); *Breed Corp. v. United States*, 223 Ct. Cl. 702 (1980), adopting with modification 27 CCF para. 80,333 (1980).
>
> . . .
>
> Moreover, the facts of this case demonstrate that the parties herein would not reasonably have anticipated that the LOC clause would control. The LOC clause concerns cost overruns. It establishes procedures that must be followed for the contractor to receive payments under the contract in excess of the estimated cost set forth in the contract. The contractor must

> make a timely request for an increase in the estimated cost and the government must agree . . . The $55 million ceiling was already part of the contract [when plaintiff asked for additional funds] and neither plaintiff nor defendant viewed plaintiff's expenditures as reimbursable under the contract. Indeed plaintiff intended to profit through future sales of RACER units and not through recovery of additional costs and fees under the contract. Hence, plaintiff is not seeking to recover costs pursuant to the terms of the contract but rather damages stemming from the governments alleged bad faith action aimed at inducing plaintiff to spend in excess of the $55 million contractual limitation. The LOC clause here involved, worded as it is, cannot reasonably be interpreted as addressing the possibility of such a recovery.

23 Cl. Ct. at 157. (emphasis added).

In *Scherr & McDermott, Inc. v. United States,* 360 F.2d 966 (Ct. Cl. 1960), plaintiff sued to recover overhead expenses. However, the contract contained a maximum cost limitation clause which stated that "[in] no event shall the total obligation of the [Government] to the Contractor under this contract exceed . . . ($248,000.00) without prior written approval of [the Government]." *Id.* at 967. The maximum authorized cost was surpassed due to surprisingly high overhead expenses and the court concluded that plaintiff incurred these expenses because the Government failed to conduct an annual audit of plaintiff's books, as required by the contract. The court stated:

> [The] failure to audit resulted in plaintiff's inability to determine actual overhead. Consequently, plaintiff was deprived of the opportunity to make a timely request for an increase of the maximum payable. We conclude, therefore, that plaintiff was excused from the requirement of obtaining the prior approval of ICA for an increase of the cost limitation.

*Id.* at 968.

Similarly, here, Plaintiff is not seeking reimbursement for its incurred costs, but is rather seeking damages equal to the value of its contribution to the Property acquired under the

Contract, which payment it should have received under the FAR had Defendant not breached its Equitable Distribution obligation. At, or prior to close out, Defendant should have, but failed to, negotiate an Equitable Distribution of "all property produced or purchased under the contract," and its failure to do so constituted a breach of contract. This admitted breach of the Contract by the Defendant entitles Plaintiff to recover damages to compensate for its loss, which under FAR 52.232-20(h) is the value of all of its incurred costs under the Contract. The LOC clause is not a limitation of damages provision. Applying the LOC clause as such would be an improper judicial re-writing of the Contract, as the aforementioned case law clearly recognized.

The Defendants should also be estopped from relying upon, or deemed to have waived, the LOC clause. "The Government in certain situations may be estopped from denying actions relied on by others to their detriment, where such action is within the scope of its agent's authority." *American Electronic Laboratories, Inc. v. United States,* 774 F.2d 1110, 113 (Fed. Cir.1985), quoting *Breed Corporation v. United States*, 223 Ct. Cl. 702, 27 CCF para. 80, 333 at 85, 453 (Ct. Cl. Tr. Div. 1978), *adopted per curiam* 223 Ct. Cl 702 (Ct. Cl. 1980). In order to establish estoppel:

> Four elements must be present to establish an estoppel: (1) the party to be estopped must know the facts, *i.e.*, the government must know of the overrun; (2) the government must intend that the conduct alleged to have induced continued performance will be acted on, or the contractor must have a right to believe the conduct in question was intended to induce continued performance; (3) the contractor must not be aware of the true facts, *i.e.*, that no implied funding of the overrun was intended; and (4) the contractor must rely on the government's conduct to its detriment.

*Emeco Industries, Inc. v. United States*, 485 F.2d 652, 657 (Ct. Cl.1973).

