**3. Plaintiff Contributed Its Cost Share Of $1,066,111.00 And The Fact That Certain Vendor's Or Employees Were Not Paid A Portion Of The Incurred Costs Is Not Relevant To That Analysis.**

**a. Plaintiff's Incurred Costs Based In Part Upon Deferred Payments To Vendors And Employees For Goods And Services Procured Under The Contract Were Proper, Legally Enforceable, And Agreed To By The Defendant.**

Plaintiff disclosed to Defendant that it was using an accrual method of accounting that reflected deferred payments to certain employees and suppliers for 26% of the value of the goods and services they provided under the Contract. Under this method, Plaintiff entered into legally binding agreements ("Agreement") with its vendors, HPM, Advance Products Corporation and Visi-Trak Corporation (hereinafter "Vendors") and employees, whereby Plaintiff would pay these Vendors or employees 74% of the invoiced costs of the goods or services and would defer payment for the remaining 26%. (Trans. pp. 688- 90, 726 and Plaintiff's Exhibit 22).

These Agreements are evidenced by Plaintiff's Exhibit 70 (p). That Agreement, dated February 5, 1997, between Plaintiff and HPM states that:

> For the first order of equipment and services, DCI will bill the government and collect seventy four percent of the cost of the equipment and services. Generally, DCI has a two week billing cycle and collects within two weeks. As soon as DCI receives its payment, DCI will pay HPM seventy four percent of HPM's billing in cash within five work days. For the second order, DCI will pay HPM on the same terms, expect that it will bill the joint venture and will pay HPM within five work days of receipt from the joint venture, not to exceed thirty days from HPM's billing date.
>
> For the remaining portion of each HPM billing (twenty six percent) relating to the two orders, DCI will give HPM an unsecured three year note. . . We will attempt to form a single debt instrument that will cover all of the payments as they are incurred, where the three year term of the note will begin on the date of the final billing from HPM. . .

Plaintiff's Exhibit 70(p) (emphasis added).

Identical agreements were signed by Defendant and sent to all of the foregoing Vendors.

Plaintiff then submitted public vouchers to the Defendant for the full invoice amount and was paid 76% of that amount. This method of invoicing was permissible under the applicable regulations and was fully disclosed to the Defendant, who acquiesced to it. (Trans. pp. 122-123 and Exhibit Plaintiff's 22). In particular this method of invoicing is proper under FAR 52.216-7 (Apr. 1984) entitled *Allowable Cost and Payment*. Subsection (b)(l) of FAR 52.216-7 entitled *Reimbursing Costs* states:

> (1) For the purpose of reimbursing allowable costs (except as provided in paragraph (2) of the clause, with respect to pension, deferred profit sharing, and employee stock ownership plan contributions), the term "costs" includes only—
>
> (i) Those recorded costs that, at the time of the request for reimbursement, the Contractor has paid by cash, check, or other form of actual payment for items or services purchased directly for the contract.

FAR 52.216-7(b)(1)(i) above, requires a contractor to pay its "costs" for items or services purchased directly under the Contract from outside Vendors *before* the contractor invoices the Government for reimbursement. However, subsection (c) of FAR 52.216-7 entitled *Small Business Concerns* ("Small Business Exception") is an exception to FAR 52.216-7(b)(1)(i) for small businesses, and states that:

> A small business concern may be paid more often than every 2 weeks and <u>may invoice and be paid for recorded costs for items or services purchased directly for the contract, even though the concern has not yet paid for those items of services.</u> (emphasis added).

Thus, the Small Business Exception (read in conjunction with FAR 52.216-7(1)(i)) allows a small business, such as Plaintiff, to invoice the Government, seek reimbursement under a public voucher for costs or items or services purchased directly for the Contract, notwithstanding the fact that it has not paid the Vendor or employee.

Furthermore, FAR 52.216-7(b)(1)(ii) states:

> When the Contractor is not delinquent in paying costs of contract performance in the ordinary course of business, costs incurred, but not necessarily paid, for [includes]
>
> . . .
>
> (B) Materials issued from the Contractor's inventory and placed in the production process for use on the contract;
>
> (C) Direct labor;
>
> (D) Direct travel;
>
> (E) Other direct in-house costs; and
>
> (F) Properly allocable and allowable indirect costs, as shown in the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts;

The foregoing subsection refers to internal costs and essentially allows a contractor, who is not delinquent in paying the costs of the Contract performance, to invoice the government for reimbursement for those costs listed in the statute, irrespective of whether the contractor has paid or not paid for the said costs. This provision applies to both large and small businesses.

