Code and in particular the Sales Article (Article 2), which relates to the sale of goods. Although one might argue concerning which state law may apply, the applicable provisions of the UCC for New Jersey, Ohio and Michigan are all substantially the same. The UCC provides that, except for a very narrow exception concerning an insolvent buyer (UCC2-702), which is not applicable here, an unpaid seller is relegated to an action for money damages and can not seek to recover the goods (UCC2-701 - 2-706). Therefore, under these provisions any unpaid Vendors of the Property would retain only a cause of action against the Plaintiff, but would not have any rights in the Property.

With respect to the retention of title by a vendor of the goods or property UCC2-401(1) provides in part "Any retention or reservation by seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." There is no evidence Plaintiff gave any security interest to any Vendor, and, therefore, no Vendor has a valid title claim. Furthermore, UCC2-401(2) provides in part that " Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the delivery of the goods, despite any security interest...." Therefore, upon delivery by the Vendors, the Plaintiff received free and clear title to all the Property acquired under the Contract and no Vendor, paid or unpaid, has any claim to the Property or the proceeds from the Contract or this action.

Finally, as already discussed, the Plaintiff has produced valid purchase orders and supporting documentation that show the actual purchase price and the agreement of certain Vendors to defer a portion thereof. There is not one shred of evidence that these were not bona fide, arms length transactions that did not pass title to the Plaintiff or establish a valid debt due to the Vendor for the deferred portion of the purchase price.

## POINT III

## PLAINTIFF IS ENTITLED TO RECOVER DAMAGES WHICH RESULTED FROM DEFENDANT'S BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

During the course of the trial, Defendant admitted that it failed to negotiate an Equitable Distribution of the Property as required by 52.232-20(h), notwithstanding the fact that it recognized its obligation to do so. (Trans. p. 24, 607-608, 666). The Plaintiff also established that the Defendant, without any contractual authorization, appropriated the Property and disbursed the Property to third parties. Defendant also failed to cooperate with Plaintiff's reasonable requests to meet to negotiate a closeout of the Contract and to otherwise cooperate with Plaintiff in the administration of the Contract. (Trans. pp. 777, 846-849). These failures, individually and collectively, are breaches of Defendant's implied covenant of good faith and fair dealing, which prevented Plaintiff from achieving the reasonable expectations to be derived from the Contract.

Every contract has an implied covenant of good faith and fair dealing which is an "implied duty that each party to a contract owes to its contracting partner." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); *See also H & S Manufacturing, Inc. v. United States*, 66 Fed. Cl. 301 (Fed. Cl. 2005). The covenant applies equally to government contracts as it does to contracts between private parties. *Centex Corporation v. United States*, 49 Fed. Cl. 691 (Fed. Cir. 2001). This is necessary so that the "Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private

parties." *Yankee Atomic Electric Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997); *See also Centex, supra*. The covenant of good faith and fair dealing, therefore, prevents the government from destroying the reasonable expectations of the contracting party, *Centex*, 395 F.3d at 1304; *H & S Manufacturing, Inc.*, 2005 U.S. Claims LEXIS 210, and also prevents the government from depriving the contracting parties from the very benefits for which they contracted. *Centex*, 49 Fed. Cl. 691.

Past case law has suggested that every government official is presumed to act in good faith. *Hubbard v. United States*, 52 Fed. Cl. 192 (Fed. Cl. 2002); *Abcon Assocs. v. United States*, 49 Fed. Cl. 678 (Fed. Cl. 2001). In certain circumstances, the burden of proof requires that malice or bad faith on the part of the government party be shown. *Hubbard*, 52 Fed. Cl. at 196. In *Hubbard*, the contractor entered into an agreement with the United States Navy for the construction of a mini-storage facility at a naval air station in exchange for a percentage of revenues from the unit rentals. Plaintiff thereby proceeded to build the facility subject to the specifications of the contract and later modifications. In return, the Navy provided a Rent All Center that included a rental office and check-in/check-out area near the storage units. Sometime after the completion of construction, over vigorous protesting by Mr. Hubbard, the Navy moved the Rent All Center to a more distant off-site location because of "aesthetic reasons" and "concern for the welfare of the employees." The plaintiff brought suit against the United States arguing that the Navy's actions constituted a breach of the implied covenant of good faith. The Court noted that although the contract does not explicitly require the defendant to maintain the office in the same location indefinitely, it was reasonable to believe that Mr. Hubbard "relied on the location of the Rent All Center." The court decided that the government's reasons for moving were dubious and the evidence strongly demonstrated that the

"move was effected in bad faith, with an evident disregard, and indeed hostility to, the government's contracting partner." The court thus concluded plaintiff's reasonable expectations as to the profits of the business had been destroyed and the violation of the covenant of good faith on the part of the Navy.

