No. 04-1113C
(Judge Susan Braden)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DIE CASTERS INTERNATIONAL, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S POST-TRIAL BRIEF

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Ulnit,
8th Floor
1100 L Street NW
Washington, D.C. 20530

March 2, 2006

Attorneys for Defendant

TABLE OF CONTENTS

BACKGROUND . . . . . 1

History of the Cooperative Threat Reduction ("CTR") Program . . . . . 1

Overview of Ukraine History and Economic Climate during the 1990s . . . . . 3

Formation of Die Casters International, Inc. ("DCI") . . . . . 5

DNA's Request for Proposals under the CTR Program: The Solicitation . . . . . 6

DCI's Proposal for Defense Conversion in Ukraine . . . . . 7

DCI's Contract with the Government . . . . . 8

Departure of Key Employees from DCI . . . . . 12

The Termination of DCI Joint Venture with Meridian . . . . . 13

DCI Failed to Consummate a Joint Venture with Burevestnik . . . . . 13

DCI's Business Plan for DCB . . . . . 14

Expiration of the Contract . . . . . 14

DCI Continued to Request a Contract Extension and Additional Funding . . . . . 15

Disposition of the Equipment Purchased by DCI Under the Contract . . . . . 16

DCI was Unable to Raise Additional Equity or Debt Capital Critical to It's Success . . 17

DCIS Investigation into DCI's Billing Practices . . . . . 19

Administrative Contract Closeout . . . . . 20

The Complaint . . . . . 21

I. DCI Failed To Establish That It Was Damaged As the Result Of The Government Breaching The Contract By Failing To Negotiate An Equitable Distribution Of The Equipment . . . . . 21

II. DCI Failed To Establish That The Government Breached The Contract By Transferring The Equipment To Burevestnik, Thereby Precluding DCI From Contributing The Equipment To The Joint Venture . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A. DCI failed to establish that the Government breached the contract. . . . . 27

B. The Government was entitled to transfer the equipment to Burevestnik . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1. The Government held legal title to the equipment. . . . . . . . . . . . 28

2. DCI had no cognizable interest in the equipment. . . . . . . . . . . . . 30

3. The equipment was in danger of being confiscated. . . . . . . . . . . 30

4. DCI was unable or unwilling safeguard the equipment. . . . . . . . 31

C. Because DCI is seeking to recover all of its incurred costs, DCI's claim is not viable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D. DCI Failed As A Matter of Fact And Law To Establish Entitlement To Lost Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IV. DCI Failed To Establish That The Government Breached The Implied Obligation Of Good Faith And Fair Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

V. The Government's Transfer Of The Equipment To Burevestnik Did Not Constitute A Takings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## CASES

Block v. United States,
66 Fed. Cl. 68 (2005) . . . . . . . . . . 35

Bluebonnet Savings Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001) . . . . . . . . . . 40

Brown v. United States,
105 F.3d 621 (Fed. Cir. 1997) . . . . . . . . . . 35

California Fed. Bank v. United States,
43 Fed. Cl. 445 (1999) . . . . . . . . . . 23, 37

California Fed. Bank v. United States ("CalFed"),
54 Fed. Cl. 704 (2002) . . . . . . . . . . 23

Chain Belt Co. v. United States,
127 Ct. Cl. 38, 115 F. Supp. 701 (1953) . . . . . . . . . . 37

Cristina Investment Corp., Inc., et al. v. United States,
40 Fed. Cl. 571 (1998) . . . . . . . . . . 44

Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc.,
213 F.3d 198 (5th Cir. 2000) . . . . . . . . . . 38, 39

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . 37

Federal Crop Insurance Corp. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . 33

G&H Machinery Company v. United States,
16 Cl. Ct. 568 (1989) . . . . . . . . . . 27

G.M. Brod & Co., Inc. v. U.S. Home Corp.,
759 F.2d 1526 (11th Cir. 1985) . . . . . . . . . . 38, 39

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . 45

Independent Business Forms, Inc. v. A-M Graphics, Inc.,
127 F.3d 698 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

J.D. Hedin Constr. Co. v. United States,
197 Ct. Cl. 782, 456 F.2d 1315 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Keene Corp. v. United States,
508 U.S. 200 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Krofft Entertainment, Inc. v. CBS Songs,
653 F. Supp. 1530 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Landmark Land Co., Inc. v. F.D.I.C.,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

L'Enfant Plaza Properties, Inc. v. United States,
3 Cl. Ct. 582 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Lester Expert Rpt., Def.'s Exh.,
1 P. 31-33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Marathon Oil Co. v. United States,
16 Cl. Ct. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

McDermott v. Middle East Carpet Co., Associated,
811 F.2d 1422 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Northern Paiute Nation v. United States,
9 Cl. Ct. 639 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 39

Schonfeld v. Hilliard,
218 F.3d 164 (2nd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Sun Oil Co. v. United States,
215 Ct. Cl. 716,
572 F.2d 786 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Transpace Carriers, Inc. v. United States,
27 Fed. Cl. 269 (1992) . . . . . 45

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . 33

Tree Farm Dev. Corp. v. United States,
218 Ct. Cl. 308,
585 F.2d 493 (1978) . . . . . 35

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . 37, 39

STATUTES

28 U.S.C. § 1491(a)(1) . . . . . 35

MISCELLANEOUS

C. McCormack, Handbook on the Law of Damages § 73 at 261 (1935) . . . . . 24

5A Corbin on Contracts § 992 (1964) . . . . . 24

3 Dobbs, Law of Remedies, § 12.4(3)(2d ed.1993) . . . . . 38, 39

Restatement (Second) of Contracts § 352 . . . . . 37

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DIE CASTERS INTERNATIONAL, INC., Plaintiff, | ) | No. 04-1113C |
| v. | ) | (Judge Susan Braden) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

BACKGROUND

History of the Cooperative Threat Reduction ("CTR") Program

Following the break-up of the Former Soviet Union in 1991, many defense enterprises in Russia's sizable military-industrial-complex were on the verge of economic collapse due to cuts in weapons manufacturing and insufficient funding to shift to non-military production. Many feared the collapse of these enterprises would lead to greater proliferation of nuclear weapons including the technology and expertise employed by them.

Congress passed the "Soviet Nuclear Threat Reduction Act of 1991" following a request by Soviet President Gorbachev for assistance in dismantling Soviet nuclear weapons. See Defendant's Exhibit ("Def. Exh.") 1, Vol. 1, Tab 5. The legislation outlined the Government's proposed cooperation regarding the "storage, transportation, dismantling, and destruction of nuclear weapons in the former Soviet republics." Id.

In November 1991, Congress authorized funding under the Nunn-Lugar Act to assist in this endeavor. See Def.'s Exh. 1, Vol. 2, Tab 34. The Soviet Nuclear Threat Reduction Act and Nunn-Lugar Act funds were expanded in 1992. In 1993 those acts evolved into the Cooperative Threat

Reduction ("CTR") program. See Def.'s Exh. 1, Vol. 1, Tab 6. The "Cooperative Threat Reduction Act of 1993" provided, among other things, support for the demilitarization of defense industries in the former Soviet Union, and the conversion of such industry and equipment to civilian purposes and uses. Id.

On October 25, 1993, the Government also entered into a cooperative agreement with the government of Ukraine regarding the elimination of strategic nuclear arms located in Ukraine and the "establishment of measures against the proliferation of nuclear weapons, and the technology and expertise related to such weapons." See Def.'s Exh. 1, Vol. 1, Tab 7. A subsequent agreement was reached on March 21, 1994, between DOD and the Ministry of Machine Building, Military-Industrial Complex and Conversion of Ukraine outlining possible assistance by DOD in the conversion of enterprises in Ukraine's military-industrial complex to non-military production facilities. See Def.'s Exh. 1, Vol. 1, Tab 10.

In May 1994, the Defense Nuclear Agency ("DNA") advertised a list of Ukraine defense enterprises considered for possible defense conversion with up to $15 million in Government assistance and requested business proposals from companies interested in "a long-term business relationship" with a Ukrainian partner and willing to "enter into a cost-sharing arrangement" with the Government. See Def.'s Exh. 1, Vol. 1, Tab 8. It also specified that Government funding "must be looked upon as seed money, and not the capital required to finance a whole venture." Id. Initial program management responsibilities were delegated to DNA. See Def.'s Exh. 1, Vol. 2, Tab 34. DNA was later renamed the Defense Special Weapons Agency ("DSWA") in early 1996. See Def.'s Exh. 1, Vol. 1, Tab 9. In August 1998, DSWA was merged into a new agency named the Defense Threat Reduction Agency ("DTRA"). See Def.'s Exh. 1, Vol. 1, Tab 11.

Overview of Ukraine History and Economic Climate during the 1990s

Ukraine declared its independence from the Soviet Union in August 1991. See Def.'s Exh. 1, Vol. 1, Tab 12, p. 4. With one of the largest landmasses in Europe and a population nearing 50 million, Ukraine was one of the most important economic components of the former Soviet Union. See Def.'s Exh. 1, Vol. 1, Tab 13, p. 1-7, and Tab 14, p. 5. Ukraine was deeply integrated into the former Soviet economy, particularly in the agricultural and defense industries and contributed substantially to the former Soviet Union's extensive military-industrial-complex. Id. Upon achieving independence, many analysts believed Ukraine was one of the best medium-term prospects for economic development of the former Soviet republics. Id. However, throughout the 1990s, Ukraine struggled to shift from a centrally planned economy to a market environment. While the Ukrainian Government quickly liberalized prices and created a process for privatization, resistance to reform within the government soon stalled the reform efforts. See Def.'s Exh. 1, Vol. 1, Tab 16.

The three years following Ukraine's independence witnessed the collapse of Ukraine's economy as mismanagement and hyperinflation devastated what once had been described as the industrial and agricultural "heartland" of the Soviet Union. Throughout the early 1990s, privatization was at a standstill, real wages plummeted, and economic output was in a steep decline. See Def.'s Exh. 1, Vol. 1, Tab 13, p. 4-7. Inflation exceeded 10,000 percent in 1993 alone. See Def.'s Exh. 1, Vol. 1, Tab 17.

