# In the United States Court of Federal Claims

No. 04-1113C
Filed September 28, 2006
**TO BE PUBLISHED**

| | |
|---|---|
| DIE CASTERS INTERNATIONAL, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Breach of Contract; Soviet Nuclear Threat Reduction Act of 1991; Nunn-Lugar Act; Cooperative Threat Reduction Act; FAR 31.201-2(a) (Allowable Costs); FAR 52.216-7 (Reimbursing Costs); FAR 52.232-20 (Limitation of Cost); FAR 52.245-5(c)(2) (Government Property); RESTATEMENT (SECOND) OF CONTRACTS § 351(1)(2). |

**Gary Marcus**, Garden City, New York, counsel for plaintiff.

**Leslie Cayer Ohta,** United States Department of Justice, Washington, D.C., counsel for defendant.

## MEMORANDUM OPINION AND ORDER

**BRADEN**, *Judge*.

To facilitate review of this Memorandum Opinion and Order, the court has provided the following outline:


**I. RELEVANT FACTS.**

**II. PROCEDURAL HISTORY.**

**III. DISCUSSION.**

**A. Jurisdiction.**

**B. Standing.**

**C. The Court's Resolution Of The Damage Claims Alleged In The July 6, 2004 Complaint.**

1. **Plaintiff Is Not Entitled To Damages Under Count One For The Government's Breach Of The Limitation Of Cost Clause.**

    a. **The Government Admitted To Breach Of The Limitation Of Cost Clause.**

    b. **The Government's Breach Did Not Cause Plaintiff To Incur Damages.**

        i. **"Reasonable Foreseeability."**

        ii. **"Substantial Causal Relationship."**

        iii. **"Reasonable Certainty."**

2. **Plaintiff Is Not Entitled To Damages Under Count Two For The Value Of The Government's Equipment Transferred.**

3. **Plaintiff Is Not Entitled To Damages Under Count Three For Alleged Lost Profits.**

4. **Plaintiff Is Not Entitled To Damages Under Count Four For An Alleged Breach Of The Implied Covenant Of Good Faith And Fair Dealing.**

5. **Plaintiff Is Not Entitled To Just Compensation Under Count Five For The Transfer Of The Government's Equipment.**

**IV. CONCLUSION.**

## I. RELEVANT FACTS.[1]

After the former Soviet Union dissolved, the United States became concerned that former military-industrial enterprises could be used for nuclear, biological, and chemical weapons. In response, Congress enacted the Soviet Nuclear Threat Reduction Act of 1991, Pub. L. No. 102-228, 105 Stat. 1693 (codified as amended in scattered sections of 22 U.S.C.) and the Nunn-Lugar Act, Pub. L. No. 102-228, 105 Stat. 1693 (codified in 22 U.S.C. § 2551 note) to assist in decommissioning these facilities.

In 1993, Congress provided additional funding for these activities by enacting the Cooperative Threat Reduction Act, Pub. L. No. 103-160, 107 Stat. 1777 (codified as amended in 22 U.S.C. §§ 5951-5958) and establishing the Cooperative Threat Reduction Program ("CTRP"). The purpose of the CTRP was to eliminate "chemical, biological, and other weapons capabilities." *Id.* In 1993, the United States also entered into an agreement with the Government of Ukraine ("Ukraine") to coordinate and establish policies against the proliferation of nuclear arms and other weapons technology.[2] *See* DX 1, vol. 1, tab 7. In March 1994, the United States and Ukraine agreed to implement an assistance program, where the United States Department of Defense ("DOD") would assist Ukraine's Ministry of Machine Building, Military-Industrial Complex, and Conversion to convert enterprises previously dedicated to military production to non-military use. *See* DX 1, vol. 1, tab 10.

In May 1994, the United States Defense Nuclear Agency ("USDNA") began implementing the CTRP, by circulating a list of Ukranian defense enterprises identified as eligible for United States financial assistance. *See* DX 1, vol. 1, tab 8. Next, the USDNA solicited business proposals from companies interested in forming relationships with Ukranian businesses. *Id*. USDNA offered to defray private expenses through a cost-sharing agreement. *Id.*

On January 25, 1994, Plaintiff, Die Casters International, Inc. ("DCI"), was organized as a Domestic Profit Corporation, under the laws of the State of New Jersey. *See* DX 1, vol. 2, tab 31

---

[1] The relevant facts recited herein were derived from the following portions of the record: DCI's July 6, 2004 Complaint ("Compl."); Defendant ("Government")'s September 17, 2004 Answer ("Answer"); DCI's October 7, 1994 Amended Motion for Partial Summary Judgment ("Pl. Motion"); Government's November 18, 2004 Response to Plaintiff's Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment ("Gov't Resp."); Transcript of November 14-17, 2005 Trial ("TR" 1-877); Plaintiff's Exhibits ("PX" 1-161); Government Exhibits ("DX" 1-388); DCI's February 3, 2006 Post-Trial Memorandum of Law ("Pl. PT Mem."); Government's March 2, 2006 Post-Trial Reply Brief ("Gov't PT Br.").

[2] Agreement Between the United States of America and Ukraine Concerning Assistance to Ukraine in the Elimination of the Strategic Nuclear Arms and the Prevention of Proliferation of Weapons of Mass Destruction, U.S. - Ukraine, October 25, 1993.

(showing the official date and type of registration for DCI). DCI was designated as a small business, as defined in the Federal Acquisition Regulations ("FAR"). *See* TR 63.

On June 27, 1994, USDNA issued Request for Proposal No. DNA001-94-R-0084 "to transition portions of former weapons and military industries [in Ukraine] into private, commercially oriented industries," through a cost-sharing program in which United States firms would receive federal funds to establish joint ventures with Ukranian firms. *See* DX 1, vol. 2, tab 34 (Statement of Work ¶ 1.2). On September 15, 1994, DCI responded by submitting a $20.2 million proposal to form a joint venture to convert a former Ukranian military plant into a die cast manufacturing facility, create a sales and service subsidiary in Ukraine, and establish another subsidiary to perform these functions in Europe and North America. *Id*. vol. 2, tabs 35-38. The Government was requested to provide $8.9 million to facilitate this effort. *Id.*

USDNA conducted a pre-award survey of DCI's proposal and concluded that, "No Award is [r]ecommended," because of DCI's lack of resources, experience, and subcontractor commitments. *See* DX 1, vol. 2, tab 39. An audit by the Defense Contract Audit Agency ("DCAA") highlighted DCI's financial shortcomings. *Id*. vol. 2, tabs 40A-B (DCI "had no experience in the preparation of an adequate proposal package including supporting documentation as required by the Federal Acquisition Regulations.").

On February 8, 1995, DCI's President, Alan Frederickson responded, stating that the September 15, 1994 proposal was "only to allow [USDNA] to become familiar with the project," and that he would soon be meeting with USDNA officials to learn the necessary "content and format" required to satisfy an audit. *See* DX 1*,* vol. 2, tab 43. Mr. Frederickson added that DCI's proposal was "to work with *one to three* companies in Ukraine," but not necessarily all three. *Id*. vol. 2, tab 43 (emphasis added). Thereafter, Mr. Frederickson had other correspondence with USDNA. *See, e.g.,* DX 1, vol. 2, tab 44 (March 20, 1995 letter stating that DCI now planned to purchase different machinery and was considering revising overhead and labor cost estimates); *Id*. vol. 2, tab 45-46 (May 10, 1995 letter detailing estimates of select costs, pricing, and investment proposals in response to questions from an April 28, 1995 USDNA meeting); *Id*. vol. 2, tab 47 (May 15, 1995 fax touting the benefits to the United States of awarding $8.3 million to DCI, since that was a lower amount than the original $8.9 million proposed on June 27, 1994); *Id*. vol. 2, tab 48 (May 24, 1995 letter responding to specific USDNA requests, including cost estimates for the proposed joint venture and requesting a meeting with USDNA); *Id*. vol. 2, tab 49 (May 28, 1995 fax promising to provide detailed cost information to satisfy the DCAA audit).

On June 16, 1995, the USDNA Contracting Officer requested that DCI submit a Best and Final Offer by June 22, 1995. *See* DX 1*,* vol. 2, tab 52. On June 21, 1995, DCI responded with a revised $13.5 million proposal to form two, rather than three, joint ventures and proposing a total cost of $6.7 million. *Id*. vol. 2, tab 53. After conducting a further analysis, USDNA agreed to enter into a smaller cost-sharing contract of $4.1 million to enable DCI to form a joint venture to convert one Ukranian plant. *Id*. vol. 2, tabs 54-60 (detailing analysis of DCI's capabilities and available resources).

On October 27, 1995, USDNA awarded DCI Contract No. DNA001-95-C-0169 (the "Contract") to provide assistance, including capital, equipment, material, training, and business assistance to the proposed joint venture, to be known as the Meridian Joint Stock Company, located in Kiev, Ukraine ("Meridian").[3] *See* DX 1, vol. 2, tab 61 (Contract at Statement of Work ¶ 1). The Contract also contemplated the formation of a wholly-owned DCI subsidiary to be located in Ukraine to market, retrofit, and retool existing die cast manufacturing equipment. *Id*. The Contract was awarded on a cost-share basis for $4,100,427. *Id*. (Contract at 2, Section B ¶ 1a). DCI promised to contribute $1,066,111, or approximately 26%, of the total contract amount to achieve the Contract objectives. The United States' financial obligation was $3,034,316, or approximately 74%, of the total contract amount. *Id*. (Contract at 2, Section B ¶¶ 1a-c).

The primary objective of the Contract was to "provide assistance to Meridian to support the conversion and privitization of its defense[-]related manufacturing base to the commercial production of consumer products (primarily die cast products) to meet consumer market demand, both internally within the Ukraine and externally." *Id*. (Contract at Statement of Work ¶ 1.2). The Contract also provided that DCI would form at least two joint venture stock ownership companies to operate as the legal entities through which DCI would form a commercial relationship with Meridian. *Id*. The contract term was twenty-four months from the effective date of October 27, 1995. *Id*. (Contract at 3, Section F ¶ 1).