In *American Electronic Laboratories*, supra, the United States Court of Appeals for the Federal Circuit held that defendant was equitably estopped from denying payment for costs

incurred by plaintiff above a Limitation of Funds Clause (LOF) where the Government's agents, including the contracting officer, induced plaintiff into continuing to perform the contract despite the fact that they knew that funds may not be available. The plaintiff notified the contracting officer and the Government that it was having funding problems and the contracting officer's technical representatives met with plaintiff to discuss additional funds. Thereafter, plaintiff notified the contract specialist that it surpassed its funding under the contract and requested additional funds. In concluding that plaintiff was induced by the Government, the Court stated that:

> The contractor was reassured repeatedly that the government had $900,000 easily available; in the seven month period from June 1979 to January 1980 'the contracting officer never discouraged [plaintiff] from performing' (citations omitted); and far from being negative and discouraging the government representations were so distinctly encouraging with regard to the $900,000 that it was not until December 20 that [plaintiff] became aware for the first time that additional funds might never be available. . . From the time that the government first learned of the impending overrun until the time that [plaintiff] finally stopped work, government representatives, including the CO, consistently induced [plaintiff] to continue its performance by making representations that the government would fund the overrun.

*Id.* at 1115. *See also Breed Corporation v. United States,* 65 F.2d 286 (Ct. Cl. 1980) (awarding damages to plaintiff, despite an LOC provision, because the "Government induced plaintiff to incur such costs in the reasonable belief that it would be reimbursed for them. By so doing, the Government waived the LOC clause limitations.").

Similarly here, the Defendant induced Plaintiff into continuing to perform when it was aware that Plaintiff had contributed all its Cost Share. Starting in late 1997 and 1998, upon the exhaustion of contract funding, the Plaintiff's President entered into discussions with Defendant regarding obtaining additional funding. In August 1998, the Contracting Officer advised

Plaintiff that Defendant might have additional funds available in order to increase funding of the Contract. (Plaintiff's Exhibit 58(f) and Trans. pp. 207-210). Additionally, on several occasions, Defendant's officials told Plaintiff not to shut down and give up on the project because additional funding was forthcoming. (Trans. pp. 214-215). Consequently, and rightfully so, Plaintiff relied on these representations and continued to invest its own money in excess of its Contract Share and the LOC clause. (Plaintiff's Exhibits 14, 15, 17 and Trans. pp. 214-216). Moreover, on February 5, 1999, Secretary of Defense Cohen in a letter to Senator Strom Thurmond stated, "we are prepared to increase funding support, subject to further negotiations." (Plaintiff's Exhibit 18 and Trans. pp. 214-216).

For over two years, Plaintiff, with the knowledge and advice of the Defendant, awaited funding and continued to invest its own money and services into the Contract. (Trans. pp. 290-291). It was not until June 13, 2000 that the Contracting Officer advised Plaintiff that "DTRA will not modify the contract to increase funding…." (Plaintiff's Exhibit 35). Defendant eventually unilaterally took possession of the property in October 2001 and did not close out the Contract until April 14, 2003. (Plaintiff's Exhibit 40).

Had Defendant advised Plaintiff in January of 1998 that no additional funding was possible and that it was closing out the contract and negotiated an Equitable Distribution, Plaintiff would have stopped investing in the Contract and would not have exceeded the LOC provisions. However, Defendant did not communicate to Plaintiff that the possibility for funding was unlikely and instead various employees of the Defendant represented that funding was imminent. Plaintiff relied on these representations to its own detriment, which the Defendant fails to acknowledge, and attempts to deprive Plaintiff of recovering the full damages rightfully owed to it.

Thus, for the reasons set forth above, Defendant's argument at trial that Plaintiff's "share of incurred costs" for purposes of limiting Plaintiff's damages to no more than Plaintiff's Cost Share under the LOC of $1,066,111.00 (Trans. p. 726) is clearly wrong. The LOC provision in the Contract merely sets a limit on the amount of money Plaintiff is obligated to invest under the Contract. It is not in any way a limitation with respect to the amount of "damages" it can receive from an Equitable Distribution of "all of the property produced or purchased under the Contract," or the damages for the Defendant's breach of the Equitable Distribution obligation.

Similarly, the Defendant's arguments concerning who had property rights in the equipment, as well as the Defendant's arguments concerning alleged Vendor's liens or the validity of the underlying debt[7] are equally inapplicable to the calculation of the Equitable Distribution and the damage analysis under Count One of the Complaint. FAR 52.232-20(h) makes no distinction concerning possessory rights, title, or who paid for it or who may have a lien with respect to the property. This provision merely concerns itself with whether it was "all property produced or purchased under the contract" and what are the incurred costs attributable to each party to the Contract. Those costs comprise all of the Property "produced or purchased under the contract" and the incurred costs of each party were conclusively established by the parties and audited by DCAA well before the initiation of this action and admitted at trial. (Trans. p. 288-289, 719 and Plaintiff's Exhibit 49, 1000, 2001).

[7] These issues are discussed under the Count Two analyses below.