As further verification of the propriety of this invoice method, neither a DCIS investigation (Plaintiff's Exhibit 58(hh)) or DCAA audits (Plaintiff's Exhibits 58(o), 58(p), 58(s) and 58(t)) ever addressed any consideration of the small business exception and its applicability to Plaintiff. Furthermore, Defendant's own documents come to the same conclusion that

Plaintiff's invoice methods were proper. (Plaintiff's Exhibit 58 (nn)). Finally, the Defendant's own expert witness admitted that Plaintiff met its Cost Share. (Deposition of Robert Petersen at p. 28, Exhibit 68).

**b. Plaintiff's Contracts With Its Vendors And Employees Created Legally Enforceable And Valid Liabilities Under The Laws Of Michigan, Ohio and New Jersey.**

The Agreements, purchase orders and invoices exchanged between Plaintiff and its Vendors, HPM (Plaintiff's Exhibit 70(p); and Defendant's Exhibits DX 03, Volume 2, C1-C8), Advance Products Corporation (Plaintiff's Exhibit 70(r); and Defendant's Exhibits DX 03, Volume 2, D1-D14) and Visi-Trak Corporation (Plaintiff's Exhibit 70(q); and Defendant's Exhibits DX 03, Volume 2, G1-G7) for the equipment and other property to be utilized in the performance of this Contract created legally enforceable valid liabilities between Plaintiff and its Vendors.

Pursuant to the General Statute of Frauds provisions in Ohio and Michigan a contract, agreement or promise which cannot be performed within one year[8] from its making is void unless that agreement, contract or promise, or a note or memorandum of the agreement, contract, or promise is in writing and signed with an authorized signature by the party to be charged with

[8] New Jersey does not require agreements of this type to be in writing as that requirement was repealed in 1995 and DCI entered into "contracts" with its Vendors after 1995. Therefore, the agreements regarding the Vendors would not fall within New Jersey's General Statute of Frauds Provision and do not need to be in writing. N.J. Stat. §25:1-5 (2005). The agreements with the Plaintiff's employees and consultants regarding the payment of their deferred compensation are similarly enforceable without any written agreement. Indeed, no evidence at all was raised at trial by the Government challenging the Plaintiff's obligations to pay the deferred compensation to its employees and consultants. (*See* Plaintiff's Exhibit 49, 1000, 2001). However, New Jersey's UCC Statute of Frauds provision with respect to Vendors is applicable to the Vendor's sale of goods to Plaintiff. See Point 3c, infra.

the agreement, contract or promise. *See* Mich. Comp. Laws §§ 566.132(1)(2005) Sec. 2(1); Ohio Rev. Code Ann. 1335.04 (2005).

The Statute of Frauds does not require the entire agreement to be in writing, but only requires that a note or memorandum of the agreement be in writing, signed by the party to be charged and have probative value demonstrating that the contract exists. *Kelly-Stehney & Associates, Inc. v. MacDonald's Indus. Products*, 693 N.W.2d 394 (Mich. 2005); *Landskroner v. Landskroner*, 154 Ohio App.3d 471 (Oh. Ct. App. 2003). The memorandum or other form of writing must contain the essential terms with certainty that can be understood from the memorandum or another form of writing. *Commercial Factors Corp. v. Zephyr Awning Corp.*, 91 N.W.2d 511 (Mich. 1958).

The agreements, purchase orders and invoices between Plaintiff and its Vendors clearly were writings evidencing the terms of their agreement and were signed by Plaintiff as the "party to be charged." (Plaintiff's Exhibits 70(p), 70(q), 70(r); and Defendant's Exhibits DX 03, Volume 2, C1-C8. D1-D14, G1-G7). It is irrelevant that the Vendors never signed these documents. These documents still created legally enforceable obligations against the Plaintiff.