In the past, clear and convincing evidence was required to overcome the presumption of good faith. *Boston Edison Co. v. United States*, 44 Fed. Cl. 167 (Fed. Cl. 2005). However, a recent Federal Claims case seems to have done away with this requirement after an extensive discussion of Supreme Court, Federal Circuit court and Federal Claims court precedents regarding the presumption of good faith and the burden of proof required to rebut that presumption. *Tecom v. United States*, 66 Fed. Cl. 736 (Fed. Cl. 2005). The *Tecom* court decided that clear and convincing evidence is only required where a party is questioning the acts of the legislative or executive branch or "the quasi-criminal wrongdoing by government officials acting in the course of their public duties." *Id.* at 768. However:

> [w]hen a government official acts under a duty to employ discretion, granted formally by law, regulation or contract, and a lack of good faith is alleged that does not sink to the level of fraud or quasi-criminal wrongdoing, clear and convincing evidence is not needed to rebut the presumption. Instead, this may be inferred from a lack of substantial evidence, gross error or the like. And when the government actions that are alleged are not formal, discretionary decisions, but instead the actions that might be taken by any party to a contract, the presumption of good faith has no application. (citations omitted) When it is not a discrete decision by one official, but a number of acts that are alleged to constitute a lack of good faith, the acts must be judged in the aggregate, and not on the basis of any particular individual's bad faith.

*Id.* at 769 (emphasis added). The court went on to quote the Federal Circuit Court *Centex* opinion noting that bad faith or clear and convincing evidence was not required and, therefore, a showing of the destruction of reasonable expectations was sufficient where the decision was not

made by someone acting in the capacity of a public official and the presumption of good faith does not apply. *Id.* at 771. The court also followed the decision of the *H & S Manufacturing* court noting that "[s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified." *Id.* at 769.

In the case at bar, the Defendant breached the implied covenant of good faith and fair dealing when it destroyed Plaintiff's reasonable expectations. Plaintiff's reasonable expectations were: (1) it would have the Property to form the Joint Venture, subject only to the Equitable Distribution pursuant to 52.252-20(h); and (2) future profits would be achieved by the implementation of the DCB Business Plan.

Since the acts of Defendant in appropriating and disposing of the Property were not in the capacity of public officials, but the actions of a party in the performance of a contract, neither bad faith, nor clear and convincing evidence is required, but rather the aggregate actions must be determined, as under *Tecom v. United States,* 66 Fed. Cl. 736 (Fed. Cl. 2005). This can be shown through the destruction of expectations or subterfuge under *Centex, supra,* 395 F.3d 1293 and *H & S*, respectively. Therefore, when the government appropriated and disbursed the Property in a manner not consistent with the provisions of the Contract and without the consent of Plaintiff, the Defendant engaged in subterfuge, and the reasonable expectations of Plaintiff were destroyed and Plaintiff was deprived of the benefits of its bargain.

Plaintiff has shown clear and convincing evidence of a breach of good faith, under the standard set by *Hubbard, supra*. Although the actions by the government in *Hubbard, supra,* were not forbidden by the contract, the court decided that they showed bad faith. Here, the Defendant's actions were not allowed by the Contract.

**POINT IV**

**PLAINTIFF IS ENTITLED TO RECOVER DAMAGES THAT RESULTED FROM DEFENDANT'S TAKING OF PLAINTIFF'S PROPERTY AND RIGHTS, WHICH TAKING CONSTITUTED A TAKING FOR WHICH JUST COMPENSATION IS DUE PLAINTIFF UNDER THE FIFTH AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES.**

The totality of the Defendant's conduct, from its admitted failure to negotiate an Equitable Distribution of "all the property produced or purchased under the Contract," to the unauthorized appropriation and disposition of that property, resulted in the Plaintiff losing valuable property interests and rights, all of which were a taking by the Defendant for which the Plaintiff was due just compensation under the Fifth Amendment of the Constitution.[11]

The Takings Clause of the Fifth Amendment provides: "Nor shall private property be taken for public use, without just compensation." *U.S. Const. Amend. V.* The goal of the Takings Clause is to "prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice should be borne by the public as a whole.'" *Norman v. United States*, 63 Fed. Cl. 231, 243 (2004).