In July 1994, Ukraine elected a new president who called for significant macroeconomic and structural reforms to instill financial discipline, reduce inflation, and restore economic growth. The privatization process was renewed in 1995 through the USAID sponsored "Mass Privatization Program," whose objectives were to: 1) quickly distribute ownership of state owned enterprises to

Ukrainian citizens, 2) develop capital markets, and 3) create a critical mass of privately owned enterprises capable of restructuring Ukrainian industry. See Def.'s Exh. 1, Vol. 1, Tab 20 and 21.

Ukraine, however, continued to suffer a protracted economic decline throughout most of the 1990s. During the decade from 1989 to 1999, the country's output is estimated to have declined by 54 percent including nine years of successive economic declines. See Def.'s Exh. 1, Vol. 1, Tab 22, p. 328. High inflation and unemployment, stifling debt payments, corruption and state interference in the private sector, all contributed to a poor investment climate further hindering economic development. See e.g. Def.'s Exh. 1, Vol. 1, Tab 23. In 1997 more than half of the population of Ukraine was estimated to be living below the poverty line. See Def.'s Exh. 1, Vol. 1, Tab 14, p. 6.

A brief period of stabilization in 1998 ended abruptly following the Russian financial crisis in August 1998. See Def.'s Exh. 1, Vol. 1, Tab 13, p. 4-7. Following the 1998 crisis, Ukraine defaulted on its debt to both public and private sector lenders, and the country went without significant external financial support until late 2000. Id. In 1999, the Economic Intelligence Unit business environment index ranked Ukraine 59th out of the 60 major world economies at that time. See Def.'s Exh. 1, Vol. 1, Tab 15, p. 1.

The virtual collapse of the economy followed with the steady increase in the "shadow" or unofficial economy in Ukraine. A report by the World Bank stated that 51.7 percent of Ukraine's GDP in 1996 was not reported to the government. See Def.'s Exh. 1, Vol. 1, Tab 15, p. 1-2 and Tab 24. Some estimates put the shadow economy at between 50 and 70 percent of the official reported GDP in 2000. See Def.'s Exh. 1, Vol. 1, Tab 23, p. 9.

As of 2000, business enterprises in Ukraine still faced "omnipresent bureaucracy, over-regulation, corruption, considerable legal uncertainty and stifling tax and customs structures." See

Def.'s Exh. 1, Vol. 1, Tab 23, p. 9. However, from 2000 forward, Ukraine began a slow process of stabilizing its economy and over the last three years has implemented significant and dramatic economic and legal reforms, leading to positive economic indicators across the board. See e.g. Def.'s Exh. 1, Vol. 1, Tab 13, p. 1-7 and Tab 19.

The defense industries proposed for conversion were confronted with a vast range of problems, including significant financial and logistical challenges with respect to conversion. See e.g Def.'s Exh. 1, Vol. 5, Tab 140 and 141. Many had built up huge debts, lost critical supply chains, and lacked the funding and expertise to retool their operations toward new products and markets. Id. During the 1990s, debt capital in Ukraine was scarce and prohibitively expensive; access to investment capital from strategic or portfolio investors was also severely limited by the inherent and perceived risks in the Ukrainian market. See e.g. Def. Exh. 1, Vol. 5, Tabs 143-152. The Ukrainian market during this time period was characterized by macroeconomic instability, slow progress in privatization, complex and burdensome taxes, as well as crime and corruption, among others, and investment into Ukraine was limited primarily to larger, well-established operations. Id. The Ukrainian business environment throughout most of the 1990s presented significant business challenges, including rapidly deteriorating economic conditions, rampant inflation, material and supply shortages, a large barter-based and unofficial economy, and burdensome taxes and regulation, among others. Id.

Formation of Die Casters International, Inc.

Die Casters International, Inc. ("DCI") DCI was incorporated as a New Jersey Domestic Profit Corporation on January 25, 1994. See Def.'s Exh. 1, Vol. 2, Tab 31. DCI was the result of a three-year effort by Alan Frederickson, and his previous company The BDC Group, Inc. ("BDC

Group"), to establish a viable, long-term defense conversion strategy for the republics of the former Soviet Union. See Def.'s Exh. 1, Vol. 2, Tab 32 and 37. DCI was reportedly formed for the specific purpose of pursuing a contract under the defense conversion program. See Def.'s Exh. 1, Vol. 2, Tab 38. Mr. Frederickson was listed as the sole owner and president of DCI and the BDC Group. Id., see also Tr. p. 63.

Through the BDC Group, Mr. Frederickson had submitted earlier proposals to the Government related to defense conversion efforts in the former Soviet Union, including an unsolicited $9.8 million dollar proposal submitted in December 1992, and subsequent conversion proposals in May 1994, involving plants in Belarus and Russia. See Def.'s Exh. 1, Vol. 2, Tab 27 and 33, and Tr. p. 67, 70-71.. Each proposal was unsuccessful for various reasons. See Tr. p. 67-68, 74.

DCI also submitted a $5.7 million proposal related to the potential conversion of a plant in Kazakhstan that had die casting operations. The proposal was revised in January 1995 and led to a Best and Final Offer ("BAFO") negotiation, but was ultimately rejected in mid-1995. See Def.'s Exh. 1, Vol. 2, Tabs 28A-28C, 28J and 28K.

DNA's Request for Proposals under the CTR Program: The Solicitation

On June 27, 1994, DNA released request for proposal ("RFP") No. DNA001-94-R-0084 related to its defense conversion efforts in Ukraine. See Def.'s Exh. 1, Vol. 2, Tab 34. The RFP provided, among other things, specific guidelines for submitting proposals to the Government, including contract requirements, applicable Federal Acquisition Regulation ("FAR") contract clauses, and a Statement of Work ("SOW"). Id.

The primary objective outlined in the SOW was to support the transition of "portions of

former weapons of mass destruction and military industries [in Ukraine] into private, commercially oriented industries." Id. at SOW p. 2. The SOW further described that the contract was expected to be a "first step in the eventual transformation of the enterprise into commercially viable producers of a product or products for the civilian sector." Id.

DCI's Proposal for Defense Conversion in Ukraine

On September 15, 1994, DCI submitted a $20.2 million, proposal in response to DNA's RFP, for conversion of up to three plants in Ukraine. See Def.'s Exh. 1, Vol. 2, Tabs 35-38. The Government's estimated cost-share portion under the proposal was $8.9 million with the remaining investment from DCI and prospective joint venture partners. Id. At the time, Mr. Frederickson was the sole employee of DCI. Id.

DCI's proposed business plan included: 1) die cast ventures with Meridian, the Mayak Plant ("Mayak"), and the Simferopol Fiolent Joint Stock Company ("Fiolent"); 2) a wholly-owned DCI-Ukraine sales and service subsidiary; and 3) a DCI sales and marketing organization established in Europe and North America. Id.

DNA subsequently evaluated the proposals received under the RFP, including conducting a "pre-award survey" of DCI as a prospective contractor. See Def.'s Exh. 1, Vol. 2, Tab 39. The Defense Contract Management Area Operations ("DCMAO") also audited the price proposal submitted by DCI and prepared reports dated April 11 and April 24, 1995. See Def.'s Exh. 1, Vol. 2, Tab 40A and 40B.

On June 16, 1995, DNA requested a Best and Final Offer ("BAFO") from DCI. See Def.'s Exh. 1, Vol. 2, Tab 52. DCI submitted it's BAFO proposal on June 21, 1995, for a total price of $13.5 million, of which $6.7 million was to be the Government's cost share portion under the

contract. See Def.'s Exh. 1, Vol. 2, Tab 53. DCI's revised proposal limited its focus to joint ventures with just Meridian and Fiolent. Id. Subsequent analysis and negotiations between DCI and DNA limited the DNA funded effort to just one plant, Meridian, and a total contract value of $4.1 million. See Def.'s Exh. 1, Vol. 2, Tabs 54-60.

DCI's Contract with the Government

On October 27, 1995, the United States Department of Defense ("DOD") awarded DCI Contract DNA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 ("contract"), a $4.1 million contract to assist in the conversion of the Korolev Radioprylad Plant ("Korolev"), a former Soviet military-industrial-enterprise headquartered in Kiev, Ukraine, from military to non-military production facility. See Def.'s Exh. 1, Vol. 2, Tab 61. The Korolev plant later became known as the Meridian Joint Stock Company ("Meridian"). The schedule specified the contract's term as the period extending 24 months following award, that is, through October 26, 1997. Id. at 3.

The contract was a cost sharing arrangement,[1] and specified an estimated cost ceiling of $4,100,427. Id. at 2, see also Tr. p. 107. Of that amount, DCI agreed to contribute 26 percent, or $1,066,111.[2] Id. The remaining 74 percent was the estimated cost to the Government, or

---

[1] A cost reimbursement contract specifies an estimate of the total cost expected to be expended. The purpose of specifying an estimate is to obligate the necessary funds and to establish a ceiling that the contractor may not exceed without the approval of the contracting officer ("CO"). FAR 16.303. A cost-reimbursement contract permits the payment of the contractor's allowable incurred costs only to the extent specified in the contract. Id.

[2] DCI argues that part of the "consideration" for DCI entering into the cost-sharing contract was the possibility of "future business relationships [that] would have a very substantial financial benefit to Plaintiff." See Plaintiff's Brief (Pl. Br.") at 3. However, the contract was explicit regarding the "Consideration and Payment (Cost Share)" of each party and did not include anything outside of the estimated $4,100,427 contract amount. See Def.'s Exh. 1, Vol. 2, Tab 61, p. 2. Furthermore, the defined scope, objectives and tasks outlined under the Statement

$3,034,316. Id. The "accounting and appropriation data" in the contract obligated Government funds in the amount of $3,034,316 -- the full amount of the Government's portion of the cost ceiling. Id.