The Contract incorporated by reference FAR 52.232-20 (Limitation of Cost) that, in relevant part, provides:

> (a) The parties estimate that performance of this contract, exclusive of any fee, will not cost the Government more than . . . (2) if this is a cost-sharing contract, the Government's share of the estimated cost specified in the Schedule. The Contractor agrees to use its best efforts to perform the work specified in the Schedule and all obligations under this contract within the estimated cost, which, if this is a cost-sharing contract, includes both the Government's and the Contractor's share of the cost.
>
> * * *
>
> (d) Except as required by other provisions of this contract, specifically citing and stated to be an exception to this clause –
>
>> (1) The Government is not obligated to reimburse the Contractor for costs incurred in excess of . . . (ii) if this is a cost-sharing contract, the estimated cost to the Government specified in the Schedule, and

[3] Meridian formerly was known as Korolev Production Amalgamation. *See* DX 1, vol. 2, tab 61 (Contract ¶ 1).

> (2) The Contractor is not obligated to continue performance under this contract (including actions under the Termination clause of this contract) or otherwise incur costs in excess of the estimated cost specified in the Schedule, until the Contracting Officer (i) notifies the Contractor in writing that the estimated cost has been increased and (ii) provides a revised estimated total cost of performing this contract. If this is a cost-sharing contract, the increase shall be allocated in accordance with the formula specified in the Schedule.

> (e) No notice, communication, or representation in any form other than that specified in subparagraph (d)(2) above, or from any person other than the Contracting Officer, shall affect this contract's estimated cost to the Government. In the absence of the specified notice, the Government is not obligated to reimburse the Contractor for any costs in excess of the estimated cost or, if this is a cost-sharing contract, for any costs in excess of the estimated cost to the Government specified in the Schedule, whether those excess costs were incurred during the course of the contract or as a result of termination.
>
> * * *
>
> (h) If this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each.

48 C.F.R. § 52.232-20 (cited in DX 1, vol. 2, tab 61 (Contract at 10, Part II, Section I)).

On January 30, 1996, the Contracting Officer issued Modification No. P00001 to add FAR 52.245-5(c)(2)[4] into the Contract, as required by 48 C.F.R. § 45.106(f)(1).[5] *See* DX 3, vol. 1, tab D3.

---

[4] FAR 52.245-5(c)(2), in relevant part provides:

> Title to all property purchased by the Contractor for which the Contractor is entitled to be reimbursed as a direct item of cost under this contract shall pass to and vest in the Government upon the vendor's delivery of such property.

48 C.F.R. § 52.245-5(c)(2).

[5] FAR 45.106(f)(1) provides:

> The contracting officer shall insert the clause at 52.245-5, Government Property (Cost-Reimbursement, Time-and-Material, or Labor-Hour Contracts), in solicitations and contracts when a cost-reimbursement, time-and-material, or labor-hour contract is contemplated[.]

That Modification stated that this FAR provision was not included in the award document, as required, because of an "inadvertent oversite [sic]" and that the Modification was made as an administrative change. *Id*. DCI did not object to this modification.

On March 15, 1996, DCI's Executive Vice President, C.W. Maillefert, sent a letter to the Contracting Officer warning of "project status, and certain financial and other matters relating to [DCI] that may impede or impair its ability to implement the contract, including . . . the resignation of certain key officers and employees." DX 1, vol. 3, tab 72 (citing "irreconcilable differences" between employees and "senior management over personnel matters"). This letter also advised the Contracting Officer that DCI's 26% share was being "financed" by partial payments of employees' salaries and that DCI, in fact, was insolvent and unable to procure the equipment, as required by the Contract. *Id*. At trial, Mr. Frederickson verified that DCI used only Government funds to purchase the equipment. *See* TR 166 (DCI was "billing the [G]overnment 100 percent of [DCI's] costs and [DCI was,] in many cases[,] paying 70 percent or less. If I had people who were salaried, I would have what was clearly a reasonable salary and I paid the employees 74 percent in most cases, and accrue[d] the rest as a liability on [sic] the company.").

Mr. Maillefert also advised in the March 15, 1996 letter that "it does not appear likely that DCI will be able to meet its obligation to raise the necessary funds . . . [and] DCI's apparent inability to secure financing . . . raises grave concerns about the Company's viability and ability to perform under the USDNA contract." DX 1, vol. 3, tab 72. Mr. Maillefert further cautioned that three of the Company's four full-time employees and one of its part-time employees "intend to resign immediately," because they were no longer willing to perform services for less than full salaries, nor did they expect repayment by DCI in the near future. *Id*.

On March 28, 1996, Mr. Frederickson sent a letter to the Contracting Officer responding to the issues discussed at a March 22, 1996 meeting regarding Mr. Maillefert's March 15, 1996 letter. *See* DX 1, vol. 3, tab 74. Therein, Mr. Frederickson reassured the Contracting Officer that the three DCI employees who resigned "are not critical to the successful completion of the contract." *Id*. Mr. Frederickson also reassured USDNA that DCI was "poised to complete the contract on time." *Id*.

On June 26, 1996, the USDNA was renamed the Defense Special Weapons Agency ("DSWA"). *See* DX 1, vol. 1, tab 9.

During 1996, John Mickowski served as a technical and engineering consultant to DCI. *See* DX 1, vol. 3, tab 74 (stating that John Mickowski was "one of our recently approved consultants" who worked on "engineering design details"). On December 30, 1996, however, Mr Mickowski resigned from DCI's Board of Directors, stating that he had "lost confidence in the management of the Company and in management's candor," and harbored "doubts and concerns about the Company's continued viability." *Id*. vol. 3, tab 76.

---

48 C.F.R. § 45.106(f)(1).

On April 4, 1997, DCI entered into a contract with Kirov Plant, Tiraspol ("Kirov Contract") to purchase the following equipment:

| Names of Goods | Qty | Price per unit | Total |
|---|---|---|---|
| Set of units for die casting machine model 711N09A(400tf) without an electrical cabinet | 3 | $41,500.00 | $124,500.00 |
| Set of units for die casting machine model 711N10A(630tf) without an electrical cabinet | 1 | $73,000.00 | $73,000.00 |
| Trimming press 1125 (25tf) | 3 | $10,000.00 | $30,000.00 |
| Spares Group | 1 | $12,700.00 | $12,700.00 |
| Equipment Cost | 8 | | $240,200.00 |
| Customs procedure | | | $636.00 |
| Registration fee and license | | | $255.00 |
| Transportation costs of goods above | | | $11,300.00 |
| Extra assembly works on the "Seller's" plant | | | $10,950.00 |
| Units acceptance by the "Seller's" experts in USA | | | $10,000.00 |
| Installation and adjustment in Kyiv at "Consignee" by the "Seller's" experts | | | $23,350.00 |
| Contract Value | | | $296,691.00 |

DX 212, tab 6.

The payment terms of the Kirov Contract provided that: "upon the receipt of the Seller's invoice the Buyer shall pay 74% of the amount and 26% shall be transferred to an ordinary three-year note[,]" with 8% per annum interest, no payments in the first four quarters of the term of the note, and eight equal payments during the last eight quarters of the note. *Id*.

Later that month, Meridian, a company with no die casting experience and no other viable contribution to the joint venture other than a building, pulled out of the project. *See* DX 1, vol. 3, tab 95; *see also* TR 136-37. Subsequently, DCI proposed a new joint venture partner, State-Owned Enterprise Plant Burevestnik, Kiev, Ukraine ("Burevestnik"), a company with significant die casting experience, skilled management, and an on-going profitable die casting business. *See* DX 1, vol. 4, tab 103.

On May 30, 1997, DCI and Burevestnik entered into a Protocol of Intention, describing a joint venture proposal to convert a portion of the Burevestnik plant to non-military production. *See*

DX 1, vol. 4, tab 103. The proposed joint venture was to be known as Die Casters Burevestnik ("DCB"). *Id.* vol. 4, tab 104. On June 20, 1997, Supplement 1 to the Protocol of Intention was executed, wherein DCI and Burevestnik agreed to add Technomet, Ltd. ("Technomet") to a DCB joint venture in exchange for Technomet agreeing to contribute other assets to the joint venture. *Id.* vol. 4, tab 104. Subsequently, DCI, Burevestnik, and Technomet prepared the requisite documents to establish DCB as a legal entity, but the documents were never signed. *Id*. vol. 4, tab 106A-106B.

On July 25, 1997, DSWA notified DCI that DOD certified DCI's new proposed partner, Burevestnik, and authorized DCI to complete the work required under the Contract. *See* DX 1, vol. 4, tab 110.

On August 22, 1997, Mr. Frederickson sent a letter to "DCI Key Suppliers and Strategic Partners," with a summary of the status of DCB and the proposed partnership between DCI, Burevestnik, and Technomet. *See* DX 1, vol. 4, tab 112 (representing that DCI was engaged in "[c]ollecting final details about each partners' [sic] contributions."). The letter also stated that DCI had not yet shipped any of the die casting equipment that it purchased to the Kiev plant location. *Id.* In addition, two other developments were highlighted: "[T]he equipment is legally US government property, and I cannot release it [to DCB] until I have written assurances that it will be received and stored in a secure location at Burevestnik." *Id.*

On August 28, 1997, DCAA sent a letter to DCI flagging a discrepancy between DCI's cost accounting and a DCAA audit that found DCI had billed the Government for all costs incurred, instead of only the 74% amount it agreed to pay under the cost-sharing agreement. *See* PX 22**.** DCAA recommended that DCI's billing and accounting policies be revised to conform with FAR requirements. *Id.* On September 5, 1997, DCI sent a letter to the DSWA Program Management Office requesting that a letter be sent advising that DSWA "had accepted the manner in which DCI billed its direct expenses, and in particular, its direct costs for salaries and subcontracts," *i.e.*, that sanctioned DCI's employees and subcontractors agreeing to accept 74% of the amount earned and/or billed to DSWA, with the remaining 26% to be accrued by DCI and paid back upon DCI's receipt of permanent financing. *Id*. DCI also "informed the [G]overnment that it was its intent to bill DSWA for full services received . . . on the assumption that DCI was in the process of obtaining financing at which time the 26% holdback would be paid to all parties, both employees and subcontractors." *Id*.

The initial term of the Contract expired on October 27, 1997. *Id*. DX 1, vol. 2, tab 61 (Contract at 3, Section F ¶ 1). On October 8, 1997, DCI sent a letter to the Contracting Officer requesting a "No-Cost" extension of the Contract through January 1998. *See* DX 1, vol. 4, tab 118. DCI also advised that additional funding was not being requested, because "[DCI] can complete the contract within the allocated funds originally authorized." *Id*. DCI attached a Summary Schedule, Supporting Schedule A1, and Schedule B. *Id*. Supporting Schedule A1 listed the Material-Equipment Purchases through October 3, 1997 and reported that the total material billings, including major pieces of equipment, through October 3, 1997, was $2,448,504.08. *Id*. The estimated total billings to complete equipment purchases were: $166,451.00 (*i.e.*, $45,000 in October 1997;

$99,880.00 in November 1997; $21,571.00 in December 1997; and $0 in January 1998). *Id*. In addition, Schedule B, a Project Milestone Schedule, reported that: four machines were to be shipped to Burevestnik from November 10, 1997 through December 16, 1997; initial plant layout and equipment installation would take place between October 27, 1997 and December 15, 1997; equipment start-up and initial system testing would take place December 1, 1997 through January 5, 1997; in-country DCB-Burevestnik operator training was scheduled between December 15, 1997 and January 19, 1998; and "real world" production runs would commence by January 26, 1997. *Id*.