The terms of the agreements and the payment terms contained in the purchase orders and invoices between Plaintiff and its Vendors clearly contain words which are words of promise or agreement or as an indication of a contract or agreement. (Plaintiff's Exhibit 70(p), 70(q), 70(r); Defendant's Exhibits DX 03, Volume 2, C1-C8. D1-D14, G1-G7). These terms indicated Plaintiff would pay the Vendors 74% of the total costs of the materials provided and the remaining 26% was to be paid at a later date. In fact, the agreements, purchase orders and invoices state that Plaintiff would issue a "debt instrument" to the Vendors memorializing the

debt and recognizing the liability that Plaintiff owed to its Vendors.[9] Additionally, each Vendor invoiced Plaintiff for the materials it supplied to Plaintiff which reflect the deferred payment plans. (Defendant's Exhibits DX03, Volume 2, C3, C8, D7.) At trial, the Court suggested that these prices invoiced by Plaintiff's Vendors were "inflated" (Trans. p. 285). However, there is not a scintilla of evidence in the record in support of this suggestion.

Based upon the foregoing, the agreements, purchase orders and invoices created legally enforceable contracts under the laws of Michigan and Ohio establishing a bona fide debt to the respective Vendor for 26% of the total purchase price of the materials supplied by such Vendor.

**c. Pursuant To The UCC Statute Of Fraud Provisions For The Sale Of Goods In Michigan, Ohio And New Jersey, Plaintiff's Contracts With Its Vendors And Employees Created Legally Enforceable Valid Liabilities.**

Notwithstanding the fact that binding legally enforceable liabilities exist between Plaintiff and its Vendors pursuant to the foregoing general Statute of Frauds provisions, the agreements, purchase orders and invoices by which the Plaintiff acquired the equipment and other tangible property in the performance of this Contract are also governed by the Statute of Frauds provisions of the Uniform Commercial Code ("UCC") of each state. The Michigan, Ohio, and New Jersey Statute of Frauds governing sales of goods are essentially the same. Mich. Comp. Laws §440.2201 (2005); Ohio Rev. Code Ann. §1302.04(2005); N.J. Stat. Ann.

---

[9] The Payment terms between Plaintiff and its Vendors stated that:

> [The Vendor] is authorized to submit partial billings at mutually agreeable milestone dates upon completion of work performed under the above workscope requirements in accordance with [the Vendor's] payment terms as outlined in its sales proposal. . ., and as further outlined in DCI's letter dated February 5, 1997 to [the Vendor] **<u>regarding issuing a debt instrument for 26% of equipment costs.</u>**

(Plaintiff's Exhibit 70(p), 70(q), 70(r); and Defendant's Exhibits DX 03, Volume 2, C1)

§12A:2-201 (2005). The requirements of the UCC Statute of Frauds, and its applicable exceptions, discussed herein, demonstrate that legally enforceable liabilities between Plaintiff and its Vendors were created and continue to exist.

**1. The Documents With The Vendors Constitute Sufficient Writings To Create Legally Enforceable Liabilities.**

Similar to the general Statute of Frauds provisions discussed above, the agreements, purchase orders and invoices were sufficient writings to create legally enforceable obligations under the UCC Statute of Frauds provisions in Michigan, Ohio and New Jersey. Mich. Comp. Laws §440.2201(1) (2005); Ohio Rev. Code Ann. §1302.04 (A)(2005); N.J. Stat. Ann. §12A:2-201(1)(2005). These provisions require that the writing or memorandum evidencing the agreement contain three elements. *Cohn v. Fisher,* 118 N.J. Super. 286, 293 (N.J. Super. Ct. 1972). First, it must evidence a contract for the sale of goods. Second, it must be signed by the party to be charged. Third, it must specify a quantity. *See Lorenz Supply Co. v. American Standard, Inc.*, 358 NW2d, 845 (Mich. 1984) (stating that the quantity of goods involved must be stated in the writing in order to satisfy the UCC). The documents at issue undoubtedly satisfy this provision. Defendant's argument that no enforceable liability was created because the Vendor's did not sign the Agreements and the purchase orders is again irrelevant. Additionally, the invoices sent by the Vendors to Plaintiff clearly acknowledge that the 26% would be paid at a later date. (Defendant's Trial Exhibits DX 03, Volume 2, C3, D1, D7, G3, G4).