In order to sustain in an action under the takings clause, "a claimant must establish that he was the owner of property and that some portion of the property was taken for a public purpose." *Public Water Supply District No.3 v. United States*, 133 Ct. Cl. 348, 135 F. Supp. 887,

---

[11] If, however, the Defendant deems these acts to be unauthorized acts as suggested by Defendant's Counsel, the Court must then grant Plaintiff judgment on Counts 2 and 3 of the Complaint. The acts cannot be authorized under those Counts and unauthorized under this Count. (See Trans., p. 59).

890 (1955). The Federal Circuit has established a well-settled test to determine "whether government action constitutes a taking of private property without just compensation." *Id.*

> Under the first prong of this test, the court must evaluate whether the claimant has a "property interest" that was affected by the government action. Second, once the court has determined that a property interest exists, it must determine whether a taking has occurred.

*Norman,* 63 Fed. Cl. at 244.

Lastly, if the court concludes that a taking did occur, then it must determine the amount of just compensation owed to the claimant. *Id.*

**A. Die Casters Has A Cognizable Property Interest In The Property.**

Under the first prong, the plaintiff has the burden of demonstrating that a property interests exists under the Takings Clause. *Demarco Durzo Development Co.* v. *United States*, 60 Fed. Cl. 632, 638 (2004). "Property rights include 'the rights to possess, use and dispose of [property].'" *Id. quoting Skip Kirchdorfer, Inc v. United States*, 6 F.3d 1573, 1582 (Fed. Cir. 1993). (Emphasis added). In *Turney v. United States*, 126 Ct.Cl. 202 (1953), the court determined that where plaintiff had bought surplus equipment, it was entitled to fair compensation when the government attempted to repossess said property, thus indicating that plaintiff had a property interest in the Equipment.

In the matter before this Court, Plaintiff has a property interest in "all property produced or purchased under the contract" ("Property"). Under the Contract and relevant regulations: (1) Plaintiff contributed to the costs to acquire the Property; (2) Plaintiff had exclusive possession, custody and control of the Property; (3) a portion of the Property was temporarily titled to Plaintiff; and (4) the Property was in a storage facility selected and retained by Plaintiff.

The Defendant admitted that Plaintiff had rights in the Property and that Plaintiff was entitled to an equitable distribution as required under FAR 52.232-20(h). (Plaintiff's Exhibit 35).

**B. The Government's Actions Constitute A Physical Taking In Violation Of the Takings Clause of the Fifth Amendment.**

It is well recognized that a taking occurs when the government physically occupies the property of another. *Norman,* 63 Fed. Cl. at 244.[12] "To the extent that the government permanently occupies physical property, it effectively destroys [the rights to possess, use and dispose of the property]." *Id.* at 245. An unconstitutional taking occurs when the government occupies private property by taking possession of it and thereby exclusively and permanently controlling the property, thus destroying the owner's right to possess and use the property.

The Court of Claims has made it clear that possession of equipment by the government constitutes a taking when a private individual has property interest in said equipment. *Osprey Pacific Corp v. United States*, 41 Fed. Cl. 150 ( Fed. Cir. 1998). This Court has extended this ruling to include even temporary possession. *J.D. Hedin Construction Co, Inc v. United States*, 456 F.2d 1315 ( Ct. Cl. 1972).

In *Miller v. United States*, 140 F. Supp. 789 (Fed. Cir. 1956), the Court of Claims held that the government's actions constituted a taking where plaintiff entered into a contract with the United States whereby the United States agreed to sell plaintiff fifty aircraft and plaintiff would resell the planes to third parties. The United States alleged that plaintiff's sold the planes in violation of foreign policy. Thereafter the defendant impounded ten of the aircraft, refused to return them to plaintiff, and sold them to another purchaser. The court stated:

---

[12] Note that the Court of Claims stated in *Societe Cotonniere Du Tonkin v. United States*, 171 F. Supp. 951, 959 (Ct. Cl. 1959) that it is not even necessary that one be deprived of legal title or physical possession in order there to be a taking. Substantial interference with the owner's use of the property is sufficient.