The contract contained FAR 52.232-20, entitled "LIMITATION OF COST (APR 1984)," that provides in pertinent part as follows:

> (a) The parties estimate that performance of this contract… will not cost the Government more than…the Government's share of the estimated cost specified in the Schedule…
>
> (b) The Contractor shall notify the Contracting Officer in writing whenever it has reason to believe that—
>
> (1) that costs the contractor expects to incur under t his contract in the next 60 days, when added to all costs previously incurred, will exceed 75 percent of the estimated cost specified in the Schedule; or
>
> (2) The total cost for the performance of the Contract will be either greater or substantially less than had been previously estimated.
>
> (c) As part of the notification, the Contractor shall provide the Contracting Officer a revised estimate of the total cost of performance.
>
> (d) (1) The Government is not obligated to reimburse the Contractor for costs incurred in excess of… (i) if this is a cost-sharing contract, the estimated cost to the Government specified in the Schedule…" (2) The Contractor is not obligated to continue performance under this contract…or otherwise incur costs in excess of the estimated cost specified in the Schedule, until the Contracting Officer (i) notifies the Contractor in writing that the estimated cost has been increased and (ii) provides a revised estimated total cost of performing the contract…
>
> (e) No notice, communication, or representation in any form other than that specified in paragraph (d)(2) above, or from any person other than the Contracting Officer,

---

of Work likewise did not reference any additional or future business relationships anticipated under the contract or as part of DCI's consideration. Id. at 1-4.

shall affect this contract's estimated cost to the Government. In the absence of the specified notice, the Government is not obligated to reimburse the Contractor…for any costs in excess of the estimated cost to the Government specified in the Schedule, whether those costs were incurred during the course of the contract or as a result of termination.

(g) Change orders shall not be considered an authorization to exceed the estimated cost to the Government specified in the Schedule, unless they contain a statement increasing the estimated cost.

(h) If this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each.

See FAR 52.232-20, Def.'s Exh. 3, Vol. 1, Tab D2.

The Schedule also contained a paragraph entitled "USE AND OWNERSHIP/DISPOSITION OF GOVERNMENT-PROVIDED PROPERTY," which provided, in part as follows:

b. All property, equipment and materials acquired with U.S. Government funding under this contract is considered a third-party contribution which is separate and distinct from property, equipment, or materials contributed by the U.S. Contractor or the FSU partner. Title and ownership of all property, equipment and materials acquired with U.S. Government funding under this Contract shall vest with the joint venture upon conclusion of the Contract, as determined by the Contracting Officer. Prior to the conclusion of the Contract, the U.S. Contractor is accountable for said items in accordance with standard government property clauses cited under SECTION I of this contract…

Id.

Included in the contract was a Statement of Work ("SOW") prepared by DCI that outlined the scope of work under the contract as to provide capital equipment, material, training, and

business assistance/advisory services to Meridian.[3] See Def.'s Exh. 1, Vol. 2, Tab 61.

The primary objective of DCI's proposal was to "provide assistance to Meridian to support the conversion and privatization of its defense related manufacturing base to the commercial production of consumer products (primarily die cast products)." Id. at SOW p. 2. DCI proposed to accomplish the defined objectives through providing capital equipment, critically needed spare parts and supplies, technical assistance and training and ongoing entrepreneurial business consulting. Id.

More specifically, the tasks outlined in the SOW included providing:

> a) Training, investment and technical assistance to produce marketable products;
> b) Business services, patented USA technology and capital equipment;
> c) Marketing assessment and advice related to the products produced;
> d) Business development assistance and strategic planning services;
> e) Modernization of die cast production facilities through equipment purchases;
> f) Transfer of manufacturing technology appropriate for the intended commercial products and install die casting equipment and technology;
> g) Technical support in developing in-house logistics systems, quality assurance and quality control, and storage and distribution systems; and
> f) Institute necessary cost accounting and financial controls.

Id. at SOW p. 3-4.

The SOW prepared by DCI further defined the end of the effort under the contract "as the time when U.S. Government funding has been utilized."[4] Id. at SOW p. 4.

---

[3] DCI, in its Post Trial Brief, defines the scope of services outlined under the SOW as "property" whereas the SOW clearly does not make that distinction. See Pl.'s Brief at 3.

[4] DCI contends that the SOW "provided [emphasis added] that the Joint Venture ... would serve as the groundwork for future business and/or joint ventures." See Pltf.'s Brief at 3. However, the SOW did not "provide" for any future or other business relationship outside of the referenced assistance to Meridian in either the "Scope", "Objectives" or the specified "Tasks" under the SOW. DCI's representation of the SOW is inaccurate and refers to a section entitled "Continued Efforts" wherein DCI expressed its desire to leverage off of the "initial relationship" to further other business interests outside the scope of the contract. Id. Regardless, DCI has not

Departure of Key Employees from DCI

Within months of DCI reaching an agreement with Meridian, three key officers and one part–time employee of DCI resigned citing "irreconcilable differences with senior management." See Def.'s Exh. 1, Vol. 3, Tab 72. In a March 15, 1996 letter to DNA contracting officer Scott Morton, Christopher W. Maillefert, DCI Executive Vice President responsible for finance and contract administration, George P. Michaely, Secretary and Corporate Counsel, David L. Konick, a Russian speaking attorney knowledgeable of legal affairs in the Newly Independent States ("NIS"), and Robert Engh, Vice President Ukraine Operations, resigned from DCI. Id. The specific reasons listed included personnel issues, concerns with Mr. Frederickson's management ability, and concerns over how resources were being obligated and utilized in the project. Id. Mr. Maillefert's letter further explained how DCI had been effectively financing its portion of the cost-share contract through partial payments on employee salaries, and described DCI's "demonstrable lack of progress in obtaining financing," and the employees' "grave concerns about the Company's viability and ability to perform under the contract." Id.

At the end of 1996, John Mickowski, DCI's Chief Engineer and a DCI Director, also resigned citing concerns similar to those expressed in Mr. Maillefert's March 1996 letter. See Def.'s Exh. 1, Vol. 3, Tab 76A. Mr. Mickowski specifically cited "a loss of confidence in the management of DCI" and overall "doubts and concerns about [DCI's] continued viability." Id.

produced any evidence that any action or inaction on the part of the Government interfered with DCI's plans to pursue other or future business ventures during the period of performance under the contract, or up through the point at which the equipment was moved from its storage locations in Moldova and Kiev some three and a half years later. See Tr. p. 832-833.

The Termination of DCI Joint Venture with Meridian

Due to the unavailability of certain facilities at Meridian, the departure of management personnel at DCI, delays in engineering studies of Meridian's facilities, and ultimately DCI's failure to attract additional outside financing consistent with the DCM business plan, the relationship between DCI and Meridian was terminated. See Def.'s Exh. 1, Vol. 3, Tabs 93, 95-99, 101.

DCI Failed to Consummate a Joint Venture with Burevestnik

The scope of the contract changed in July 1997 from Meridian to Zavod Burevestnik ("Burevestnik"), another military industrial enterprise also located in Kiev, Ukraine, as a result of the termination of the joint venture agreement between Meridian and DCI. See Def.'s Exh. 1, Vol. 4, Tab 103. DCI signed a Protocol of Intention to form a joint venture with Burevestnik. Id. The May 30, 1997 agreement provided that DCI would contribute the equipment and services necessary to create a die casting operation, and Burevestnik would contribute the equipment and facilities at its plant in Kiev. Id. The new joint venture was to be called Die Casters Burevestnik ("DCB"). Id. On June 20, 1997, DCI signed a supplemental Protocol of Intention with Burevestnik and Technomet, Ltd. ("Technomet"), providing for Technomet's participation in the proposed DCB joint venture. See Def.'s Exh. 1, Vol. 4, Tabs 104 and 107. Shortly thereafter, DCI drafted an "Agreement on Establishing the Joint Venture 'DCB' and a 'Charter of the Joint-stock company 'DCB'". See Def.'s Exh. 1, Vol. 4, Tab 106A-106B. Despite being over eighteen months into the two year performance period under the contract, DCI did not request any additional extension of time under the contract at that time. See Tr. p. 835-836.

DCI's Business Plan for DCB

In September 1997, about one year after the award of the two-year contract, DCI submitted its official DCB business plan to DSWA for review. See Def.'s Exh. 1, Vol. 4, Tab 110 and 111. DCI's proposed contribution to DCB was new die casting machinery, state-of-the-art control systems, production and quality control management, and Western business practices. Id. Burevestnik and Technomet were to contribute "facilities, machinery, management personnel, labor, die casting expertise and a backlog of export orders." Id. DCI's business plan also included plans to raise $6.0 million in debt capital and another $2 million in equity for the joint venture. Id. As with the proposed DCM joint venture, the success of DCI's business plan was dependent on its ability to raise the additional $8 million dollars in investment capital.

By October 1997, DCI was in the process of shipping the equipment that had been purchased under the contract to Kiev and Tiraspol, Moldova. However, formalization of the joint venture stalled while awaiting DCI's efforts to obtain additional financing necessary to complete facility renovations and install the equipment at the Burevestnik plant. See Def.'s Exh. 1, Vol. 4, Tabs 115-117.

Expiration of the Contract

On October 8, 1997, DCI formally requested a "No-Cost" extension of the contract through January 1998. See Def.'s Exh. 1, Vol. 4, Tab 118. DCI claimed to have $299,282 remaining to be billed under the contract and projected that it could have the equipment installed and running by January 1998. Id. Pursuant to the terms of the contract, the period of performance was to expire 24 months from the date of the contract, which would have been

October 27,1997. See Def.'s Exh. 1, Vol. 2, Tab 61, p. 3, and Tr. p. 772. DSWA executed a modification to DCI's contract on November 21, 1997, granting an additional three-month period of performance through January 30, 1998. See Def.'s Exh. 1, Vol. 4, Tab 120, and Tr. p. 772. By January 12, 1998, DCI had made no additional progress toward completing it's performance under the contract, and requested a second "No-Cost" contract extension through April 1998. See Def.'s Exh. 1, Vol. 4, Tab 122, and Tr. p. 530-531. DCI's reason for the requested extension was a lack of sufficient funds to properly prepare the Burevestnik plant for the installation of the equipment. Id. As of December 28, 1997, DCI had invoiced the Government for $3,990,128, or over 97 percent of the funds provided under the contract. Id.

The contract period of performance expired on January 30, 1998 with no further contract extensions. See Tr. p. 212-213, 776.

DCI Continued to Request a Contract Extension and Additional Funding

DCI continued to request a further extension of the contract to allow it the opportunity to raise an additional $500,000 for plant preparation and equipment installation, and various other start-up costs. See Def.'s Exh. 1, Vol. 4, Tabs 123-124. By mid-1998, DCI turned it's attention for additional funding to the Government, and submitted a proposal to DTRA on August 18, 1998, outlining its needs for $500,000 to "complete the project." See Def.'s Exh. 1, Vol. 4, Tab 125.