On November 21, 1997, the Contracting Officer issued Modification No. P00002, extending the term of the Contract through January 30, 1998. *See* DX 1, vol. 4, tab 120. Modification P00002 incorporated DCI's October 8, 1997 letter, but specified that the total amount of the Contract remained unchanged and no other changes were being made. *Id*. vol. 4, tab 120.[6]

On January 10, 1998, DCI sent a letter to DSWA requesting another Contract extension "to raise critical financing that is necessary to prepare the plant and to get us started." DX 1, vol. 4, tab 124. On January 12, 1998, DCI sent a letter to the Contracting Officer requesting another "No-Cost" extension of the Contract through April 1998, because the delay in setting up the die casting machines in Burevestnik was the result of a change in joint venture partners, scheduling employee trips "during the holiday season[,] and the fact that DCI is still awaiting additional financing to properly prepare the Burevestnik plant." *Id*. vol. 4, tab 122. By January 12, 1998, DCI had billed the United States for $3.99 million instead of the $3.034 million authorized. *Id.* DX 216, tab 8 (January 7, 1998 memo reflecting that DCI had "a total of $110.3K to be billed", but "[i]t will cost approximately $300,000 to prepare the [DCB] building for our 1st Stage equipment"). Although DCI continued to request contract modifications, DSWA did not grant DCI any further time extensions or funding. *See e.g.*, TR 212-13, 776 (Mr. Frederickson testified that DCI did not receive a Contract extension after January 30, 1998); DX 1, vol. 4, tab 123 (May 19, 1998 letter from DCI to DSWA, stating that "we need to have our contract extended" and emphasizing "our project's need for the additional [$500,000 in] funding"); *Id.* vol. 4, tab 125 (August 18, 1998 DCI proposal requesting $500,000 from the Defense Threat Reduction Agency ("DTRA");[7] *Id.* vol. 4, tab 126 (February 17, 1999 meeting agenda in which DCI requested $730,000 in additional funding from DTRA); *Id.* vol. 4, tab 127 (June 2, 2000 DTRA letter informing DCI that "[n]o decision has been made by DTRA to provide DCI with additional funds in any amount"); *Id.* vol. 4, tab 129, PX 58(ii) (June 13, 2000 letter from DTRA to DCI stating that "it has been determined that the Government will not modify the subject contract to increase funding").

---

[6] On October 27, 1997, at the request of DCAA, the Defense Criminal Investigative Service ("DCIS") initiated an investigation of "billing irregularities, indirect cost certification, and FAR violations by [DCI]." DX 331; *see also* DX 329 (a September 30, 1997 DCAA referral to DCIS regarding potential billing irregularities).

[7] On October 1, 1998, DSWA merged into the new Defense Threat Reduction Agency ("DTRA"). *See* DX 1, vol. 1, tab 11; *see also* 10 U.S.C. § 111.

On January 30, 1998, the Contract expired. *See* DX 1, vol. 4, tab 120; *see also* DX 216, tab 9 (minutes from a December 7, 1998 meeting of the three firms confirming that "[t]he period of performance of the [C]ontract has expired. [Mr.] Frederickson has yet to fulfill any [C]ontract obligations[,] including: training, and business and marketing assistance".)[8]

On February 8, 1999, DCI sent a letter to the Contracting Officer to alert DTRA of the "potential loss of $3 million of equipment":

> We are quickly reaching a critical time where we could lose the equipment we have had in storage in Kyiv and Moldova for over a year. This project may be a low priority for DTRA, but $3 million worth of equipment is important to DCI and to DCI's potential partners and should be for the US government that paid for 74 percent of it. . . . [T]he warehouse in Kyiv is closing and has told us that we need to move the equipment out by the end of this month. . . . DCI has been carrying the burden of paying for the storage and has informed you that it will not do so any longer. We have not received any response to our communications so that we can inform our people what to do. Not only do we have to pay for the last several months of fees and penalties, but we need to find another place to store the material and to arrange for shipment. If we do not resolve the issue with the warehouse, I can only assume what the warehouse will do with the equipment. . . . I am also told that the costs we will incur to release and move the equipment will be about $8,000.
>
> We are also running into problems with the storage of the equipment in Moldova. That equipment was imported duty-free based on a "temporary in-transit for export" classification with the Moldovan customs authorities. That classification was for one year. The equipment has been in Moldova since September/October 1997, well over the year. We have been telling the factory that our new funding was imminent since last October. Customs is not willing to listen to more empty promises and wants a firm schedule or we could incur significant duties. We also need to respond to Modolva this week[.]
>
> Because we have no idea what is happening about our additional funding despite all the promises and expectations and because of the continual delays in a decision about our funding, our partners in Ukraine are certainly not going to encumber themselves with the burden to resolve the issues and to store the equipment. Since last March, we have known our situation and never expected that we would be left in the dark for such a long time[.]
>
> By Wednesday [February 10, 1999], I need a firm timetable about the funding or a decision that the funding will not be provided[.].

---

[8] On June 18, 1998, DCIS served DCI with a subpoena for financial and business records to investigate suspected cost accounting irregularities. *See* DX 331.

PX 17.

On February 10, 1999, DCAA's Northern New Jersey Branch Office prepared Audit Report No. 6201-97B10250006 concerning DCI's incurred costs for calendar year 1995. *See* PX 58(o). The Audit questioned $15,599 of proposed direct costs, nominally representing 26% of the labor and subcontract costs, because those were amounts withheld from employees and the subcontractor, based on oral agreements. *Id.* Since those amounts were not paid in the ordinary course of business, as of the date of the Audit, DCAA determined they were not "allowable," pursuant to FAR 31.201-2(a).[9] According to the Contract, costs had to be paid in the ordinary course of business. *See* DX 1, vol. 2, tab 61 (Contract at 9, Part II Contract Clauses, Section I); *see also* FAR 52.216-7.[10] In

---

[9] FAR 31.201-2, in relevant part, provides:

(a) A cost is allowable only when the cost complies with all of the following requirements:

(1) Reasonableness.
(2) Allocability.
(3) Standards promulgated by the CAS Board, if applicable, otherwise generally accepted accounting principles and practices appropriate to the circumstances.
(4) *Terms of the contract.*
(5) Any limitations set forth in this subpart.

48 C.F.R. § 31.201-2(a) (emphasis added).

[10] FAR 52.216-7, in relevant part, provides:

(b) Reimbursing costs.

(1) For the purpose of reimbursing allowable costs (except as provided in paragraph (b)(2) of the clause, with respect to pension, deferred profit sharing, and employee stock ownership plan contributions), the term "costs" includes only--

(i) Those recorded costs that, at the time of the request for reimbursement, the Contractor has paid by cash, check, or other form of actual payment for items or services purchased directly for the contract;

(ii) When the Contractor is not delinquent in paying costs of contract performance in the ordinary course of business, costs incurred, but not necessarily paid, for–
A) Supplies and services purchased directly for the contract and associated financing payments to subcontractors, provided payments determined due will be made--
(1) In accordance with the terms and conditions of a subcontract or invoice; and

addition, the DCAA Audit adjusted the proposed indirect cost rate from 6% to 7.45%. *See* PX 58(o). DCI did not concur in the proposed adjustments. *Id*.

On February 11, 1999, Mr. Frederickson sent an e-mail to DTRA expressing concern over the fate of the stored equipment, because DCI had no remaining funds: "Should it become apparent that heavy fines will be imposed [by Moldovan Customs Officials or Ukranian warehousing representatives] . . . the only option I can look at now is to liquidate the equipment ASAP (and it may

---

(2) Ordinarily within 30 days of the submission of the Contractor's payment request to the Government;

(B) Materials issued from the Contractor's inventory and placed in the production process for use on the contract;
(C) Direct labor;
(C) Direct travel;
(E) Other direct in-house costs; and
(F) Properly allocable and allowable indirect costs, as shown in the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts; and

(iii) The amount of financing payments that have been paid by cash, check, or other forms of payment to subcontractors.

(2) Accrued costs of Contractor contributions under employee pension plans shall be excluded until actually paid unless--

(i) The Contractor's practice is to make contributions to the retirement fund quarterly or more frequently; and

(ii) The contribution does not remain unpaid 30 days after the end of the applicable quarter or shorter payment period (any contribution remaining unpaid shall be excluded from the Contractor's indirect costs for payment purposes).

(3) Notwithstanding the audit and adjustment of invoices or vouchers under paragraph (g) below, allowable indirect costs under this contract shall be obtained by applying indirect cost rates established in accordance with paragraph (d) below.

(4) Any statements in specifications or other documents incorporated in this contract by reference designating performance of services or furnishing of materials at the Contractor's expense or at no cost to the Government shall be disregarded for purposes of cost-reimbursement under this

48 C.F.R. § 52.216-7.

be too late for that action), use the cash to pay off whatever fines are left[,] and divide the remainder in accordance with our cost share." DX 231.

On February 17, 1999, Mr. Frederickson met with several DTRA representatives to discuss the state of DCI's business and request an additional $730,000 grant. *See* DX 1, vol. 4, tab 126; *see also* DX 233. Mr. Frederickson also expressed disappointment that "DTRA was never ready to commit to how much money they planned to provide[,] nor to when [they might provide funding]." DX 233.

On March 10, 1999, Mr. Frederickson sent the Contracting Officer an e-mail advising that the stored equipment would be subject to fines, unless it was removed by March 20, 1999. *See* DX 234. Mr. Frederickson also stated that DCI had no remaining funds and no prospects of private financing, but, nevertheless, requested additional Government funding.[11] *Id.* On March 22, 1999, DTRA informed DCI that, because of the risk of confiscation of the DCB property, DTRA is "in the process of moving all of this equipment into a USG Bonded warehouse." DX 237.