In *McAusland v. Rieser*, 82 N.J. Eq. 614 (N.J. 1914) the Court of Errors and Appeals elaborated on this requirement by stating that:

> In a very large proportion, perhaps most, of the contracts of sale in everyday business there is no writing at all. When there is writing, it is often, perhaps usually, no more than the written memorandum signed by

> the party to be charged, and not by both parties. Even in large transactions, where 'bought and sold notes' are used, neither note is signed by or on behalf of both parties. We have no doubt that in ordinary commercial parlance such memoranda would be spoken of as contracts. . . We think it cannot have been the legislative intent to trammel the execution of ordinary mercantile contracts by formalities suitable rather to the most formal acts of conveyance. *Id.* at 617.

*See also, Pitts v. Monaco Coach Corp.,* 330 F. Supp 2d 918 (W.D. Mich. 2004); *Skyline Steel Corp v. A.J. Dupuis Co.,* 648 F.Supp 360 (E.D. Mich. 1986); *R.B. Sales Company v. JHS of Tennessee, Inc.,* 1996 Ohio App. LEXIS 3495 *10-11 (Ohio App. Ct. 1996).

**2. The Documents With The Vendors Were Sufficient To Create Binding Obligations Between Merchants.**

The UCC Statute of Frauds provisions in Michigan, Ohio and New Jersey provide that a binding agreement will be formed:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) [discussed above] against such party unless written notice of objection to its contents is given within ten days after it is received. Mich. Comp. Laws §440.2201(2) (2005); Ohio Rev. Code Ann. §1302.04 (B)(2005); N.J. Stat. Ann. §12A:2-201(2)(2005).

Under this "merchants exception," a legally binding contract will be formed where a confirmation of an oral contract is sent and the party receiving it fails to object within 10 days. In *Skyline Steel Corp. v. A.J. Dupuis Co.*, 648 F. Supp. 360 (E.D. Mich. 1986), the Court held that invoices sent from plaintiff to defendant constituted sufficient writing to satisfy this provision regardless of the fact that the invoices were not signed by the party against whom enforcement was sought since the invoices contained the terms of the oral agreements and

defendant failed to object to them within 10 days. *See also Huyler Paper Stock Co. v. Information Supplies Corp.*, 117 N.J. Super 353 (N.J. Super. Ct. Law Div. 1971); *Aircraft Inventory Corp. v. Falcon Jet Corp.,* 18 F.Supp.2d 409 (D.N.J. 1998) (when a transaction is between merchants a writing which is not signed by the party against whom the enforcement is sought, may nevertheless satisfy the statute if a confirmatory writing is sent that contains language sufficient to indicate that the parties reached an agreement and the party receiving the writing does not object within 10 days); *Thomson Printing Machinery Co. v. B.F. Goodrich Co.,* 714 F.2d 744 (7th Cir. 1983); *See American Parts Co. v. American Arbitration Association,* 15 N.W.2d 5 (Mich. Ct. App. 1967)*; Alarm Device Mfg. Co. v. Arnold Industries,* 417 N.E.2d 1284 (Ohio App. Ct. 1979); *Puritan Systems, Inc. v. M.G. Industries, Inc*., 1997 Ohio App. LEXIS 4758 (Ohio Ct. App. 1997) (purchase orders were sufficient to be confirmatory writings and satisfy the "merchants exception" because it put the seller on notice that the buyer believed there was a transaction based on an oral contract and did not object to the purchase order within 10 days and of receiving the confirmatory writings).

Applying the "merchants exception" to the facts at hand, Plaintiff formed legally binding Contracts with its Vendors. The Agreements and purchase orders sent by Plaintiff to its Vendors were confirmations of their agreements and evince the terms of the Agreements, including the payment methods. The Vendors received the Agreements and the purchase orders and did not object within 10 days. Rather, they performed under the terms of these "contracts" and invoiced Plaintiff. Such invoices recognized the outstanding debt of 26% owed by the Plaintiff. (Defendant's Exhibits DX 03, Volume 2, C3, D1, D7, G3, G4). Therefore, the Agreements, purchase orders and invoices created legally enforceable contracts and valid debts to the Vendors

for the 26% deferred portion of the invoiced amounts under the "merchants exception" to the Statute of Frauds.