> Ten of the planes purchased had been delivered to plaintiff and by him had been made ready for delivery. These were repossessed by defendant. Plaintiff asks just compensation for their taking. He is entitled to recover just compensation.
>
> Defendant contends that there was no compensable taking under the Fifth Amendment because there was no intention to take and because the taking was not for a public use. Defendant not only repossessed the 10 planes, but it later sold them to another purchaser. The intention to take for a public use is apparent.

Id. at 11.

Similarly, in *Turney*, 126 Ct. Cl. 202, the Court of Claims held that the government's actions constituted a taking in violation of the takings clause where the United States repossessed radar equipment that it had sold to plaintiff. The court reasoned that plaintiff was permanently deprived of his ownership rights and the government confiscated the property without just compensation.

In *Seery v. United States*, 127 F. Supp. 601 (Ct. Cl. 1955), the United States appropriated the house of an United States Citizen in Austria to use it as an Officer's Club. This appropriation deprived her of her use, possession, control and right to dispose her property and thus the court found a taking. The court noted that even though the property was not in the United States when it was taken, "the Constitutional guaranty of just compensation, contained in the Fifth Amendment is applicable." *Id.* at 483.

**C. Plaintiff Is Entitled To Just Compensation.**

Just compensation serves to ensure "that the "government remunerate a deprived property owner so as to place the property owner in as good a pecuniary position as if the government has not taken his property." *Basset, New Mexico LLC v. United States*, 55 Fed. Cl. 63, 69 (Fed. Cl.

2002). In order to do this the property owner must be compensated for the fair market value of the party that they have lost as a consequence of the taking. *Id.* "Fair market value 'is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts.'" *Id.* (quoting *United States v. Cartwight*, 411 U.S. 546, 551, 93 S. Ct. 1713 (1973). In *Miller*, 140 F. Supp. 789 (Ct. Cl. 1956), the court determined that plaintiff was entitled to damages which included the amount of expenses spent working on the plane plus the amount for which the plaintiff could have sold them. It is an uncontroverted fact that the total incurred costs for the Property, as of the close of the Contract, was $5,955,933.32. (Plaintiff's Exhibit 49, 1000, 2001). At the very minimum, Plaintiff is entitled to its incurred costs which equals to 49% of the total incurred costs or $2,918,407.32 (see POINT I above). In addition, Plaintiff is entitled to $3,037,526.00, which is the balance of the damages Plaintiff suffered by not being able to contribute the Property to the Joint Venture (see POINT II above), and Lost Profits in the amount of $103,147,275.80 (see POINT V below).

## POINT V

**THE PLAINTIFF'S DAMAGES ARISING FROM THE DEFENDANT'S BREACHES OF CONTRACT AND TAKING INCLUDE THE LOSS OF ITS FUTURE PROFITS THAT IT WOULD HAVE EARNED IF THE DEFENDANT HAD NOT BREACHED THE CONTRACT AND TAKEN THE PROPERTY, THEREBY PREVENTING THE PLAINTIFF FROM FORMING THE CONTRACTUALLY CONTEMPLATED JOINT VENTURE AND SUBSEQUENT "BUSINESSES AND/OR JOINT VENTURES" AND REALIZING THE BENEFITS ENURING FROM THOSE "BUSINESSES AND JOINT VENTURES" AS MORE PARTICULARLY DESCRIBED IN THE PLAINTIFF'S DCB BUSINESS PLAN.**