DCI revised its request for funds to $730,000 in October / November 1998, including the request that the funding be provided as a grant versus the cost-sharing arrangement under the original contract. See Def.'s Exh. 2, Vol. 1, Tab 1, and Pl.'s Exh. 14.. DCI subsequently met with DTRA in early 1999 to discuss the request and the proposed use of the funds. See Def.'s Exh. 1,

Vol. 4, Tab 126. DCI continued to request additional funding from the Government throughout 1999 and into 2000. However, the CO never told DCI that additional funds would be added to the contract. See Tr. p. 776-777, and Def.'s Exh. 1, Vol. 4, Tab 127.

On June 13, 2000, the CO informed DCI that "the Government will not modify the subject contract to increase funding." See Def.'s Exh. 1, Vol. 4, Tab 129. This was further reiterated in a subsequent letter on June 16, 2000 where the CO clarified that it had been determined that "no further funding will be provided to DCI by any financial instrument, to include contract, grant, or other transaction." See Def.'s Exh. 1, Vol. 4, Tab 130.

Disposition of the Equipment Purchased by DCI Under the Contract

The period of performance under the contract expired on January 30, 1998, with virtually all of the contract funds having been disbursed. See e.g. Def.'s Exh. 1, Vol. 4, Tab 122. While DCI had failed to accomplish the formation of a joint venture with Burevestnik, DCI had purchased equipment for the contract using Government funds. DCI shipped some of the die casting equipment to Litmash in Moldova for the purpose of modifying the equipment for use in the Burevestnik facility. See West Decl., Pl.'s Exh. 58u. Other equipment was in storage in a warehouse in Kiev.

DCI notified DTRA that Moldovan customs intended to confiscate the equipment because it had been retained in Moldova for a period longer than permitted under a temporary import license and that it (DCI) had no funds available to ship the equipment on to Burevestnik. See e.g. Def.'s Exh. 231-233, 236. DCI also informed the Government that it (DCI) lacked funds to pay outstanding storage fees to the Kiev warehouse. See e.g. Def.'s Exh. 234-235, 237, and Pltf.'s Exh. 17. Given DCI's lack of available funds, DCI was unable to take any further action

with regard to the equipment and it remained in storage until 2001.

In July 2001, the Government stepped in and informed the Ukrainian government that it intended to release the equipment in Kiev to it and to initiate a sale of the equipment located in Moldova. See Def.'s Exh. 1, Vol. 4, Tabs 133-134. In response, the Ukrainian government questioned the intent to sell the equipment located in Moldova, and requested further discussion. See Def.'s Exh. 1, Vol. 4, Tab 135. The Government acquiesced and agreed to pay the outstanding storage fees and customs fines and ship the equipment to Kiev from Moldova. See Def.'s Exh. 1, Vol. 4, Tab 136.

In November 2001, the Ukrainian government further requested that the Government ship the equipment to Burevestnik, and to consider providing an additional $730,000 in funding to have the equipment installed. See Def.'s Exh. 1, Vol. 4, Tab 137. In late 2001, the Government's logistical contractor, Raytheon Technical Services Company, shipped to Kiev the equipment, that had been stored in Kiev, and in Tiraspol, Moldova, that had been purchased by DCI with contract funds, where it was later installed at Burevestnik. See e.g. Def.'s Exh. 1, Vol. 4, Tab 138.

The Government paid to ship the equipment from Moldova to Ukraine and paid Litmash the amounts it was due under its contract with DCI. See e.g. Def.'s Exh. 212, Tab 16-17. The Government also paid the warehouse in Kiev what is was owed for storage. Id.

DCI was Unable to Raise Additional Equity or Debt Capital Critical to It's Success

DCI's business plans were entirely dependant upon raising outside capital.[5] See Def.'s

[5] DCI contends that from the beginning of the contract it was understood there would be a need for additional funding and "that this funding was to come from either outside investment or, in the alternative, from the United States Government increasing its Cost Share

Exh. 1, Vol. 6, Tabs 153-156. Besides the economic, industry, and business challenges faced by DCI, DCI lacked the ability to obtain debt and/or equity capital from any financial or investment source.[6] See Def.'s Exh. 1, Vol. 6, Tab 153, Tr. p. 202-205. Credit availability in the private debt sector of Ukraine was scarce throughout the 1990s, and what was available was typically short-term and prohibitively expensive. See Def.'s Exh. 1, Vol. 6, Tab 157 and Vol. 1, Tab 13. Credit availability from private equity sectors was also scarce; DCI's risk profile severely limited interest from major sources of equity investment capital actively funding projects in Ukraine during this period. The challenges faced by DCI in raising additional capital were numerous and included the following: DCI did not have a legally established joint venture with its Ukrainian partner, see e.g. Def.'s Exh. 1, Vol. 4, Tab 125; the proposed DCB joint venture was effectively a start-up business, see e.g. Def.'s Exh. 1, Vol. 4, Tab 35, and Tr. p. 203; the proposed joint venture did not have established operations with a track record of manufacturing, sales and effective management, see e.g. Def.'s Exh. 274, and Tr. p. 204-205; DCI and its principals had

---

under the Contract. See Pl.'s Brief at 4. However, DCI has provided no evidence that additional funding from the Government was contemplated by the Government at either the beginning of the contract or at any time during the period of performance under the contract. In fact, throughout the period of performance under the contract, DCI continued to represent its ability to meet the contract requirements without additional funding from the Government including making two requests for "no-cost" contract extensions. See Def.'s Exh. 1, Vol. 4, Tab 118 and Tab 122, see also Tr. p. 530-531. Furthermore, DCI acknowledged that the Government had no obligation to provide additional funding under the contract. See e.g. Frederickson Deposition, Def.'s Exh. 373, p. 53.

[6] DCI alleges that the Government, "through its actions and inactions, blocked or otherwise obstructed the efforts DCI made to acquire additional funding, and thereby guaranteed the ultimate inability of the DCI to complete the SOW." See Pl.'s Brief at 4. However, DCI testified at trial that no act or omission on the part of the Government negatively impacted DCI's ability to raise investment capital during the period of performance under the contract. See Tr. p. 832-833.

no demonstrated successful track record of operating in the die casting industry; the new die casting equipment had not been installed or tested, and the work force had not been trained on its use, see e.g. Def.'s Exh. 1, Vol. 6, Tab 239; DCI did not have any capital or cash to put into the operation, and therefore had little tangible risk in the project, see e.g. Def.'s Exh. 17 and Def.'s Exh. 1, Vol. 6, Tab 237; DCI was effectively insolvent during the contract, with significant outstanding liabilities, and the inability to pay its debts as they came due, see e.g. Lester Expert Rpt., Def.'s Exh. 1, p. 31-33; DCI's proposed joint venture partners were not in good financial standing, see e.g. Def.'s Exh. 1, Vol. 6, Tab 248-250; and DCI had no guaranteed source of revenues, including contract orders, or strategic relationships with potential customers.

Despite attempts to solicit interest from over 40 different potential investors, DCI failed to obtain even sufficient capital to meet its cost-share portion under the contract. See Def.'s Exh. 1, Vol. 6, Tabs 158-164, 166-223, 224-246.

DCIS Investigation into DCI's Billing Practices

In October 1997, shortly before the expiration of the contract period of performance, the Defense Criminal Investigative Service ("DCIS") initiated an investigation into concerns expressed by the Defense Contract Audit Agency ("DCAA") regarding DCI's compliance with the cost sharing provisions of the contract.[7] See e.g. Def.'s Exh. 331. The DCAA questioned DCI's practice of

---

[7] DCI further alleges that the Government "blocked or otherwise obstructed the efforts DCI made to acquire additional funding" by preventing the DCI from attracting outside investment as a result of the DCIS investigation. See Pltf.'s Brief at 4. However, DCI did not even become aware of the DCIS investigation until June 1998, some five months after the period of performance under the contract had expired. See Frederickson Dep., Def.'s Exh. 372, p. 91. There is also no evidence to support the assertion that any private investor or financial institution was aware of the DCIS investigation prior to June 1998. Id. at 92-93. Furthermore, it is well established that DCI had all but stopped looking for additional funding from sources other than the Government before June 1998. See e.g. Def.'s Exh. 1, Vol. 6, Tab 263 (April 17, 1998: "I

submitting public vouchers for the full wages earned by employees and amounts invoiced by subcontractors, including DCI's 26 per cent cost share, when in fact DCI was only paying employees and subcontractors 74 per cent of these amounts.[8] Id. The 26 per cent of the labor and subcontract costs were submitted to the Government by DCI as incurred costs when in fact the costs had not been paid. Id. DCI subsequently became aware of the DCIS investigation when it was served with a subpoena in June 1998. See Def.'s Exh. 333, and Frederickson Dep., Def.'s Exh. 372, p. 91. The DCIS investigation was subsequently closed on March 13, 2000 as a result of the United States Attorney's office lack of interest in "pursuing the investigation due to lack of company [DCI] assets." See Pltf.'s Exh. 58(hh).

Administrative Contract Closeout

The contract was administratively closed on April 14, 2003. See Def.'s Exh. 1, Vol. 4, Tab 131-132. The CO made no modifications to the contract following the no-cost extension granted by modification P0002. See Tr. p. 370, 508-509. The CO never increased the estimated cost specified in the contract. See Tr. p. 370, 508-509. The CO did not increase the percentage of allowable costs the Government would reimburse DCI. See Tr. p. 370, 508-509.

DCI's vouchers reflected its total billings under the contract for the applicable periods as

---

believe that government funding is the only plausible means to raise the $500,000 we need..."

[8] DCI alleges that as early as the pre-award survey it disclosed to the Government that it was utilizing certain "deferred payment arrangements with suppliers and employees for 26 per cent of the costs of goods and services they provided under the Contract." See Pl.'s Brief at 5. However, not only was the pre-award survey over six months before the contract was actually awarded, the documentation cited in support of the assertion makes no mention of DCI's alleged deferred payment arrangement. See Def.'s Exh. 1, Vol. 2, Tab 39. On the contrary, the pre-award survey concluded that DCI did not "have the resources to finance the proposed award" and recommended that the contract not be awarded to DCI. Id.

follows: $97,897 for 1995; $737,719 for 1996; $3,154,512 for 1997; and $110,299 for 1998. The total amount billed was $4,100,427. Peterson Expert Report, Def.'s Exh. 3, Vol. 1, Tab 4. Of that amount, the Government reimbursed DCI in the total amount of $3,034,316, the full amount of the Government's portion of the cost ceiling, and the maximum amount the Government was required to reimburse DCI under the contract.