On May 5, 2000, the Director of the Cooperative Threat Reduction Policy ("Director") sent a Memorandum to the Deputy Assistant Secretary of Defense for Threat Reduction Policy requesting additional funding for the DCI Defense Conversion Project in Ukraine. *See* PX 28. The Memorandum estimated that approximately $1.4 million of equipment, purchased with DOD and DCI funds, had been shipped to Moldova for DCI-developed modification. *Id.* The equipment, however, now was in "imminent danger of being confiscated," because Moldovan [C]ustoms officials declared that DCI "must either ship the equipment, pay import duties, or [customs] would confiscate the equipment." *Id.* Of note, DOD also was reminded of the duty to prevent the equipment from being confiscated, since DOD had a 75% "ownership" of the equipment until the Contract was completed. *Id.* DCI, however, was not responsible for protection of the equipment, because the original Contract funding had expired and DCI was owed "no additional funding." *Id.* Therefore, if "DOD chooses not to fund the contract, DOD would have to close the contract and make a decision regarding disposition of the equipment." *Id.* *S*ince "DOD provided 75% of the funding," DOD has a "vested interest in its disposition." Further, the Memorandum noted that after a two and a half year investigation, the DOD Inspector General was unable to find any evidence of improper billing regarding $4 million of expense vouchers, of which DCI was reimbursed approximately $3 million. *Id.* Moreover, "[i]f DCI took out loans to finance its portion of the work that is entirely allowable." *Id.* Of the $4 million expense vouchers, $2.97 million was for equipment purchases, with the approximate value of that portion reimbursed by DOD. *Id.* Therefore, the Director's Memorandum concluded: "After reviewing these issues, we are persuaded that we can best accomplish our defense conversion objectives by the allocation of additional funding (of $560,000) to complete the DCI project." *Id.* Accordingly, the Memorandum recommended that

---

[11] On February 14, 2000, an Assistant United States Attorney assigned to investigate possible accounting irregularities by DCI under the Contract, decided not to pursue the investigation of DCI further "due to a lack of company assets and the actions of the procuring activity." PX 58(hh) ¶ 11.

"CTR Policy . . . direct DTRA to contract with DCI to transport and install the previously purchased equipment[.]" *Id.*

On May 31, 2000, the Contracting Officer sent a letter to DCI stating:

> To ensure that the equipment now located in Moldova is safeguarded and available should the decision be made to continue the project, it has been determined that DTRA will retrieve the equipment and place it in storage in Ukraine. DTRA will hire and pay the cost of the shipping contractor.
>
> In taking this action it is understood that DCI and others may have a financial interest in the equipment. Therefore, I request that your provide me with the names of all parties with a financial interest in the equipment. Please provide this information to me by June 2, 2000.
>
> No decision to provide funds to DCI has been made. The decision on whether to provide funds to DCI is still under consideration and as soon as it is made I will let you know.

PX 32.

On June 2, 2000, the Contracting Officer responded to a May 31, 2000 DCI e-mail and June 1, 2000 DCI letter regarding DCI's assertion that it "has continued to operate under the original contract which still remains in effect and under which [DCI] continue[s] to incur costs." DX 1, vol. 4, tab 127. The Contracting Officer advised DCI that, under FAR Clause 52.232-20(d), the Government was not obligated to reimburse DCI for costs incurred in excess of the costs estimated in the Contract, unless DCI was notified in writing that the estimated cost of the Contract had been increased. *Id.*

On June 8, 2000, DCI's counsel sent a letter to the Contracting Officer following up on a June 6, 2000 telephone conversation. *See* PX 34. This letter stated that, during that telephone conversation, the Contracting Officer "acknowledged that, under the . . . contract, DCI has ownership rights in certain equipment obtained pursuant to the contract and currently located in a factory in Moldova." *Id.* The letter also stated that the Contracting Officer acknowledged that DTRA had not provided DCI with:

> (1) an explication of the legal authority under which it intends to relocate the equipment to Kyiv; (2) the reasons for the relocation; (3) the terms and circumstances of the relocation; (4) the site in Kyiv to which DTRA intends to move the equipment; (5) assurances that the equipment will be properly inspected, handled and maintained; and (6) the status of the contract. You promised to respond to these questions, and to provide further considered evaluation of DTRA's actions . . . . DCI continues to demand both an immediate response to the above questions and that

> DTRA cease and desist from any efforts to relocate the equipment unless and until it receives written consent from DCI to do so.

*Id*.

On June 13, 2000, the Contracting Officer sent a letter to DCI advising that DTRA would "take no further action to secure or protect the equipment located in Moldova." *See* DX 1, vol. 4, tab 129. The letter also stated that no funds remained on the contract and that "the Government will not modify the subject contract to increase funding. . . . The contract will be closed out in due course." *Id*. DCI was requested to submit an Inventory Schedule of all equipment procured with federal funding that was not "consumed" during performance, so DTRA could "negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each party." *Id*. On June 16, 2000, the Contracting Officer clarified that DTRA would not provide funding to DCI through contract modification nor through a grant or separate contract. *Id*. vol. 4, tab 130.

On July 14, 2000, the Contracting Officer sent another letter to DCI stating that the Contract was being closed and requesting that DCI provide: (1) a complete list of equipment purchased under the Contract; (2) documentation reflecting the cost of the equipment at the time of purchase; and (3) documentation reflecting the percentage of funding DCI contributed to the purchase of each item of equipment. *See* PX 36.

On July 21, 2000, DCI responded by e-mail to the Contracting Officer with a Lotus file containing unaudited information, including: a summary table showing itemized equipment costs by piece of equipment and the location of each piece of equipment; a table of detailed costs by supplier; summary costs for the equipment listed by storage location; a "general ledger table," showing costs by vendor and year; a summary showing all years and total costs of equipment, including estimates for commissioning; a table by year with total costs of equipment through March 2000; and a table with total costs of equipment including commissioning estimates. *See* PX 37.

On August 2, 2001, DCI again notified DTRA that the equipment was in imminent danger of being confiscated by Moldovan Customs, because the equipment had been held for a period longer than authorized by the temporary import license. *See* PX 58(u). On August 10, 2001, DTRA directed a logistics support contractor to take possession of the equipment in Moldova for transport to Kiev and subsequent delivery to Burevestnik. *Id*. The Government spent $188,120 for these shipping and storage charges. *Id*.

On December 21, 2001, the following equipment was transferred from the United States to the Ministry of Industrial Policy of Ukraine and then delivered by the Government of Ukraine to Burevestnik:

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | E | Die Casting Machine 400 Ton Consists of: | | 3 | SE | | |
| 1.1 | E | Die Casting Press Unit | HPM-400 | 3 | EA | $170,000.00 | $510,000.00 |
| 1.1.1 | C | Press Unit Control System | 71109T.80.0 0.600 | 3 | EA | $60,000.00 | $180,000.00 |
| 1.2 | S | Assembly Set | 71109D.00. 00.000 | 3 | EA | $50,000.00 | $150,000.00 |
| 1.3 | S | Cooling System | 71111E.46. 00.000 | 3 | EA | $1,000.00 | $3,000.00 |
| 1.4 | C | Trim Press | P25R.00.00. 000 | 3 | EA | $10,000.00 | $30,000.00 |
| 2 | E | Die Casting Machine 600 Ton Consists of: | | 1 | SE | | |
| 2.1 | E | Die Casting Press Unit | HPM-630 | 1 | EA | $309,472.60 | $309,472.60 |
| 2.1.1 | C | Press Unit Control System | 71110T.80.0 0.600 | 1 | EA | $60,000.00 | $60,000.00 |
| 2.2 | S | Assembly Set | 71110D.00. 00.000 | 1 | EA | $55,489.00 | $55,489.00 |
| 2.2.1 | S | Stand | 71110T.11.0 0.000 | 1 | EA | $26,000.00 | $26,000.00 |
| 2.2.2 | S | Locking System | 71110T.30.0 0.000 | 1 | EA | $55,000.00 | $55,000.00 |
| 2.2.3 | S | Guard | 71110T.41.0 0.000 | 1 | EA | $15,000.00 | $15,000.00 |
| 2.2.4 | S | Cooling System | 71111E.46. 00.000 | 1 | EA | $1,000.00 | $1,000.00 |
| 2.3 | S | Spare Parts | N/A | 1 | EA | $16,691.00 | $16,691.00 |
| | | | | | | Total | $1,411,652.60 |

Gov't Resp. at 65-66.

On January 24, 2002, other die casting equipment was transferred from the Government to the Ministry of Industrial Policy of Ukraine and then delivered to Burevestnik. *See* DX 1, vol. 1, tab 4; DX 3, vol. 1, tab 46. The equipment delivered included:

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | E | Furnace, HolmesY Holding, 2,220lb Aluminium Holding Capacity, 18 KW, 240/480V, 50HZ, Single Phase | 62-SH1B16-L | 4 | EA | $28,188.00 | $112,752.00 |
| 1.1 | S | Element, Heating, 240V, 3 KW, Side Loading, HolmesY | SL3000HE | 12 | EA | $87.00 | $1,044.00 |
| 1.2 | S | Bracket, Support, Heating Element | SL1006H | 24 | EA | $17.45 | $418.80 |
| 1.3 | S | T/C K-1861.5-T Assembly, TX Coated | K-1861.5-T | 6 | EA | $97.00 | $582.00 |
| 1.4 | S | Gasket, 8.5" x 48," Felt | D1007H | 22 | EA | $10.91 | $240.00 |
| 1.5 | S | Set, Spare Fuse, 250V | FNM-2/FNQ-R-1/FNR-R-90 | 2 | SE | $27.00 | $54.00 |
| 1.6 | S | Set, Partition Wall Assembly | 62-H1816-L | 1 | SE | $1,350.00 | $1,350.00 |
| 1.7 | S | Controller | HNWL DC-300-E-E-200-10-0A00–0 | 1 | EA | $410.00 | $410.00 |
| 1.8 | S | Cement, Crucible, Dry Powder Mix | PLISTIX 900 | 4 | EA | $3.00 | $12.00 |
| 1.9 | S | Wire, AWG 4 SRML, 500 FT | AWG 4 SRNL | 1 | RO | $750.00 | $750.00 |
| 2 | E | System, Spray, Gemini 155 | Gemini 155 | 3 | EA | $34,811.00 | $104,433.00 |
| 2.1 | S | Lubricator, Shot Sleeve | SLV | 3 | EA | $1,194.00 | $3,582.00 |
| 3 | E | Ladler, Automatic | SL1200 | 3 | EA | $31,075.00 | $93,225.00 |
| 4 | S | Spare Parts for Die Casting Machines | N/A | 1 | SE | $14,502.00 | $14,502.00 |
| 5 | E | Furnace, Electric, DPPTU-0.51 | DPPTU-05 1 | 2 | EA | $80,100.00 | $160,200.00 |
| 6 | E | Control Cabinet | N/A | 3 | EA | $7,600.00 | $22,800.00 |