**3. Plaintiff Admitted At Trial It Entered Into Contracts With Its Vendors.**

The UCC Statute of Frauds provisions in Michigan, Ohio and New Jersey also provide for an "admission exception" to the UCC Statute of Frauds by stating:

> A contract that does not satisfy the requirements of [the statute of frauds] but is valid in other respects is enforceable [in any of the following circumstances]:
>
> . . .
>
> If the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted. Ohio Rev. Code Ann. §1302.04(B)(2) (2005); Mich. Comp. Laws §440.2201(3)(b) (2005); N.J. Stat. Ann. §12A:2-201(3)(b)(2005) (emphasis added).

In *Steel Products Co. v. Sharon Steel Corp.,* 705 F.2d 134 (6th Cir. 1983), the Court of Appeals, applying the judicial admissions exception to Ohio's UCC Statute of Frauds provision, allowed an authorized agent to bind the company he worked for to a disputed contract because he admitted the existence of an oral contract in court. *See also Chrysler Corp. v. Majestic Marine, Inc.,* 192 N.W.2d 507 (Mich. Ct. App. 1971).

Here, at trial, the Plaintiff, the party to be charged, through its President, admitted that it entered into contracts, by way of the Agreements and purchase orders sent from Plaintiff to its Vendors for the sale of goods. (Trans. p. 281). Accordingly, regardless of the fact as to whether the purchase orders satisfied any other sections of the UCC Statute of Frauds provisions, valid

enforceable Contracts were admittedly created under this section establishing enforceable debts due to the Vendors for the 26% deferred portion of the purchase prices.

**4. Plaintiff Partly Paid For The Goods Supplied By Its Vendors And The Vendors Accepted Such Payment Thereby Creating Valid Legally Enforceable Liabilities.**

Pursuant to the "payment exception" to the Michigan, Ohio and New Jersey UCC Statute of Frauds provisions:

> A contract which does not satisfy the requirements of [the statute of frauds] but which is valid in other respects is enforceable in any of the following circumstances:
>
> . . . With respect to goods for which payment has been made and accepted... Mich. Comp. Laws § 440.2201(3)(c); Ohio Rev. Code Ann.§1302.04(C)(3); N.J. Stat. Ann. §12A:2-201(3)(c)(2005).

Here, Plaintiff partially paid 74% of the total invoiced amounts to each Vendor and the Vendors accepted such payment. Consequently, legally enforceable contracts with the Vendors for the remaining 26% of the invoice amounts were created under Michigan, Ohio and New Jersey "payment exception" to the UCC Statute of Frauds. *See Leonard v. Roth*, 130 N.W. 208 (Mich. 1911); *Cohn v. Fisher,* 118 N.J. Super. 286 (N.J. Super. Ct. 1972).

**5. Plaintiff Received And Accepted the Goods from Its Vendors Thereby Creating Valid Legally Enforceable Liabilities.**

The "goods received and accepted exception" to the Michigan, Ohio, and New Jersey UCC Statute of Frauds provisions makes clear that a valid, enforceable contract is formed between parties where goods are received and accepted by the buyer. Mich. Comp. Laws §440.2201(3)(c)(2005); Ohio Rev. Code Ann. 1302.04 (C)(3) (2005); N.J. Stat. Ann. §12A:2-201(2005) (3)(c); *see Alarm Device Mfg. Co. v. Arnold Industries*, 417 N.E.2d 1284

(Ohio App. Ct. 1979) (stating that a contract for the sale of merchandise is enforceable between parties if the buyer receives and accepts the goods, regardless of whether there is an insufficient writing to satisfy the Statute of Frauds); *R.G. Moeller Co. v. Van Kampen Constr. Co.,* 57 Mich. App. 308, 225 N.W.2d 742 (Mich. Ct. App. 1975) (stating that the Statute of Frauds is not applicable to goods received and accepted); *Huyler Paper Stock Co. v. Information Supplies Corp.,* 117 N.J. Super 353 (N.J. Super. Ct. Law Div. 1971).