The SOW specifically provided and recognized that the Joint Venture that Plaintiff was to form with the UJVP and the modernized Facility that the Joint Venture would create would "serve as the groundwork for future business and/or joint ventures". The Facility was to be the model for the establishment by the Joint Venture of other die casting facilities in the Ukraine. (Plaintiff's Exhibit 2, SOW, p. 4). These future business relationships would have a very substantial financial benefit to Plaintiff and were the sole consideration for Plaintiff entering into and making a substantial investment in this cost-sharing Contract. Plaintiff was required and did make substantial investments which included the continued development of its intellectual property that was incorporated in the design of the Equipment and its DCB Business Plan (Trans. pp. 134, 135). The fact that the Plaintiff was making this sizable investment and the Plaintiff's reliance on the receipt of the very substantial future benefits, as well as the extent of those benefits, was well documented by the Plaintiff and known to the Defendant. (Trans pp. 136, 201 and Plaintiff's Exhibits 7, 8). The loss of these substantial future benefits to the Plaintiff that were caused by the Defendant's breaches of the Contract and Taking are quantified as lost profits and illustrated and explained in detail in Plaintiff's Certified Claim,

which was submitted to the Defendant on February 25, 2004, and Mr. Frederickson's testimony at trial (Plaintiff's Exhibit 1, Vol. 1B; Trans., p. 342-348).

The calculations of lost profits as set forth in the Plaintiff's Certified Claim was derived directly from the DCB "DIE CASTERS BUREVESTNIK" BUSINESS PLAN created in September, 1997, long before any litigation between the parties was initiated or even contemplated. (Plaintiff's Exhibit 7). This DCB business plan and the projections contained therein should not be subject to the usual skepticism given most lost profit analysis, which, like those of the Defendant's experts, are usually created expressly for or at least in contemplation of litigation. This analysis that was prepared and submitted to the Defendant and third-party investment sources, puts this lost profit claim on an entirely different level then typical lost profit analysis that this Court has at times deemed not susceptible to reasonable proof or speculation in nature. (*See Standard Federal v. United States*, 62 Fed. Cl. 265, 272 (Fed. Cl. 2004)). These projections were prepared contemporaneously with the Plaintiff's solicitation of investment funds and not as an afterthought in preparation of proving damages for a litigated matter.

The issue of the award of expectancy damages and, in particular, lost profits, has been addressed numerous times by this Court and the Court of Appeals for the Federal Circuit.

As stated by this Court at page 272 in *See Standard Federal v.United States*, 62 Fed. Cl. 265, (Fed. Cl. 2004)), the United States Court of Appeals for the Federal Circuit has explained that "in the event of a breach, contract law recognizes that the promisee has three enforceable interests: <u>expectation</u>, reliance and restitution". (Emphasis added). The Court explains that the "granting of expectation damages is one method of making the non-breaching party whole" because this remedy gives the non-breaching party "the benefits he expected to receive had the breach not occurred." *Id.* citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324

(Fed. Cir. 2002). (quoting *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001) citing Restatement (Second) of Contracts § 344(a) (1981), rehearing denied (2002).

The *Standard Federal* Court then continues to state that this award of damages is "commonly referred to as giving the injured party the "benefit of the bargain". *Id.* "The principle of contract damages is that the non-breaching party is entitled to the benefits it reasonably would have received had the contract been performed, that is, profits that would have been earned but for the breach." *Id.*

With respect to expectancy damages by way of lost profits, this Court and the Federal Circuit have delineated the standard, which must be met by a plaintiff to recover lost profits. *The Globe Savings Bank, F.S.B. v. United States,* 65 Fed. Cl. 330, 345 (Fed. Cl. 2005). In *Globe Savings Bank, F.S.B. v. The United States*, this Court, citing *Energy Capital, supra,* states that the standard governing recovery of lost profits is stated as a three-part test: (1) the loss was the proximate result of the breach; (2) the loss of the profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

## A. Proximate Cause

Applying this standard to the undisputed facts, it is obvious that the failure of the Defendant to negotiate an Equitable Distribution as required under 52.232-20(h) and then its unauthorized appropriation and disposition of "all property produced or purchased under the contract" were the immediate and proximate causes that precluded the Plaintiff from forming the Joint Venture and future "businesses and joint ventures" contemplated in the SOW. Without "all

property produced or purchased under the contract" or a portion thereof resulting from an FAR 52.232-20(h) Equitable Distribution, Plaintiff was unable to formulate the Joint Venture (or even a scaled-down Joint Venture resulting from an Equitable Distribution) and, therefore, was unable to form the contemplated future "businesses and joint ventures" or achieve the projected profits therefrom Plaintiff was thus damaged in an amount equal to those Lost Profits.