The Complaint

DCI in its complaint alleged that the Government breached the contract in the following ways: 1) the Government failed to negotiate an equitable distribution of the equipment, Count 1 ($3.5), see Complaint (Comp.") ¶ 6-7; 2) the Government transferred the equipment to Burevestnik, thereby precluding DCI from contributing the equipment to the JV, Count 2 ($7M), see Comp.¶ 7-8; 3) the Government transferred the equipment to Burevestnik, Count 3 ($103M), see Comp. ¶ 9; 4) the Government breached the implied obligation of good faith and fair dealing by transferring the equipment to Burevestnik, Count 4 ($110M, see Compl. ¶ 9-10; and 5) the Government's transfer of the equipment to Burevestnik constituted a takings, Count 4 ($110M), see Compl. ¶ 10.

## I. DCI Failed To Establish That It Was Damaged As the Result Of The Government Breaching The Contract By Failing To Negotiate An Equitable Distribution Of The Equipment.

At trial, the Government admitted that the contracting officer technically breached the contract by failing to negotiate an equitable distribution of the equipment.[9] See Tr. p. 24. The

[9] If the CO had insisted that negotiations be held to arrive at the fair and reasonable distribution of the property, the result of such negotiations, based upon the evidence in the record, would have been a CO's final decision that DCI was not entitled to any share of the value of the property at issue because DCI had not contributed any of its own funds towards its purchase, and had failed to establish that any of the vendors had a legally cognizable interest in

applicable contractual provision provides as follows:

> (h) If this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution of all property . . . purchased under the contract, based upon the share of costs incurred by each. FAR 52.232-20, LIMITATION OF COST [10]

The Government admitted that a breach occurred when the CO failed to insist that the parties negotiate an equitable distribution of the equipment.[11] See Tr. p. 24. While it is not clear when the breach occurred, the earliest date would have been when the decision was made by the CO not to add funds to the contract in June 2000, see Def.'s Exh. 1, Vol. 4, Tab 129; and at the latest, when the CO closed the contract in April 2003. See Def.'s Exh. 1, Vol. 4, Tabs 131-132.

The Government asserted and demonstrated at trial that the term "property" includes the invoiced amount plus the value of the engineering incorporated into the property (the "intellectual property" component of the equipment).[12] See Tr. p. 25. DCI did not dispute the

---

the property, the same issues that were litigated during the trial of this matter.

[10] DCI alleged that the breach occurred when the contract was "terminated" upon the removal of the equipment from Moldova and from the Kiev warehouse. The contract, however, was never terminated.

[11] For the purposes of this brief, the terms "property" and "equipment" are used interchangeably to refer to the die casting equipment purchased by DCI with funds provided by the Government pursuant to the contract.

[12] The Government's use of the term "property" was consistent with the definition contained in FAR 45.101, entitled "Government Property". See FAR 45.101, Def.'s Exh. 3, Vol. 1, Tab E1. The definition of property as both "real and personal" that "includes facilities, material, special tooling, special test equipment, and agency-peculiar property" was specific to both "government-furnished property" as well as "contractor-acquired property" - further defined as "property acquired or otherwise provided by the contractor for performing a contract and to which to the Government has title" [emphasis added].

appropriateness of the Government's definition.[13]

Since the goal of the law is to make DCI "whole," not to put DCI in a better position than DCI would have been but for the breach, DCI can only be awarded that amount for which DCI proved it is legally liable. The sole issue at trial concerning this issue was whether DCI had established that it, or any of the vendors, had a legally cognizable interest in the property.

A plaintiff must prove that damages allegedly resulting from the Government's breach of a contract "was attributable solely to, and was therefore directly caused by, the [breach]." J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 456 F.2d 1315, 1330 (1972). See also Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) ("[T]he plaintiff can only recover those items of damage which are the proximate result of the acts of the Government. . . . For damages to be direct there must be no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably."); see also, Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353, 356 (1951), quoting Myerle; California Fed. Bank v. United States ("CalFed"), 54 Fed. Cl. 704, 711 (2002). The decision in Krofft Entertainment, Inc. v. CBS Songs, 653 F. Supp. 1530 (S.D.N.Y. 1987), is instructive. In Krofft, plaintiff claimed that CBS's breach of a licensing agreement caused it to be unable to obtain financing to produce a Broadway play. CBS maintained that there could be no causation if it established that, even if it had not breached the

[13] DCI's contention at trial that the Government Property clause (Part 45) was inapplicable to other FAR provisions, including the Limitation of Cost Clause (Part 52), see Tr. at 724-725, is wholly unpersuasive. The Government Property clause, in fact, prescribes policies and procedures for providing Government property to contractors and for contractors' use and management of Government property, and was applicable to the property acquired by DCI under the contract because the Government held title to the property from the moment it was purchased with Government funds. See FAR 45.101, Def.'s Exh. 3, Vol. 1, Tab E1.

license agreement, Krofft would still have been unable to obtain financing. The district court agreed. In addressing the law of causation, the district court cited C. McCormack, Handbook on the Law of Damages § 73 at 261 (1935), for the proposition that, in a breach of contract case, a breaching party's act or omission ordinarily can only be considered a "substantial factor" in causing the damage "where the damage would not have occurred 'but for' the alleged wrongful act or omission . . . " Id. at 1534. Similarly, the court cited 5A Corbin on Contracts §§ 992 at 6-7, and 997 at 21 (1964), for the proposition that "[i]t must be shown that but for the breach" the damages would not have been incurred. Id. "Corbin concludes that a plaintiff cannot charge the other party with losses and disappointments that would have occurred in the absence of any breach by the other party, since such losses were 'not caused by the other party's breach of duty.' Id. § 992 at 6." Id.

DCI failed to present a scintilla of evidence in support of its contention that this Court should award it $3,500,000 in damages for this breach. DCI, in fact, offered no evidence or argument that countered the Government's demonstration that the maximum amount DCI could recover was 26 percent of the total of the invoiced amounts ($2.3 million), plus the "intellectual property" component ($136,000),[14] and that the minimum amount was 26 percent of the fair market value of the equipment at the time of distribution should have occurred. DCI presented no credible evidence that the Government was the cause of DCI's inability to raise investment capital, the linchpin of its business plan, and the sole reason, according to DCI, that it was

[14] The $136,000 figure is based upon the following evidence: See e.g. Peterson Expert Rpt., Def.'s Exh. 3, Vol. 1, Tab 7 and 9, and Def.'s Exh. 1, Vol. 6, Tab 275.

unable to move the equipment.[15] Since it was undisputed that DCI contributed none of its own funds towards the purchase of the property,[16] the maximum amount that DCI could recover was the current amount of DCI's liability to the vendors from whom the equipment was purchased.

As demonstrated by the summary of the evidence contained in the following chart, which evidence was unrebutted by any trial testimony or documentary evidence, DCI failed to demonstrate that DCI had any liability, let alone current liability. to the vendors from whom the equipment was obtained.

| **Vendor** | **Cost $1000K** | **Paid $1000K** | **Owed $1000K** | **Notes** | **Executed** | **Term** | **Payment Due** | **Payment Made** | **Locations Involved** | **Statute of Limi.** | **Liability** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Litmash | $318 | $251 | $67 | No | No | 3yrs. | 9/30/97 | None | NJ /Mold. | 4 yrs. | None |
| Binom | $337 | $326 | $10 | No | No | n/a | n/a | n/a | n/a | n/a | None |
| HPM | $1,142 | $831 | $310 | Yes | No | 3 yrs. | 9/30/97 | None | NJ / OH | 4 yrs. | None |
| APC | $388 | $287 | $101 | Yes | No | 3yrs.s | 9/30/97 | None | NJ / MI | 4 yrs. | None |
| Lindberg | $117,613 | $87,305 | $30,308 | No | No | n/a | n/a | n/a | n/a | n/a | None |
| Tymac | $114 | $100 | $13 | No | No | n/a | n/a | n/a | n/a | n/a | None |

The evidence at trial irrefutably supported the Government's position that DCI had no cognizable interest in the equitable distribution of the equipment purchased with the funds provided by the Government under the contract. Moreover, DCI failed to establish that the

---

[15] DCI, in fact, absolved the Government of any blame for DCI's inability to raise investment capital during the period of performance under the contract. See Tr. p. 832-833. The only evidence offered by DCI was the loss of potential funding from the Department of Energy ("DOE"). See Tr. at 268-270, and Pl.'s Exh. 70(n). However, it was clearly established that no action or inaction on the part of the Government prevented the DOE from providing funds to DCI under a separate contract. See Tr. at 268-270, and Pl.'s Exh. 70(o).

[16] Specific documents establishing that DCI contributed none of its own funds towards the purchase of the equipment includes the following: See e.g. Tr. p. 120-122, 595-596 and 757, Pl.'s Exh. 38, and Peterson Expert Rpt., Def.'s Exh. 3, Vol. 1, Tab 3.

vendors from whom the equipment was purchased had a cognizable interest in the property.[17]

The following facts were virtually undisputed: 1) since DCI had no funds to pay its 26 percent share of the purchase price, DCI's cash contribution towards the purchase of the equipment was zero, see e.g. Tr. p. 120-122, 124; 2) DCI required that the vendors accept 74 percent of the purchase price, that is, the Government's share, see e.g. Tr. p. 120-121, 166, 174; 3) in some cases, DCI executed notes to the vendor for 26 percent of the purchase price, Id., see also Tr. p. 167-168, 170; and Def.'s Exh. 282, 293-297. 4) in the eight years since the equipment was purchased, not a single vendor has instituted a lawsuit to recover on its note, see e.g. Tr. p. 853; 5) in the eight years since the equipment was purchased, not a single vendor has requested that DCI submit a pass-through claim to the Government; and 6) the expiration of the statute of limitations precludes the vendors from recovering on their notes even if they had them; 7) DCI produced no documents generated after the equipment was purchased that evidenced DCI's intention to pay the vendors or that evidenced that the vendors were demanding payment from DCI, see e.g. Tr. p. 170-171, and 851-854; and 8) DCI made no attempt to elicit testimony from any of the vendors by way of affidavit, deposition testimony, or trial testimony regarding whether they had a financial interest in the equipment.

Given that it is beyond cavil that DCI's cash contribution towards the equipment was zero, DCI's net gain, therefore, should be zero.