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 7 | E | Transformer, TRSP-630.05 | TRSP-630/0.5 | 2 | EA | $18,900.00 | $37,800.00 |
| 8 | E | Reactor, SROS-800.05 | SROS-800/0.5 | 4 | EA | $14,880.00 | $59,520.00 |
| | | | | | | Total | $613,674.80 |

*Id.*

On January 10, 2003, additional equipment was transferred by the United States Government to the Ministry of Industrial Policy of Ukraine and delivered by the Government of Ukraine to Burevestnik. *See* DX 1, vol. 1, tab 3. The equipment delivered included:

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number/ Serial Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9, with 2 Spare Filter Cartridges | HK15-9/ 591092 | 1 | EA | $7,060.11 | $7,060.11 |
| 2 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9 With 2 Spare Filter Cartridges | HK15-9/ 592092 | 1 | EA | $7,060.11 | $7,060.11 |
| 3 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9 With 2 Spare Filter Cartridges | HK15-9/ 593092 | 1 | EA | $7,060.11 | $7,060.11 |
| 4 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9 With 2 Spare Filter Cartridges | HK15-9/ 594092 | 1 | EA | $7,060.11 | $7,060.11 |
| 5 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9 With 2 Spare Filter Cartridges | HK15-9/ 595092 | 1 | EA | $7,060.11 | $7,060.11 |

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number/ Serial Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 6 | E | Appliance, Heating and Cooling, Single Circuit, Thermobiehl HK 15-9 With 2 Spare Filter Cartridges | HK15-9/ 596092 | 1 | EA | $7,060.11 | $7,060.11 |
| | | | | | | Total | $42,360.67 |

*Id.*

| Line Item No. | Asset Code Equipment = E Component = C Spares = S Materials = M | Item Description | Part Number/ Serial Number | Qty | Unit of Measure | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | E | Compressor, Air, Fan, Stationary, Atlas Copco GA30P-7.5 | GA30P-7.5/ All 381334 | 1 | EA | $9,486.00 | $9,486.00 |
| 2 | E | Compressor, Air, Fan, Stationary, Atlas Copco GA30P-7.5 | GA30P-7.5/ All 381362 | 1 | EA | $9,486.00 | $9,486.00 |
| | | | | | | Total | $18,972.00 |

Gov't Resp. at 72.

On April 14, 2003, the Contracting Officer sent a letter to DCI advising that no funds remained on the Contract and that the Contract would not be modified for any increase in funding. *See* PX 40. That letter also stated:

> All information available to DTRA indicates that the only payments made for the equipment purchased under this contract were funded by DTRA. Consequently, as the only party contributing to the cost of the equipment, DTRA determined title to vest in the Government. DTRA took possession and has disposed of the equipment. Based on the above, no further action is usefull [sic] at this point, and the contract is considered closed.

*Id.*

On February 25, 2004, DCI sent a letter to the Contracting Officer asserting three claims against DTRA: (1) $3,359,901.51, representing costs DCI incurred of $2,921,653.49, plus a reasonable profit of $438,248.02, for DCI's equitable adjustment claim, pursuant to FAR § 52.232-20(h), Limitation of Cost; (2) $109,996,640.71, representing alleged damages with respect to the value of the equipment of $5,995,969.49, plus a reasonable profit of $893,395.41 and lost profits of $103,147,275.80, based on the assumption that the Government breached the Contract through its

alleged wrongful and illegal disposition of the property produced or purchased under the Contract; and (3) a claim for entitlement to settlement expenses. *See* PX 59(a)(iv).

The following schedule of total incurred costs, by year, was attached to the February 25, 2004 claim:

| | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| Total Incurred Costs | $118,688.58 | $750,178.45 | $3,139,236.43 | $391,871.41 | $292,018.01 |
| Government's Share of Claimed Costs | $86,950.94 | $547,308.70 | $2,298,449.24 | $101,607.13 | |
| DCI's Share of Claimed Costs | $30,550.33 | $192,297.65 | $807,563.24 | $35,699.77 | |
| DCI Additional Incurred Costs | $1,187.31 | $10,572.10 | $33,223.95 | $254,564.51 | $292,018.01 |
| Cumulative Total Incurred Costs Audited Percent of Total | $118,688.58 | $868,867.03 | $4,008,103.46 | $4,399,974.87 | $4,691,992.88 |

*Id.*

| | 2000 | 2001 | 2002 | 4/14/2003 | Total - All Years |
|---|---|---|---|---|---|
| Total Incurred Costs | $309,804.21 | $312,278.10 | $548,519.79 | $93,338.34 | $5,955,933.32 |
| Government's Share of Claimed Costs | | | | | $3,034,316.00 |
| DCI's Share of Claimed Costs | | | | | $1,066,111.00 |
| DCI Additional Incurred Costs | $309,804.21 | $312,278.10 | $548,519.79 | $93,338.34 | $1,855,506.32 |
| Cumulative Total Incurred Costs Audited Percent of Total | $5,001,797.09 84% | | | | |

*Id.*

On April 14, 2004, the Contracting Officer sent a letter to DCI requesting additional time to evaluate the February 25, 2004 claim and indicating that a Final Decision would be issued on or before June 30, 2004. *See* PX 59(a)(v).

On June 25, 2004, the Contracting Officer sent a Final Decision to DCI's counsel denying all of the claims asserted in DCI's February 25, 2004 claim letter. *See* Gov't Resp. at 7-11. The Final Decision stated that the Contract was completed, albeit unsuccessfully, because DCI was unable to meet certain objectives, *i.e.*, namely, the failure to form a joint venture. *Id.* at 9. The Final

Decision also stated that, because the joint venture was not formed as required, Special Contract Requirement Number 5 had no effect.[12] Since DCI did not have the resources to protect the property, the Government was forced to take action to prevent seizure and loss. *Id*. at 9-10. In addition, the Final Decision observed that no evidence had been presented that any DCI funds were used to make payments on any of the costs that comprised DCI's 26% share of the Contract. *Id*. at 10. DCI's claim for lost profits was characterized as "extremely speculative, at best, and inappropriate for payment by the Government." *Id*. Finally, since there was no need for additional settlement activities, that claim also was denied. *Id*.

## II. PROCEDURAL HISTORY.

On July 6, 2004, DCI filed a Complaint in the United States Court of Federal Claims requesting a review of the June 25, 2004 Final Decision denying DCI's certified claims with respect to the Contract, pursuant to 41 U.S.C. § 601 *et seq*. The case was assigned to The Honorable Victor J. Wolski.

The Complaint alleges five causes of action. First, DCI alleges that the Government breached the Contract when it failed to negotiate an equitable distribution of equipment purchased thereunder. *See* Compl.¶¶ 27-35. Second, DCI alleges that the Government breached the Contract when it transferred the equipment to Burevestnik, because the Contract specified DCI's ownership and use of said equipment, and thereby deprived DCI of the value of the equipment. *Id*. at ¶¶ 36-42. Third, DCI also alleges that the Government's equipment transfer to Burevestnik precluded DCI from expected profits. Compl. ¶¶ 43-45. Fourth, DCI alleges that the Government breached an

---

[12] Clause 5 states, in part:

> a. All property, equipment and materials acquired with United States (U.S.) Government funding under this Contract shall be acquired solely for the use of the joint venture, or business arrangement formed by the U.S. Contractor and the Former Soviet Union (FSU) enterprise partner in performance of the terms of this contract.
>
> * * *
>
> b. All property, equipment and materials acquired with U.S. Government funding under this contract is considered a third-party contribution which is separate and distinct from property, equipment or materials contributed by the U.S. Contractor or the FSU enterprise partner. Title and ownership of all property, equipment and materials acquired with U.S. Government funding under this Contract shall vest with the joint venture upon conclusion of the Contract, as determined by the Contracting Officer. Prior to the conclusion of the Contract, the U.S. Contractor is accountable for said items in accordance with standard government property clauses cited under SECTION I of this contract[.]

DX 1, vol. 2, tab 61 (Contract Section H ¶ 5)

implied obligation of good faith and fair dealing through improper conduct, including transferring the equipment to Burevestnik. *Id*. at ¶¶ 46-49. Fifth, DCI alleges that the Government's transfer of equipment to Burevestnik violated the Fifth Amendment prohibition of taking of property without just compensation. *Id*. at ¶¶ 50-52.

On July 12, 2004, the case was reassigned to the undersigned judge.

* * *

On September 17, 2004, the Government filed an Answer and Affirmative Defenses for failure of consideration and estoppel. On September 21, 2004, DCI filed a Memorandum of Law In Support of a Motion for Partial Summary Judgment, an Affidavit in Support, Exhibits, and Proposed Findings of Uncontroverted Facts. DCI, however, did not file a Motion for Partial Summary Judgment. On October 6, 2004, the court issued an Order that DCI file a Motion for Partial Summary Judgment and declined to accept DCI's Memorandum of Law In Support, because the original filing had missing pages. On October 7, 2004, DCI filed an "Amended" Motion for Partial Summary Judgment and Amended Memorandum of Law In Support.

On November 18, 2004, the Government filed a Response to DCI's Amended Motion for Partial Summary Judgment and a Cross-Motion for Summary Judgment. On the same date, the Government also filed a Response to DCI's Proposed Findings of Uncontroverted Facts and Additional Proposed Findings of Uncontroverted Facts. On December 6, 2004, DCI filed a Reply Brief, together with a Reply Affidavit. On the same date, DCI also filed a Reply to the Government's Response to DCI's Proposed Findings of Uncontroverted Fact and to the Government's Additional Proposed Findings of Uncontroverted Facts.

On December 13, 2004, the court held a status conference. On December 23, 2004, the Government filed a Reply to DCI's Response to the Government's Cross-Motion for Summary Judgment. On January 7, 2005, the parties filed a proposed Scheduling Order. The court held status conferences on January 11, 2005 and on January 18, 2005. On January 18, 2005, the court entered a Scheduling Order for fact discovery and expert discovery and established a trial date to commence on November 14, 2005.

On July 29, 2005, the court issued a Memorandum Opinion and Order denying DCI's October 7, 2004 Motion for Partial Summary Judgment and denying the Government's November 18, 2004 Cross-Motion for Summary Judgment. *See Die Casters Int'l, Inc.* v. *United States*, 67 Fed. Cl. 362 (Fed. Cl. 2005) (holding summary judgment was not warranted because material facts were in dispute). The Memorandum Opinion and Order confirmed the November 14, 2005 trial date. On October 12, 2005, DCI submitted a Memorandum of Contentions of Fact and Law. On October 17, 2005, the Government filed a Trial Brief with Proposed Findings of Fact and Conclusions of Law.