Here, Plaintiff received and accepted the merchandise ordered from its Vendors, thus creating a legally enforceable contract and establishing valid debts due to the Vendors for the 26% deferred portion of the purchase price under the "goods received and accepted exception" to the Statute of Frauds, regardless of whether the Agreements, purchase orders and invoices constituted a written agreement.

**d. The Statute of Limitations Does Not Eliminate the Debt Plaintiff Owes To Its Vendors.**

Pursuant to the UCC Statute of Limitations provisions of Michigan, Ohio and New Jersey, a party has four years to recover a debt owed to it when such promise to pay was made under a contract for the sale of goods. Mich. Comp. Laws §440.2725 (2005); N.J. Stat. Ann. §12A:2-725(2005); Ohio Rev. Code Ann. §1302.98 (2006).

Defendant at trial argues that the Statute of Limitations bars the Vendors from recovering their debts owed by Plaintiff thereby eliminating any legal obligations and excusing Plaintiff from paying its Vendors. However, Defendant's argument is mistaken.

Plaintiff entered into legally enforceable contracts, as explained above, with its Vendors whereby Plaintiff would pay the Vendors 74% of the invoiced amounts and deferred the remaining 26% as debts. Plaintiff and its Vendors agreed that the repayment of these debts was

deferred until the issuance of the final invoice and then these debts were to be paid over a three-year period commencing from the final invoice. Plaintiff's Exhibit 70(p) evidences this agreement:

> For the first order of equipment and services, DCI will bill the government and collect seventy four percent of the cost of the equipment and services. Generally, DCI has a two week billing cycle and collects within two weeks. As soon as DCI receives its payment, DCI will pay HPM seventy four percent of HPM's billing in cash within five work days. For the second order, DCI will pay HPM on the same terms, expect that it will bill the joint venture and will pay HPM within five work days of receipt from the joint venture, not to exceed thirty days from HPM's billing date.
>
> <u>For the remaining portion of each HPM billing (twenty six percent) relating to the two orders, DCI will give HPM an unsecured three year note</u>. . . We will attempt to form a single debt instrument that will cover all of the payments as they are incurred, <u>where the three year term of the note will begin on the date of the final billing from HPM</u>. . .

Plaintiff's Exhibit 70(p) (emphasis added).

The final invoice was to be issued by the Plaintiff to the Vendors upon the installation and testing of the Property. These events remained possible until the Defendant closed out the Contract in April 2003. At this time, it became impossible for Plaintiff to comply with its deferred payment obligations to the Vendors and their claims against the Plaintiff accrued. The Statute of Limitations applicable to such claims does not, therefore, expire until April 2007.

## POINT II

## PLAINTIFF IS ENTITLED TO DAMAGES UNDER COUNT TWO OF THE COMPLAINT IN THE AMOUNT OF $5,955,933.32 REPRESENTING THE VALUE OF THE EQUIPMENT AND OTHER PROPERTY PLAINTIFF PROCURED UNDER THE CONTRACT THAT WAS WRONGFULLY APPROPIATED BY THE DEFENDANT

### A. The Contract Lacked Any Provision That Allowed The Defendant To Unilaterally Appropriate The Equipment And Other Property Plaintiff Procured Under The Contract, And Defendant's Rationalizations Of Government Ownership Of The Equipment And Need To Safeguard The Equipment Are Erroneous And Not Supportable By Either The Contract Provisions Or The Law.

There is no factual dispute that during the autumn of 2001 the Defendant, through its contractor, appropriated from two locations the equipment and other property (hereinafter "Property") Plaintiff had purchased or produced under the Contract and moved that Property to the Burevestnik facility in the Ukraine. There is also no factual dispute that the Property, prior to its being moved by the Defendant, was stored by Plaintiff, in Plaintiff's name, and that the Plaintiff did not consent to the Defendant moving the property. (Plaintiff's Exhibit 34). It is also not disputed that there is no express provision of the Contract that allows the Defendant to unilaterally seize this Property.

Lacking a contractual provision that specifically allowed the Defendant to appropriate Property, the Defendant tries to justify its actions on the basis that it had ownership of the equipment (Trans. p. 484 and Plaintiff's Exhibit 38) and/or it needed to protect the Property from a potential forfeiture to the Ukrainian or Moldavian governments (Plaintiff's Exhibit 32). Neither of these rationales has any merit in fact or in law.