Lost profits are appropriate when they are "the proximate result of the breach" and their "but for" existence is definitely established. *LaSalle Talman Bank, F. S.B. v. U.S.*, 64 Fed. Cl. 90, 98-99 (Fed. Cl. 2003). In *The Globe Savings Bank, F.S.B.*, 59 Fed. Cl. 86, 92 (Fed. Cl. 2003), *affirmed* by 65 Fed. Cl. 330 (Fed. Cl. 2005), the Court stated:

> If the [lost] profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. These are part and parcel of the contract itself, and must have been in the contemplation of the parties when the agreement was entered into.

*Id.* (quoting *Wells Fargo Bank, NA v. United States*, 88 F.3d 1012, 1023-1024 (Fed. Dir. 1996).

In *Franconia Associates v. United States*, 61 Fed. Cl. 718, 750-51 (Fed. Cl. 2004) the plaintiff, Franconia Associates, entered into mortgage contracts with a federal Governmental Agency in exchange for payment. Subsequently, Congress passed the Emergency Low Income Housing Preservation Act and placed restraints on the contract. The court held that plaintiffs' lost profits were a direct result of the government's failure to perform under the contract and the profits "would have 'accrued and grown' from the . . . termination of those agreements, 'as the direct and immediate results of [their] fulfillment'." *Id.*

## B. Foreseeability

Furthermore, it is impossible to deny that the second prong of the Lost Profit Test concerning foreseeability is also met, given the fact that the SOW specifically references that the Joint Venture would "serve as the groundwork for future businesses and/or joint ventures." It was this future expansion that was the sole reason for the Plaintiff's investment, a fact that was well documented and known to the Defendant. (See above).

As to this foreseeability prong, it is well settled that damages are foreseeable so long as they "follow[] from the breach of contract in the ordinary course of events." *LaSalle Talman Bank F.S.B.*, 64 Fed. Cl. at 98. To satisfy this prong, the Plaintiff must only prove that its injury differed, was foreseeable "and of an amount that is not beyond the bounds of reasonable prediction." *Id.*

In *The Globe Savings Bank, F.S.B. v. U.S.,* 65 Fed. Cl. 330, 348 (Fed. Cl. 2005) ("*The Globe Savings Bank II"*), the Federal Claims Court stated that since the government was aware of the fact that Globe Savings Bank, a new business, would base its profits on the government's fulfillment of its obligations and duties under the contract between the parties, Globe met its burden in proving that its losses were a foreseeable result of the government's breach. In reaching this conclusion the Court relief on the Restatement of Contracts and stated:

> A contracting party is generally expected to take account of those risks that are foreseeable at the time he makes the contract . . . The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable. It is enough, however, that the loss was foreseeable as a probable, as distinguished from a necessary, result of his breach. Furthermore, the party in breach need not have made a "tacit agreement" to be liable for the loss. Nor must he have had the loss in mind when

> making the contract, for the test is an objective one based on what he had reason for foresee.

*Id.* (quoting Restatement (Second) Contracts § 351 cmt. a).

Similarly, in *Franconia Associates v. United States, supra*, 61 Fed. Cl. at 751, the court stated that lost profits were foreseeable since it was apparent that plaintiff would lose money if it was unable to perform under the contract, which is what happened when Congress subsequently passed the Low Income Housing Preservation Act. The Court stated that "[v]irtually all of the evidence presented at trial confirms that the government should have known – and, in fact, knew – about the profit expectations that led plaintiffs to agree to the housing contracts." *Id.*

### C. Reasonable Certainty

Finally, with respect to the third prong of the lost profits test that "a sufficient basis exists for estimating the amount of the lost profits with reasonable certainty", the Court will ultimately have to weigh the validity of the Plaintiff's contemporaneously prepared DCB plan[13], prepared in contemplation of raising investment capital, verses Defendant's expert witnesses' critic of the DCB plan which was prepared eight years after the fact relying upon cursory investigations, incorrect and incomplete information and basic assumptions, and prepared solely to defend this litigation.