---

[17] DCI made only a fainthearted attempt, at best, to establish that the vendors had a financial interest in the equipment. In fact, it was the Government that contacted the vendors in an attempt to determine whether any of them had an enforceable right against DCI to collect the 24 percent of the value of the equipment that they purportedly financed.

## II. DCI Failed To Establish That The Government Breached The Contract By Transferring The Equipment To Burevestnik, Thereby Precluding DCI From Contributing The Equipment To The Joint Venture.

In Count two of its complaint, DCI alleged that it incurred $7,000,000 in damages as the result of the Government breaching the contract by transferring the equipment to Burevestnik, thereby precluding DCI from contributing the equipment to the joint venture. See Compl.¶ 7-8. DCI's contention has no legal or factual merit.

### A. DCI failed to establish that the Government breached the contract.

In a breach-of-contract case, the plaintiff bears the burden as to all elements of the claim. See G&H Machinery Company v. United States, 16 Cl Ct. 568, 571 (1989) ("The burden of proof stands as a threshold question. If the claimant fails to carry the burden of proof then, even in the absence of opposing evidence, he cannot recover on a breach of contract claim.").

In support of its contention that the Government breached the contract by moving the equipment to Burevestnik, DCI relies upon the following contractual provisions:

> Schedule, Section H, 5, a. All . . . equipment . . . acquired with . . Government funding . . . shall be acquired solely for the use of the joint venture . . . formed by the [DCI] and the Former Soviet Union (FSU) enterprise partner . . . .
>
> Schedule, Section H, 5, b. Title and ownership of all . . .equipment . . . acquired with . . . Government funding . . . shall vest with the joint venture upon conclusion of the Contract, as determined by the [CO]. Prior to the conclusion of the Contract, [DCI] is accountable for said items in accordance with standard government property clauses cited under SECTION I of this contract. Title and ownership of all . . . equipment . . . provided by [DCI] or the FSU enterprise partner shall be determined in accordance with the terms of

> the agreement between said parties.

There is nothing in Section H, 5, a of the Schedule ("Clause a") that imposes a duty upon the Government. Clause a prohibited DCI from using Government funds to acquire property that was not intended solely for the use of the joint venture. Similarly, there is nothing in Section H, 5, b of the Schedule ("Clause b") that imposes a duty upon the Government. Clause b simply provides that title to the property acquired under the contract would vest in the joint venture. Because the joint venture was never formed, this clause never became operative. Since neither Clause a nor Clause b imposed a duty upon the Government, Count Two of the Complaint is, as a matter of law, not cognizable.

B. <u>The Government was entitled to transfer the equipment to Burevestnik.</u>

In deciding to transfer the equipment to Burevestnik, the Government did not breach the contract. That decision fully comported with both the contract and the underling purpose of the Defense Conversion Program. Under the circumstances, moreover, that decision was both necessary and reasonable. DCI's position to the contrary is not tenable as a matter of law and as a matter of fact.

1. <u>The Government held legal title to the equipment.</u>

Nothing in the contract supports the proposition that DCI had, or would ever have, title to the equipment.

The contract provided as follows:

> Schedule, Section H, 5,b: Title . . .of all . . . equipment . . . acquired with Government funding . . shall vest with the joint venture upon conclusion of the Contract, as determined by the CO . . . .

Clearly, it was the CO's responsibility to determine if, and when, title to the equipment would vest in the joint venture. Unless the Government held title to the equipment, the Government would not have the legal ability to transfer title.

In addition, Schedule, Section H, 5, b provided as follows:

> Prior to the conclusion of the Contract, . . . [DCI] is accountable for [the equipment] in accordance with standard government property clauses cited under SECTION I of this contract …

If DCI held title to the equipment, the contract could not hold DCI accountable for the equipment and could not dictate that DCI had to maintain the equipment.

Moreover, Schedule, Section H, 5, b provided as follows:

> All . . . equipment . . . acquired with Government funding . . . is considered a third-party contribution which is separate and distinct from . . . equipment . . contributed by [DCI] or the FSU partner.

The contract clearly stated that the value of the equipment could not count towards DCI's contribution of capital to the joint venture. The equipment was solely a contribution by the Government to the joint venture. The clear implication is that the Government held title, and not DCI.[18]

Finally, FAR 52.245-5. 1 (e)(2), incorporated by reference into the contract, provides as follows:

> [DCI] shall establish and maintain a program for the

---

[18] DCI argued at trial and in its brief that title to the property was not the issue but rather "possession is the key criteria". See Pl.'s Brief at 36, and Tr. at 681-686. DCI offered no tenable argument in support of its position and further ignores that the only value to be derived from the equipment was once title had transferred from the Government to the joint venture (as a third party contribution), which was never formed.

> use, maintenance, repair, protection, and preservation of Government property in accordance with sound business practice . . .

FAR 52.245-5. 1 (g) (4) provides as follows:

> If [DCI] transfers Government property to the possession and control of a subcontractor, the transfer shall not affect the liability of [DCI] for loss or destruction of, or damage to, the property as set forth above.

The contract required that DCI protect the equipment. If DCI had title, that clause would be rendered meaningless.

2. DCI had no cognizable interest in the equipment.

The facts do not support DCI's contention that it had a legally cognizable interest in the equipment. As previously discussed, DCI 's only interest in the equipment was the amount to which it was legally liable to the vendors as the equipment was purchased with 74 percent of Government funds and DCI financed it's the remaining 26 percent with debts to the vendors. See e.g. Tr. p. 120-122, 170, 172.

3. The equipment was in danger of being confiscated.

The equipment was in danger of being confiscated by either those in possession of the equipment or by governmental entities. See e.g. Pltf.'s Exh. 17. The equipment in Moldova was in danger of being confiscated by the Moldovan government. See Def.'s Exh. 212 (Tab 11-13), 231-232, 236. In addition, Litmash wanted to be paid for storing the equipment. See Def.'s Exh. 236. Similarly, the equipment that was stored in the warehouse in Kiev was also in danger of being confiscated because of back storage fees and penalties and because the warehouse was closing. See e.g. Def.'s Exh. 234-237, and Pl's.'s Exh. 17. Because the contract had expired,

DCI had no contractual obligation to protect the equipment.[19] In fact, the contract specifically provided that DCI was not "obligated to continue performance under this contract … or otherwise incur costs in excess of the estimated cost specified in the Schedule, until the Contracting Officer (i) notifies the Contractor in writing that the estimated cost has been increased and (ii) provides a revised estimated total cost of performing the contract …." See Def.'s Exh. 1, Vol. 2, Tab 34.

4. DCI was unable or unwilling safeguard the equipment.

DCI was financially incapable of moving the equipment or safeguarding the equipment. See e.g. Def.'s Exh. 236. DCI had spent all of the Government funds provided under the contract. See Def.'s Exh. 1, Vol. 4, Tab 123. DCI never had any funds of its own. See e.g. Tr. p. 120-122, 124. For all practical purposes, DCI was insolvent. See Lester Expert Rpt., Def.'s Exh. 1 p. 31-33. DCI needed at least $500,000 to ship the equipment and to install it at Burevestnik, its proposed joint venture partner's facility. See Tr. p. 837-838, Def.'s Exh. 1, Vol. 4, Tab 125. DCI was unable raise any investment capital for those purposes. See Tr. p. 832-833, 837-838.

Moreover, the CO decided not to add funds to DCI's contract. See Def.'s Exh. 1, Vol. 4, Tab 129-130.

Finally, Litmash would have shipped the equipment to Kiev, but DCI refused to provide an address to which to ship it (see Glouchkov Decl., Def.'s Exh. 212), and Burevestnik and

---

[19] DCI contends that after the contract expired the Government was obligated to "add additional funds to the contract so the DCI could be compensated for ongoing property administration costs..." See Pl.'s Brief at 37. In reality, the Government had no such obligation and Mr. Frederickson testified to his understanding as such. See Frederickson Dep., Def.'s Exh. 372, p. 53, 105-106.

Technomet were willing to pay to ship the equipment and to get it installed. See Maiko and Slavitsky Decl.'s, Def.'s Exh. 213 and 216. DCI, however, was unwilling to accept assistance from Litmash, Burevestnik, or Technomet. See Glouchkov, Maiko and Slavitksy Decl.'s, Def.'s Exh. 212, 213 and 216. A reasonable inference that can be drawn from DCI's unwillingness to pursue offers from Burevestnik and Technomet is that DCI needed to maintain physical control over the equipment, given that the equipment was its sole source of negotiating leverage over Burevestnik and Technomet with respect to its share in the joint venture. See e.g. Tr. p. 839, 845. DCI was unwilling to accept assistance from Burevestnik or Technomet because DCI's percent ownership in the joint venture would have been adversely impacted.

By the time the equipment was transferred to Burevestnik by the U. S. Government in 2001, DCI had had over four years within which to consummate a joint venture, but had been unable to do so. See e. g. Tr. p. 836-837.

In addition, it is clear from the evidence that there would have been no joint venture upon terms that would have been acceptable to DCI. See e. g. Tr. p. 866-867. Mr. Frederickson testified that he would not have consummated the joint venture agreement with Burevestnik and Technomet if his share was going to be only 10 percent. See e. g. Tr. p. 866-867. Mr. Maiko's testimony was that he, as the Director of Burevestnik, would not have executed a joint venture with DCI if DCI's share was greater than 10 percent. See Maiko Decl., Def.'s Exh. 213. Mr. Maiko's testimony in this regard, the single most important point that Mr. Maiko made, was not challenged by DCI during cross-examination. See Tr. p. 984-989. In addition, sworn testimony by Igor Slavistky, the Director of Technomet, was in accordance with Mr. Maiko's. See Slavitsky Decl., Def.'s Exh. 216. DCI waived its right to challenge Mr. Slavisky's testimony

although Mr. Slavitsky was present at trial and available to be cross-examined. See Tr. p. 991. Thus, Mr. Slavistky's written direct testimony was wholly unrebutted. In short, there never would have been a joint venture between DCI and Burevestnik and Technomet because there was an intractable and irreconcilable difference among the parties with respect to DCI's share in the joint venture. Neither Burevestnik nor Technomet would have entered into a joint venture with DCI unless DCI's interest was no more than 10 percent, see e.g. Maiko and Slavitsky Decl.s, Def.'s Exh. 213, 216 – not the 40 percent that DCI was insisting upon. See e. g. Pl.'s Exh. 62, p. 5-6.