From November 14, 2005 to November 17, 2005, the court convened a trial. On February 3, 2006, DCI submitted a Post-Trial Memorandum. On March 2, 2006, the Government filed a Response Post-Trial Brief.

## III. DISCUSSION.

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States* v. *Testan*, 424 U.S. 392, 398 (1976)). Therefore, in order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action, . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under . . . the Contract Disputes Act of 1978, including a dispute concerning . . . rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2); *see Alliant Techsystems, Inc.* v. *United States*, 178 F.3d 1260, 1270 (Fed. Cir. 1999) (holding that "the Tucker Act grants the United States Court of Federal Claims jurisdiction to grant nonmonetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms.").

The Contract Disputes Act provides that "claims[13] relating to a contract by a contractor or the Government shall be submitted to the contracting officer for a decision and the contracting officer's decision shall be in writing and furnished to the contractor, stating the reasons for the decision and informing the contractor of its rights thereunder." *See* 41 U.S.C. § 605(a); *see also Alliant Techsystems, Inc.*, 178 F.3d at 1267. The Contract Disputes Act also provides that the "contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter." 41 U.S.C. § 605(b).

The United States Court of Appeals for the Federal Circuit has "enforced the strict limits of the [Contract Disputes Act] as 'jurisdictional prerequisites to any appeal.'" *England* v. *The Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) (citing *Sharman Co.* v. *United States*, 2 F.3d 1564, 1569 n.6 (Fed. Cir. 1993), *overruled on other grounds by Reflectone, Inc.* v. *Dalton*, 60 F.3d 1572 (Fed. Cir. 1995)). Accordingly, "jurisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim." *The Swanson Group*, 353 F.3d at 1379; *see also James M. Ellett Constr. Co.* v. *United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996) ("Thus for the [United States Court of Federal Claims] to have jurisdiction under the [Contract Disputes Act], there must be both a valid claim, a term the act leaves undefined, and a contracting officer's final decision on that claim.").

In this case, there is no dispute that a contract existed between DCI and the Government. *See Trauma Service Group* v. *United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To show jurisdiction . . . [Plaintiff] must show that either an express or implied-in-fact contract underlies its claim."). In addition, DCI's claim against the Government was presented to the Contracting Officer and a Final Decision was rendered on June 25, 2004. *See* Gov't App. at 7-11. Accordingly, the court has determined that it has jurisdiction to adjudicate DCI's breach of contract claims in this case.

---

[13] Although the Contract Disputes Act does not define "claim," that term is defined in the Federal Acquisition Regulations as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101. For claims exceeding $100,000, the contractor must certify that: the claim is made in good faith; the supporting data is accurate and complete; and the amount requested accurately reflects the amount for which the contractor believes the Government is liable. *See* 41 U.S.C. § 605(c)(1). Government claims, however, do not require certification. *See Placeway Constr. Corp.* v. *United States*, 920 F.2d 903, 906-07 (Fed. Cir. 1990) (holding that Government claim seeking incidental and consequential damages for plaintiff's alleged breach of contract did not require certification).

## B. Standing.

DCI is a party to the Contract with the Government and, therefore, has standing to bring an action in the United States Court of Federal Claims, pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. § 609(a).

## C. The Court's Resolution Of The Damage Claims Alleged In The July 6, 2004 Complaint.

### 1. Plaintiff Is Not Entitled To Damages Under Count One For The Government's Breach Of The Limitation Of Cost Clause.

#### a. The Government Admitted To Breach Of The Limitation Of Cost Clause.

Count One of DCI's Complaint alleges that the Government failed to negotiate an equitable distribution of the equipment purchased under the Contract and therefore is entitled to damages amounting to DCI's share of the incurred costs, estimated at $2,921,653.49. *See* Compl.¶¶ 27-35.[14]

The Government admitted breach of FAR 52.232-20(h), the Limitation of Cost Clause, incorporated by reference into the Contract, by failing to negotiate an equitable distribution of the property upon closure of the Contract.[15] *See* Gov't. PT Br. at 21-22; *see also* TR 24-25, 607-08, 666.

#### b. The Government's Breach Did Not Cause Plaintiff To Incur Damages.

DCI may recover for damages that were directly caused by the breach. *See J.D. Hedin Constr. Co.* v. *United States*, 456 F.2d 1315, 1330 (Ct. Cl. 1972) (plaintiff must prove that damages from the Government's breach of a contract were "attributable solely to, and was therefore directly caused by, the [breach]"). An injured party, however, can only recover damages, where the breach was "(1) *reasonably foreseeable* by the breaching party at the time of contracting; (2) the breach is

---

[14] In the Complaint, DCI also requested $438,248.02 for "reasonable profits" under Count One, but did not discuss this claim in its Post-Trial Memo. *See* Compl.¶ 35; *see also* Pl. PT Mem. at 10.

[15] FAR 52.232-20(h) provides:

> If this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each.

48 C.F.R. § FAR 52.232-20.

a *substantial causal factor* in the damages; *and* (3) the damages are shown with *reasonable certainty*." *See Indiana Michigan Co.* v. *United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing *Energy Capital Corp.* v. *United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)) (emphasis added).

**i. "Reasonable Foreseeability."**

First, in an action for breach of contract damages, the plaintiff must establish that any losses incurred as a result of a partial breach of contract were reasonably foreseeable by the defendant when the contract was executed. *See Indiana Michigan Co.*, 422 F.3d at 1373; see *also* RESTATEMENT (SECOND) OF CONTRACTS ("RESTATEMENT") ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made." *Id*. § 351(1)). As the RESTATEMENT further explains, a "loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events that the party in breach had reason to know." *Id.* § 351(2).

In this case, it was foreseeable to the Government that the business venture might not be achieved before the funding was exhausted. For this reason, the Contract provided for an equitable distribution through the Limitation of Cost Clause. *See* DX 1, vol. 2, tab 61 (Contract at 10, Part II, Section I); *see also* 48 C.F.R. § 52.232-20. It also was foreseeable to the Government that, if an equitable distribution was not undertaken, the Government might be liable for any damages caused by such a failure.

**ii. "Substantial Causal Relationship."**

Second, the United States Court of Appeals for the Federal Circuit has held that there must be a direct causal relationship between the breach and any claimed losses. *See Bluebonnet Savings Bank, F.S.B.* v. *United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001) ("the breach . . . was a substantial factor in [the] . . . costs [claimed]").

The Government's breach of the Limitation of Cost Clause that required an equitable distribution, however, was not a "substantial cause" of DCI's failure to recover its cost-share of the property. If an "equitable distribution" had occurred, DCI had the contractual right only to recover "property purchased under the contract,"[16] based on "the share of costs incurred." "Costs incurred"

[16] DCI claims that the term "property" should include both "tangible property," *i.e.*, "equipment," and "intangible property," *e.g.*, "services," "expertise," and "intellectual property." Pl. PT Mem. at 12. The Government claims that the term "property" should include "the invoiced amounts plus the value of the engineering incorporated into the property (the "intellectual property" component of the equipment)." *See* Gov't PT Br. at 22. There was a dispute at trial as to whether FAR 45.101, the Government Property Definitions, was applicable to other FAR provisions, including FAR 52.232-20(h). *See* TR 724-25. However, since the court believes that DCI and the Government ultimately used the same definition, consistent with the plain meaning of the Contract,

include actual financial contributions and legally enforceable debts, but not mere promises to pay in the future. *See* DX 1, vol. 2, tab 61 (Contract at 10, Part II, Section I); *see also* 48 C.F.R. § 52.232-20(h).

The Contract allocated costs between the parties so that the Government's cost share was 74% (*i.e.*, $3,034,316.00) and DCI's cost share was 26% (*i.e.*, $1,066,111.00). *See* DX1, vol. 2, tab 61 (Contract at 2, Section B ¶¶ 1a-c)). DCI asserted that it incurred costs of $2,921,653.49 or 49% of the total incurred costs. See Pl. PT Mem. at 13. The record reflects, however, that DCI used only Government funds to pay for the equipment. *See* TR 120-22, 166, 174. Nevertheless, DCI avers to have executed promissory notes to HPM Corporation ("HPM"), Advance Products Corporation ("APC") and Visi-Trak Corporation ("Visi-Trak") for an additional 26% of the purchase price. *See* TR 167-68, 170. Therefore, DCI argues that it was obligated to pay an additional 26% "deferred payment." TR 169. However, at trial, DCI did not present persuasive evidence of a legal obligation to pay the additional $411,000 amount allegedly due HPM and APC.[17]

DCI bears the burden of establishing evidence of any debt owed. At trial, DCI did not proffer any written evidence of the alleged notes. The only evidence proffered was: 1) DCI and vendor invoices and 2) purchase orders signed only by DCI. *See* DX 3, vol. 2, C1-C8, D1-D14, and G1-G7; *see also* PX 70 (p), 70(q), 70(r). The invoices are not legally enforceable debt instruments. Only the purchase orders constitute contracts that the vendors *could* legally enforce.[18] Nonetheless,

---

there is no reason to address this dispute.

[17] At trial, the court learned that any debt DCI may have owed Visi-Trak was canceled when Visi-Trak declared bankruptcy.

| | |
|---|---|
| DCI's COUNSEL: | On these three [notes]. Have you paid any of those? |
| MR. FREDRICKSON: | No. Once, with Visi-Trak, that was canceled. |
| JUDGE BRADEN: | It was canceled? |
| MR. FREDRICKSON: | Well, they went into bankruptcy and so we never – it got wiped out in the bankruptcy of Visi-Trak. |

TR 172.

[18] The purchase orders, signed by DCI, evidence the sale and specify the quantity of equipment and related services, such as installation of start-up assistance. *See e.g.*, PX 70(p), 70(q), 70(r). The statute of frauds provisions of the Uniform Commercial Code ("UCC") in the states of Ohio, Michigan, and New Jersey do not require that an agreement for the sale of goods be in writing for a contract to be formed, but do require a note or memorandum evidencing the sale of goods, signed by the party to be charged, and specifying the quantity of such goods. *See* MICH. COMP. LAWS § 440.2201 (1)(2005); N.J. STAT. ANN. § 12A:2-201(1) (2005); OHIO REV. CODE ANN. § 1302.04(A)(2005). For the sale of services that cannot be performed in one year, the requirements are the same under the Ohio and Michigan Statute of Frauds, but quantity does not have to be

DCI must prove that the vendors have the ability and intention to collect on the alleged debts, resulting in actual costs incurred.