**1. Whether The Defendant Has All Or Any Ownership Rights In The Property Is Irrelevant And Is Not A Legal Justification For The Defendant Appropriating The Property Acquired Under The Contract.**

The Defendant asserts that it has sole ownership rights in the Property and that sole ownership is what gave it the right to unilaterally appropriate the Property and to deliver it to Burivestnik. Although the Defendant's analysis of its interest is flawed, the real problem is that the relevant question is not "Who has ownership or title?" The relevant question is "Who is entitled to possession?"

The operative contract clause is H-5, subsection (a) entitled USE AND OWNERSHIP/DISPOSITION OF GOVERNMENT-PROVIDED PROPERTY, which provides:

> a. All property, equipment and materials acquired with United States (U.S.) Government funding under this Contract shall be acquired solely for the use of the joint venture, or business arrangement formed by the U.S. Contractor and the Former Soviet Union (FSU) enterprise partner in performance of the terms of this contract.

Sub-section (b) of Paragraph 5 provides in part:

> Title and ownership of all property, equipment and materials acquired with U.S. government funding under this Contract shall vest with the joint venture upon conclusion of the Contract, as determined by the Contracting Officer. Prior to conclusion of the Contract, the U.S. Contractor is accountable for said items in accordance with standard government property clauses cited under SECTION I of this contract. Title and ownership of all property, equipment and materials provided by the U.S. Contractor or the FSU enterprise partner shall be determined in accordance with the terms of the agreement between said parties.

The key language in this provision after the discussion of title is "Prior to the conclusion of the Contract, the U.S. Contractor is accountable for said items in accordance with the standard

government property clauses cited under SECTION I of this contract." Due to Defendant's oversight the government property clause was not originally incorporated into the Contract and the Defendant attempted to add it by subsequent modification to the contract,[10] but whether the correct clause was in the Contract or not, it is clear that Plaintiff was accountable for the Property and as such was entitled to sole and exclusive possession until one of two things happened: (1) the Joint Venture was formed, at which point possession and title of the Property transfers to the Joint Venture, or (2) the Joint Venture is not formed because the contract funding is exhausted and no addition funds are added or the contract is terminated, in which case possession and associated title is shared pursuant to an Equitable Distribution (see section I above).

Whoever had title at any particular point prior to delivery to the Joint Venture or Equitable Distribution is totally irrelevant. The proper analogy is to the rights of the lessee of a car or an apartment. The lessee, although not having title, is entitled to the exclusive possession of the car or the apartment, even to the exclusion of the owner/lessor (who does have title). This concept is recognized in government property clauses (*see* FAR 52.245-2 et seq) pursuant to which possession of government property is transferred to the contractor but title is not. That is the precise situation here and no matter how often the government asks the wrong question, "Who has ownership or title?", it does not change the fact that possession is the key criteria, not title. Since Plaintiff has the right to possession (whether it had any title interest or not) the appropriation of the Property was wrongful and constitutes a breach of contract that entitles the Plaintiff to damages equal to the value of the Property.

Finally, FAR52.245-2 which the Defendant relies upon for its rights to the Property acquired under the contract, only grants the government "access" to the "Government property"

[10] It should be noted Plaintiff never executed the Modification. (Plaintiff's Exhibit 58(m)).

only for "the purpose of inspecting the Government property," but provides absolutely no justification for the Defendant unilaterally removing any of the Government property. (FAR52.245-5 (f)).

**2. The Potential Confiscation Of The Property Acquired By Plaintiff Under The Contract By The Ukrainian Or Moldavian Governments Does Not Justify The Defendant's Wrongful Appropriation And Disposition Of The Property.**

Pursuant to Provision H-5 of the Contract (see section I (A) (1) above) and FAR 52.245-5(e)(2) the Plaintiff had the obligation under the Contract to possess and administer any Government property, and concomitant with those obligations, the Plaintiff was to be reimbursed by the Defendant for the costs of administration, which included the protection and preservation of the Government property (see FAR 52.245-5 (e) (2)).