Looking at this third prong in more detail, the Federal Circuit has reiterated that "when a 'reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery'." *LaSalle Talman Bank F.S.B. v. United States*, 64 Fed. Cl. 90, 100 (Fed. Cl 2005); *see also Locke v. United States*, 151 Ct. Cl. 262, 267 (Ct. Cl. 1960). Thus, plaintiff's

[13] All other plans, including the DCM plan and the pre-contract plan and proposal as testified to by Defendant's witnesses Konig and Maillert, are not relevant to this analysis.

damages must only be based upon a "reasoned conclusion". *LaSalle Talman Bank F.S.B. v. United States*, 64 Fed. Cl. 90, 100 (Fed. Cl. 2005). In fact, the Federal Circuit has been lenient in the application of this prong. It has stated "when damages are hard to estimate the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank v. United States*, 317 F. 3d 1363, 1374 (Fed. Cir. 2003).

Along the same lines "[d]oubts [about reasonable certainty] are generally resolved against the party in breach . . . Damages need not be calculable with mathematical accuracy and are often at best approximate." *The Globe Savings Bank v. United States*, 65 Fed. Cl. 330, 361 (Fed. Cl. 2005) (quoting Restatement (Second) contracts § 352 cmt. a.); *see Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 55, 563 (1991) (where plaintiff's harm "is of such a nature as to preclude assessment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.")

Furthermore, it is well recognized that a "binding contract which would have resulted in ascertainable profits can satisfy the plaintiff's burden of proving lost profits with reasonable certainty." *Hiller v. Manufacturers Product Research*, 59 F.3d 1514, 1530-31, 1535 (5th Cir. 1995). In *Hiller*, the court concluded that the existence of a contract was enough to prove damages sustained by plaintiff with reasonable certainty. *Id.*

While the evidence presented at trial established that Technomet was not a new business[14] (even in relation to the die casting industries), Defendant has indicated that it will argue that Plaintiff was a new business.

---

[14] It had revenue and profits. *See* Trans. pp. 194, 195, 196 and Plaintiff's Exhibit 70(g) and (s).

While the Federal Circuit has stated that it is more challenging for a new business to establish lost profits, it has also steadfastly rejected any per se rule barring new businesses from recovering lost profits. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed. Cir. 2002); *Franconia Associates v. United States*, 61 Fed. Cl. 718, 757-58 (Fed. Cir. 2004); *International Telepassport v. Corp. v. USFI*, 89 F.3d 82, 86 (2d Cir. 1996). Any attempt by the Defendant to create a per se rule that bars new ventures from recovering lost profits is clearly erroneous. Many jurisdictions have abandoned the "new business rule" when applying the reasonable certainty prong of the lost profits test. *See MindGames, Inc. v. Western Publishing Co.*, 218 F.3d 652, 656 (7th Cir. 200); *See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 726 (10th Cir. 1993) (stating many states have abandoned a strict application of the new business rule).

The Court of Appeals in *Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) found that the trial court's award of lost profits to Energy Capital was reasonably ascertainable and not speculative regardless of the fact that Energy Capital was a new business. In that case, Energy Capital, a new corporation, entered into a contract with the Department of Housing and Urban Development. The contract essentially created a program called Affordable Housing Energy Loan Program ("AHELP") and authorized Energy Capital to give loans to owners of property. However, before Energy Capital extended its first loan the government breached the contract by canceling the program. Energy Capital brought an action for lost profits. The government argued that Energy Capital was a new business and thus, it could not provide an accurate measure of its lost profits. In rejecting the government's argument the Court stated:

> We do not agree that lost profits should be precluded as a matter of law for new ventures that have not previously been performed by a third party. Whether or not one considers AHELP to have been a "new venture" or merely an extension of Energy Capital's existing loan business, Energy Capital was required to demonstrate its entitlement to lost profits. . . While the nature of a new venture may make it difficult to recover lost profits by establishing all of the elements of the general rule, such damages are not barred as a matter of law.

*Id.* 302 F.3d at 1327. *See Independent Business Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698, 708 (8th Cir. 1997) (stating that "new businesses" are not barred from recovering lost profits); *In re Merritt Logan, Inc.*, 901 F.2d 349, 357-59 (3rd Cir. 1990); Restatement (Second) of Contracts § 352 cmt. B (stating new businesses may establish proof of lost profits with "reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises and the like."); *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1366 (7th Cir. 1996) (stating that "the weight of modern authority does not predicate recovery of lost profits upon the artificial categorization of a business as 'unestablished', 'existing', or 'new' particularly where the defendant itself has wrongfully prevented the business from coming into existence and generating a track record of profits.")