In short, the Government's decision to take possession of the equipment did not constitute a breach of the contract: it was done in accordance with the contract and applicable law and was necessary and appropriate under the circumstances.

C. Because DCI is seeking to recover all of its incurred costs, DCI's claim is not viable.

Moreover, even assuming that the Government breached the contract as DCI contends, DCI's claim for its incurred costs is not legally viable.[20] The initial period of performance under

[20] To the extent that DCI contends that it was misled into believing that additional funds would be added to the contract, and that in reliance, DCI continued to incur debt, DCI's claim must fail. Mr. Frederickson admitted at trial that no contracting officer ever indicated to him that additional funds would be added to the contract. See e.g. Tr. p. 776-777. To the extent that Mr. Frederickson relies upon the statements of other Government employees, his reliance is misplaced. It is axiomatic that only those with actual authority to bind the Government may do so. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380 (1947). To the extent that DCI relied upon statements made by DTRA employees, other than the CO, DCI did so at its own risk. Only the CO had the authority to modify DCI's contract. See FAR 43.102(a). A contractor assumes the risk of accurately ascertaining the government representative's authority to bind the government, even where the government representative may be unaware of the limits of his authority. Federal Crop Insurance Corp., 332 U.S. at 384; Trauma Service Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). The only individual authorized by the CO to take any action whatsoever was the CO's representative ("COR"). The COR's authority, however,

the contract was 24 months, that is, from October 27, 1995, the date the contact was award, until October 26, 1997. See Def.'s Exh. 1, Vol. 4, Tab 61, p. 3. The period of performance was extended by the execution of a no-cost bilateral modification to January 30, 1998. See Def.'s Exh. 1, Vol. 4, Tab 120. DCI's obligation to continue performance under the contract, and DTRA's obligations to pay DCI's allowable incurred costs, ended on January 26, 1998.[21] See e.g. Tr. p. 109, 776-777. The Limitation Of Cost Provision prohibits the award of costs incurred by DCI after the expiration of the contract on January 30, 1998. The applicable FAR provisions provides as follows:

> FAR 52.232-20: (d)(1) The Government is not obligated to reimburse [DCI] for costs incurred in excess of…(i) if this is a cost-sharing contract, the estimated cost to the Government specified in the Schedule…"
>
> FAR 52.232-20: (e) No notice, communication, or representation in any form other than that specified in paragraph (d)(2) above, or from any person other than the [CO], shall affect this contract's estimated cost to the Government. In the absence of the specified notice, the Government is not obligated to

---

was severely limited: The [COR] is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract. FAR 43.102(a).

21 DCI's argument at trial and in its brief that DCI is entitled to a larger percentage of the value of the equipment purchased under the contract because it had "incurred costs" in excess of $5.9 million up through April 2003, despite the fact that DCI's cost share portion under the contract was limited to $1,066,111, see Tr. at 708-714, and Pl.'s Brief at 13, is frivolous at best. Nothing in the contract provides grounds upon which DCI could ever recover even its cost-share contribution to the contract, assuming DCI had even made it, let alone all of the costs it allegedly incurred in pursuing its goal of establishing a viable joint venture in Ukraine. DCI further contends in its brief that the Government conceded that DCI had incurred costs in excess of $5.9 million, when in fact the Government only acknowledged that DCI had approximately $5.9 million of costs listed in its books and records. See Pl's Brief at 12 and 49, and Tr. at 719.

> reimburse [DCI] … for any costs in excess of the estimated cost to the Government specified in the Schedule, whether those costs were incurred during the course of the contract or as a result of termination.

Not only was DCI bound by this contractual provision, Mr. Frederickson was fully aware that any costs he incurred after the expiration of the contract were incurred at his own risk.[22] See e.g. Tr. p. 109, 773-774.

D. DCI Failed As A Matter of Fact And Law To Establish Entitlement To Lost Profits.

In Count three of its complaint, DCI contends, as in count two, that the Government breached the contract by transferring the equipment to Burevestnik, thereby precluding DCI from forming a joint venture in accordance with its business plan. See Compl. ¶. 9. While the substance of the factual allegations is the same as count two, the damages claimed amount to $110,000,000 in lost profits.[23]

---

[22] To the extent DCI claims that DTRA employees made misrepresentations regarding the availability of additional funding, DCI's claim sounds in tort. Claims sounding in tort must be dismissed for lack of jurisdiction. Whether DCI's alleges fraud, misrepresentation, conversion of property, or some other tort, it is axiomatic that this Court's Tucker Act jurisdiction does not extend to tort claims. Block v. United States, 66 Fed. Cl. 68 (2005) ("It is well settled that a claim for conversion of property or for misappropriation of trade secrets sounds in tort…it is equally well settled that the Court of Federal Claims does not have jurisdiction over matters sounding in tort. 28 U.S.C. § 1491(a)(1)"), citing Keene Corp. v. United States, 508 U.S. 200,214 (1993), Brown v. United States, 105 F.3d 621,623 (Fed. Cir. 1997), and Tree Farm Dev. Corp. v. United States, 218 Ct. Cl. 308, 585 F.2d 493, 498 (1978).

[23] Included in DCI's claim for lost profits is DCI's assertion that the joint venture in question would have served as the groundwork for future business relationships that would have brought substantial financial benefit to DCI, which was the "sole consideration" for DCI entering into the contract. See Pl.'s Brief at 3, 50 and 54. However, the contract was explicit regarding the "Consideration and Payment (Cost Share)" of each party and did not include or foresee anything outside of the estimated $4,100,427 contract amount.

Under a cost-reimbursement contract, such as the one that is the subject matter of this dispute, the contractor receives no profit and is reimbursed only for an agreed-upon portion of its allowable costs. See FAR 16.301-1. Pursuant to DCI's cost share, no fee contract with DTRA, therefore, DCI is not entitled to profit. See e.g Tr. p. 107. DCI was aware that the funds provided by the Government was only "seed money." See e.g. Frederickson Dep., Def.'s Exh. 373, p. 70. If DCI was to eventually make a profit, it was absolutely critical that DCI consummate the joint venture agreement with its proposed Ukrainian partners. See e.g. Def.'s Exh. 16 and 222. It was only when the joint venture agreement was consummated that title to the equipment could be transferred by the CO to the joint venture. In fact, since all of the Government provided funds had been expended, the transfer of the title would have been the last operative act of the Government. At that point, the contract would have been closed out. At that point, DCI's ability to make a profit through its joint venture would have solely depended upon the viability of DCI's business plan.

Moreover, there is no authority for the proposition that in a case brought pursuant to the CDA a contractor is entitled to lost profits. The Government is unaware of any decision in this Court awarding lost profits in a case arising under the Contract Disputes Act.

DCI's claim for lost profits, therefore, is without merit. Moreover, even under the Winstar line of cases awarding lost profits, DCI's claim is not viable. DCI has failed to establish that the damages it seeks were actually or reasonably foreseeable, were caused by the breach of the contract at issue, and are not speculative. To recover lost profits for breach of contract, plaintiff must establish by a preponderance of the evidence that (1) the loss was the proximate result of the breach, (2) the loss of profits caused by the breach was within the contemplation of

the parties because the loss was foreseeable or because defaulting party had knowledge of special circumstances at time of contracting, and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. Energy Capital Corp. v. United States, 302 F.3d 1314 (Fed. Cir. 2002).

Thus, to recover under a lost profits claim, a plaintiff must prove by the preponderance of the evidence the following elements: 1) causation; 2) reasonable foreseeability; and 3) reasonable certainty. Chain Belt Co. v. United States, 127 Ct. Cl. 38, 115 F. Supp. 701, 714-15 (1953); accord Landmark Land Co. v. United States, 46 Fed. Cl. 261, 270 (2000), aff'd in part, vacated in part, remanded by Landmark Land Co., Inc. v. F.D.I.C., 256 F.3d 1365 (Fed. Cir. 2001). "'To recover lost profits for breach of contract, the plaintiff must establish that . . . a sufficient basis exists for estimating the amount of lost profits with reasonable certainty." California Fed. Bank v. United States, 43 Fed. Cl. 445, 451 (1999) (discussing Chain Belt, 115 F. Supp. at 714), appeals argued, Nos. 99-5108, 99-5119 (Fed. Cir. July 7, 2000); see also Restatement (Second) of Contracts § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."). In applying the "reasonable certainty" standard, the Federal Circuit has stated that "attempting to determine what would have happened if the [bank's leverage had not been affected by the breach] necessarily involves a highly speculative and conjectural inquiry." Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996); see Schonfeld v. Hilliard, 218 F.3d 164, 174 (2nd Cir. 2000) (plaintiff not entitled to recover lost profits because he "failed to establish the high degree of correlation between [his corporation] or the nonexistent operating entity and proffered firms (in terms of, inter alia, investors, management and cost structures) upon which the probative

quality of this evidence depends").

There are essentially two methods by which DCI could have attempt to prove lost profits in this case, assuming that this Court would even entertain the claim. The first is to rely on DCI's past history of performance in order to estimate with a reasonable degree of certainty the amount of profits that would have been made but for the alleged breach. See 3 Dobbs, Law of Remedies, § 12.4(3) at 72 (2d ed.1993); Independent Business Forms, Inc. v. A-M Graphics, Inc., 127 F.3d 698, 703 (8th Cir. 1997) ("In order to recover lost profits, plaintiff must produce proof of the business' income and expenses during a reasonable period of time prior to the interruption of the business."); McDermott v. Middle East Carpet Co., Associated, 811 F.2d 1422, 1428 (11th Cir. 1987) (claimant may recover lost profits if it can show a "track record" of profitability). Since DCI, a startup venture, specially created to bid on this and similar contracts, had no previous history of performance in the die casting industry, DCI, as a matter of law, can not sustain its burden of proving lost profits under this theory.

The second potential method of proving lost profits is through a competitor's and other's comparable experience, referred to as "yardstick evidence." See 3 Dobbs, Law of Remedies, § 12.4(3) at 73; see Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc., 213 F.3d 198, 207 (5th Cir. 2000) (yardstick test consists of a study of the profits of business operations that are closely comparable to the plaintiff's); G.M. Brod & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1538-1539 (11th Cir. 1985). Yardstick evidence may be relevant to establish lost profits when: "the plaintiff's business bears a close comparison to another business which furnishes the yardstick, where the products or services involved are standardized, do not depend heavily on local or personal management skills, and where the plaintiff can show his share of the total

market before breach." Id.; see Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc., 213 F.3d at 207 ("Although allowances can be made for differences between the firms, the business used as a standard must be as nearly identical to the plaintiff's as possible.") However, "[w]hen the business profits depend on highly individualized elements, the plaintiff's own past experience may be the only reliable guide." Dobbs, Law of Remedies, § 12.4(3) at 73.