The statute of limitations provisions of the UCC in Michigan, New Jersey, and Ohio, allow a party only fours years to recover a debt owed on a contract for the sale of goods. *See* MICH. COMP. LAWS § 440.2725(2005); N.J. STAT. ANN. § 12A:2-725(2005); OHIO REV. CODE ANN. § 1302.98 (2006). In these states, the cause of action accrues when the breach occurs. *Id*.

According to the Government, the expiration of the statute of limitations precludes the vendors from recovering on the alleged debts. *See* Gov't PT Br. at 26. The Government argues that the first "deferred payments" to vendors were due a month after the equipment was shipped, *i.e.*, September of 1997, and any breach occurred when those payments were not executed. *See* TR 28. Since the statute of limitations commenced over eight years ago, any vendor claims for the 26% "deferred payments" would now be barred. *See* Gov't PT Br. at 26.

DCI counters that the statute of limitations did not begin to run until 2003, because DCI agreed that the repayment of vendor debts would be deferred until the issuance of the final invoice, to occur upon the installation and testing of the equipment.[19] *See* Pl. PT Mem. at 32-33. According to DCI, the "deferred payments" did not accrue until the Government closed the Contract in April 2003. *Id.* Therefore, the statute of limitations does not expire until April 2007. *Id.*

Assuming *arguendo* that DCI's breach of the vendor contracts did not occur until April 2003, less than six months of a four-year statute of limitations remains for the vendors to bring their claims.

Again, regardless of whether the vendor claims are time barred, DCI presented no evidence at trial to show that HPM and APC intended to collect any "deferred payments" due. DCI did not proffer any written documents generated after the equipment was purchased to evidence that DCI intended to pay the vendors or that the vendors were demanding payment from DCI. *See* TR 170-72,

---

specified. As of 1995, New Jersey no longer requires service contracts that cannot be performed in one year to be in writing. *See* N.J. STAT. § 25:1-5 (2005). DCI entered into agreements with the vendors after 1995. *See* PX 70(p), 70(q), 70(r).

[19] The purchase orders between DCI and HPM provide:

> For the remaining portion of each HPM billing (twenty six percent) relating to the two orders, DCI will give HPM an unsecured three year note. . . . We will attempt to form a single debt instrument that will cover all of the payments as they are incurred, where the three year term of the note will begin on the date of the final billing from HPM[.]

PX 70(p); *see also* PX 70(q), 70(r).

851-54. In the eight years since the equipment was purchased, not a single vendor has instituted an action to recover any alleged debt. *See* TR 853. Moreover, no vendor has requested that DCI submit a pass-through claim to the Government. Finally, even after the court requested to hear from the vendors at trial, DCI made no attempt to elicit testimony from any of the vendors by way of affidavit, deposition testimony, or trial testimony regarding whether they had a financial interest in the equipment.[20] *See* TR 860-66. Accordingly, DCI did not prove by a preponderance of the evidence that the alleged debts will become actual costs incurred.

Since DCI did not incur any costs to purchase the equipment, DCI would not have received any property if an equitable distribution had taken place. Therefore, the lack of an equitable distribution did not damage DCI.

**iii. "Reasonable Certainty."**

Third, the United States Court of Appeals for the Federal Circuit has held that the injured party bears the burden of establishing that any costs incurred, because of an alleged breach of contract, are established with "reasonable certainty." *See Indiana Michigan*, 422 F.3d at 1373 (citing *Energy Capital*, 302 F.3d at 1320); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

Just as DCI failed to prove that the Government's breach of the Limitation of Cost Clause substantially caused DCI to incur debts, DCI cannot calculate the alleged debts with reasonable certainty. Again, DCI did not proffer valid promissory notes, but instead relied on purchase orders to evidence the "deferred payments" allegedly owed to the vendors. Moreover, DCI presented no evidence to show that HPM and APC have any intention to collect on the "deferred payments," especially since the vendors have, at most, six more months to bring their claims.

Therefore, DCI did not establish by a preponderance of evidence two of the three requisite elements of causation. Accordingly, DCI is not entitled to damages for the Government's breach of the Limitation of Cost Clause of the Contract.

**2. Plaintiff Is Not Entitled To Damages Under Count Two For The Value Of The Government's Equipment Transferred.**

Count Two alleges that the Government breached the Contract when the equipment was transferred to Burevestnik, for which DCI is claiming damages in the amount of $5,955,933.32, *i.e.*, the value of the equipment at issue. *See* Compl.¶¶ 36-42. First, DCI argues that without a

[20] At trial, the Government pointed out that DCI does not have an incentive to get in touch with vendors, because the Government would pay debts directly to vendors or have DCI immediately sign the check over to vendors. *See* TR 864-65.

contractual provision specifically allowing the transfer, the Government had no right to order the equipment's removal to Burevestnik, which breached the Contract. *See* Pl. PT Mem. at 34. In the alternative, DCI contends that the issue of which party had title to the equipment is "irrelevant," because the right to transfer lies with the party that has "sole and exclusive possession." *Id.* at 35-37. Here, DCI assumes that the Contract made DCI "accountable" for the property and, as such, DCI became entitled to "sole and exclusive possession" until the joint venture was formed or at such time as an equitable distribution took place. *Id.* at 36. Therefore, DCI reasons that it had the right of possession, making the appropriation of the property "wrongful" and a "breach of contract that entitles the [DCI] to damages equal to the value of the property." *Id.*

The Government responds that it had absolute authority to transfer the equipment to Burevestnik, because the Government held title to the equipment. *See* Gov't PT Br. at 28-30. The Government also notes that the Contract did not impose any duty on the Government to refrain from transferring the equipment. *Id.* at 27-28. Moreover, the Government contends the transfer was "necessary and reasonable," under the circumstances, because the equipment was "in danger of being confiscated" and DCI was "unable or unwilling" to move the equipment. *Id.* at 30-33; *see also* TR 31-40.

It is well established that the "party alleging a breach of contract bears the burden of proving the breach." *See Technical Assistance Int'l., Inc.* v. *United States.*,150 F.3d 1369, 1373 (Fed. Cir. 1998) (citing *Perry* v. *Department of the Army*, 992 F.2d 1575, 1577 (Fed. Cir.1993)); *G&H Mach. Co.* v. *United States*, 16 Cl. Ct. 568, 571 (1989) ("The burden of proof stands as a threshold question. If the claimant fails to carry the burden of proof then, even in the absence of opposing evidence, he cannot recover on a breach of contract claim.").

There is no language in the Contract that states DCI was to have "sole and exclusive possession" of the equipment. *See* DX 1, vol. 2, tab 61. The Contract, however, does provide that: "Prior to the conclusion of the Contract, [DCI] is accountable for [the equipment]." *Id.* vol. 2, tab 61 (Contract Section H, 5, b). Although the term "accountable," is not defined in the Contract, FAR 52.245-5 (e), incorporated by reference, defines "accountable" to mean: "shall establish a program for use, maintenance, repair, protection, and preservation of Government property." *See* 48 CFR § 52.245-5(e). Therefore, DCI contracted to provide services utilizing Government-owned property, that it was to handle with due care.

Moreover, the Contract expressly provides:

> Schedule, Section H, 5, b: Title and ownership of all . . . equipment . . . acquired with . . . Government funding . . . shall vest with the joint venture upon conclusion of the Contract, *as determined by the CO* [Contracting Officer] (emphasis added).

DX 1, vol. 2, tab 61.

Since the equipment was purchased solely with Government funds, only the Contracting Officer had the responsibility to determine, if, and when, title to the equipment would vest in the joint venture. Without holding title, the Government would not have the legal ability to transfer title to the joint venture. Accordingly, since the joint venture was never established, the Government, as title-holder, had the right to transfer the equipment to Burevestnik when the Contract expired.

For these reasons, the Government did not breach the Contract and Plaintiff is not entitled to damages under Count Two.

**3. Plaintiff Is Not Entitled To Damages Under Count Three For Alleged Lost Profits.**

Count Three alleges that DCI should recover "anticipated" lost profits of $103,147,275.80, because of the Government's alleged breach of contract caused by the "illegal removal and disposition of the Equipment[.]" *See* Compl.¶¶ 43-45. This claim asserts that the Government's actions prevented DCI from forming the contractually contemplated joint venture and subsequent "businesses and/or joint ventures" and "realizing the benefits enuring from those businesses and joint ventures." *Id.*

As previously discussed, although the Government failed to negotiate an equitable distribution of the property, DCI can only recover for damages directly caused by the breach. To recover lost profits, a plaintiff must establish by a preponderance that the breach was "(1) reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Michigan*, 422 F.3d at 1373. DCI did not adduce any evidence at trial to satisfy the second and third elements of causation.

In fact, DCI failed to form a joint venture within the period designated for performance of the Contract, because of financial difficulties and mismanagement. *See* DX 1, vol. 4, tab 123 (DCI spent all of the Government's funds); *see also* Lester Expert Rpt., DX 1, pp.31-33 (DCI was insolvent); DX vol. 4, tab 125 (DCI needed at least $500,000 to ship the equipment and to install it at Burevestnik, but it was unable to raise any investment capital for those purposes); TR 832-33, 837-38. Therefore, the Government's failure to negotiate an equitable distribution did not cause the failure of the joint venture. *See* Maiko and Slavitsky Decls., DX 213, 216 (showing that the joint venture was unlikely, because DCI insisted on its share being more than 10% and Burevestnik and Technomet representatives testified that they would not have executed a joint venture if DCI's share was greater than 10 %); *see also* TR 866-67. In fact, the joint venture failed when funding for the Contract expired. *See* Gov't PT Br. at 22; *see also* TR 24-25.

Accordingly, DCI cannot recover damages for lost profits under Count Three of the Complaint.

### 4. Plaintiff Is Not Entitled To Damages Under Count Four For An Alleged Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

Count Four of the Complaint alleges that the Government breached an implied covenant of good faith and fair dealing in the administration of the Contract. *See* Compl.¶¶ 46-49. DCI argues that the covenant was breached when the Government "appropriated" the equipment and "disbursed [it] to third parties" "without any contractual authorization." *See* Pl. PT Mem. at 41. DCI also asserts that the Government breached the covenant when it failed to meet with DCI to "negotiate a closeout of the Contract," equitably distribute the equipment, and "otherwise cooperate." *Id.* at 41. DCI seeks $109,996,640.71 in damages for this alleged breach. *See* Compl. ¶ 49.