When the Contract funding was exhausted sometime in 1998, the Defendant was obligated to either (1) add additional funds to the Contract so the Plaintiff could be compensated for the ongoing property administration costs, (2) closeout the Contract and dispose of the Property acquired under the Contract to FAR 52.232-20(h), or (3) authorize the Contractor to continue to property administration. Since it is indisputable that the Contracting Officer did neither (1) or (2) above, it is clear that by default the Defendant utilized the third option. Defendant by its actions and words implicitly extended the time of Contract performance and authorized the Plaintiff to continue its efforts and incur expenses related thereto.

Pursuant to that implicit direction and extension of the Contract performance period, as well as the Defendant's additional directions and requests for continuing efforts under the Contract (Trans. p. 290-291 and Plaintiff's Exhibit 58(f)), the Plaintiff, in good faith, continued to perform under the Contract, including the safeguarding of the Property acquired under the

Contract. Simultaneously with incurring these authorized expenditures, the Plaintiff sought additional funding under the Contract to continue these efforts and to continue with the balance of the SOW. Not withstanding many words of encouragement and optimism, no funding was ever added to the Contract.

At some point, almost three years after the Contract funding had expired, the Property was still being stored in the Ukraine and Moldavia. This period exceeded the permissible periods under the laws of those countries, and the Plaintiff's ability to continue to protect the Property was being compromised. The contractual solution to this problem was to add funds to the Contract to permit Plaintiff to continue to protect the Property, not to utilize an illegal action of self-help.

**B. By Reason Of The Defendant's Breach Of Contract In Wrongfully Appropriating And Disposing Of The Property Acquired Under The Contract, Plaintiff Is Entitled To Recover The Value Of All Of The Property That Would Have Been Plaintiff's Contribution To The Joint Venture.**

If the Defendant had not wrongfully appropriated and disposed of the Property acquired under the Contract, the Plaintiff would have had that Property to contribute to the Joint Venture together with other assets. The Defendant's wrongful actions deprived Plaintiff of these assets, which are valued at not less that $5,955,933.32. (Plaintiff's Exhibit 49, 1000, 2001). The Defendant challenges this award on three bases (1) the Government's cost share of $3,034,316.00 represents Government property and is not includable in Plaintiff's damages; (2) Plaintiff's cost share of $1,066,111.00 is not includable because there is no contribution by Plaintiff; and (3) Plaintiff's contributions in excess of its cost share of $2,921,653.29 are not includable because they were not authorized by the Contracting Officer.

**1. The Government's Cost Share Of $3,034,316.00 Is To Be Included In Plaintiff's Damages Because Notwithstanding The Form Of The Relationship As A Cost Share Contract It Was Really A Grant To Plaintiff.**

As suggested by both the Court and Defendant's counsel (Trans. p. 726), the contractual vehicle of a cost sharing contract was totally inappropriate for this procurement, it should have been a grant. If substance is put over form, it was a grant and not a cost share contract. Government contracts usually terminate with some deliverable benefits to the government, as opposed to a grant where there is usually only some incidental deliverable to the government, but the primary beneficiary is some third party. For example, a contract for an Aids vaccine would have the vaccine delivered to the government, while a grant for Aids research would have incidental reports delivered to the government, but the ultimate beneficiary would be the beneficiary of the grant, the public health system and Aids patients. Applying these distinctions to the present case, only incidental deliverables in the form of reports and plans were deliverables to the government (Plaintiff's Exhibit 2); the real beneficiaries were the Joint Venture and the Ukrainian people. If this was a grant and possession of the Property was given to the Plaintiff, subject to some limitations, it effectively became the Plaintiff's Property not withstanding that at any particular point in time legal title would vest in the government. It was the control of the use of the Property that was the valuable asset, not the title itself. That control was vested in Plaintiff and it was this valuable asset that was extinguished when Defendant wrongfully appropriated the Property.

**2. Plaintiff's Contracts With Its Vendors And Employees Created Valid Liabilities And With Respect To Which The Vendors Transferred To Plaintiff Good And Unencumbered Title Of All Goods.**

The purchase orders by which the Plaintiff acquired the equipment and other tangible property in the performance of this Contract are generally governed by the Uniform Commercial