In *Mid-Am. Tablewares, Inc.*, 100 F.3d 1353 (7th Cir. 1996), whether a new venture was entitled to recover lost profits was directly in issue. The Court stated that:

> The difficulty for new businesses, as this case amply illustrates, is proving their lost future profits with the requisite degree of "reasonable certainty". Significantly, to avoid the harsh consequences that may result from an overly rigid application of the reasonable certainty" requirement, courts frequently invoke a number of modifying principles, most notably, "Where the defendant's wrong has caused the difficulty of proof of damages, he cannot complain of the resulting uncertainty" and "If the best evidence of the damage of which the situation admits is furnished, this is sufficient."

*Id.* at 1365.

Defendant has indicated that it will argue that the only two acceptable methods of proving lost profits are the "past history method" (or as the courts refer to it the "before and after" method) and the "yardstick method". However, while the foregoing methods may be the two most common methods used to calculate lost profits, "a plaintiff may [also] prove damages by a different measure tailored to the facts of the case, so long as the estimates and assumptions used rest on adequate data." *Eleven Line, Inc. v. North Texas State Soccer Ass'n. Inc.*, 213 F.3d 198, 207 (5th Cir. 2000).

Finally, the matter presently before this Court can be distinguished from *Rumsfeld v. Freedom*, 329 F.3d 1320 (Fed. Cir. 2003), where the Court rejected the plaintiff's argument for anticipated profits and fixed overhead associated with future contracts, for which plaintiff was not eligible, because it was not an approved MBR producer due to the Defendant's actions. Both the *Rumsfeld,* case, *supra,* and *Locke v. United States*, 151 Ct. Cl. 262 (Ct. Cl. 1960) in which the Freedom court distinguished from its holding, were both *sui generis* cases dealing with the failure of the contractor to qualify for future contracts due to the government's actions. In one case the court held the anticipated damages too remote and speculative (*Freedom, supra*) and in one case not too remote and speculative (*Locke*). The case before this Court is much more analogous to the *Energy Capital, supra,* 302 F.2d 1314 (Fed. Cir. 2002) case, which specifically addressed the issue of lost profits vis-à-vis a stream of revenue, as its lost profits. Furthermore, the *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996), *Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741 (1980) and *Rocky Mountain Construction Co.*, 218 Ct. Cl. 665 (1978) cases, cited in *Rumsfeld* in support of anticipated profits being remote and uncertain, were also cases involving future contracts and, therefore, not controlling with respect to the case in

hand, and were effectively overruled by the *Energy Capital* case, *supra*, which is the controlling law with respect to the award of anticipated profits.

## CONCLUSION

Defendant's (i) admitted breach of its admitted contractual obligations pursuant to 52.232-20(h) to negotiate an "equitable distribution" of the Equipment, (ii) illegal and wrongful actions of unilaterally appropriating and disposing of the Equipment, (iii) breach of its implied covenant of good faith and fair dealing, and (iv) failure to compensate Plaintiff for its taking of Plaintiff's Property, entitle Plaintiff to Judgment on:

Count One of the Complaint in the amount of $2,921,653.49.

Count Two of the Complaint in the amount of $5,955,933.32.

Count Three of the Complaint in the amount of $103,147,275.80.

Count Four of the Complaint in the amount of $109,996,640.71.

Count Five of the Complaint in the amount of $109,996,640.71.

Dated: Rockville Centre, New York
February 3, 2006

Respectfully submitted,

GOLDBERG & CONNOLLY

By: ______________________
Mitchell B. Reiter (MR-9696 )

Attorney for Plaintiff
66 North Village Avenue
Rockville Centre, New York 11570
Telephone No. (516) 764-2800
Fax No. (516) 764-2827

CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2006, the foregoing PLAINTIFF'S POST-TRIAL MEMORANDUM OF LAW was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the United States Court of Federal Claims' Local Rules, and/or the United States Court of Federal Claims' Rules on Electronic Service upon the following parties and participants:

Leslie Cayer Ohto, Esq.
U.S. Department of Justice
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Dated: Rockville Centre, New York
February 3, 2006

GOLDBERG & CONNOLLY
Attorneys for Plaintiff

By:______________________
Mitchell B. Reiter (MR-9696)

66 North Village Avenue
Rockville Centre, NY 11570
(516) 764-2800