Since DCI has not identified any die casting business that is similar, let alone identical to, the one that DCI intended to create, DCI, as a matter of law, can not sustain its burden of proving lost profits under this theory.

DCI's wholly speculative claim for lost profits must be dismissed because speculative expectancy damages may not be awarded against the United States. Wells Fargo Bank N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996) ("remote and consequential damages are not recoverable in a common-law suit for breach of contract ... especially ... in suits against the United States for the recovery of common-law damages."). According to Wells Fargo, "[i]f the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement.... But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit." Wells Fargo, 88 F.3d at 1022-23 (Fed. Cir.1996) (quoting Ramsey v. United States, 101 F. Supp. 353, 121 Ct. Cl. 426 (1951)). Here, DCI had no expectation, either contractually or otherwise, of making a profit under the contract at issue.

Profits, if any, would have only inured to the benefit of the joint venture if, and when, the joint venture was able to implement DCI's business plan. First, however, DCI needed a viable business plan, and needed a joint venture partner. DCI utterly failed on both points. The expert report of Todd Lester, the Government's expert on the viability of DCI's business plan went into evidence unrebutted when DCI decided to waive its right to cross-examine the Government's experts, see Tr. p. 991, and the deposition testimony of John Tomlinson offered by DCI did not even address the viability of DCI's business plan at any time relevant to the contract in this case, see Tomlinson Dep., Def.'s Exh. 375, p. 142-143. Thus, DCI has failed to demonstrate that its business plan was viable. Moreover, DCI offered no evidence to rebut the testimony of Messrs. Maiko and Slavistky that there never would have been a joint venture.

DCI failed, as an evidentiary matter, to establish entitlement to such profits. See L'Enfant Plaza Properties, Inc. v. United States, 3 Cl. Ct. 582, 590-91 (1983) (finding that the evidence was insufficient to show all three prongs of reasonable certainty, causation, and foreseeability); Northern Paiute Nation v. United States, 9 Cl. Ct. 639, 646 (1986) (stating that "the problem of speculation is insurmountable"); see also Bluebonnet Savings Bank, F.S.B. v. United States, 266 F.3d 1348, 1358 (Fed. Cir. 2001) (affirming the Court of Federal Claims' decision not to award lost profits because "the evidence was insufficient to determine the quantum of ... damages to a reasonable certainty."). DCI failed to demonstrate with any degree of certainty, let alone a reasonable degree of certainty, that DCI lost profits as a result of DTRA's alleged breach. As a matter of law, therefore, DCI is not entitled to lost profits.

Moreover, DCI's calculation of lost profits is fundamentally flawed as a matter of law. In calculating its lost profits, DCI assumed that it would have had a 40 percent ownership share in

the joint venture it intended to form with Burevestnik and Technomet, based, in part, upon the value of the equipment purchased with Government funds. See e. g. Pl.'s Exh. 62, p. 5-6. As a matter of law, the value of the equipment could not be considered part of DCI's contribution to the joint venture because, as previously discussed, the contract provided that the equipment constituted a third party contribution by the Government. See Def.'s Exh. 1, Vol. 4, Tab 61, p. 7-8.

DCI's analysis of it's alleged damages for lost profits is also flawed because it is based upon unreasonable and unrealistic assumptions, and relies upon information that is unduly speculative. See e.g. Lester Expert Report, Def.'s Exh. 1, p. 4. DCI's success in establishing the proposed DCB joint venture in Ukraine depended upon its ability to overcome numerous business risks and uncertainties in establishing a new business venture, many of which DCI was poorly equipped to handle. Id. DCI's ability to address these challenges was limited by a critical lack of liquidity and investment capital, little operating experience in the die cast industry or with starting up and running a business in Ukraine, as well as a lack of full-time management. Id.

Due to Ukraine's investment climate, DCI's status as a startup, it's lack of history with die casting businesses or successful operations in Ukraine, and DCI's lack of capital to put into the proposed joint venture, DCI failed to raise any additional debt or equity capital for its proposed business venture. Id. at 5. During the period of performance under the contract, DCI was not a financially viable business, and without additional funding did not have the capability to successfully implement its business plan for the proposed DCB joint venture. Id. DCI's projections of alleged lost profits are based on a yet to be established business and an unproven business plan, both of which are an unreasonable and unreliable basis for projecting lost profits.

Id.

In short, the linchpin of DCI's business plan was the infusion of investment capital. Id. at 33-34. DCI, however, was wholly unable to raise investment capital. Id. at 29-31; see also Tr. p. 825. DCI was unable to raise investment capital because DCI lacked a viable business plan. See e.g. Tr. p. 825-826, 829-830. DCI's claim for lost profits must fail as a matter of law and as a matter of fact.

## IV. DCI Failed To Establish That The Government Breached The Implied Obligation Of Good Faith And Fair Dealing.

In Count four of the complaint, DCI contends the Government breached the implied obligation of good faith and fair dealing by transferring the equipment to Burevestnik, thereby depriving DCI of the benefits for which it bargained under the contract. See Compl. ¶ 9-10. Those benefits, according to DCI, amount to $110,000,000.

The only specific instance of the Government's allegedly failure to cooperate is the Government's transfer of the equipment from the Moldova and from the Kiev warehouse. For all of the reasons previously discussed, DCI's claim must fail because the transfer of the equipment, equipment to which the Government held title, did not constitute a breach of the contract, and was reasonable and necessary under the circumstances.

As a matter of law, DCI's claim must fail.

All DCI bargained for was the Government providing about $3M as seed money to DCI. See e.g. Frederickson Dep., Def.'s Exh. 373, p. 69-70. That is all the Government promised; that is what the Government provided. As a matter of fact and law, the Government did not breach

its duty to cooperate.[24] The Government's decision to take possession of the equipment did not constitute a breach of the contract: it was done in accordance with the contract and applicable law and was necessary and appropriate under the circumstances.

DCI does not allege in its Complaint that the Government breached any contractual provision, including the duty to cooperate, by not providing funds over and above what the contract required. That decision is wholly discretionary. No CO final decision was issued nor was one required. No justification for that decision was required nor is it subject to judicial review. In any event, that decision is fully supportable: DCI was unable to consummate a joint venture after 3 years of what was supposed to be a 2 year contract; DCI insolvent; DCI had at least $1M in debt, the amount of its cost share; DCI had put none of its own funds at risk; creditors had no recourse since DCI was insolvent; DCI wanted a grant or a no cost share modification; DCI was not even willing to acquire additional debt; and DCI had never been able

---

[24] The frivolity of DCI's claim that the agency failed to co-operate is evidenced by the numerous instances that demonstrate that the agency did far more than the contract required in its efforts to assist DCI. Evidence of the Government's cooperation includes the following: DCI was awarded the contract even though DCMAO deemed DCI's proposal technically inadequate and found that DCI was not financially capable; the period of performance was extended by three months in ordered to allow DCI to submit pending invoices; DCI's contract was not terminated based upon the Maillefert letter; DCI's contract was not terminated when DCI failed to raise the critical capital if needed to perform under the contract; DCI was not terminated when DCI was unable to perform under the contract with the joint venture partner that it had identified in its proposal; DCI's contract was not terminated when DCI changed its proposed joint venture partner 18 months into a 24 month contract; DCI's contact was modified to allow DCI to name Burevestnik as its proposed joint venture partner; DCI's invoices were paid even after the period of performance had expired; DCI's invoices were paid in full despite determination made by the Defense Contract Audit Agency ("DCAA") that substantial costs were unallowable; the agency did not act upon DCAA's recommendation that the agency recover about $500,000 from DCI for unallowable costs that had been paid; and when DCI's efforts to raise investment capital from private sources failed, the agency worked hard to find Government funds to add to DCI's contract.

to obtain any venture capital, a clear indication that its business plan was fundamentally flawed. Counsel for DCI admitted during his opening statement that he was unable to establish that any Government employee had any personal animus towards DCI when they made the decisions they did in connection with the contract. See Tr. p. 17-18.

## V. The Government's Transfer Of The Equipment To Burevestnik Did Not Constitute A Takings.

In Count five of its complaint, DCI maintains that the Government's transfer of the equipment to Burevestnik constituted a takings under the Fifth Amendment of the Constitutional, thereby damaging DCI in the amount of $110,000,000. See Compl. ¶ 10. DCI's claim must fail as a matter of law.

The Fifth Amendment provides in pertinent part that "…nor shall private property be taken for public use, without just compensation …" DCI can not establish that it possessed a cognizable property interest in the equipment, which the Government transferred from Moldova and from the warehouse in Kiev so as to entitle DCI to just compensation under the Fifth Amendment. Moreover, to allege a cognizable takings claim, DCI must concede the validity of the Government's action that is the subject of his claim. This is a jurisdictional requirement, and stems from the fact that the takings clause of the Fifth Amendment does not empower the court to award just compensation for the unauthorized acts of government officials. Cristina Investment Corp., Inc., et al. v. United States, 40 Fed. Cl. 571, 578 (1998). DCI has in fact alleged just the opposite, that is, that the taking of the equipment was "wrongful and illegal" and a breach of contract.

Moreover, when the Government contracts, it engages in a proprietary action and

consequently the appropriate analysis of the Government's act is in light of the rights that stem from the contract. If the Government breaches the terms of the contract, then the appropriate remedy is a breach of contract remedy. If the Government's action, as is the case here, is consistent with the terms of the contract, then no property right could possibly have been taken by the Government because the only rights the contractor possesses are the rights granted by the contract terms, and the Government has acted in accordance with those terms. See e.g., Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001); Sun Oil Co. v. United States, 215 Ct. Cl. 716, 768-70, 572 F.2d 786, 818 (1978); see also Transpace Carriers, Inc. v. United States, 27 Fed. Cl. 269, 274 (1992); Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 338-39 (1989).

## CONCLUSION

For all of the foregoing reasons, it is respectfully requested that the Court enter judgement in favor of the United States.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Mark A. Melnick.
MARK A. MELNICK
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street NW
Washington, D.C. 20530

March 2, 2006

Attorneys for Defendant