Every contract has an implied covenant of good faith and fair dealing, *i.e.*, an "implied duty that each party to a contract owes to its contracting partner." *Centex Corp.* v. *United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). This covenant applies to government contracts, as well as contracts between private parties. *Id*. The covenant "includes the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."[21] *Id.* Breach of the covenant of good faith and fair dealing is assessed under a reasonableness standard and depends on the "particular contract, its context, and its surrounding circumstances." *Commerce Int'l Co.* v. *United States*, 167 F.2d 81 (Ct. Cl. 1964); *see also Essex Electro Engineers, Inc.,* v. *Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (holding that breach will depend on whether the "government acted reasonably in the substance and pace of its responses.").

The record establishes that the equipment was in danger of being confiscated by the Moldovan government. *See* PX 17; DX 212, tab 1–13, 231-32, 236. Other equipment stored in the warehouse also was in danger of being confiscated, because back storage fees and penalties were registered, and the warehouse was closing. *See* DX 234-37; *see also* PX 17. Because funding had expired, DCI had no contractual obligation to protect the equipment. *See* DX 1, vol. 2., tab 34. DCI was not "obligated to continue performance under this contract . . . or otherwise incur costs in excess of the estimated cost specified in the Schedule, until the Contracting Officer (i) notifies the Contractor in writing that the estimated cost has been increased and (ii) provides a revised estimated

[21] The *Celtex* standard is distinguishable from the presumption of good faith historically applied to the actions of government officials. For example, in *Am Pro Protective Agency, Inc.* v. *United States*, 281 F.3d 1234 (Fed. Cir. 2002), the United States Court of Appeals for the Federal Circuit applied the presumption of good faith and determined it was a "strong presumption," when "it arises in the context of quasi-criminal wrongdoing by government officials acting the course of their public duties." *Id.* at 1239. Therefore, where a discretionary decision is at issue, the court should not employ a presumption of good faith. In *Celtex,* the United States Court of Appeals for the Federal Circuit did not apply a presumption of good faith but held that Congress had breached the covenant of good faith and fair dealing because it had acted to "destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* at 1304.

total cost of performing the contract[.]" DX 1, vol. 2, tab 61 (Contract at 10, Part II, Section I); *see also* 48 C.F.R. § 52.232-20(d)(2). DCI needed at least $500,000 to ship the equipment and install it at Burevestnik. *See* TR 837-38, DX 1, vol. 4, tab 125. DCI was financially incapable of moving or safeguarding the equipment. *See* DX 236. By this time, for all practical purposes, DCI was insolvent. *See* DX 1 vol. 4, tab 123, DX 236. Moreover, DCI was unable to raise any capital. *See* TR 832-33, 837-38. In addition, DCI had spent all of the Government's funds provided under the Contract. *See* DX 1, vol. 4, tab 123. And, the Contracting Officer decided not to further fund DCI's activities. *See Id.* vol. 4, tab 129-130.

In addition to being unable to transfer the equipment, DCI also was unwilling to do so. Litmash would have shipped the equipment to Kiev, but DCI refused to provide a shipping address. S*ee* Glouhkov Decl., DX 212. Burevestnik and Technoment also were willing to pay to ship the equipment. *See* Maiko and Slavitsky Decl., DX 213, 216. DCI, however, was unwilling to accept assistance from Litmash, Burevestnik, or Techomet. *See* Glouchkov, Maiko, and Slavitsky Decl.; DX 212, 213, 216. The Government only transferred the equipment to Burevestnik, after a four year time period in which DCI failed to consummate a joint venture. *See* TR 836-37.

Therefore, the Government did not "destroy" DCI's "reasonable expectations" as to the potential benefits of the Contract. The record establishes that the Contracting Officer's decision to transfer the equipment to the Ukranian Government for delivery to Burevestnik was reasonable. Moreover, the record evidences that the Government attempted to cooperate with DCI throughout the administration of the Contract.[22] *See* TR 52-56. Indeed, the Government was not obligated to fund the Contract beyond October 27, 1997. *See* DX 1, vol. 4, tab 129-30.

Accordingly, the Government did not breach the implied covenant of good faith and fair dealing and DCI is not entitled to any damages.

---

[22] DCI was awarded the Contract for $4.1 million, despite the fact that USNDA deemed DCI's proposal technically inadequate and found that DCI was not financially capable. See DX 1, vol. 2, tab 39; *see also id.* vol. 2, tab 40 A-B. The period of performance was extended in order to allow DCI to submit pending invoices. *See* DX 1, vol. 4, tabs 118, 130. DCI's contract initially was not terminated when DCI failed to raise the critical capital needed to perform. *Id.* vol. 4, tab 120. When DCI was unable to perform under the Contract on January 30, 1998, DCI was allowed to change the proposed joint venture partner and designate Burevestnik as a new joint venture partner. *Id.* vol. 4, tab 103. DCI's invoices were paid even after the period of performance had expired and paid in full despite determination made by the DCAA that substantial costs were unallowable. *See* PX 58(o). And, although DCI's efforts to raise investment capital from private sources failed, the agency worked hard to find Government funds to add to DCI's Contract.

**5. Plaintiff Is Not Entitled To Just Compensation Under Count Five For The Transfer Of The Government's Equipment.**

Count Five of the Complaint alleges that the Government's transfer of the equipment to Burevestnik was a taking of private property for which just compensation is due. *See* Compl. ¶¶ 50-52. This claim is premised on DCI's assertion of a property interest in the equipment, including the rights to possess, use, and dispose of this property. *See* Pl. PT Mem. at 46.

The United States Court of Appeals for the Federal Circuit, however, has held when the Government acts as a contractual partner in a commercial venture, the rights and responsibilities of the parties must be analyzed with reference to the contract: "The concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Hughes Communications Galaxy, Inc.* v. *United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (*quoting Sun Oil Co.* v. *United States*, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978)). Therefore, taking claims "rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights." *Id.* at 1070.

In this case, DCI voluntarily entered into a cost-sharing contract to purchase equipment with the Government as a commercial partner. Accordingly, the distribution of the rights to or costs associated with the property purchased pursuant to the Contract must be decided with reference to contract law. *See Hughes Communications*, 271 F.3d at 1070.

Assuming *arguendo* that DCI could allege a takings claim, the Fifth Amendment of the United States Constitution provides, "Nor shall private property be taken for public use, without just compensation[.]" U.S. CONST. AMEND V. Therefore, in order to sustain an action thereunder, "a claimant must establish a legally cognizable property interest." *Skip Kirchdorfer, Inc.,* v. *United States*, 6 F.3d 1573, 1580 (Fed. Cir. 1993); *see also Applegate* v. *United States*, 35 Fed. Cl. 406, 413 (1996) ("A claimant must establish that he was the owner of property and that some portion of the property was taken for a public purpose"). DCI, however, did not establish any cognizable property interest in the equipment. *See Kirchdorfer*, 6 F.3d at 1580. According to the Contract, the Government held title to the equipment and had the right to determine when title vested in the joint venture, but the joint venture was never formed. *See* DX 1, vol 2, tab 61 (Contract Section H,5,b). In fact, the equipment was purchased through a government contract, with government funds, and no contractual terms gave DCI *sole* and *exclusive* use and possession. DCI did not contribute any non-Government funds towards the purchase of the equipment and did not establish at trial that it owed any debt to vendors of the equipment for 26% "deferred payments."[23]

[23] DCI cites several cases for the proposition that "possession of equipment by the government constitutes a taking when a private individual has [sic] property interest in said

Accordingly, DCI has no claim to be adjudicated under the Fifth Amendment.

## IV. CONCLUSION.

The court has determined that the Government breached the Limitation of Cost Clause in the Contract by failing to negotiate an equitable distribution of the equipment. Plaintiff, however, failed to establish by a preponderance of the evidence that the breach caused any damages. Accordingly, Count One is dismissed.

The court also has determined that Plaintiff failed to establish that the Government otherwise breached the Contract. Therefore, Counts Two, Three, and Four of the Complaint are dismissed. In addition, the court has determined that Plaintiff failed to establish that any private property was taken by the Government. Therefore, Count Five of the Amended Complaint is dismissed.

The Government's September 17, 2004 Answer also requested such "further relief as the Court may deem just and proper." Answer at 8. The Government called The Honorable Vitaly I. Maiko, Deputy Minister of the Verkhovna Rada, the Ukranian Parliament, as a witness. Thereafter, the Government's counsel secured a Declaration from the Deputy Minister, wherein he discussed his knowledge of Burevestnik, of which he was General Director from May 1997 through July 2002. *See* DX 213. DCI insisted that the Declaration was not admissible without live cross examination of Deputy Minister Maiko that was absolutely critical to DCI's case and, without it, DCI would be severely prejudiced. In response, the Government's counsel went to great effort to secure the live appearance of the Deputy Minister via video conference and the services of a translator. At the trial,

---

equipment." *See* Pl. PT Mem. at 47. Each of the cases is distinguishable because, plaintiffs in those cases had cognizable property interests.

For example, in *Miller* v. *United States*, 140 F. Supp. 789 (Fed. Cir. 1956), the Government entered into a contract to sell fifty aircraft that plaintiff would then resell to third parties. *Id.* at 790-793. After partial payment and delivery, the Government repossessed ten aircraft claiming that plaintiff had resold them in violation of United States foreign policy. *Id.* Our appellate court held that the Government's action was a taking and plaintiff was entitled to recover damages for the fair market value of the aircraft plus the amount plaintiff spent repairing them. *Id.* at 795. Unlike DCI, however, the plaintiff in *Miller* had a cognizable property interest, because it paid for the ten aircraft and spent money for repairs.

In *Osprey Pacific Corp.* v. *United States*, 41 Fed. Cl. 150 (1998), the court held that the plaintiff, who leased a Navy patrol boat from a state agency that had received the boat through a donation from a federal agency, had a "valid and compensable property interest" which could be the subject of a taking. *Id.* at 154-56. Unlike the Government in the case at bar, the federal agency repossessed the boat from a third party with whom it had no contractual relationship. Moreover, unlike DCI, the other plaintiff had a clear and definite lease with the state agency that gave it sole and exclusive possession of the boat for twelve months. *Id.*

it became apparent that this entire undertaking was a charade and imposed unnecessary costs on the Government, not to mention the court. *See* TR 982-89. Therefore, the court will leave open the record for 30 days, before entering a final judgment, to ascertain whether the Government intends to seek reimbursement for these costs.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**